# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
CAMDEN DIVISION

| | | |
|---|---|---|
| FIRSTLINE NATIONAL INSURANCE COMPANY, 200 North Main Street Bel Air, MD 21014 Plaintiff, | : : : : : : | Civil Action |
| vs. | : : : | No. |
| LANDIS PIG ROAST, LLC, 623 E. Landis Avenue Vineland, NJ 08360 And DENNIS COSBY 1123 Chestnut Avenue Vineland, NJ 08360 And EUGENE COSBY 1123 Chestnut Avenue Vineland, NJ 08360 And **(CONTINUED ON NEXT PAGE)** Defendants. | : : : : : : : : : : : : : : : : : : : : | DECLARATORY JUDGMENT COMPLAINT |

Louis Niedelman, Esquire
Attorney Identification No: 254601969
COOPER LEVENSON, P.A.
1125 Atlantic Avenue, 3rd Floor
Atlantic City, NJ 08401
File No. 60696.10
Attorneys for Plaintiff Firstline National Insurance Company

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
CAMDEN DIVISION

| | | |
|---|---|---|
| FIRSTLINE NATIONAL  INSURANCE COMPANY,<br>200 North Main Street<br>Bel Air, MD 21014<br>        Plaintiff, | : <br> : <br> : <br> : <br> : | Civil Action |
| vs. | : <br> : <br> : | No. |
| TERRY R. MAYES<br>221 Laurel Street<br>Vineland, NJ 08360<br>And<br>ZIGGY DOBKOWSKI<br>242 Mystic Drive<br>Egg Harbor Township, NJ 08234<br>And<br>DIANE DOBKOWSKI<br>242 Mystic Drive<br>Egg Harbor Township, NJ 08234<br>And<br>RAHEEM McCLENDON<br>619 East Landis Avenue<br>Vineland, NJ 08360 | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | DECLARATORY JUDGMENT<br>COMPLAINT |
|         Defendants. | : | |

Louis Niedelman, Esquire
Attorney Identification No: 254601969
COOPER LEVENSON, P.A.
1125 Atlantic Avenue, 3rd Floor
Atlantic City, NJ 08401
File No. 60696.10
Attorneys for Plaintiff  Firstline National Insurance Company

## COMPLAINT FOR DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. SECTIONS 2201 AND 2202

Plaintiff Firstline National Insurance Company(hereinafter referred to as "Firstline") is an insurance company domiciled in the State of Maryland with an address of 200 North Main Street, Bel Air, MD 21014, and in support of its Declaratory Judgment Complaint alleges as follows:

### JURISDICTION AND PARTIES

1.      The Federal Rules of Civil Procedure expressly authorize Declaratory Judgments by the adoption of the Declaratory Judgments Act, 28 U.S.C. § 2201, Federal Courts have jurisdiction to decide coverage issues under an insurance contract.

2.      Pursuant to 28 U.S.C. § 1332 this Court has diversity jurisdiction.

3.      Plaintiff Firstline is an insurance company duly authorized by the Department of Insurance to issue insurance policies in the State of New Jersey and has its principal place of business located at 200 North Main Street, Bel Air, MD 21014.

4.      Defendant Landis Pig Roast, LLC, is a limited liability company domiciled in the State of New Jersey and is listed in their Firstline insurance policy as doing business at 623 E. Landis Avenue, Vineland, New Jersey 08360.

5.      Defendant Dennis Cosby is an adult individual residing at 1123 East Chestnut Avenue, Apt. A-17, Vineland, New Jersey 08360.

6.      Defendant Eugene Cosby is an adult individual residing at 1123 East Chestnut Avenue, Apt. A-17, Vineland, New Jersey 08360.

7.      Defendant Terry R. Mayes, is an adult individual residing at 221 Laurel Street, Vineland, New Jersey 08360.

3

8.    Defendant Ziggy Dobkowski, is an adult individual residing at 242 Mystic Drive, Egg Harbor Township, New Jersey 08234.

9.    Defendant Diane Dobkowski is an adult individual residing at 242 Mystic Drive, Egg Harbor Township, New Jersey 08234.

10.    Defendant Raheem McClendon is an adult individual, who, to the best of Plaintiff's knowledge, resides in the State of New Jersey, and leased premises at the address of 619 East Landis Avenue, Vineland, New Jersey 08360.

11.    The amount in controversy exceeds $75,000.00.

12.    The present action involves a claim for declaratory relief by Firstline arising out of a request for a defense and indemnity made to Firstline by its insureds, Landis Pig Roast, LLC, Ziggy Dobkowski, and Diane Dobkowski("the insured") under a Business Owners policy having policy number 8171734, which policy was in full force and effect on April 21, 2017, a true and correct copy of which application, policy and declaration pages are collectively attached as Exhibit A.

13.    The liability limits of the Firstline policy issued under policy number 8171734 is one million dollars($1,000,000.00).

14.    There is currently a pending action venued in the Superior Court of New Jersey, Law Division, Cumberland County, No. CUM-L-00403-17, entitled Cosby, et al v. Z & D Realty, LLC, et al., a true and correct copy of which Third Amended Complaint is attached as Exhibit B.

**FACTS**

4

15.     Defendants Dennis Cosby, Defendant Eugene Cosby and Defendant Terry R. Mayes have made personal injury claims against co-defendants Landis Pig Roast, LLC, Ziggy Dobkowski, Diane Dobkowski and Raheem McClendon. See Exhibit B.

16.     According to the Cosby Complaint, on or about April 21, 2017 Defendants Dennis Cosby, Defendant Eugene Cosby and Defendant Terry R. Mayes were on the premises known as Grant Plaza, at 619 East Landis Avenue, Vineland, Cumberland County, State of New Jersey attending a party, and suffered injuries from gunshots when they were attacked by an unknown assailant/or assailants.

17.     Plaintiff issued this insurance policy to Landis Pig Roast, LLC for premises located at 623 East Landis Avenue in Vineland, Cumberland County, State of New Jersey. These premises were characterized as a "restaurant." See Exhibit A. This insurance policy was issued based upon representations that were false, misleading and fraudulent as perpetrated by Defendants Landis Pig Roast, LLC, Ziggy Dobkowski, and Diane Dobkowski. Plaintiff relied upon these representations to its detriment.

18.     The underlying lawsuit(See Exhibit B) claims that the premises where this incident occurred was known as "Grant Plaza" with an address of 619 East Landis Avenue. This incident occurred during and following a party that involved an admission price, security guards, and alcohol service. "Grant Plaza" was leased for this purpose by Defendant Raheem McClendon.

19.     Plaintiff did not intend to issue any coverage protection to Defendants Landis Pig Roast, LLC, Ziggy Dobkowski, or Diane Dobkowski for any of the above activities at an address different than 623 East Landis Avenue, Vineland, New Jersey or for a contracted party at a location known as "Grant Plaza" where there were security guards, alcohol service and an

admission price. Approximately 500 to 600 people were in attendance at this party. Plaintiff, in fact, issued its insurance coverage for 623 East Landis Avenue, Vineland, New Jersey characterized by Defendants Landis Pig Roast, LLC, Ziggy Dobkowski, and Diane Dobkowski as a "restaurant."

20.    Plaintiff also asserts multiple exclusions, endorsements and conditions within the policy that serve to deny any insurance coverage to Defendants Landis Pig Roast, LLC, Ziggy Dobkowski, and Diane Dobkowski.

## COUNT I
## FRAUD AND MISREPRESENTATION

21.    Plaintiff incorporates by reference all allegations set forth in the Complaint as if set forth fully herein.

22.    The property located at 619 East Landis Avenue and/or Grant Plaza was never listed in the Firstline Insurance Policy.

23.    The Plaintiff would not have insured the property located at 623 East Landis Avenue, New Jersey, or "Grant Plaza" had it known that the insureds leased any premises for a 500 to 600 person  party with alcohol service, security guards and an admission price.

## COUNT II
## FRAUD IN THE INDUCEMENT

24.    Plaintiff incorporates by reference all allegations set forth in the Complaint as if set forth fully herein.

25.    The elements of fraud in the inducement are as follows: "'(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying

6

on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."

26.    The insured Defendants represented that the property and premises at 623 East Landis Avenue, Vineland, New Jersey 08360 was to be used as a "restaurant." and did not disclose that it or any non-insured adjacent properties owned by them were being leased for parties where alcohol was being served, where there were security guards, where 500 to 600 people attended and where there was an admission price.

27.    The insured Defendants were aware of their actions because the applicable liquor license was issued in the name of the insured Defendants.

28.    The insured Defendants did not disclose the actual and intended use of the property and premises at 619 or 623 East Landis Avenue, Vineland, New Jersey knowing that Plaintiff would not issue coverage for same.

29.    Plaintiff had relied upon the representations of the insured Defendants prior to issuing the subject policy of insurance.

30.    Plaintiff relied to their substantial detriment upon the misrepresentations of the insured Defendants .

31.    Plaintiff would not have issued the subject policy if the insured Defendants had disclosed that the property was being used as a banquet, catering hall, or party venue where there were security guards, where alcohol was served, where 500 to 600 people attended and where there was an admission price.

## COUNT III
## BREACH OF WARRANTY OF DEALING IN GOOD FAITH

32.     Plaintiff incorporates by reference all allegations set forth in the Complaint as if set forth fully herein.

33.     The insured Defendants' written application and words to Plaintiff constituted an implied promise to provide information that was true and correct.

34.     The insured Defendants breached that promise without good cause and in bad faith and as a direct and proximate result of the Defendants' breach, the Plaintiff may suffer damages from the underlying pending action in New Jersey State Court. See Exhibit A.

35.     The breach by the insured Defendants of their promise, which was willful, reckless and/or grossly negligent, was attended by such malice, insult, and abuse that it constitutes an independent tort.

## COUNT IV
## RESCISSION OF THE CONTRACT

36.     Plaintiff incorporates by reference all allegations set forth in the Complaint as if set forth fully herein.

37.     In addition to and/or in the alternative to the declaratory relief being sought in the nature of a declaratory judgment Plaintiff seeks a rescission of the subject insurance policy based upon the insured Defendants misrepresentations and fraudulent conduct in failing to disclose and intentionally withholding information regarding the actual use of the subject property and premises.

## CLAIMS FOR RELIEF

38.     Plaintiff incorporates by reference all allegations set forth in the Complaint as if set forth fully herein.

39.     The underlying state court action alleges that personal injuries were caused to the Plaintiffs as the result of negligent security, assault and battery, negligent hiring, service of

alcohol to unknown intoxicated individuals, in addition to other intentional torts and negligence-based causes of action all occurring at 619 East Landis Avenue, Vineland, New Jersey. See Exhibit A. Defendants Landis Pig Roast, LLC, Ziggy Dobkowski and Diane Dobkowski provided notice of the underlying action to Firstline and demanded that it provide a defense and indemnification for the claims.

40.    Upon information and belief Firstline denies that it owes any insurance coverage to Defendant Landis Pig Roast, LLC, Ziggy Dobkowski and Diane Dobkowski for these claims under the Firstline policy.

41.    There is an actual and existing controversy among the parties concerning insurance coverage to Defendant Landis Pig Roast, LLC, Ziggy Dobkowski and Diane Dobkowski in the underlying action and the Plaintiffs who have also been named as Defendants herein.

42.    Pursuant to the clear language and the terms, provisions, conditions, exclusions and limitations of Firstline's insurance policy, Firstline is entitled to a declaration that Firstline owes no duty of coverage or defense in the underlying state court action.

WHEREFORE, Plaintiff Firstline respectfully requests that the Court:

a.    Declare that Firstline has no duty to defend Landis Pig Roast, LLC, Ziggy Dobkowski and Diane Dobkowski in connection with the underlying action state court action, Superior Court of New Jersey, Law Division, Cumberland County, No. CUM-L-00403-17, entitled Cosby,et al v. Z & D Realty, LLC, et al.;

b.    Declare that Firstline has the right to withdraw immediately from any defense of Landis Pig Roast, LLC, Ziggy Dobkowski and Diane Dobkowski in the underlying

action state court action, Superior Court of New Jersey, Law Division, Cumberland County, No. CUM-L-00403-17, entitled <u>Cosby, et al v. Z & D Realty, LLC, et al.</u>;

      c.      Declare that Firstline owes no obligation to indemnify any of the above defendant parties in the underlying action state court action, Superior Court of New Jersey, Law Division, Cumberland County, No. CUM-L-00403-17, entitled <u>Cosby, et al v. Z & D Realty, LLC, et al.</u>;

      e.      Declare that the Firstline policy owes no coverage to Landis Pig Roast, LLC, Ziggy Dobkowski and Diane Dobkowski and demands the right to reimbursement of attorney fees and costs paid to date;

      f.      Declare that this Firstline policy is rescinded.

COOPER LEVENSON, P.A.

Dated: 1-25-19

By: _____

LOUIS NIEDELMAN, ESQUIRE

CLAC 4588633.1

# EXHIBIT A

DEC-BP-04(1)

# The Harford Mutual Insurance Companies
Bel Air, Maryland 21014-3544

**Company:** Firstline National Insurance Company

**Policy Number:** 8171734    **Renewal of:** 8165294      **BUSINESSOWNERS DECLARATIONS**

**Named Insured and Mailing Address**      **Agency Name and Address**

LANDIS PIG ROAST LLC       9051-BAS    BIONDI INSURANCE AGENCY, INC.
623 E LANDIS AVE                    PO BOX 1418
VINELAND, NJ 08360               VINELAND, NJ 08362
                                  8566960700

**Policy Period: From** 01/03/2017 to 01/03/2018 at 12:01 A.M. Standard Time at your mailing address shown above.
In return for the payment of the premium and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

## THIS POLICY CONTAINS AGGREGATE LIMITS; REFER TO SECTION II - LIABILITY AND MEDICAL EXPENSES LIMITS OF INSURANCE FOR DETAILS.

BUSINESS DESCRIPTION: RESTAURANT
FORM OF BUSINESS: Limited Liability Company
-----------------------------------------------------------------------

SECTION I - PROPERTY

PREMISES INFORMATION: PREMISES 1, BUILDING 1

     PREMISES ADDRESS:                Construction: Joisted Masonry
         623 E LANDIS AVE             Protection Class: 4
         VINELAND, NJ 08360
         COUNTY: CUMBERLAND

         Occupancy: Restaurant

     PROPERTY COVERAGES:   ($1,000 property deductible per occurrence)     LIMIT OF INSURANCE
         BUSINESS PERSONAL PROPERTY - Seasonal Increase 25%.......................$   100,000
         BUSINESS INCOME - Included - Refer to Endorsements for Coverage and Limitations

     OPTIONAL COVERAGES:   ($500 deductible for OPTIONAL COVERAGES)
         MONEY & SECURITIES - Maximum Inside the Premises Limit...................$    10,000
                       - Maximum Outside the Premises Limit..................$     2,000
-----------------------------------------------------------------------
LIABILITY AND MEDICAL EXPENSES:   See Liability and Medical Expenses Schedule
-----------------------------------------------------------------------
FORMS AND ENDORSEMENTS:   See Form Schedule
-----------------------------------------------------------------------
PREMIUM:   $2,384     Surcharge: $14     Total: $2,398
-----------------------------------------------------------------------
CEmm

(1) 2015/10/01-1.00(29)
ISSUE DATE: 11/21/2016 #1

Countersigned: _____

                   (Authorized Representative)    (Date)

**FILE COPY**

```
--------------------------------------------------------------------------------
LIABILITY AND MEDICAL EXPENSES SCHEDULE
--------------------------------------------------------------------------------
SECTION II - LIABILITY AND MEDICAL EXPENSES

Each paid claim for the following coverages reduces the amount of insurance we
provide during the applicable annual period.  Please refer to Section II-Liability
in the Businessowners Coverage Form and any attached endorsements.

    LIABILITY COVERAGE*                                        LIMIT OF INSURANCE
        Liability and Medical Expenses (Per Occurrence)...........................$1,000,000
        Medical Expenses (Per Person)................................................$    5,000
        Damage to Premises Rented to You (Any One Premises).......................$  100,000
        Other Than Products/Completed Operations Aggregate........................$2,000,000
        Products/Completed Operations Aggregate...................................$2,000,000

        *Optional Property Damage Liability Deductible May Apply. Refer to
        Forms Schedule for Deductible Information (If Applicable).
--------------------------------------------------------------------------------
```



```
(2) POLICY: 8171734 2015/10/01-1.00(29)
ISSUE DATE: 11/21/2016 #1
```

```
-------------------------------------------------------------------------------
IMPORTANT NOTICES TO POLICYHOLDERS
-------------------------------------------------------------------------------
     BPMS12-1        BUSINESSOWNERS EQUIPMENT BREAKDOWN
     BPMS14-2        BOP ACCESS OR DISCLOSURE ADVISORY NOTICE
     BPNJ00-1(0400)  ADVISORY NOTICE TO POLICYHOLDERS-LEAD LIABILITY COVERAGE
     ILMS001 (0117)  FLOOD INSURANCE NOTICE
     ILMS003 (0115)  POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE
     ILMS013 (0416)  POLICYHOLDER NOTICE REGARDING CYBER LIABILITY COVERAGE
     ILMS014 (0416)  NOTICE REGARDING CLAIMS-MADE COVERAGE ON YOUR POLICY
     ILMS016 (1015)  CUSTOMER PRIVACY POLICY
     ILMS11  (0604)  ADVISORY NOTICE TO POLICYHOLDERS - OFAC
     ILMS11-1(0411)  PROTECTIVE SAFEGUARD ENDORSEMENT ADVISORY NOTICE
     ILN001  (0903)  FRAUD STATEMENT
     ILNJ03-1        NEW JERSEY EARTHQUAKE INSURANCE AVAILABILITY NOTICE


-------------------------------------------------------------------------------
                              FORM SCHEDULE
-------------------------------------------------------------------------------
FORMS AND ENDORSEMENTS APPLYING TO AND MADE A PART OF THIS POLICY AT TIME OF ISSUE:
-------------------------------------------------------------------------------
     BP0003  (0713)  BUSINESSOWNERS COVERAGE FORM
     BP0189  (0315)  NEW JERSEY CHANGES
     BP0478  (0702)  NEW JERSEY CHANGES-COVERAGE & EXCLUSION FOR HAZARDS OF LEAD
     BP0501  (0702)  CALCULATION OF PREMIUM
     BP0517  (0106)  EXCLUSION - SILICA OR SILICA-RELATED DUST
     BP0523  (0115)  CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM
     BP0538  (0115)  EXCLUSION-OTHER ACTS OF TERRORISM; CAP ON CERTIFIED ACTS OF TERRORISM
     BP0542  (0115)  EXCLUSION OF PUNITIVE DAMAGES RELATED TO A CERTIFIED ACT OF TERRORISM
     BP0577  (0106)  FUNGI OR BACTERIA EXCLUSION (LIABILITY)
     BP0598  (0713)  AMENDMENT OF INSURED CONTRACT DEFINITION
     BP1504  (0514)  EXCLUSION-ACCESS/DISCLOSURE W/LTD BODILY INJURY EXCEPTION
     BPHG28  (0713)  BUSINESSOWNERS IMPROVED VALUE ENDORSEMENT
     BPHG51  (0105)  ASBESTOS EXCLUSION ENDORSEMENT
     BPHG58  (0908)  TOBACCO HEALTH HAZARD EXCLUSION
     BPHG63  (0509)  EQUIPMENT BREAKDOWN GREEN ENVIRONMENTAL AND EFFICIENCY IMPROVEMENTS
     BPHG64  (0509)  GREEN ENVIRONMENTAL AND EFFICIENCY IMPROVEMENTS
     BPIN01  (0713)  BUSINESSOWNERS COVERAGE FORM INDEX
     BP0430  (0713)  PROTECTIVE SAFEGUARDS
                     Symbols Applicable: P-5
                          Premises 1, Building 1

     BP0489  (0110)  LIQUOR LIABILITY COVERAGE.......................................467.00
             Aggregate/Ea. Cause Limit: $1,000,000
                  Alcohol Receipts: $60,000

     BP0778  (0713)  RESTAURANTS.....................................................184.00
                          Premises 1, Building 1

     BPHG40  (0713)  EQUIPMENT BREAKDOWN ENHANCEMENT ENDORSEMENT (MP)................35.00
     BPHG80  (0713)  EMPLOYMENT PRACTICES LIABILITY ENDORSEMENT.....................140.00
             ****THIS COVERAGE IS CLAIMS MADE, READ YOUR POLICY CAREFULLY****
             ****DEFENSE COSTS ARE WITHIN POLICY LIMITS****
                     Each Claim Limit: $100,000
                     Aggregate Limit: $100,000
                  Deductible Each Claim: $5,000 Each Claim
                     Retroactive Date: 01/03/2016


     ILHG07  (0416)  CYBER LIABILITY ENDORSEMENT CLAIMS-MADE &  REPORTED COVERAGE....46.00
             ****THIS COVERAGE IS CLAIMS MADE, READ YOUR POLICY CAREFULLY****
             ****DEFENSE COSTS ARE WITHIN POLICY LIMITS****
                     Retroactive Date: 01/03/2017


(3) POLICY: 8171734 2015/10/01-1.00(29)
ISSUE DATE: 11/21/2016 #1
```

COVERAGE EXTENSIONS AND/OR MISCELLANEOUS CHARGES

CUSTOMER SEATING...................................................................136.00
Premises 1, Building 1

SURCHARGES APPLIED TO THIS POLICY

NJ Property-Liability Insurance Guaranty Association Surcharge........................14.00

OTHER CHARGES APPLIED TO THIS POLICY

Terrorism Risk Insurance Program Reauthorization Act of 2015 - Certified Acts -
Premium Charged...................................................................4.00
Fire Following Exception - Certified Acts of Terrorism - Premium Charged.............1.00



(4) POLICY: 8171734 2015/10/01-1.00(.29)
ISSUE DATE: 11/21/2016 #1

# The Harford Mutual Insurance Companies
Bel Air, Maryland 21014-3544

**Company:** Firstline National Insurance Company

**Policy Number:** 8171734   **Renewal of:** 8165294

**BUSINESSOWNERS DECLARATIONS**
ENDORSEMENT SUMMARY

**Named Insured and Mailing Address**
    LANDIS PIG ROAST LLC
    623 E LANDIS AVE
    VINELAND, NJ 08360

**Agency Name and Address**
9051-BAS   BIONDI INSURANCE AGENCY, INC.
    525 ELMER STREET
    VINELAND, NJ 08362
    8566960700

**Policy Period:** **From** 01/03/2017 to 01/03/2018 at 12:01 A.M. Standard Time at your mailing address shown above.

In return for the payment of the premium and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

This endorsement is effective: 05/05/2017

DESCRIPTION OF CHANGE
    ADDED FORM BP0448 FOR CITY OF VINELAND AS RESPECTS TO OUTDOOR BARBECUE ON 5/7/17

FORM OF BUSINESS: LIMITED LIABILITY COMPANY

POLICY SUMMARY OF PREMIUMS                      POLICY*

| | |
|---|---:|
| BUSINESS PERSONAL PROPERTY | 596.00 |
| LIABILITY | 762.00 |
| TENANTS FIRE LEGAL | 13.00 |
| NJ PROPERTY-LIABILITY INSURANCE GUARANTY ASSOCIATION SURCHARGE | 14.00 |
| TERRORISM RISK INSURANCE PROGRAM REAUTHORIZATION ACT OF 2015 (CERTIFIED) | 4.00 |
| ALL OTHERS | 1,034.00 |

\* = Includes premium for all parts.      **REVISED TOTAL ANNUAL COST**    2,423.00

TOTAL ADDITIONAL FOR THIS ENDORSEMENT: $17

----------------------------------------------------------------

SECTION II - LIABILITY AND MEDICAL EXPENSES

LIABILITY COVERAGE*                      LIMIT OF INSURANCE
  Liability and Medical Expenses (Per Occurrence)..........................$1,000,000
  Medical Expenses (Per Person)............................................$ 5,000
  Damage to Premises Rented to You (Any One Premises)......................$ 100,000
  Other Than Products/Completed Operations Aggregate......................$2,000,000
  Products/Completed Operations Aggregate.................................$2,000,000

  *Optional Property Damage Liability Deductible May Apply. Refer to
  Forms Schedule for Deductible Information (If Applicable).

----------------------------------------------------------------

CEmm

**FILE COPY**

CEmm

# The Harford Mutual Insurance Companies
Bel Air, Maryland 21014-3544

**Company:** Firstline National Insurance Company

**Policy Number:** 8171734    **Renewal of:** 8165294

**BUSINESSOWNERS ENDORSEMENT**

**Named Insured and Mailing Address**
LANDIS PIG ROAST LLC
623 E LANDIS AVE
VINELAND, NJ 08360

**Agency Name and Address**
9051-BAS    BIONDI INSURANCE AGENCY, INC.
525 ELMER STREET
VINELAND, NJ 08362
8566960700

**This endorsement is effective:**    05/05/2017

## DESCRIPTION OF CHANGE
ADDED FORM BP0448 FOR CITY OF VINELAND AS RESPECTS TO OUTDOOR BARBECUE ON 5/7/17

SECTION I - PROPERTY

PREMISES INFORMATION: PREMISES 1, BUILDING 1

PREMISES ADDRESS:
623 E LANDIS AVE
VINELAND, NJ 08360
COUNTY: CUMBERLAND

Construction: Joisted Masonry
Protection Class: 4

Occupancy: Restaurant

```
PROPERTY COVERAGES:  ($1,000 property deductible per occurrence)    LIMIT OF INSURANCE
   BUSINESS PERSONAL PROPERTY - Seasonal Increase 25%.....................$    100,000
   BUSINESS INCOME - Included - Refer to Endorsements for Coverage and Limitations

OPTIONAL COVERAGES:  ($500 deductible for OPTIONAL COVERAGES)
   MONEY & SECURITIES - Maximum Inside the Premises Limit..................$     10,000
                      - Maximum Outside the Premises Limit.................$      2,000
```

| PREMIUMS | NEW ANNUAL COST | PREVIOUS ANNUAL COST |
|---|---|---|
| BUSINESS PERSONAL PROPERTY | 596 | 596 |
| LIABILITY | 762 | 762 |
| TENANTS FIRE LEGAL | 13 | 13 |
| NJ PROP-LIAB INS. GUARANTY ASSOC SURCHARGE | 14 | 14 |
| TERRORISM RISK INSURANCE ACT OF 2015 | 4 | 4 |
| ADDITIONAL CHARGE FOR FIRE FOLLOWING TERRORI | 1 | 1 |
| ALL OTHERS | 1,033 | 1,008 |
| | | |
| TOTAL | 2,423 | 2,398 |

TOTAL ADDITIONAL PRO RATA FOR THIS PREMISES:    $17

CEmm

(3) POLICY: 8171734 2015/10/01-1.00(29)
ISSUE DATE: 06/06/2017 #2

**FILE COPY**

```
-----------------------------------------------------------------------------------------
IMPORTANT NOTICES TO POLICYHOLDERS
-----------------------------------------------------------------------------------------
      BPMS12-1       BUSINESSOWNERS EQUIPMENT BREAKDOWN
      BPMS14-2       BOP ACCESS OR DISCLOSURE ADVISORY NOTICE
      BPNJ00-1(0400) ADVISORY NOTICE TO POLICYHOLDERS-LEAD LIABILITY COVERAGE
      ILMS001 (0117) FLOOD INSURANCE NOTICE
      ILMS003 (0115) POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE
      ILMS013 (0416) POLICYHOLDER NOTICE REGARDING CYBER LIABILITY COVERAGE
      ILMS014 (0416) NOTICE REGARDING CLAIMS-MADE COVERAGE ON YOUR POLICY
      ILMS016 (1015) CUSTOMER PRIVACY POLICY
      ILMS11  (0604) ADVISORY NOTICE TO POLICYHOLDERS - OFAC
      ILMS11-1(0411) PROTECTIVE SAFEGUARD ENDORSEMENT ADVISORY NOTICE
      ILN001  (0903) FRAUD STATEMENT
      ILNJ03-1       NEW JERSEY EARTHQUAKE INSURANCE AVAILABILITY NOTICE
```

```
-----------------------------------------------------------------------------------------
                                FORM SCHEDULE
-----------------------------------------------------------------------------------------
FORMS AND ENDORSEMENTS APPLYING TO AND MADE A PART OF THIS POLICY AT TIME OF ISSUE:
-----------------------------------------------------------------------------------------
      BP0003  (0713) BUSINESSOWNERS COVERAGE FORM
      BP0189  (0315) NEW JERSEY CHANGES
      BP0478  (0702) NEW JERSEY CHANGES-COVERAGE & EXCLUSION FOR HAZARDS OF LEAD
      BP0501  (0702) CALCULATION OF PREMIUM
      BP0517  (0106) EXCLUSION - SILICA OR SILICA-RELATED DUST
      BP0523  (0115) CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM
      BP0538  (0115) EXCLUSION-OTHER ACTS OF TERRORISM; CAP ON CERTIFIED ACTS OF TERRORISM
      BP0542  (0115) EXCLUSION OF PUNITIVE DAMAGES RELATED TO A CERTIFIED ACT OF TERRORISM
      BP0577  (0106) FUNGI OR BACTERIA EXCLUSION (LIABILITY)
      BP0598  (0713) AMENDMENT OF INSURED CONTRACT DEFINITION
      BP1504  (0514) EXCLUSION-ACCESS/DISCLOSURE W/LTD BODILY INJURY EXCEPTION
      BPHG28  (0713) BUSINESSOWNERS IMPROVED VALUE ENDORSEMENT
      BPHG51  (0105) ASBESTOS EXCLUSION ENDORSEMENT
      BPHG58  (0908) TOBACCO HEALTH HAZARD EXCLUSION
      BPHG63  (0509) EQUIPMENT BREAKDOWN GREEN ENVIRONMENTAL AND EFFICIENCY IMPROVEMENTS
      BPHG64  (0509) GREEN ENVIRONMENTAL AND EFFICIENCY IMPROVEMENTS
      BPIN01  (0713) BUSINESSOWNERS COVERAGE FORM INDEX
      BP0430  (0713) PROTECTIVE SAFEGUARDS
                     Symbols Applicable: P-5
                         Premises 1, Building 1

      BP0448  (0713) ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION.........25.00
                         Organization: CITY OF VINELAND

      BP0489  (0110) LIQUOR LIABILITY COVERAGE...................................467.00
              Aggregate/Ea. Cause Limit: $1,000,000
                     Alcohol Receipts: $60,000

      BP0778  (0713) RESTAURANTS.................................................184.00
                         Premises 1, Building 1

      BPHG40  (0713) EQUIPMENT BREAKDOWN ENHANCEMENT ENDORSEMENT (MP)..............35.00
      BPHG80  (0713) EMPLOYMENT PRACTICES LIABILITY ENDORSEMENT...................140.00
                     ****THIS COVERAGE IS CLAIMS MADE, READ YOUR POLICY CAREFULLY****
                     ****DEFENSE COSTS ARE WITHIN POLICY LIMITS****
                         Each Claim Limit: $100,000
                          Aggregate Limit: $100,000
                     Deductible Each Claim: $5,000 Each Claim
                          Retroactive Date: 01/03/2016

      ILHG07  (0416) CYBER LIABILITY ENDORSEMENT CLAIMS-MADE &  REPORTED COVERAGE....46.00
                     ****THIS COVERAGE IS CLAIMS MADE, READ YOUR POLICY CAREFULLY****
                     ****DEFENSE COSTS ARE WITHIN POLICY LIMITS****
(4) POLICY: 8171734 2015/10/01-1.00(29)
ISSUE DATE: 06/06/2017 #2
```

Retroactive Date: 01/03/2017

---

COVERAGE EXTENSIONS AND/OR MISCELLANEOUS CHARGES

---

CUSTOMER SEATING.....................................................................136.00
Premises 1, Building 1

---

SURCHARGES APPLIED TO THIS POLICY

---

NJ Property-Liability Insurance Guaranty Association Surcharge.......................14.00

---

OTHER CHARGES APPLIED TO THIS POLICY

---

Terrorism Risk Insurance Program Reauthorization Act of 2015 - Certified Acts -
Premium Charged........................................................................4.00
Fire Following Exception - Certified Acts of Terrorism - Premium Charged.............1.00



# The Harford Mutual Insurance Companies
Bel Air, Maryland 21014-3544

Company: Firstline National Insurance Company

**Policy Number:** 8171734    **Renewal of:** 8165294

**BUSINESSOWNERS DECLARATIONS**
ENDORSEMENT SUMMARY

**Named Insured and Mailing Address**

LANDIS PIG ROAST LLC
623 E LANDIS AVE
VINELAND, NJ 08360

**Agency Name and Address**

9051-BAS  BIONDI INSURANCE AGENCY, INC.
525 ELMER STREET
VINELAND, NJ 08362
8566960700

**Policy Period:   From   01/03/2017 to 01/03/2018  at 12:01 A.M. Standard Time** at your mailing address shown above.
In return for the payment of the premium and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

This endorsement is effective: 07/23/2017

DESCRIPTION OF CHANGE
ADDED FORM BP0448 FOR CITY OF VINELAND AS RESPECTS TO EVENT AT 623 E LANDIS AVE,
VINELAND, NJ ON 7/23/17

FORM OF BUSINESS: LIMITED LIABILITY COMPANY

| POLICY SUMMARY OF PREMIUMS | POLICY* |
|---|---|
| BUSINESS PERSONAL PROPERTY | 596.00 |
| LIABILITY | 762.00 |
| TENANTS FIRE LEGAL | 13.00 |
| NJ PROPERTY-LIABILITY INSURANCE GUARANTY ASSOCIATION SURCHARGE | 15.00 |
| TERRORISM RISK INSURANCE PROGRAM REAUTHORIZATION ACT OF 2015 (CERTIFIED) | 4.00 |
| ALL OTHERS | 1,059.00 |

\* = Includes premium for all parts.                    REVISED TOTAL ANNUAL COST       2,449.00

TOTAL ADDITIONAL FOR THIS ENDORSEMENT:  $12
(Surcharge Change for this Endorsement included in above total:  $1)

---

SECTION II - LIABILITY AND MEDICAL EXPENSES

LIABILITY COVERAGE*                                            LIMIT OF INSURANCE
Liability and Medical Expenses (Per Occurrence).......................$1,000,000
Medical Expenses (Per Person)........................................$    5,000
Damage to Premises Rented to You (Any One Premises)..................$  100,000
Other Than Products/Completed Operations Aggregate..................$2,000,000
Products/Completed Operations Aggregate.............................$2,000,000

*Optional Property Damage Liability Deductible May Apply. Refer to
Forms Schedule for Deductible Information (If Applicable).

---

CEmm

(1) 2015/10/01-1.00(29)
ISSUE DATE: 08/03/2017 #3

CEmm

FILE COPY

# The Harford Mutual Insurance Companies
Bel Air, Maryland 21014-3544

**Company:** Firstline National Insurance Company

**Policy Number:** 8171734    **Renewal of:** 8165294

**BUSINESSOWNERS ENDORSEMENT**

**Named Insured and Mailing Address**
LANDIS PIG ROAST LLC
623 E LANDIS AVE
VINELAND, NJ 08360

**Agency Name and Address**
9051-BAS  BIONDI INSURANCE AGENCY, INC.
525 ELMER STREET
VINELAND, NJ 08362
8566960700

**This endorsement is effective:** 07/23/2017

## DESCRIPTION OF CHANGE
ADDED FORM BP0448 FOR CITY OF VINELAND AS RESPECTS TO EVENT AT 623 E LANDIS AVE, VINELAND, NJ ON 7/23/17

SECTION I - PROPERTY

PREMISES INFORMATION: PREMISES 1, BUILDING 1

PREMISES ADDRESS:
623 E LANDIS AVE
VINELAND, NJ 08360
COUNTY: CUMBERLAND

Construction: Joisted Masonry
Protection Class: 4

Occupancy: Restaurant

---

PROPERTY COVERAGES:  ($1,000 property deductible per occurrence)    LIMIT OF INSURANCE
BUSINESS PERSONAL PROPERTY - Seasonal Increase 25%......................$   100,000
BUSINESS INCOME - Included - Refer to Endorsements for Coverage and Limitations

OPTIONAL COVERAGES:  ($500 deductible for OPTIONAL COVERAGES)
MONEY & SECURITIES - Maximum Inside the Premises Limit...................$    10,000
                   - Maximum Outside the Premises Limit.................$     2,000

---

| PREMIUMS | NEW ANNUAL COST | PREVIOUS ANNUAL COST |
|---|---|---|
| BUSINESS PERSONAL PROPERTY | 596 | 596 |
| LIABILITY | 762 | 762 |
| TENANTS FIRE LEGAL | 13 | 13 |
| NJ PROP-LIAB INS. GUARANTY ASSOC SURCHARGE | 15 | 14 |
| TERRORISM RISK INSURANCE ACT OF 2015 | 4 | 4 |
| ADDITIONAL CHARGE FOR FIRE FOLLOWING TERRORI | 1 | 1 |
| ALL OTHERS | 1,058 | 1,033 |
| TOTAL | 2,449 | 2,423 |

TOTAL ADDITIONAL PRO RATA FOR THIS PREMISES:          $12

---

CEmm

(3) POLICY: 8171734 2015/10/01-1.00(29)
ISSUE DATE: 08/03/2017 #3

**FILE COPY**

```
--------------------------------------------------------------------------
IMPORTANT NOTICES TO POLICYHOLDERS
--------------------------------------------------------------------------
        BPMS12-1        BUSINESSOWNERS EQUIPMENT BREAKDOWN
        BPMS14-2        BOP ACCESS OR DISCLOSURE ADVISORY NOTICE
        BPNJ00-1(0400)  ADVISORY NOTICE TO POLICYHOLDERS-LEAD LIABILITY COVERAGE
        ILMS001 (0117)  FLOOD INSURANCE NOTICE
        ILMS003 (0115)  POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE
        ILMS013 (0416)  POLICYHOLDER NOTICE REGARDING CYBER LIABILITY COVERAGE
        ILMS014 (0416)  NOTICE REGARDING CLAIMS-MADE COVERAGE ON YOUR POLICY
        ILMS016 (1015)  CUSTOMER PRIVACY POLICY
        ILMS11  (0604)  ADVISORY NOTICE TO POLICYHOLDERS - OFAC
        ILMS11-1(0411)  PROTECTIVE SAFEGUARD ENDORSEMENT ADVISORY NOTICE
        ILN001  (0903)  FRAUD STATEMENT
        ILNJ03-1        NEW JERSEY EARTHQUAKE INSURANCE AVAILABILITY NOTICE


--------------------------------------------------------------------------
                              FORM SCHEDULE
--------------------------------------------------------------------------
FORMS AND ENDORSEMENTS APPLYING TO AND MADE A PART OF THIS POLICY AT TIME OF ISSUE:
--------------------------------------------------------------------------
        BP0003  (0713)  BUSINESSOWNERS COVERAGE FORM
        BP0189  (0315)  NEW JERSEY CHANGES
        BP0478  (0702)  NEW JERSEY CHANGES-COVERAGE & EXCLUSION FOR HAZARDS OF LEAD
        BP0501  (0702)  CALCULATION OF PREMIUM
        BP0517  (0106)  EXCLUSION - SILICA OR SILICA-RELATED DUST
        BP0523  (0115)  CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM
        BP0538  (0115)  EXCLUSION-OTHER ACTS OF TERRORISM; CAP ON CERTIFIED ACTS OF TERRORISM
        BP0542  (0115)  EXCLUSION OF PUNITIVE DAMAGES RELATED TO A CERTIFIED ACT OF TERRORISM
        BP0577  (0106)  FUNGI OR BACTERIA EXCLUSION (LIABILITY)
        BP0598  (0713)  AMENDMENT OF INSURED CONTRACT DEFINITION
        BP1504  (0514)  EXCLUSION-ACCESS/DISCLOSURE W/LTD BODILY INJURY EXCEPTION
        BPHG28  (0713)  BUSINESSOWNERS IMPROVED VALUE ENDORSEMENT
        BPHG51  (0105)  ASBESTOS EXCLUSION ENDORSEMENT
        BPHG58  (0908)  TOBACCO HEALTH HAZARD EXCLUSION
        BPHG63  (0509)  EQUIPMENT BREAKDOWN GREEN ENVIRONMENTAL AND EFFICIENCY IMPROVEMENTS
        BPHG64  (0509)  GREEN ENVIRONMENTAL AND EFFICIENCY IMPROVEMENTS
        BPIN01  (0713)  BUSINESSOWNERS COVERAGE FORM INDEX
        BP0430  (0713)  PROTECTIVE SAFEGUARDS
                        Symbols Applicable: P-5
                              Premises 1, Building 1

        BP0448  (0713)  ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION..........25.00
                        Organization: CITY OF VINELAND

        BP0448  (0713)  ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION..........25.00
                        Organization: CITY OF VINELAND

        BP0489  (0110)  LIQUOR LIABILITY COVERAGE....................................467.00
                Aggregate/Ea. Cause Limit: $1,000,000
                        Alcohol Receipts: $60,000

        BP0778  (0713)  RESTAURANTS..................................................184.00
                              Premises 1, Building 1

        BPHG40  (0713)  EQUIPMENT BREAKDOWN ENHANCEMENT ENDORSEMENT (MP)..............35.00
        BPHG80  (0713)  EMPLOYMENT PRACTICES LIABILITY ENDORSEMENT...................140.00
                        ****THIS COVERAGE IS CLAIMS MADE, READ YOUR POLICY CAREFULLY****
                        ****DEFENSE COSTS ARE WITHIN POLICY LIMITS****
                              Each Claim Limit: $100,000
                              Aggregate Limit: $100,000
                        Deductible Each Claim: $5,000 Each Claim
                              Retroactive Date: 01/03/2016

(4) POLICY: 8171734 2015/10/01-1.00(29)
ISSUE DATE: 08/03/2017 #3
```

ILHG07  (0416) CYBER LIABILITY ENDORSEMENT CLAIMS-MADE &  REPORTED COVERAGE....46.00
        ****THIS COVERAGE IS CLAIMS MADE, READ YOUR POLICY CAREFULLY****
        ****DEFENSE COSTS ARE WITHIN POLICY LIMITS****
            Retroactive Date: 01/03/2017

---

COVERAGE EXTENSIONS AND/OR MISCELLANEOUS CHARGES

---

CUSTOMER SEATING...............................................................136.00
                    Premises 1, Building 1

---

SURCHARGES APPLIED TO THIS POLICY

---

NJ Property-Liability Insurance Guaranty Association Surcharge.......................15.00

---

OTHER CHARGES APPLIED TO THIS POLICY

---

Terrorism Risk Insurance Program Reauthorization Act of 2015 — Certified Acts —
Premium Charged.....................................................................4.00
Fire Following Exception — Certified Acts of Terrorism — Premium Charged.............1.00



(5) POLICY: 8171734 2015/10/01-1.00(29)
ISSUE DATE: 08/03/2017 #3

### The Harford Mutual Insurance Companies
Bel Air, Maryland 21014-3544

Company: Firstline National Insurance Company

**Policy Number:** 8171734    **Renewal of:** 8165294

**BUSINESSOWNERS DECLARATIONS**
ENDORSEMENT SUMMARY

**Named Insured and Mailing Address**
LANDIS PIG ROAST LLC
623 E LANDIS AVE
VINELAND, NJ 08360

**Agency Name and Address**
9051-BAS    BIONDI INSURANCE AGENCY, INC.
525 ELMER STREET
VINELAND, NJ 08362
8566960700

**Policy Period: From** 01/03/2017 to 01/03/2018 at 12:01 A.M. Standard Time at your mailing address shown above.
In return for the payment of the premium and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

This endorsement is effective: 08/25/2017

DESCRIPTION OF CHANGE
ADDED FORM BP0448 FOR THE CITY OF VINELAND AS RESPECTS TO OUTDOOR BBQ ON 9/17/17

FORM OF BUSINESS: LIMITED LIABILITY COMPANY

| POLICY SUMMARY OF PREMIUMS | POLICY* |
|---|---|
| BUSINESS PERSONAL PROPERTY | 596.00 |
| LIABILITY | 762.00 |
| TENANTS FIRE LEGAL | 13.00 |
| NJ PROPERTY-LIABILITY INSURANCE GUARANTY ASSOCIATION SURCHARGE | 15.00 |
| TERRORISM RISK INSURANCE PROGRAM REAUTHORIZATION ACT OF 2015 (CERTIFIED) | 4.00 |
| ALL OTHERS | 1,084.00 |

\* = Includes premium for all parts.    REVISED TOTAL ANNUAL COST    2,474.00

TOTAL ADDITIONAL FOR THIS ENDORSEMENT: $9

---

SECTION II - LIABILITY AND MEDICAL EXPENSES

LIABILITY COVERAGE*            LIMIT OF INSURANCE
Liability and Medical Expenses (Per Occurrence)......................$1,000,000
Medical Expenses (Per Person).........................................$ 5,000
Damage to Premises Rented to You (Any One Premises)...................$ 100,000
Other Than Products/Completed Operations Aggregate...................$2,000,000
Products/Completed Operations Aggregate..............................$2,000,000

*Optional Property Damage Liability Deductible May Apply. Refer to
Forms Schedule for Deductible Information (If Applicable).

---

CEmm

**The Harford Mutual Insurance Companies**
Bel Air, Maryland 21014-3544

Company: Firstline National Insurance Company

Policy Number: 8171734    Renewal of: 8165294              **BUSINESSOWNERS ENDORSEMENT**

**Named Insured and Mailing Address**                     **Agency Name and Address**
LANDIS PIG ROAST LLC                          9051-BAS  BIONDI INSURANCE AGENCY, INC.
623 E LANDIS AVE                                        525 ELMER STREET
VINELAND, NJ 08360                                      VINELAND, NJ 08362
                                                        8566960700

**This endorsement is effective:**    08/25/2017

**DESCRIPTION OF CHANGE**
ADDED FORM BP0448 FOR THE CITY OF VINELAND AS RESPECTS TO OUTDOOR BBQ ON 9/17/17

SECTION I - PROPERTY

PREMISES INFORMATION: PREMISES 1, BUILDING 1

    PREMISES ADDRESS:                          Construction: Joisted Masonry
    623 E LANDIS AVE                           Protection Class: 4
    VINELAND, NJ 08360
    COUNTY: CUMBERLAND

    Occupancy: Restaurant

---

PROPERTY COVERAGES:  ($1,000 property deductible per occurrence)    LIMIT OF INSURANCE
    BUSINESS PERSONAL PROPERTY - Seasonal Increase 25%......................$    100,000
    BUSINESS INCOME - Included - Refer to Endorsements for Coverage and Limitations

OPTIONAL COVERAGES:  ($500 deductible for OPTIONAL COVERAGES)
    MONEY & SECURITIES - Maximum Inside the Premises Limit...................$     10,000
                       - Maximum Outside the Premises Limit..................$      2,000

---

| PREMIUMS | NEW ANNUAL COST | PREVIOUS ANNUAL COST |
|---|---|---|
| BUSINESS PERSONAL PROPERTY | 596 | 596 |
| LIABILITY | 762 | 762 |
| TENANTS FIRE LEGAL | 13 | 13 |
| NJ PROP-LIAB INS. GUARANTY ASSOC SURCHARGE | 15 | 15 |
| TERRORISM RISK INSURANCE ACT OF 2015 | 4 | 4 |
| ADDITIONAL CHARGE FOR FIRE FOLLOWING TERRORI | 1 | 1 |
| ALL OTHERS | 1,083 | 1,058 |
| | | |
| TOTAL | 2,474 | 2,449 |

TOTAL ADDITIONAL PRO RATA FOR THIS PREMISES:         $9

---

CEmm

(3) POLICY: 8171734 2015/10/01-1.00(29)
ISSUE DATE: 09/08/2017 #4

FILE COPY

---

IMPORTANT NOTICES TO POLICYHOLDERS

---

```
BPMS12-1        BUSINESSOWNERS EQUIPMENT BREAKDOWN
BPMS14-2        BOP ACCESS OR DISCLOSURE ADVISORY NOTICE
BPNJ00-1(0400)  ADVISORY NOTICE TO POLICYHOLDERS-LEAD LIABILITY COVERAGE
ILMS001 (0117)  FLOOD INSURANCE NOTICE
ILMS003 (0115)  POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE
ILMS013 (0416)  POLICYHOLDER NOTICE REGARDING CYBER LIABILITY COVERAGE
ILMS014 (0416)  NOTICE REGARDING CLAIMS-MADE COVERAGE ON YOUR POLICY
ILMS016 (1015)  CUSTOMER PRIVACY POLICY
ILMS11  (0604)  ADVISORY NOTICE TO POLICYHOLDERS - OFAC
ILMS11-1(0411)  PROTECTIVE SAFEGUARD ENDORSEMENT ADVISORY NOTICE
ILN001  (0903)  FRAUD STATEMENT
ILNJ03-1        NEW JERSEY EARTHQUAKE INSURANCE AVAILABILITY NOTICE
```

---

FORM SCHEDULE

---

FORMS AND ENDORSEMENTS APPLYING TO AND MADE A PART OF THIS POLICY AT TIME OF ISSUE:

---

```
BP0003  (0713) BUSINESSOWNERS COVERAGE FORM
BP0189  (0315) NEW JERSEY CHANGES
BP0478  (0702) NEW JERSEY CHANGES-COVERAGE & EXCLUSION FOR HAZARDS OF LEAD
BP0501  (0702) CALCULATION OF PREMIUM
BP0517  (0106) EXCLUSION - SILICA OR SILICA-RELATED DUST
BP0523  (0115) CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM
BP0538  (0115) EXCLUSION-OTHER ACTS OF TERRORISM; CAP ON CERTIFIED ACTS OF TERRORISM
BP0542  (0115) EXCLUSION OF PUNITIVE DAMAGES RELATED TO A CERTIFIED ACT OF TERRORISM
BP0577  (0106) FUNGI OR BACTERIA EXCLUSION (LIABILITY)
BP0598  (0713) AMENDMENT OF INSURED CONTRACT DEFINITION
BP1504  (0514) EXCLUSION-ACCESS/DISCLOSURE W/LTD BODILY INJURY EXCEPTION
BPHG28  (0713) BUSINESSOWNERS IMPROVED VALUE ENDORSEMENT
BPHG51  (0105) ASBESTOS EXCLUSION ENDORSEMENT
BPHG58  (0908) TOBACCO HEALTH HAZARD EXCLUSION
BPHG63  (0509) EQUIPMENT BREAKDOWN GREEN ENVIRONMENTAL AND EFFICIENCY IMPROVEMENTS
BPHG64  (0509) GREEN ENVIRONMENTAL AND EFFICIENCY IMPROVEMENTS
BPIN01  (0713) BUSINESSOWNERS COVERAGE FORM INDEX
BP0430  (0713) PROTECTIVE SAFEGUARDS
               Symbols Applicable: P-5
                  Premises 1, Building 1

BP0448  (0713) ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION..........25.00
                  Organization: CITY OF VINELAND

BP0448  (0713) ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION..........25.00
                  Organization: CITY OF VINELAND

BP0448  (0713) ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION..........25.00
                  Organization: CITY OF VINELAND

BP0489  (0110) LIQUOR LIABILITY COVERAGE....................................467.00
           Aggregate/Ea. Cause Limit: $1,000,000
                  Alcohol Receipts: $60,000

BP0778  (0713) RESTAURANTS.................................................184.00
                  Premises 1, Building 1

BPHG40  (0713) EQUIPMENT BREAKDOWN ENHANCEMENT ENDORSEMENT (MP)...............35.00
```

```
BPHG80   (0713) EMPLOYMENT PRACTICES LIABILITY ENDORSEMENT.....................140.00
         ****THIS COVERAGE IS CLAIMS MADE, READ YOUR POLICY CAREFULLY****
         ****DEFENSE COSTS ARE WITHIN POLICY LIMITS****
                    Each Claim Limit: $100,000
                     Aggregate Limit: $100,000
             Deductible Each Claim: $5,000 Each Claim
                  Retroactive Date: 01/03/2016

ILHG07   (0416) CYBER LIABILITY ENDORSEMENT CLAIMS-MADE &  REPORTED COVERAGE....46.00
         ****THIS COVERAGE IS CLAIMS MADE, READ YOUR POLICY CAREFULLY****
         ****DEFENSE COSTS ARE WITHIN POLICY LIMITS****
                  Retroactive Date: 01/03/2017
```

---
                      COVERAGE EXTENSIONS AND/OR MISCELLANEOUS CHARGES
---
```
    CUSTOMER SEATING.................................................................136.00
                         Premises 1, Building 1
```
---
                        SURCHARGES APPLIED TO THIS POLICY
---
```
NJ Property-Liability Insurance Guaranty Association Surcharge.......................15.00
```
---
                        OTHER CHARGES APPLIED TO THIS POLICY
---
```
Terrorism Risk Insurance Program Reauthorization Act of 2015 - Certified Acts -
Premium Charged......................................................................4.00
Fire Following Exception - Certified Acts of Terrorism - Premium Charged..............1.00
```

```
(5) POLICY: 8171734 2015/10/01-1.00(29)
ISSUE DATE: 09/08/2017 #4
```

## NOTICE OF CANCELLATION, NONRENEWAL OR DECLINATION OF INSURANCE
### (New Jersey)

| | | |
|---|---|---|
| **NAME AND ADDRESS OF INSURANCE COMPANY** | Firstline National Insurance Company<br>200 N. Main Street<br><br>Bel Air     MD     21014<br>Tel: (410) 838-4000 | **KIND OF POLICY:** Businessowners |
| | | **POLICY/APPLICATION/BINDER NO.:** 6171734 |
| | | **EFFECTIVE DATE OF NOTICE:**<br>01/03/2018          12:01 AM<br>(DATE)          (HOUR-STANDARD TIME AT THE ADDRESS OF THE INSURED) |
| | | **DATE OF MAILING:** 11/01/2017 |
| **NAME AND ADDRESS OF INSURED** | LANDIS PIG ROAST LLC<br>623 E LANDIS AVE<br><br>VINELAND     NJ     08360 | **NAME AND ADDRESS OF AGENT/BROKER:** Tel: 8566960700<br>Biondi Insurance Agency, Inc.   (9051-BAS)<br>PO Box 1418<br><br>Vineland          NJ          08362 |

**(Applicable item marked "X")**

**Cancellation**  ☐ You are hereby notified in accordance with the terms and conditions of the above mentioned policy, and in accordance with law, that your insurance will cease at and from the hour and date mentioned above for the **reason(s)** stated in this form.

☐ If your insurance is being cancelled due to nonpayment of premium, cancellation can be avoided by paying the premium due prior to the effective date of cancellation. $ _____ is the amount of premium that was due on _____.

See the "Important Notices" section for other information that may apply.

**Premium Adjustment**
☐ Unearned premium, if any, will be returned to you within 60 days of the effective date of cancellation.
☐ The excess of paid premium, if any, above the pro rata premium for the expired time, (if not tendered) will be refunded upon demand.
☐ A bill for the premium earned to the time of cancellation will be forwarded in due course.
☐ Other: _____

**Nonrenewal**  ☒ You are hereby notified in accordance with the terms and conditions of the above mentioned policy, and in accordance with law, that the above mentioned policy will expire effective at and from the hour and date mentioned above and the policy will NOT be renewed for the reason(s) stated in this form.

See the "Important Notices" section for other information that may apply.

**Declination of Insurance**  ☐ Your application for the kind of insurance mentioned above has been declined.

See the "Important Notices" section for other information that may apply.

**Important Notices**  ☒ Reason(s) for cancellation, nonrenewal or declination (reason(s) stated only if this item is marked):
THE INSURED NO LONGER MEETS UNDERWRITING GUIDELINES DUE TO UNFAVORABLE LOSS EXPERIENCE (100% OVER THE LAST 2 YEARS). THE INSURED'S LOSS RATIO IS CURRENTLY 1,145.32% FOR THE LAST TWO YEAR POLICY TERM (SEE ATTACHED LOSS REPORT.)
_____
_____
_____
_____

☒ **FILING OF COMPLAINT:** If you wish, you may file a written complaint concerning this cancellation or nonrenewal (except in the case of nonpayment of premium) with the New Jersey Department of Banking and Insurance, Division of Enforcement and Consumer Protection, Consumer Inquiry and Case Preparation Unit, 20 West State Street, 9th Floor, P. O. Box 471, Trenton, NJ 08625 or electronically at http://www.state.nj.us/dobi/consumer.htm. Should you decide to file a complaint, the Department should be contacted immediately.

☐ **Automobile Replacement Insurance:** You have been notified herewith that this Company will no longer be carrying your automobile insurance. You are possibly eligible for automobile insurance through another insurer or under the New Jersey Automobile Insurance Plan. Please contact your insurance agent for more information.

☐ **Appeal to Automobile Insurance Plan Governing Committee:** As your policy was one obtained through the New Jersey Automobile Insurance Plan, you are hereby advised, regarding the above notification of cancellation, that you have the right to appeal to the Governing Committee of the Plan, 10000 Midatlantic Drive, Suite 403 West, Mount Laurel, New Jersey 08054.

☐ **Additional Information Regarding the Reason(s) for Cancellation, Nonrenewal or Declination:** You have the right to know the specific items of information that support the reason(s) given for this decision and the identity of the source of that information. You also have the right to see and obtain copies of documents relating to this decision.

If you ask us to correct, amend, or delete any information about you in our files and if we refuse to do so, you have the right to give us a concise statement of what you believe is the correct information. We will put your statement in our file so that anyone reviewing your file will see it.

If you would like additional information concerning this action, state law requires that you submit a written request within ninety (90) business days of the date this notice was mailed to you. Please send your request to:

_____
_____

(Name and address of the person or department to contact for additional information.)

(E)GU 6009k (Ed. 12-14) Wolters Kluwer Financial Services | Uniform Forms™
© 2014 Wolters Kluwer Financial Services          **COMPANY'S COPY**          \*\*\* MORE INFORMATION ON REVERSE SIDE \*\*\*          Page 1 of 2

## NOTICE OF CANCELLATION, NONRENEWAL OR DECLINATION OF INSURANCE
(New Jersey)

| NAME AND ADDRESS OF INSURANCE COMPANY | Firstline National Insurance Company<br>200 N. Main Street<br>Bel Air   MD   21014<br>Tel: (410) 838-4000 | KIND OF POLICY:<br>Businessowners |
|---|---|---|
| | | POLICY/APPLICATION/BINDER NO.: 8171734 |
| | | EFFECTIVE DATE OF NOTICE:<br>01/03/2018 (DATE)    12:01 AM (HOUR-STANDARD TIME AT THE ADDRESS OF THE INSURED) |
| | | DATE OF MAILING: 11/01/2017 |
| NAME AND ADDRESS OF INSURED | LANDIS PIG ROAST LLC<br>623 E LANDIS AVE<br>VINELAND   NJ   08360 | NAME AND ADDRESS OF AGENT/BROKER: Tel: 8566960700<br>Biondi Insurance Agency, Inc.  (9051-BAS)<br>PO Box 1418<br>Vineland   NJ   08362 |

| Important Notices cont'd | ☐ Copy to Designated Third Party: You are hereby notified that a copy of this notice was also sent to the following designated third party: |
|---|---|

(Name and address of the designated third party)

☐ **Consumer Report:** In compliance with the Fair Credit Reporting Act (FCRA), as amended, you are hereby informed that the action taken above is being taken wholly or partly because of information contained in a consumer report from the following consumer reporting agency:

(Name) _____ (Phone Number) _____
(Address) _____

**Please see additional information for a disclosure of your rights under this federal law.**

### Additional Information regarding your rights under the Fair Credit Reporting Act (FCRA)

#### Pursuant to the FCRA, you are informed that:

The consumer reporting agency identified on this form did not make any decisions regarding the stated insurance policy. Therefore, the consumer reporting agency would not be able to provide you with the specific reasons why the insurance company is taking the present action.

You have the right to obtain within 60 days of the receipt of this notice a free copy of your consumer report from the consumer reporting agency which has been identified on this form.

You have the right to dispute inaccurate information by contacting the consumer reporting agency directly. Once you have directly notified the consumer reporting agency of your dispute, the agency must, within a reasonable period of time reinvestigate and record the current status of the disputed information. If after reinvestigation, such information is found to be inaccurate or unverifiable, such information must be promptly deleted from your records. If the reinvestigation does not resolve the dispute, you may file a brief statement setting forth the nature of the dispute with the consumer reporting agency. Your filed statement will then be included or summarized in any subsequent consumer report containing the information in question.

For complete information regarding the FCRA, please refer to The Code of the Laws of the United States of America, Title 15, Chapter 41, Subchapter III, (15 U.S.C. §1681 et seq.).

*Jana C. Williams*

AUTHORIZED REPRESENTATIVE

**UNITED STATES POSTAL SERVICE.**

**Certificate Of Mailing**

To pay fee, affix stamps or meter postage here.

This Certificate of Mailing provides evidence that mail has been presented to USPS® for mailing. This form may be used for domestic and international mail.

From: Firstline National Insurance Company

200 N. Main Street

Bel Air          MD     21014

To: LANDIS PIG ROAST LLC

623 E LANDIS AVE

VINELAND          NJ     08360

Postmark Here

PS Form **3817**, April 2007  PSN 7530-02-000-9065 - Facsimile

**(If notice of cancellation, nonrenewal or declination is mailed to the insured, complete the following.)**

**CERTIFICATION OF MAILING**

I hereby certify that I personally mailed in the U. S. Post Office at the place and time stamped hereon, a notice of cancellation, nonrenewal or declination to the insured, an exact copy attached hereto and at said time received from the U. S. Postal Service the receipt made a part hereof or attached hereto.

Applying to Policy # 8171734

Signed on this Date of Mailing 11/01/2017

Signature

## Policyholders Notice
## Businessowners Equipment Breakdown

Equipment failure due to mechanical or electrical breakdown is more common than fire.

Most of you, our insureds, have equipment and need equipment coverage. Equipment breakdown covers over 1,000 types of equipment including, air conditioning units, telephone systems, refrigeration units, motors, pumps, compressors, data processing equipment, business and communication equipment, electrical equipment, boilers, and much more. It covers this equipment for losses due to mechanical breakdown, steam explosion and electrical arcing.

The Harford Mutual Insurance Company's policy will now automatically include this coverage for a small premium charge. Providing coverage in conjunction with your Businessowners policy enables us to provide this coverage at dramatic savings compared to purchasing a separate policy. The savings generated by not having to issue an extra policy are passed on to you.

In cases where an inspection of your systems is required, this service is provided at no additional cost. If you have questions about this service or require a jurisdictional inspection, please call (approximately 60 days prior to certificate expiration):

**MBR, a business unit of FM Global**
**Jurisdictional Inspection Service Line**
**800-814-4458 X 7896**
**866-594-1257**

As more and more people use computers and electrical devices, our Equipment Breakdown Coverage provides coverage for you where it did not exist before. In addition this protection gives you broader coverage and fewer coverage gaps at a tremendous savings and within one policy. We are excited about being able to offer you this broadened coverage at a very competitive price.

If you have any questions, please do not hesitate to contact your agent.

**No coverage is provided by this notice, nor can it be construed to replace any provision of your policy. You should read your policy and any related endorsements and review your declarations page for complete information on the coverages you are provided. If there is any conflict between the policy and this notice, the provisions of the policy shall prevail.**

BUSINESSOWNERS
BPMS 14-2

# BUSINESSOWNERS ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION EXCLUSIONS

## ADVISORY NOTICE TO POLICYHOLDERS

This Notice does not form part of your policy. No coverage is provided by this Notice nor can it be construed to replace any provision of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided. If there is any conflict between the Policy and this Notice, **THE PROVISIONS OF THE POLICY SHALL PREVAIL.**

Carefully read your policy, including the endorsements attached to your policy.

This Notice provides information concerning the following new endorsements, which applies to your renewal policy being issued by us:

**BP 15 04 05 14 – Exclusion – Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability – With Limited Bodily Injury Exception**

When this endorsement is attached to your policy:

- With respect to liability for Bodily Injury and Property Damage, coverage is excluded for damages arising out of any access to or disclosure of confidential or personal information. This is a reinforcement of coverage.
- With respect to liability for Personal And Advertising Injury, coverage is excluded for personal and advertising injury arising out of any access to or disclosure of confidential or personal information. To the extent that any access or disclosure of confidential or personal information results in an oral or written publication that violates a person's right of privacy, this may result in a reduction in coverage.

**BP 15 05 05 14 – Exclusion – Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability – Limited Bodily Injury Exception Not Included**

When this endorsement is attached to your policy:

- With respect to liability for Bodily Injury and Property Damage, coverage is excluded for damages arising out of any access to or disclosure of confidential or personal information. This is a reinforcement of coverage. However, when this endorsement is attached, it will result in a reduction of coverage due to the deletion of an exception with respect to damages because of bodily injury arising out of loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.
- With respect to liability for Personal And Advertising Injury, coverage is excluded for personal and advertising injury arising out of any access to or disclosure of confidential or personal information. To the extent that any access or disclosure of confidential or personal information results in an oral or written publication that violates a person's right of privacy, this may result in a reduction in coverage.

**BP 15 06 05 14 – Exclusion – Access Or Disclosure Of Confidential Or Personal Information (Personal And Advertising Injury Only)**

When this endorsement is attached to your policy, coverage is excluded for personal and advertising injury arising out of any access to or disclosure of confidential or personal information. To the extent that any access or disclosure of confidential or personal information results in an oral or written publication that violates a person's right of privacy, this may result in a reduction in coverage.



# THE HARFORD MUTUAL INSURANCE COMPANIES

*Fire and Casualty Insurance*

THE HARFORD MUTUAL INSURANCE COMPANY
FIRSTLINE NATIONAL INSURANCE COMPANY

200 N. Main Street
Bel Air, Maryland 21014-3544

PHONE 1-410-838-4000
FAX NO. 1-410-838-8676

## ADVISORY NOTICE TO POLICYHOLDERS

### LEAD LIABILITY COVERAGE
### (APPLIES ONLY IN NEW JERSEY)
### BP0478

**NO COVERAGE IS PROVIDED BY THIS POLICYHOLDER NOTICE NOR CAN IT BE CONSTRUED TO REPLACE ANY PROVISIONS OF YOUR POLICY. IT HAS BEEN PREPARED TO MAKE YOU AWARE OF CERTAIN CHANGES IN COVERAGE PROVIDED BY YOUR POLICY FOR CLAIMS OR SUITS ARISING OUT OF THE DISPERSAL, RELEASE, INGESTION, INHALATION OR ABSORPTION OF LEAD. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE FOR COMPLETE INFORMATION ON THE COVERAGES YOU ARE PROVIDED. IF THERE IS ANY CONFLICT BETWEEN THE POLICY AND THIS SUMMARY, THE PROVISIONS OF THE POLICY SHALL PREVAIL.**

### PLEASE READ YOUR POLICY, AND THE ENDORSEMENTS ATTACHED TO YOUR POLICY, CAREFULLY.

Form BP0478 has been attached to your policy. This endorsement **excludes** coverage for any injury, damage, loss, cost, payment or expense arising out of, resulting from, caused by or contributed to by the actual or alleged presence or actual alleged or threatened dispersal, release, ingestion, inhalation or absorption of lead, lead compounds or lead which is or was contained or incorporated into any material or substance. This exclusion **will not apply** to injury or damage arising out of any building or premises which is constructed in or after 1978 or which has been certified as being free of existing lead hazards pursuant to standards established by the Department of Community Affairs.

If you own, manage, or are otherwise responsible for buildings or premises which were constructed prior to 1978, you are responsible for ensuring that those premises are certified as being free of existing lead hazards pursuant to the standards established by the Department of Community Affairs. If you fail to obtain such certification, you will have **no coverage** for any injury, damage, loss, cost, payment or expense arising out of, resulting from, caused by or contributed to by the actual or alleged presence or actual, alleged or threatened dispersal, release, ingestion, inhalation or absorption of lead, lead compounds or lead which is or was contained or incorporated into any material or substance.

Includes Copyrighted Material of Insurance Services Office, Inc.
with its permission. Copyright, Insurance Services Office, Inc.

BPNJ00-1 04 00

**Flood Insurance Notice**

We are advising you that your policy does **NOT** provide coverage for flood. You will **NOT** have coverage for property damage due to flood, surface water, waves, tidal water, or any other overflow of a body of water unless you take steps to purchase a separate policy for Flood Insurance.

This Notice does not expand or increase coverage in your policy or any endorsement to that policy. The policy and accompanying endorsements remain subject to all exclusions, limitations and conditions.

If you would like more information about obtaining flood insurance, please contact your insurer, your insurance agent or you can contact the National Flood Insurance Program direct. If a flood policy is purchased through the National Flood Insurance Program, contents coverage may be available for an additional premium. For more information about the National Flood Insurance Program call 1-888-CALL-FLOOD ext. 445, TDD# 1-800-427-5593 or access their website at http://www.fema.gov/nfip/

Company:

**The Harford Mutual Insurance Companies**
Bel Air, Maryland 21014-3544

Policy Number:                Renewal of:

Named Insured and Mailing Address                Agency Name and Address

# POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

Applicable to the following policies and coverages if included:

Commercial Property, Commercial Liability, Commercial Inland Marine, Commercial Crime, excluding Theft & Burglary, Businessowners Policies, and Commercial Umbrella Policies

Coverage for acts of terrorism is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security, and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% beginning on 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of terrorism included in this policy is $_____ and does not include any charges for the portion of losses covered by the United States government under the Act.

## REJECTION OF TERRORISM INSURANCE

UNDER FEDERAL LAW, YOU HAVE THIRTY (30) DAYS TO CONSIDER THIS OFFER OF COVERAGE FOR TERRORIST ACTS. YOU MAY REJECT COVERAGE BY SIGNING THE STATEMENT BELOW AND RETURNING THIS NOTICE. ONCE WE RECEIVE THE SIGNED REJECTION STATEMENT, TERRORISM EXCLUSIONS WILL BE ADDED TO YOUR POLICY AND YOU WILL NOT BE COVERED FOR LOSSES ARISING FROM TERRORIST ACTS.

☐  I hereby decline to purchase terrorism coverage for certified acts of terrorism. I understand that I will have no coverage for losses resulting from certified acts of terrorism under this policy.

_____        _____        _____
Signature of Policyholder                Printed Name of Policyholder                Date

This policyholder notice provides no coverage nor can it be construed to replace any provision of your policy. The coverage provided by your policy for certified acts of terrorism and all other coverage is limited by the exclusions, limits, terms and conditions of your policy. If there is any conflict between the policy and this notice, the provisions of the policy shall prevail. Nothing in this notice should be construed as an offer to reinstate coverage for a cancelled/expired policy.

ILMS003 0115                                        Page 1 or 1

## ADVISORY NOTICE TO POLICYHOLDERS

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

**NO COVERAGE IS PROVIDED BY THIS POLICYHOLDER NOTICE NOR CAN IT BE CONSTRUED TO REPLACE ANY PROVISIONS OF YOUR POLICY. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE FOR COMPLETE INFORMATION ON THE COVERAGES YOU ARE PROVIDED.**

**THIS NOTICE PROVIDES INFORMATION CONCERNING POSSIBLE IMPACT ON YOUR INSURANCE COVERAGE DUE TO DIRECTIVES ISSUED BY OFAC.**

### PLEASE READ THIS NOTICE CAREFULLY

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- ➢ Foreign agents;
- ➢ Front organizations;
- ➢ Terrorists;
- ➢ Terrorist organizations; and
- ➢ Narcotics traffickers;

As "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site - http://www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

# PROTECTIVE SAFEGUARD ENDORSEMENT
# ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this policyholder notice nor can it be construed to replace any provisions of your policy or endorsements. You should read your policy and review your Declaration Page for complete information on the coverages you are provided. If there is any conflict between the policy and this summary, **THE PROVISIONS OF THE POLICY SHALL PREVAIL.**

## PROTECTIVE SAFEGUARD ENDORSEMENT

Please be advised that your policy contains a protective safeguard endorsement which could apply to your automatic sprinkler system, central station fire alarm, fire detection or suppression system or any other protective device or service listed in the endorsement. Because your policy may include a reduced premium for having this additional protection, you are required to maintain the protective devices or services listed in the endorsement as a condition to your policy.

This means that we will not pay for loss or damage caused by or resulting from fire, if prior to the loss, you 1) knew of any suspension or impairment in the protective safeguard listed in the endorsement and failed to notify the agent or company; or 2) failed to maintain any protective safeguard listed in the endorsement in complete working order if you had control to do so.

Please make sure that you have the proper maintenance in place to keep these systems and services in good working order and that you also have the proper controls in place to notify the agent or company immediately when they become inoperable or are discontinued.

# POLICYHOLDER NOTICE REGARDING
# CYBER LIABILITY COVERAGE

**CAUTION:** No coverage is provided by this notice; nor can it be construed to replace any provision of your policy. You should read your policy and review your Declarations Page for complete information on the coverages you are provided. If there is a conflict between the policy and this notice, THE PROVISIONS OF THE POLICY SHALL PREVAIL. PLEASE READ YOUR POLICY CAREFULLY.

Your renewal policy includes a new endorsement for Cyber Liability that covers losses resulting from a claim for an actual or alleged wrongful act and first party costs resulting from a first party insured event, as defined in your policy . Under this coverage, you have 60 days to report a claim once it has become known to you. This coverage is explained in your policy. Please read the new coverage endorsement carefully to understand this coverage.

Your renewal premium will also include a premium for this new endorsement. By accepting this policy you are consenting to this coverage enhancement. If you have questions about this coverage, or would like this coverage removed, please contact your agent at the phone number provided on your policy.

---

## MANAGING CYBER SECURITY RISK

With the purchase of CYBER LIABILITY COVERAGE through Harford Mutual, you have **FREE** and **UNLIMITED** access to a Cyber Security Risk Management Website to help you manage the many exposures to your business and reduce or prevent costly claims.

 **WEBSITE:** www.HarfordMutualCyber.com
 **CODE:** HARFORDCYBER01

# NOTICE REGARDING CLAIMS-MADE LIABILITY COVERAGE ON YOUR POLICY

**CAUTION:** No coverage is provided by this notice; nor can it be construed to replace any provision of your policy. You should read your policy and review your Declarations Page for complete information on the coverages you are provided. If there is a conflict between the policy and this notice, THE PROVISIONS OF THE POLICY SHALL PREVAIL. PLEASE READ YOUR POLICY CAREFULLY.

You have purchased a claims-made liability coverage on this insurance policy. Please read this policy carefully to understand your coverage. There are certain circumstances in which you must be provided the opportunity to purchase an extended reporting period for reporting claims. These are explained in your policy. If you have any questions regarding the cost of an extended reporting period or the available options under the extended reporting period, please contact your insurance company or your insurance agent.

**ILMS014 0416**                                                                 **Page 1 of 1**



### HARFORD MUTUAL
COMMITTED TO MUTUAL SUCCESS

## Customer Privacy Policy

Since 1842, Harford Mutual Insurance Company has been committed to the mutual success of our policyholders, agencies and local community. It is because of this commitment that we are dedicated to protecting the confidentiality of our customers' Nonpublic Personal Information (NPI). We take this opportunity to share our procedures and policies designed to safeguard your information, which may be obtained in the course of our business relationship with you.

This notice serves to explain: what type of information we collect; how we collect it; what we do with it after we collect it; how we safeguard your privacy; and how you may obtain information, if any, about your NPI. We will inform you concerning these policies in this notice and every year that you remain our customer.

### Our Privacy Policy
- We do not sell your NPI.
- We do not share your NPI with nonaffiliated third parties other than as necessary to service your policy or claim.
- We do not share your health or financial information, except as authorized by law.
- We use your NPI only to service your policies, claims and to meet your needs as they have been described to us.
- We will require that persons or organizations providing goods or services to you on our behalf protect the confidentiality of your NPI.
- We protect your NPI regardless of whether you are a current or a former customer.
- We maintain physical, electronic and procedural safeguards to protect your NPI from disclosure.

### How We Collect Information
We collect and retain information about you to provide you with the coverage, product, or service you request, or to service your account as permitted by law, and as needed to conduct business. We collect your NPI from the following sources:
- Your application for insurance or similar forms;
- Consumer reporting agencies, motor vehicle records, credit reports, claims history, loss information reports, court records or other public records; property inspections to verify value and condition for property insurance; or
- Your insurance agent.

### Information We Collect About You
Harford Mutual gets most of its information from your application for insurance or from your insurance agent. This includes, for example, your name; address; social security number; financial account or credit card information; vehicle type; credit based insurance score; a report about your coverage and claims history with other companies and motor vehicle records, to name a few.

For property and liability insurance, we may send someone to inspect your property and verify the value and condition of your property. A photo of any property to be insured may be taken and retained. We may also obtain reports concerning the square footage of your property from companies that collect such data.

For workers' compensation insurance, we may send someone to perform an audit or accounting of your business records to ensure that you are getting the appropriate premium charge.

### What We Do With the Information Collected
Harford Mutual uses your information only as permitted by law. We may use your information to: service products you have purchased; underwrite your policy; process claims; protect against fraud; and comply with legal requirements.

Information collected is maintained in either our policy records or in your agent's files. We may review it to evaluate requests for insurance coverage or to determine your insurance rates. Your information may also be used to decide whether to issue a renewal policy or settle a claim.

If coverage is declined, or if your rates increase because of information we received from a consumer report, we will tell you as required by the Fair Credit Reporting Act.

ILMSO16 1015

Page 1 of 2

## Information Disclosure

We will not disclose information about you without your written consent unless the disclosure is necessary to conduct our business. By law, we can share information about you without your permission under certain circumstances to certain people and organizations. Examples include:

- Our affiliated companies.
- Independent claim adjusters, appraisers, contractors, auto repair shops, investigators and attorneys in order to investigate, defend or settle a claim involving you.
- Your agent.
- Mortgagees, lienholders, lessors, loss payees, or other persons shown on our records as having a legal or beneficial interest in your policy or claim proceeds.
- Consultants or other service providers that perform business functions for us such as mailing or marketing services.
- Our reinsurance companies.
- Businesses that conduct research for us such as actuarial or underwriting studies.
- Other insurance companies.
- Consumer reporting agencies in connection with any application, policy or claim involving you.
- Insurance support organizations that collect information to detect and prevent insurance crimes or fraud.
- Medical care institutions or professionals to verify coverage or claims-related services.
- Insurance regulatory agencies in connection with the regulation of our business.
- Law enforcement or other governmental authorities.
- By order of subpoena, warrant or other court order as required by law.

We do not otherwise give information about you to people or organizations that would use the information to contact you about their product or services.

## How We Protect Your Information

Harford Mutual maintains physical, electronic and procedural safeguards to protect your NPI. Access to customer records is restricted to employees with a business reason for knowing such information in order to provide products and services to you. Employees are trained to protect customer privacy by adhering to the privacy responsibilities outlined by the company. Should you cease being a customer, we will continue to protect your personal information in the same manner. At Harford Mutual, our employees are responsible for upholding a Code of Conduct and Confidentiality policy that requires them to keep confidential all NPI obtained in the course of our business.

## Your Rights

You have the right to know what information we have about you and to receive a copy upon request. Despite your request, we may not be able to disclose certain types of information collected when evaluating claims or possible lawsuits. In this regard, we will not send you any medical information we have received about you from a doctor or other health care provider due to certain health information protection laws. Rather, you should contact the doctor or health care provider directly to obtain this information.

Also, we will not send you any reports provided by any consumer reporting agency. Instead, we will give you the name and address of any consumer reporting agency that prepared the report about you, so that you can contact them for a copy.

To submit your request for other types of information, please send your complete name, address and policy number to:

Harford Mutual Insurance Company
Privacy Inquiries
Office of General Counsel & Director of Compliance
200 North Main Street
Bel Air, MD 21014

Within thirty (30) business days of receipt of your written request, we will disclose to you the NPI about you in our files. You may receive a copy at a reasonable charge. We will tell you with whom we have shared your NPI within the past two (2) years, or for the time period required by state law. If you believe your file should be corrected, please contact us in writing with the request. We will make the change or provide an explanation of our refusal to do so.

Thank you for choosing Harford Mutual for your insurance protection. We work hard to preserve the confidentiality of your nonpublic personal information.

Our longstanding commitment to preserving your privacy continues, as does our dedication to providing personal service aimed at ensuring our mutual success. We have been in business to accomplish this goal since 1842.

IL N 001 09 03

# FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

 © ISO Properties, Inc., 2003

# NEW JERSEY EARTHQUAKE INSURANCE
## AVAILABILITY NOTICE

All insureds and applicants are cautioned that commercial property insurance policies do not provide coverage for earthquake damage.

The definition of an *earthquake*:

- is a shaking or trembling of the earth that is geologic or tectonic in nature;
- includes shock waves or tremors before, during or after a volcanic eruption; and
- can also include after-shocks that occur within a seventy-two hour period following an *earthquake*.

A typical policy covering commercial property:

- **does not** cover the cost to replace or repair your damaged building, premises or structures, such as garages, resulting from *earthquake*;
- **does not** cover the cost to replace or repair the contents of your business if the damages result from an *earthquake*; and
- **does not** pay for additional business expenses if your property is badly damaged or destroyed by an *earthquake*.

**Earthquake insurance is available through an endorsement to your policy for an additional premium. The decision to purchase earthquake insurance is one that should be carefully considered based on individual circumstances.**

Historically, an earthquake in New Jersey is a rare event, although the possibility exists that it could happen. Over the five-year period from 1997-2002, for every $1 of *earthquake* insurance premium, 3/10 of one cent has been paid out for losses.

**Please contact your agent listed below if you have any questions or want additional information on how you can obtain *earthquake* insurance.**

**This notice is a general description of coverage and does not change, modify or invalidate any of the provisions, terms or conditions of your policy or endorsements.**

**Agent Name, Address & Phone Number:**

Case 1:19-cv-01627-RBM-SBA Document 52-1 Filed 07/29/19 Page 34 of 235 Page 45 of 235
PageID: 457

# BUSINESSOWNERS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Form, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

In Section II – Liability, the word "insured" means any person or organization qualifying as such under Paragraph **C.** Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Paragraph **H.** Property Definitions in Section **I** – Property and Paragraph **F.** Liability And Medical Expenses Definitions in Section **II** – Liability.

## SECTION I – PROPERTY

### A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

#### 1. Covered Property

Covered Property includes Buildings as described under Paragraph **a.** below, Business Personal Property as described under Paragraph **b.** below, or both, depending on whether a Limit Of Insurance is shown in the Declarations for that type of property. Regardless of whether coverage is shown in the Declarations for Buildings, Business Personal Property, or both, there is no coverage for property described under Paragraph **2.** Property Not Covered.

a. Buildings, meaning the buildings and structures at the premises described in the Declarations, including:

(1) Completed additions;

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed:

(a) Machinery; and

(b) Equipment;

(4) Your personal property in apartments, rooms or common areas furnished by you as landlord;

(5) Personal property owned by you that is used to maintain or service the buildings or structures or the premises, including:

(a) Fire extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings; and

(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(6) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to the buildings or structures;

(b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the buildings or structures.

b. Business Personal Property located in or on the buildings or structures at the described premises or in the open (or in a vehicle) within 100 feet of the buildings or structures or within 100 feet of the premises described in the Declarations, whichever distance is greater, including:

(1) Property you own that is used in your business;

(2) Property of others that is in your care, custody or control, except as otherwise provided in Loss Payment Property Loss Condition Paragraph **E.5.d.(3)(b);**

(3) Tenant's improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

(a) Made a part of the building or structure you occupy but do not own; and

(b) You acquired or made at your expense but cannot legally remove;

(4) Leased personal property which you have a contractual responsibility to insure, unless otherwise provided for under Paragraph **1.b.(2);** and

(5) Exterior building glass, if you are a tenant and no Limit Of Insurance is shown in the Declarations for Building property. The glass must be owned by you or in your care, custody or control.

## 2. Property Not Covered

Covered Property does not include:

a. Aircraft, automobiles, motortrucks and other vehicles subject to motor vehicle registration;

b. "Money" or "securities" except as provided in the:

    (1) Money And Securities Optional Coverage; or

    (2) Employee Dishonesty Optional Coverage;

c. Contraband, or property in the course of illegal transportation or trade;

d. Land (including land on which the property is located), water, growing crops or lawns (other than lawns which are part of a vegetated roof);

e. Outdoor fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants (other than trees, shrubs or plants which are part of a vegetated roof), all except as provided in the:

    (1) Outdoor Property Coverage Extension; or

    (2) Outdoor Signs Optional Coverage;

f. Watercraft (including motors, equipment and accessories) while afloat;

g. Accounts, bills, food stamps, other evidences of debt, accounts receivable or "valuable papers and records"; except as otherwise provided in this policy;

h. "Computer(s)" which are permanently installed or designed to be permanently installed in any aircraft, watercraft, motortruck or other vehicle subject to motor vehicle registration. This paragraph does not apply to "computer(s)" while held as "stock";

i. "Electronic data", except as provided under Additional Coverages — Electronic Data. This Paragraph i. does not apply to your "stock" of prepackaged software or to "electronic data" which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system; or

j. Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings.

## 3. Covered Causes Of Loss

Direct physical loss unless the loss is excluded or limited under Section I -- Property.

## 4. Limitations

a. We will not pay for loss of or damage to:

    (1) Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

    (2) Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

    (3) Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property. This limitation does not apply to the Optional Coverage for Money and Securities.

    (4) Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

    (5) The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

        (a) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

© Insurance Services Office, Inc., 2012

BP 00 03 07 13

(b) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

(6) Lawns, trees, shrubs or plants which are part of a vegetated roof, caused by or resulting from:

    (a) Dampness or dryness of atmosphere or of soil supporting the vegetation;

    (b) Changes in or extremes of temperature;

    (c) Disease;

    (d) Frost or hail; or

    (e) Rain, snow, ice or sleet.

b. We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

(1) Animals, and then only if they are killed or their destruction is made necessary.

(2) Fragile articles such as glassware, statuary, marble, chinaware and porcelain, if broken. This restriction does not apply to:

    (a) Glass that is part of the exterior or interior of a building or structure;

    (b) Containers of property held for sale; or

    (c) Photographic or scientific instrument lenses.

c. For loss or damage by theft, the following types of property are covered only up to the limits shown (unless a higher Limit Of Insurance is shown in the Declarations):

(1) $2,500 for furs, fur garments and garments trimmed with fur.

(2) $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semiprecious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

(3) $2,500 for patterns, dies, molds and forms.

**5. Additional Coverages**

  **a. Debris Removal**

    (1) Subject to Paragraphs **(2)**, **(3)** and **(4)**, we will pay your expense to remove debris of Covered Property and other debris that is on the described premises, when such debris is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

    (2) Debris Removal does not apply to costs to:

      (a) Remove debris of property of yours that is not insured under this policy, or property in your possession that is not Covered Property;

      (b) Remove debris of property owned by or leased to the landlord of the building where your described premises are located, unless you have a contractual responsibility to insure such property and it is insured under this policy;

      (c) Remove any property that is Property Not Covered, including property addressed under the Outdoor Property Coverage Extension;

      (d) Remove property of others of a type that would not be Covered Property under this policy;

      (e) Remove deposits of mud or earth from the grounds of the described premises;

      (f) Extract "pollutants" from land or water; or

      (g) Remove, restore or replace polluted land or water.

    (3) Subject to the exceptions in Paragraph **(4),** the following provisions apply:

      (a) The most that we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

Case 1:19-cv-01607-RMB-SAK Document 52-1 Filed 07/09/14 Page 37 of 53 PageID: 47
PageID: 460

(b) Subject to Paragraph (3)(a) above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage. However, if no Covered Property has sustained direct physical loss or damage, the most we will pay for removal of debris of other property (if such removal is covered under this Additional Coverage) is $5,000 at each location.

(4) We will pay up to an additional $25,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

(a) The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

(b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if Paragraphs (4)(a) and/or (4)(b) apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $25,000.

(5) **Examples**

**Example 1**

| Limit of Insurance | $ 90,000 |
|---|---|
| Amount of Deductible | $ 500 |
| Amount of Loss | $ 50,000 |
| Amount of Loss Payable | $ 49,500 |
| | ($50,000 – $500) |
| Debris Removal Expense | $ 10,000 |
| Debris Removal Expense Payable | $ 10,000 |
| ($10,000 is 20% of $50,000) | |

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore, the full amount of debris removal expense is payable in accordance with the terms of Paragraph (3).

**Example 2**

| Limit of Insurance | $ 90,000 |
|---|---|
| Amount of Deductible | $ 500 |
| Amount of Loss | $ 80,000 |
| Amount of Loss Payable | $ 79,500 |
| | ($80,000 – $500) |
| Debris Removal Expense | $ 40,000 |
| Debris Removal Expense Payable | |
| Basic Amount | $ 10,500 |
| Additional Amount | $ 25,000 |

The basic amount payable for debris removal expense under the terms of Paragraph (3) is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph (4), because the debris removal expense ($40,000) exceeds 25% of the loss payable plus the deductible ($40,000 is 50% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $40,000 = $119,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $25,000, the maximum payable under Paragraph (4). Thus, the total payable for debris removal expense in this example is $35,500; $4,500 of the debris removal expense is not covered.

 © Insurance Services Office, Inc., 2012

b. **Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

(1) While it is being moved or while temporarily stored at another location; and

(2) Only if the loss or damage occurs within 30 days after the property is first moved.

c. **Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $2,500 for service at each premises described in the Declarations, unless a different limit is shown in the Declarations. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

This Additional Coverage applies to your liability for fire department service charges:

(1) Assumed by contract or agreement prior to loss; or

(2) Required by local ordinance.

d. **Collapse**

The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse as described and limited in Paragraphs **d.(1)** through **d.(7)**.

(1) For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

(2) We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this policy or that contains Covered Property insured under this policy, if such collapse is caused by one or more of the following:

(a) Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

(b) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

(c) Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

(d) Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

(i) A cause of loss listed in Paragraph **(2)(a)** or **(2)(b)**;

(ii) One or more of the "specified causes of loss";

(iii) Breakage of building glass;

(iv) Weight of people or personal property; or

(v) Weight of rain that collects on a roof.

(3) This Additional Coverage – Collapse does **not** apply to:

(a) A building or any part of a building that is in danger of falling down or caving in;

(b) A part of a building that is standing, even if it has separated from another part of the building; or

(c) A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(4) With respect to the following property:

(a) Awnings;

(b) Gutters and downspouts;

(c) Yard fixtures;

(d) Outdoor swimming pools;

(e) Piers, wharves and docks;

(f) Beach or diving platforms or appurtenances;

(g) Retaining walls; and

(h) Walks, roadways and other paved surfaces;

© Insurance Services Office, Inc., 2012

if an abrupt collapse is caused by a cause of loss listed in Paragraphs (2)(a) through (2)(d), we will pay for loss or damage to that property only if such loss or damage is a direct result of the abrupt collapse of a building insured under this policy and the property is Covered Property under this policy.

(5) If personal property abruptly falls down or caves in and such collapse is not the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

(a) The collapse of personal property was caused by a cause of loss listed in Paragraphs (2)(a) through (2)(d) of this Additional Coverage;

(b) The personal property which collapses is inside a building; and

(c) The property which collapses is not of a kind listed in Paragraph (4), regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph (5) does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

(6) This Additional Coverage – Collapse does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(7) This Additional Coverage – Collapse will not increase the Limits of Insurance provided in this policy.

(8) The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in Paragraphs d.(1) through d.(7).

### e. Water Damage, Other Liquids, Powder Or Molten Material Damage

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

We will not pay the cost to repair any defect that caused the loss or damage, but we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

(1) Results in discharge of any substance from an automatic fire protection system; or

(2) Is directly caused by freezing.

### f. Business Income

(1) Business Income

(a) We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of a building, your premises mean:

(i) The portion of the building which you rent, lease or occupy;

(ii) The area within 100 feet of the building or within 100 feet of the premises described in the Declarations, whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

(iii) Any area within the building or at the described premises, if that area services, or is used to gain access to, the portion of the building which you rent, lease or occupy.

© Insurance Services Office, Inc., 2012

(b) We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage. We will only pay for ordinary payroll expenses for 60 days following the date of direct physical loss or damage, unless a greater number of days is shown in the Declarations.

(c) Business Income means the:

    (i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

    (ii) Continuing normal operating expenses incurred, including payroll.

(d) Ordinary payroll expenses:

    (i) Means payroll expenses for all your employees except:

        i. Officers;

        ii. Executives;

        iii. Department Managers;

        iv. Employees under contract; and

        v. Additional Exemptions shown in the Declarations as:

            ● Job Classifications; or

            ● Employees.

    (ii) Include:

        i. Payroll;

        ii. Employee benefits, if directly related to payroll;

        iii. FICA payments you pay;

        iv. Union dues you pay; and

        v. Workers' compensation premiums.

(2) Extended Business Income

    (a) If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

        (i) Begins on the date property except finished stock is actually repaired, rebuilt or replaced and "operations" are resumed; and

        (ii) Ends on the earlier of:

            i. The date you could restore your "operations", with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage had occurred; or

            ii. 60 consecutive days after the date determined in Paragraph (a)(i) above, unless a greater number of consecutive days is shown in the Declarations.

    However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

    (b) Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

(3) With respect to the coverage provided in this Additional Coverage, suspension means:

    (a) The partial slowdown or complete cessation of your business activities; or

    (b) That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

(4) This Additional Coverage is not subject to the Limits of Insurance of Section I – Property.

g. **Extra Expense**

(1) We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of a building, your premises mean:

(a) The portion of the building which you rent, lease or occupy;

(b) The area within 100 feet of the building or within 100 feet of the premises described in the Declarations, whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

(c) Any area within the building or at the described premises, if that area services, or is used to gain access to, the portion of the building which you rent, lease or occupy.

(2) Extra Expense means expense incurred:

(a) To avoid or minimize the suspension of business and to continue "operations":

(i) At the described premises; or

(ii) At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.

(b) To minimize the suspension of business if you cannot continue "operations".

(c) To:

(i) Repair or replace any property; or

(ii) Research, replace or restore the lost information on damaged "valuable papers and records";

to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage f. Business Income.

(3) With respect to the coverage provided in this Additional Coverage, suspension means:

(a) The partial slowdown or complete cessation of your business activities; or

(b) That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

(4) We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance of Section I – Property.

h. **Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay for each location under this Additional Coverage is $10,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

 © Insurance Services Office, Inc., 2012 BP 00 03 07 13

### i. Civil Authority

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

(2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for necessary Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

(1) Four consecutive weeks after the date of that action; or

(2) When your Civil Authority Coverage for Business Income ends;

whichever is later.

The definitions of Business Income and Extra Expense contained in the Business Income and Extra Expense Additional Coverages also apply to this Civil Authority Additional Coverage. The Civil Authority Additional Coverage is not subject to the Limits of Insurance of Section I – Property.

### j. Money Orders And "Counterfeit Money"

We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

(1) Money orders issued by any post office, express company or bank that are not paid upon presentation; or

(2) "Counterfeit money" that is acquired during the regular course of business.

The most we will pay for any loss under this Additional Coverage is $1,000.

### k. Forgery Or Alteration

(1) We will pay for loss resulting directly from forgery or alteration of any check, draft, promissory note, bill of exchange or similar written promise of payment in "money" that you or your agent has issued, or that was issued by someone who impersonates you or your agent.

(2) If you are sued for refusing to pay the check, draft, promissory note, bill of exchange or similar written promise of payment in "money", on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur in that defense.

(3) For the purpose of this coverage, check includes a substitute check as defined in the Check Clearing for the 21st Century Act and will be treated the same as the original it replaced.

(4) The most we will pay for any loss, including legal expenses, under this Additional Coverage is $2,500, unless a higher Limit Of Insurance is shown in the Declarations.

### l. Increased Cost Of Construction

(1) This Additional Coverage applies only to buildings insured on a replacement cost basis.

(2) In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with the minimum standards of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in Paragraphs (3) through (9) of this Additional Coverage.

 © Insurance Services Office, Inc., 2012

(3) The ordinance or law referred to in Paragraph (2) of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises and is in force at the time of loss.

(4) Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

    (a) You were required to comply with before the loss, even when the building was undamaged; and

    (b) You failed to comply with.

(5) Under this Additional Coverage, we will not pay for:

    (a) The enforcement of or compliance with any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot; or

    (b) Any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungi", wet rot or dry rot.

(6) The most we will pay under this Additional Coverage, for each described building insured under Section I – Property, is $10,000. If a damaged building(s) is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for each damaged building, is $10,000.

The amount payable under this Additional Coverage is additional insurance.

(7) With respect to this Additional Coverage:

    (a) We will not pay for the Increased Cost of Construction:

        (i) Until the property is actually repaired or replaced, at the same or another premises; and

        (ii) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

    (b) If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction is the increased cost of construction at the same premises.

    (c) If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction is the increased cost of construction at the new premises.

(8) This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion, to the extent that such exclusion would conflict with the provisions of this Additional Coverage.

(9) The costs addressed in the Loss Payment Property Loss Condition in Section I – Property do not include the increased cost attributable to enforcement of or compliance with an ordinance or law. The amount payable under this Additional Coverage, as stated in Paragraph (6) of this Additional Coverage, is not subject to such limitation.

**m. Business Income From Dependent Properties**

(1) We will pay for the actual loss of Business Income you sustain due to physical loss or damage at the premises of a dependent property or secondary dependent property caused by or resulting from any Covered Cause of Loss.

 © Insurance Services Office, Inc., 2012

However, this Additional Coverage does not apply when the only loss at the premises of a dependent property or secondary dependent property is loss or damage to "electronic data", including destruction or corruption of "electronic data". If the dependent property or secondary dependent property sustains loss or damage to "electronic data" and other property, coverage under this Additional Coverage will not continue once the other property is repaired, rebuilt or replaced.

The most we will pay under this Additional Coverage is $5,000 unless a higher Limit Of Insurance is indicated in the Declarations.

(2) We will reduce the amount of your Business Income loss, other than Extra Expense, to the extent you can resume "operations", in whole or in part, by using any other available:

   (a) Source of materials; or

   (b) Outlet for your products.

(3) If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

(4) Dependent property means property owned by others whom you depend on to:

   (a) Deliver materials or services to you, or to others for your account. But services does not mean water supply services, wastewater removal services, communication supply services or power supply services;

   (b) Accept your products or services;

   (c) Manufacture your products for delivery to your customers under contract for sale; or

   (d) Attract customers to your business.

The dependent property must be located in the coverage territory of this policy.

(5) Secondary dependent property means an entity which is not owned or operated by a dependent property and which;

   (a) Delivers materials or services to a dependent property, which in turn are used by the dependent property in providing materials or services to you; or

   (b) Accepts materials or services from a dependent property, which in turn accepts your materials or services.

A road, bridge, tunnel, waterway, airfield, pipeline or any other similar area or structure is not a secondary dependent property.

Any property which delivers any of the following services is not a secondary dependent property with respect to such services:

   (i) Water supply services;

   (ii) Wastewater removal services;

   (iii) Communication supply services; or

   (iv) Power supply services.

The secondary dependent property must be located in the coverage territory of this policy.

(6) The coverage period for Business Income under this Additional Coverage:

   (a) Begins 72 hours after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the premises of the dependent property or secondary dependent property; and

   (b) Ends on the date when the property at the premises of the dependent property or secondary dependent property should be repaired, rebuilt or replaced with reasonable speed and similar quality.

(7) The Business Income coverage period, as stated in Paragraph (6), does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

   (a) Regulates the construction, use or repair, or requires the tearing down of any property; or

   (b) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not reduce the Business Income coverage period.

(8) The definition of Business Income contained in the Business Income Additional Coverage also applies to this Business Income From Dependent Properties Additional Coverage.

**n. Glass Expenses**

(1) We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

(2) We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

**o. Fire Extinguisher Systems Recharge Expense**

(1) We will pay:

(a) The cost of recharging or replacing, whichever is less, your fire extinguishers and fire extinguishing systems (including hydrostatic testing if needed) if they are discharged on or within 100 feet of the described premises; and

(b) For loss or damage to Covered Property if such loss or damage is the result of an accidental discharge of chemicals from a fire extinguisher or a fire extinguishing system.

(2) No coverage will apply if the fire extinguishing system is discharged during installation or testing.

(3) The most we will pay under this Additional Coverage is $5,000 in any one occurrence.

**p. Electronic Data**

(1) Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore "electronic data" which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that "electronic data" is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the "electronic data" was stored, with blank media of substantially identical type.

(2) The Covered Causes of Loss applicable to Business Personal Property include a computer virus, harmful code or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including "electronic data") by any employee, including a temporary or leased employee, or by an entity retained by you, or for you, to inspect, design, install, modify, maintain, repair or replace that system.

(3) The most we will pay under this Additional Coverage – Electronic Data for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved, is $10,000, unless a higher Limit Of Insurance is shown in the Declarations. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in, but not after, that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

(4) This Additional Coverage does not apply to your "stock" of prepackaged software, or to "electronic data" which is integrated in and operates or controls a building's elevator, lighting, heating, ventilation, air conditioning or security system.

**q. Interruption Of Computer Operations**

(1) Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a suspension of "operations" caused by an interruption in computer operations due to destruction or corruption of "electronic data" due to a Covered Cause of Loss.

© Insurance Services Office, Inc., 2012

(2) With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

(a) Coverage under this Additional Coverage – Interruption Of Computer Operations is limited to the "specified causes of loss" and Collapse.

(b) If the Businessowners Coverage Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage.

(c) The Covered Causes of Loss include a computer virus, harmful code or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including "electronic data") by any employee, including a temporary or leased employee, or by an entity retained by you, or for you, to inspect, design, install, modify, maintain, repair or replace that system.

(3) The most we will pay under this Additional Coverage – Interruption Of Computer Operations for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved, is $10,000 unless a higher Limit Of Insurance is shown in the Declarations. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

(4) This Additional Coverage – Interruption Of Computer Operations does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in (3) above has not been exhausted.

(5) Coverage for Business Income does not apply when a suspension of "operations" is caused by destruction or corruption of "electronic data", or any loss or damage to "electronic data", except as provided under Paragraphs (1) through (4) of this Additional Coverage.

© Insurance Services Office, Inc., 2012

(6) Coverage for Extra Expense does not apply when action is taken to avoid or minimize a suspension of "operations" caused by destruction or corruption of "electronic data", or any loss or damage to "electronic data", except as provided under Paragraphs **(1)** through **(4)** of this Additional Coverage.

(7) This Additional Coverage does not apply when loss or damage to "electronic data" involves only "electronic data" which is integrated in and operates or controls a building's elevator, lighting, heating, ventilation, air conditioning or security system.

r. **Limited Coverage For "Fungi", Wet Rot Or Dry Rot**

(1) The coverage described in Paragraphs r.(2) and r.(6) only applies when the "fungi", wet rot or dry rot is the result of a "specified cause of loss" other than fire or lightning that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

(2) We will pay for loss or damage by "fungi", wet rot or dry rot. As used in this Limited Coverage, the term loss or damage means:

(a) Direct physical loss or damage to Covered Property caused by "fungi", wet rot or dry rot, including the cost of removal of the "fungi", wet rot or dry rot;

(b) The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungi", wet rot or dry rot; and

(c) The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi", wet rot or dry rot is present.

(3) The coverage described under this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungi", wet rot or dry rot, we will not pay more than the total of $15,000 even if the "fungi", wet rot or dry rot continues to be present or active, or recurs, in a later policy period.

(4) The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungi", wet rot or dry rot, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungi", wet rot or dry rot, loss payment will not be limited to the terms of this Limited Coverage, except to the extent that "fungi", wet rot or dry rot causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

(5) The terms of this Limited Coverage do not increase or reduce the coverage provided under the Water Damage, Other Liquids, Powder Or Molten Material Damage or Collapse Additional Coverages.

 © Insurance Services Office, Inc., 2012

(6) The following applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the suspension of "operations" satisfies all the terms and conditions of the applicable Business Income and/or Extra Expense Additional Coverage:

(a) If the loss which resulted in "fungi", wet rot or dry rot does not in itself necessitate a suspension of "operations", but such suspension is necessary due to loss or damage to property caused by "fungi", wet rot or dry rot, then our payment under the Business Income and/or Extra Expense Additional Coverages is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

(b) If a covered suspension of "operations" was caused by loss or damage other than "fungi", wet rot or dry rot, but remediation of "fungi", wet rot or dry rot prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

## 6. Coverage Extensions

In addition to the Limits of Insurance of Section I – Property, you may extend the insurance provided by this policy as provided below.

Except as otherwise provided, the following extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises:

### a. Newly Acquired Or Constructed Property

(1) **Buildings**

If this policy covers Buildings, you may extend that insurance to apply to:

(a) Your new buildings while being built on the described premises; and

(b) Buildings you acquire at premises other than the one described, intended for:

(i) Similar use as the building described in the Declarations; or

(ii) Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

(2) **Business Personal Property**

If this policy covers Business Personal Property, you may extend that insurance to apply to:

(a) Business Personal Property, including such property that you newly acquire, at any location you acquire; or

(b) Business Personal Property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations.

This Extension does not apply to personal property that you temporarily acquire in the course of installing or performing work on such property or your wholesale activities.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

(3) **Period Of Coverage**

With respect to insurance provided under this Coverage Extension for Newly Acquired Or Constructed Property, coverage will end when any of the following first occurs:

(a) This policy expires;

(b) 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as Covered Property; or

(c) You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as Covered Property.

### b. Personal Property Off-premises

You may extend the insurance provided by this policy to apply to your Covered Property, other than "money" and "securities", "valuable papers and records" or accounts receivable, while it is in the course of transit or at a premises you do not own, lease or operate. The most we will pay for loss or damage under this Extension is $10,000.

c. **Outdoor Property**

You may extend the insurance provided by this policy to apply to your outdoor fences, radio and television antennas (including satellite dishes), signs (other than signs attached to buildings), trees, shrubs and plants (other than trees, shrubs or plants which are part of a vegetated roof), including debris removal expense. Loss or damage must be caused by or result from any of the following causes of loss:

(1) Fire;

(2) Lightning;

(3) Explosion;

(4) Riot or Civil Commotion; or

(5) Aircraft.

The most we will pay for loss or damage under this Extension is $2,500, unless a higher Limit Of Insurance for Outdoor Property is shown in the Declarations, but not more than $1,000 for any one tree, shrub or plant.

Subject to all aforementioned terms and limitations of coverage, this Coverage Extension includes the expense of removing from the described premises the debris of trees, shrubs and plants which are the property of others, except in the situation in which you are a tenant and such property is owned by the landlord of the described premises.

d. **Personal Effects**

You may extend the insurance that applies to Business Personal Property to apply to personal effects owned by you, your officers, your partners or "members", your "managers" or your employees, including temporary or leased employees. This extension does not apply to:

(1) Tools or equipment used in your business; or

(2) Loss or damage by theft.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises.

e. **Valuable Papers And Records**

(1) You may extend the insurance that applies to Business Personal Property to apply to direct physical loss or damage to "valuable papers and records" that you own, or that are in your care, custody or control, caused by or resulting from a Covered Cause of Loss. This Coverage Extension includes the cost to research, replace or restore the lost information on "valuable papers and records" for which duplicates do not exist.

(2) This Coverage Extension does not apply to:

(a) Property held as samples or for delivery after sale; and

(b) Property in storage away from the premises shown in the Declarations.

(3) The most we will pay under this Coverage Extension for loss or damage to "valuable papers and records" in any one occurrence at the described premises is $10,000, unless a higher Limit Of Insurance for "valuable papers and records" is shown in the Declarations.

For "valuable papers and records" not at the described premises, the most we will pay is $5,000.

(4) Loss or damage to "valuable papers and records" will be valued at the cost of restoration or replacement of the lost or damaged information. To the extent that the contents of the "valuable papers and records" are not restored, the "valuable papers and records" will be valued at the cost of replacement with blank materials of substantially identical type.

(5) Paragraph **B.** Exclusions in Section **I** – Property does not apply to this Coverage Extension except for:

(a) Paragraph **B.1.c.**, Governmental Action;

(b) Paragraph **B.1.d.**, Nuclear Hazard;

(c) Paragraph **B.1.f.**, War And Military Action;

© Insurance Services Office, Inc., 2012

(d) Paragraph **B.2.f.,** Dishonesty;

(e) Paragraph **B.2.g.,** False Pretense;

(f) Paragraph **B.2.m.(2),** Errors Or Omissions; and

(g) Paragraph **B.3.**

**f. Accounts Receivable**

(1) You may extend the insurance that applies to Business Personal Property to apply to accounts receivable. We will pay:

(a) All amounts due from your customers that you are unable to collect;

(b) Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

(c) Collection expenses in excess of your normal collection expenses that are made necessary by loss or damage; and

(d) Other reasonable expenses that you incur to reestablish your records of accounts receivable;

that result from direct physical loss or damage by any Covered Cause of Loss to your records of accounts receivable.

(2) The most we will pay under this Coverage Extension for loss or damage in any one occurrence at the described premises is $10,000, unless a higher Limit of Insurance for accounts receivable is shown in the Declarations.

For accounts receivable not at the described premises, the most we will pay is $5,000.

(3) Paragraph **B.** Exclusions in Section I – Property does not apply to this Coverage Extension except for:

(a) Paragraph **B.1.c.,** Governmental Action;

(b) Paragraph **B.1.d.,** Nuclear Hazard;

(c) Paragraph **B.1.f.,** War And Military Action;

(d) Paragraph **B.2.f.,** Dishonesty;

(e) Paragraph **B.2.g.,** False Pretense;

(f) Paragraph **B.3.;** and

(g) Paragraph **B.6.,** Accounts Receivable Exclusion.

**g. Business Personal Property Temporarily In Portable Storage Units**

(1) You may extend the insurance that applies to Business Personal Property to apply to such property while temporarily stored in a portable storage unit (including a detached trailer) located within 100 feet of the buildings or structures described in the Declarations or within 100 feet of the described premises, whichever distance is greater.

(2) The limitation under Paragraph **A.4.a.(5)** also applies to property in a portable storage unit.

(3) Coverage under this Extension:

(a) Will end 90 days after the Business Personal Property has been placed in the storage unit;

(b) Does not apply if the storage unit itself has been in use at the described premises for more than 90 consecutive days, even if the Business Personal Property has been stored there for 90 or fewer days as of the time of loss or damage.

(4) Under this Extension, the most we will pay for the total of all loss or damage to Business Personal Property is $10,000 (unless a higher limit is indicated in the Declarations for such Extension) regardless of the number of storage units.

(5) This Extension does not apply to loss or damage otherwise covered under this Coverage Form or any endorsement to this Coverage Form, and does not apply to loss or damage to the storage unit itself.

**B. Exclusions**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

**a. Ordinance Or Law**

(1) The enforcement of or compliance with any ordinance or law:

(a) Regulating the construction, use or repair of any property; or

(b) Requiring the tearing down of any property, including the cost of removing its debris.

(2) This exclusion, Ordinance Or Law, applies whether the loss results from:

(a) An ordinance or law that is enforced even if the property has not been damaged; or

(b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property or removal of its debris, following a physical loss to that property.

**b. Earth Movement**

(1) Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;

(2) Landslide, including any earth sinking, rising or shifting related to such event;

(3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

(4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in Paragraphs (1) through (4) above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

(5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or volcanic action, we will pay for the loss or damage caused by that fire, building glass breakage or volcanic action.

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

(a) Airborne volcanic blast or airborne shock waves;

(b) Ash, dust or particulate matter; or

(c) Lava flow.

With respect to coverage for volcanic action as set forth in 5(a), 5(b) and 5(c), all volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss of or damage to Covered Property.

This exclusion applies regardless of whether any of the above, in Paragraphs (1) through (5), is caused by an act of nature or is otherwise caused.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

(1) Originates away from the described premises; or

(2) Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

© Insurance Services Office, Inc., 2012

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

This exclusion does not apply to loss or damage to "computer(s)" and "electronic data".

### f. War And Military Action

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

### g. Water

(1) Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

(2) Mudslide or mudflow;

(3) Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings; or

(5) Waterborne material carried or otherwise moved by any of the water referred to in Paragraph (1), (3) or (4), or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs (1) through (5), is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs (1) through (5), results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

### h. Certain Computer-related Losses

(1) The failure, malfunction or inadequacy of:

(a) Any of the following, whether belonging to any insured or to others:

(i) "Computer" hardware, including microprocessors or other electronic data processing equipment as may be described elsewhere in this policy;

(ii) "Computer" application software or other "electronic data" as may be described elsewhere in this policy;

(iii) "Computer" operating systems and related software;

(iv) "Computer" networks;

(v) Microprocessors ("computer" chips) not part of any "computer" system; or

(vi) Any other computerized or electronic equipment or components; or

(b) Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph (a) above;

due to the inability to correctly recognize, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

(2) Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph (1) above.

However, if excluded loss or damage, as described in Paragraph (1) above, results in a "specified cause of loss" under Section I – Property, we will pay only for the loss or damage caused by such "specified cause of loss".

We will not pay for repair, replacement or modification of any items in Paragraph (1)(a) or (1)(b) to correct any deficiencies or change any features.

### i. "Fungi", Wet Rot Or Dry Rot

Presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot.

But if "fungi", wet rot or dry rot results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

(1) When "fungi", wet rot or dry rot results from fire or lightning; or

(2) To the extent that coverage is provided in the Limited Coverage For "Fungi", Wet Rot Or Dry Rot Additional Coverage, with respect to loss or damage by a cause of loss other than fire or lightning.

### j. Virus Or Bacteria

(1) Any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

(2) However, the exclusion in Paragraph (1) does not apply to loss or damage caused by or resulting from "fungi", wet rot or dry rot. Such loss or damage is addressed in Exclusion i.

(3) With respect to any loss or damage subject to the exclusion in Paragraph (1), such exclusion supersedes any exclusion relating to "pollutants".

2. We will not pay for loss or damage caused by or resulting from any of the following:

### a. Electrical Apparatus

Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

(1) Electrical or electronic wire, device, appliance, system or network; or

(2) Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

(1) Electrical current, including arcing;

(2) Electrical charge produced or conducted by a magnetic or electromagnetic field;

(3) Pulse of electromagnetic energy; or

(4) Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by fire.

We will pay for loss or damage to "computer(s)" due to artificially generated electrical, magnetic or electromagnetic energy if such loss or damage is caused by or results from:

(1) An occurrence that took place within 100 feet of the described premises; or

(2) Interruption of electric power supply, power surge, blackout or brownout if the cause of such occurrence took place within 100 feet of the described premises.

### b. Consequential Losses

Delay, loss of use or loss of market.

### c. Smoke, Vapor, Gas

Smoke, vapor or gas from agricultural smudging or industrial operations.

 © Insurance Services Office, Inc., 2012

### d. Steam Apparatus

Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

### e. Frozen Plumbing

Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the building or structure; or

(2) You drain the equipment and shut off the supply if the heat is not maintained.

### f. Dishonesty

Dishonest or criminal acts (including theft) by you, anyone else with an interest in the property, or any of your or their partners, "members", officers, "managers", employees (including temporary or leased employees), directors, trustees or authorized representatives, whether acting alone or in collusion with each other or with any other party; or theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion:

(1) Applies whether or not an act occurs during your normal hours of operation;

(2) Does not apply to acts of destruction by your employees (including temporary or leased employees) or authorized representatives; but theft by your employees (including temporary or leased employees) or authorized representatives is not covered.

With respect to accounts receivable and "valuable papers and records", this exclusion does not apply to carriers for hire.

This exclusion does not apply to coverage that is provided under the Employee Dishonesty Optional Coverage.

### g. False Pretense

Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

### h. Exposed Property

Rain, snow, ice or sleet to personal property in the open.

### i. Collapse

(1) Collapse, including any of the following conditions of property or any part of the property:

(a) An abrupt falling down or caving in;

(b) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

(c) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to Paragraph i.(1)(a) or i.(1)(b).

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

(2) This Exclusion i. does not apply:

(a) To the extent that coverage is provided under the Additional Coverage – Collapse; or

(b) To collapse caused by one or more of the following:

(i) The "specified causes of loss";

(ii) Breakage of building glass;

(iii) Weight of rain that collects on a roof; or

(iv) Weight of people or personal property.

### j. Pollution

We will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

 © Insurance Services Office, Inc., 2012

**k. Neglect**

Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**l. Other Types Of Loss**

(1) Wear and tear;

(2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

(6) Mechanical breakdown, including rupture or bursting caused by centrifugal force.

This exclusion does not apply with respect to the breakdown of "computer(s)";

(7) The following causes of loss to personal property:

(a) Dampness or dryness of atmosphere;

(b) Changes in or extremes of temperature; or

(c) Marring or scratching.

But if an excluded cause of loss that is listed in Paragraphs (1) through (7) above results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**m. Errors Or Omissions**

Errors or omissions in:

(1) Programming, processing or storing data, as described under "electronic data" or in any "computer" operations; or

(2) Processing or copying "valuable papers and records".

However, we will pay for direct physical loss or damage caused by resulting fire or explosion if these causes of loss would be covered by this Coverage Form.

**n. Installation, Testing, Repair**

Errors or deficiency in design, installation, testing, maintenance, modification or repair of your "computer" system including "electronic data".

However, we will pay for direct physical loss or damage caused by resulting fire or explosion if these causes of loss would be covered by this Coverage Form.

**o. Electrical Disturbance**

Electrical or magnetic injury, disturbance or erasure of "electronic data", except as provided for under the Additional Coverages of Section I – Property.

However, we will pay for direct loss or damage caused by lightning.

**p. Continuous Or Repeated Seepage Or Leakage Of Water**

Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**3.** We will not pay for loss or damage caused by or resulting from any of the following Paragraphs **a.** through **c.** But if an excluded cause of loss that is listed in Paragraphs **a.** through **c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a. Weather Conditions**

Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **B.1.** above to produce the loss or damage.

**b. Acts Or Decisions**

Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c. Negligent Work**

Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property on or off the described premises.

© Insurance Services Office, Inc., 2012

**4. Additional Exclusion**

The following applies only to the property specified in this Additional Exclusion:

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**5. Business Income And Extra Expense Exclusions**

a. We will not pay for:

(1) Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

(a) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

(b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage.

(2) Any other consequential loss.

b. With respect to this exclusion, suspension means:

(1) The partial slowdown or complete cessation of your business activities; and

(2) That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

**6. Accounts Receivable Exclusion**

The following additional exclusion applies to the Accounts Receivable Coverage Extension:

We will not pay for:

a. Loss or damage caused by or resulting from alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of "money", "securities" or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

b. Loss or damage caused by or resulting from bookkeeping, accounting or billing errors or omissions.

c. Any loss or damage that requires any audit of records or any inventory computation to prove its factual existence.

**C. Limits Of Insurance**

1. The most we will pay for loss or damage in any one occurrence is the applicable Limits Of Insurance of Section I – Property shown in the Declarations.

2. The most we will pay for loss or of damage to outdoor signs attached to buildings is $1,000 per sign in any one occurrence.

3. The amounts of insurance applicable to the Coverage Extensions and the following Additional Coverages apply in accordance with the terms of such coverages and are in addition to the Limits of Insurance of Section I – Property:

a. Fire Department Service Charge;

b. Pollutant Clean-up And Removal;

c. Increased Cost Of Construction;

d. Business Income From Dependent Properties;

e. Electronic Data; and

f. Interruption Of Computer Operations.

**4. Building Limit – Automatic Increase**

a. In accordance with Paragraph C.4.b., the Limit of Insurance for Buildings will automatically increase by 8%, unless a different percentage of annual increase is shown in the Declarations.

 © Insurance Services Office, Inc., 2012

**b.** The amount of increase is calculated as follows:

    **(1)** Multiply the Building limit that applied on the most recent of the policy inception date, the policy anniversary date or any other policy change amending the Building limit by:

        **(a)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 7% is .07); or

        **(b)** .08, if no percentage of annual increase is shown in the Declarations; and

    **(2)** Multiply the number calculated in accordance with **b.(1)** by the number of days since the beginning of the current policy year, or the effective date of the most recent policy change amending the Building limit, divided by 365.

**Example**

If:

The applicable Building limit is $100,000. The annual percentage increase is 8%. The number of days since the beginning of the policy year (or last policy change) is 146.

The amount of increase is

$100,000 x .08 x 146 ÷ 365 = $3,200.

**5. Business Personal Property Limit – Seasonal Increase**

    **a.** Subject to Paragraph **5.b.**, the Limit of Insurance for Business Personal Property is automatically increased by:

    **(1)** The Business Personal Property – Seasonal Increase percentage shown in the Declarations; or

    **(2)** 25% if no Business Personal Property – Seasonal Increase percentage is shown in the Declarations;

to provide for seasonal variances.

    **b.** The increase described in Paragraph **5.a.** will apply only if the Limit Of Insurance shown for Business Personal Property in the Declarations is at least 100% of your average monthly values during the lesser of:

    **(1)** The 12 months immediately preceding the date the loss or damage occurs; or

    **(2)** The period of time you have been in business as of the date the loss or damage occurs.

**D. Deductibles**

    **1.** We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance of Section I – Property.

    **2.** Regardless of the amount of the Deductible, the most we will deduct from any loss or damage under all of the following Optional Coverages in any one occurrence is the Optional Coverage Deductible shown in the Declarations:

        **a.** Money and Securities;

        **b.** Employee Dishonesty;

        **c.** Outdoor Signs; and

        **d.** Forgery or Alteration.

    But this Optional Coverage Deductible will not increase the Deductible shown in the Declarations. This Deductible will be used to satisfy the requirements of the Deductible in the Declarations.

    **3.** No deductible applies to the following Additional Coverages:

        **a.** Fire Department Service Charge;

        **b.** Business Income;

        **c.** Extra Expense;

        **d.** Civil Authority; and

        **e.** Fire Extinguisher Systems Recharge Expense.

**E. Property Loss Conditions**

    **1. Abandonment**

    There can be no abandonment of any property to us.

    **2. Appraisal**

    If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

        **a.** Pay its chosen appraiser; and

        **b.** Bear the other expenses of the appraisal and umpire equally.

© Insurance Services Office, Inc., 2012

If there is an appraisal, we will still retain our right to deny the claim.

3. **Duties In The Event Of Loss Or Damage**

a. You must see that the following are done in the event of loss or damage to Covered Property:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limits of Insurance of Section I – Property. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

(9) Resume all or part of your "operations" as quickly as possible.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

4. **Legal Action Against Us**

No one may bring a legal action against us under this insurance unless:

a. There has been full compliance with all of the terms of this insurance; and

b. The action is brought within two years after the date on which the direct physical loss or damage occurred.

5. **Loss Payment**

In the event of loss or damage covered by this policy:

a. At our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to Paragraph **d.(1)(e)** below.

b. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

c. We will not pay you more than your financial interest in the Covered Property.

d. Except as provided in Paragraphs **(2)** through **(7)** below, we will determine the value of Covered Property as follows:

(1) At replacement cost without deduction for depreciation, subject to the following:

(a) If, at the time of loss, the Limit of Insurance on the lost or damaged property is 80% or more of the full replacement cost of the property immediately before the loss, we will pay the cost to repair or replace, after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:

(i) The Limit of Insurance under Section I – Property that applies to the lost or damaged property;

(ii) The cost to replace, on the same premises, the lost or damaged property with other property:

    i. Of comparable material and quality; and

    ii. Used for the same purpose; or

(iii) The amount that you actually spend that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost is limited to the cost which would have been incurred had the building been built at the original premises.

(b) If, at the time of loss, the Limit of Insurance applicable to the lost or damaged property is less than 80% of the full replacement cost of the property immediately before the loss, we will pay the greater of the following amounts, but not more than the Limit of Insurance that applies to the property:

(i) The actual cash value of the lost or damaged property; or

(ii) A proportion of the cost to repair or replace the lost or damaged property, after application of the deductible and without deduction for depreciation. This proportion will equal the ratio of the applicable Limit of Insurance to 80% of the full replacement cost of the property.

**Example**

The full replacement cost of property which suffers a total loss is $100,000. The property is insured for $70,000. 80% of the full replacement cost of the property immediately before the loss is $80,000 ($100,000 x .80 = $80,000). A partial loss of $25,000 is sustained. The amount of recovery is determined as follows:

Amount of recovery

$70,000 ÷ $80,000 = .875

.875 x $25,000 = $21,875

(c) You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

(d) We will not pay on a replacement cost basis for any loss or damage:

(i) Until the lost or damaged property is actually repaired or replaced; and

(ii) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

However, if the cost to repair or replace the damaged building property is $2,500 or less, we will settle the loss according to the provisions of Paragraphs **d.(1)(a)** and **d.(1)(b)** above whether or not the actual repair or replacement is complete.

(e) The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

(2) If the Actual Cash Value – Buildings option applies, as shown in the Declarations, Paragraph (1) above does not apply to Buildings. Instead, we will determine the value of Buildings at actual cash value.

(3) The following property at actual cash value:

(a) Used or secondhand merchandise held in storage or for sale;

(b) Property of others. However, if an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance;

© Insurance Services Office, Inc., 2012

(c) Household contents, except personal property in apartments or rooms furnished by you as landlord;

(d) Manuscripts; and

(e) Works of art, antiques or rare articles, including etchings, pictures, statuary, marble, bronzes, porcelain and bric-a-brac.

(4) Glass at the cost of replacement with safety glazing material if required by law.

(5) Tenants' improvements and betterments at:

(a) Replacement cost if you make repairs promptly.

(b) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(i) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

(ii) Divide the amount determined in (i) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(c) Nothing if others pay for repairs or replacement.

(6) Applicable only to the Optional Coverages:

(a) "Money" at its face value; and

(b) "Securities" at their value at the close of business on the day the loss is discovered.

(7) Applicable only to accounts receivable:

(a) If you cannot accurately establish the amount of accounts receivable outstanding as of the time of loss or damage:

(i) We will determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurs; and

(ii) We will adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

(b) The following will be deducted from the total amount of accounts receivable, however that amount is established:

(i) The amount of the accounts for which there is no loss or damage;

(ii) The amount of the accounts that you are able to reestablish or collect;

(iii) An amount to allow for probable bad debts that you are normally unable to collect; and

(iv) All unearned interest and service charges.

e. Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

f. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

g. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, provided you have complied with all of the terms of this policy, and:

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

h. A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

## 6. Recovered Property

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, you may retain the property. But then you must return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limits of Insurance of Section I – Property.

## 7. Resumption Of Operations

We will reduce the amount of your:

a. Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

b. Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

## 8. Vacancy

### a. Description Of Terms

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs (a) and (b) below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

### b. Vacancy Provisions

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

© Insurance Services Office, Inc., 2012

(c) Building glass breakage;

(d) Water damage;

(e) Theft; or

(f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in Paragraphs (1)(a) through (1)(f) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

## F. Property General Conditions

### 1. Control Of Property

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Form at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

### 2. Mortgageholders

a. The term "mortgageholder" includes trustee.

b. We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

c. The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

d. If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

(1) Pays any premium due under this policy at our request if you have failed to do so;

(2) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

(3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this policy will then apply directly to the mortgageholder.

e. If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this policy:

(1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

(2) The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

f. If we cancel this policy, we will give written notice to the mortgageholder at least:

(1) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

g. If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

### 3. No Benefit To Bailee

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

### 4. Policy Period, Coverage Territory

Under Section I – Property:

a. We cover loss or damage commencing:

(1) During the policy period shown in the Declarations; and

(2) Within the coverage territory or, with respect to property in transit, while it is between points in the coverage territory.

b. The coverage territory is:

(1) The United States of America (including its territories and possessions);

(2) Puerto Rico; and

(3) Canada.

 © Insurance Services Office, Inc., 2012

**G. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages also apply. These coverages are subject to the terms and conditions applicable to property coverage in this policy, except as provided below:

**1. Outdoor Signs**

a. We will pay for direct physical loss of or damage to all outdoor signs at the described premises:

(1) Owned by you; or

(2) Owned by others but in your care, custody or control.

b. Paragraph **A.3.**, Covered Causes Of Loss and Paragraph **B.**, Exclusions in Section I – Property do not apply to this Optional Coverage, except for:

(1) Paragraph **B.1.c.**, Governmental Action;

(2) Paragraph **B.1.d.**, Nuclear Hazard; and

(3) Paragraph **B.1.f.**, War And Military Action.

c. We will not pay for loss or damage caused by or resulting from:

(1) Wear and tear;

(2) Hidden or latent defect;

(3) Rust;

(4) Corrosion; or

(5) Mechanical breakdown.

d. The most we will pay for loss or damage in any one occurrence is the Limit Of Insurance for Outdoor Signs shown in the Declarations.

e. The provisions of this Optional Coverage supersede all other references to outdoor signs in this policy.

**2. Money And Securities**

a. We will pay for loss of "money" and "securities" used in your business while at a bank or savings institution, within your living quarters or the living quarters of your partners or any employee (including a temporary or leased employee) having use and custody of the property, at the described premises, or in transit between any of these places, resulting directly from:

(1) Theft, meaning any act of stealing;

(2) Disappearance; or

(3) Destruction.

b. In addition to the Limitations and Exclusions applicable to Section I – Property, we will not pay for loss:

(1) Resulting from accounting or arithmetical errors or omissions;

(2) Due to the giving or surrendering of property in any exchange or purchase; or

(3) Of property contained in any "money"-operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

c. The most we will pay for loss in any one occurrence is:

(1) The limit shown in the Declarations for Inside the Premises for "money" and "securities" while:

(a) In or on the described premises; or

(b) Within a bank or savings institution; and

(2) The limit shown in the Declarations for Outside the Premises for "money" and "securities" while anywhere else.

d. All loss:

(1) Caused by one or more persons; or

(2) Involving a single act or series of related acts;

is considered one occurrence.

e. You must keep records of all "money" and "securities" so we can verify the amount of any loss or damage.

**3. Employee Dishonesty**

a. We will pay for direct loss of or damage to Business Personal Property and "money" and "securities" resulting from dishonest acts committed by any of your employees acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:

(1) Cause you to sustain loss or damage; and also

(2) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

(a) Any employee; or

(b) Any other person or organization.

 © Insurance Services Office, Inc., 2012 BP 00 03 07 13

Case 1:19-cv-01627-RBM-BAS Document 52 Filed 07/29/19 Page 64 Page 35 Page 74
PageID: 487

b. We will not pay for loss or damage:

   (1) Resulting from any dishonest or criminal act that you or any of your partners or "members" commit whether acting alone or in collusion with other persons.

   (2) Resulting from any dishonest act committed by any of your employees (except as provided in Paragraph a.), "managers" or directors:

     (a) Whether acting alone or in collusion with other persons; or

     (b) While performing services for you or otherwise.

   (3) The only proof of which as to its existence or amount is:

     (a) An inventory computation; or

     (b) A profit and loss computation.

   (4) Caused by an employee if the employee had also committed theft or any other dishonest act prior to the effective date of this policy and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the employee, learned of that theft or dishonest act prior to the policy period shown in the Declarations.

c. The most we will pay for loss or damage in any one occurrence is the Limit Of Insurance for Employee Dishonesty shown in the Declarations.

d. All loss or damage:

   (1) Caused by one or more persons; or

   (2) Involving a single act or series of acts;

   is considered one occurrence.

e. If any loss is covered:

   (1) Partly by this insurance; and

   (2) Partly by any prior cancelled or terminated insurance that we or any affiliate had issued to you or any predecessor in interest;

the most we will pay is the larger of the amount recoverable under this insurance or the prior insurance.

We will pay only for loss or damage you sustain through acts committed or events occurring during the policy period. Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

f. This Optional Coverage is cancelled as to any employee immediately upon discovery by:

   (1) You; or

   (2) Any of your partners, "members", "managers", officers or directors not in collusion with the employee;

of any dishonest act committed by that employee before or after being hired by you.

g. We will pay only for covered loss or damage sustained during the policy period and discovered no later than one year from the end of the policy period.

h. If you (or any predecessor in interest) sustained loss or damage during the policy period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Optional Coverage, provided:

   (1) This Optional Coverage became effective at the time of cancellation or termination of the prior insurance; and

   (2) The loss or damage would have been covered by this Optional Coverage had it been in effect when the acts or events causing the loss or damage were committed or occurred.

i. The insurance under Paragraph h. above is part of, not in addition to, the Limit of Insurance applying to this Optional Coverage and is limited to the lesser of the amount recoverable under:

   (1) This Optional Coverage as of its effective date; or

   (2) The prior insurance had it remained in effect.

j. With respect to the Employee Dishonesty Optional Coverage in Paragraph **G.3.**, employee means:

   (1) Any natural person:

     (a) While in your service or for 30 days after termination of service;

     (b) Who you compensate directly by salary, wages or commissions; and

     (c) Who you have the right to direct and control while performing services for you;

(2) Any natural person who is furnished temporarily to you:

    (a) To substitute for a permanent employee, as defined in Paragraph **(1)** above, who is on leave; or

    (b) To meet seasonal or short-term workload conditions;

(3) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **(2)** above;

(4) Any natural person who is a former employee, director, partner, member, manager, representative or trustee retained as a consultant while performing services for you; or

(5) Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside any building you occupy in conducting your business.

But employee does not mean:

(1) Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

(2) Any "manager", director or trustee except while performing acts coming within the usual duties of an employee.

**4. Equipment Breakdown Protection Coverage**

  **a.** We will pay for direct loss of or damage to Covered Property caused by or resulting from a mechanical breakdown or electrical failure to pressure, mechanical or electrical machinery and equipment.

Mechanical breakdown or electrical failure to pressure, mechanical or electrical machinery and equipment does not mean any:

(1) Malfunction including but not limited to adjustment, alignment, calibration, cleaning or modification;

(2) Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

(3) Damage to any vacuum tube, gas tube, or brush; or

(4) The functioning of any safety or protective device.

  **b.** Paragraphs **A.4.a.(1)** and **A.4.a.(2),** Limitations, do not apply to this Optional Coverage.

  **c.** With respect to the coverage provided by this Optional Coverage, the following exclusions in Paragraph **B. Exclusions** do not apply:

(1) Paragraph **B.2.a.,** Electrical Apparatus;

(2) Paragraph **B.2.d.,** Steam Apparatus; and

(3) Paragraph **B.2.l.(6),** Mechanical Breakdown.

  **d.** With respect to the coverage provided by this Optional Coverage, Paragraph **G.1.c.(5)** of the **Outdoor Signs Optional Coverage** does not apply.

  **e.** If a dollar deductible is shown in the Declarations for this Optional Coverage, we will first subtract the applicable deductible amount from any loss we would otherwise pay. We will then pay the amount of loss in excess of the applicable deductible up to the applicable limit for this coverage.

If no optional deductible is chosen for this Optional Coverage, the Property Deductible shown in the Declarations applies.

  **f.** With respect to Additional Coverages **5.f.** Business Income and **5.g.** Extra Expense, if the 72-hour time period in the definition of "period of restoration" (hereinafter referred to as time deductible) is amended for this Optional Coverage as shown in the Declarations, we will not pay for any Business Income loss that occurs during the consecutive number of hours shown as the time deductible in the Declarations immediately following a mechanical breakdown or electrical failure. If a time deductible is shown in days, each day shall mean 24 consecutive hours.

With respect to the coverage provided by this Optional Coverage, any time deductible shown in the Declarations for Equipment Breakdown Protection Coverage supersedes any time deductible otherwise applicable to the Business Income coverage provided by this policy.

  **g.** With respect to the coverage provided by this Optional Coverage, Paragraph **H. Property Definitions** is amended as follows:

    1. "Computer" means:

      a. Programmable electronic equipment that is used to store, retrieve and process data; and

© Insurance Services Office, Inc., 2012     **BP 00 03 07 13**

b. Associated peripheral equipment that provides communication, including input and output functions such as printing and auxiliary functions such as data transmission.

"Computer" includes those used to operate production-type machinery or equipment.

h. Whenever any covered pressure, mechanical or electrical machinery and equipment is found to be in, or exposed to, a dangerous condition, any of our representatives may suspend coverage provided by this Optional Coverage for loss from a mechanical breakdown or electrical failure to that pressure, mechanical or electrical machinery and equipment.

However, coverage provided by this Optional Coverage may be reinstated for loss from a mechanical breakdown or electrical failure to that pressure, mechanical or electrical machinery and equipment if the reasons for the suspension are found by any of our representatives to no longer exist.

We may suspend or reinstate this Optional coverage by mailing or delivering a written notification regarding the suspension or reinstatement to:

(1) Your last known address; or

(2) The address where the pressure, mechanical or electrical machinery and equipment is located.

This notification will indicate the effective date of the suspension or reinstatement.

If the coverage provided by this Optional Coverage is not reinstated, you will get a pro rata refund of premium. But the suspension will be effective even if we have not yet made or offered a refund.

**H. Property Definitions**

1. "Computer" means:

    a. Programmable electronic equipment that is used to store, retrieve and process data; and

    b. Associated peripheral equipment that provides communication, including input and output functions such as printing and auxiliary functions such as data transmission.

    "Computer" does not include those used to operate production-type machinery or equipment.

2. "Counterfeit money" means an imitation of "money" that is intended to deceive and to be taken as genuine.

3. "Electronic data" means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a "computer" or device connected to it, which enable the "computer" or device to receive, process, store, retrieve or send data.

4. "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

5. "Manager" means a person serving in a directorial capacity for a limited liability company.

6. "Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

7. "Money" means:

    a. Currency, coins and bank notes in current use and having a face value; and

    b. Traveler's checks, register checks and money orders held for sale to the public.

8. "Operations" means your business activities occurring at the described premises.

9. "Period of restoration":

    a. Means the period of time that:

        (1) Begins:

            (a) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

            (b) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

            caused by or resulting from any Covered Cause of Loss at the described premises; and

(2) Ends on the earlier of:

    (a) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

    (b) The date when business is resumed at a new permanent location.

**b.** Does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

    (1) Regulates the construction, use or repair, or requires the tearing down of any property; or

    (2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

**10.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**11.** "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or other property and includes:

    **a.** Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

    **b.** Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money".

**12.** "Specified causes of loss" means the following:

Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

    **a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

        (1) The cost of filling sinkholes; or

        (2) Sinking or collapse of land into man-made underground cavities.

    **b.** Falling objects does not include loss of or damage to:

        (1) Personal property in the open; or

        (2) The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

    **c.** Water damage means:

        (1) Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam; and

        (2) Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe that is located off the described premises and is part of a municipal potable water supply system or municipal sanitary sewer system, if the breakage or cracking is caused by wear and tear.

But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion. Therefore, for example, there is no coverage in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather-induced flooding which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.

To the extent that accidental discharge or leakage of water falls within the criteria set forth in **c.(1)** or **c.(2)** of this definition of "specified causes of loss", such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or water under the ground surface.

**13.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

© Insurance Services Office, Inc., 2012

**BP 00 03 07 13**

14. "Valuable papers and records" means inscribed, printed or written:

   a. Documents;

   b. Manuscripts; and

   c. Records;

   including abstracts, books, deeds, drawings, films, maps or mortgages.

   But "valuable papers and records" does not mean "money" or "securities".

## SECTION II – LIABILITY

### A. Coverages

1. **Business Liability**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or any offense and settle any claim or "suit" that may result. But:

      **(1)** The amount we will pay for damages is limited as described in Paragraph **D. Liability And Medical Expenses Limits Of Insurance in Section II – Liability**; and

      **(2)** Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements or medical expenses.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Paragraph **f. Coverage Extension – Supplementary Payments.**

   b. This insurance applies:

      **(1)** To "bodily injury" and "property damage" only if:

         **(a)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

         **(b)** The "bodily injury" or "property damage" occurs during the policy period; and

         **(c)** Prior to the policy period, no insured listed under Paragraph **C.1. Who Is An Insured** and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known before the policy period.

      **(2)** To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **C.1. Who Is An Insured** or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **C.1. Who Is An Insured** or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

   e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

 © Insurance Services Office, Inc., 2012

**f. Coverage Extension – Supplementary Payments**

(1) We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

(a) All expenses we incur.

(b) Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Business Liability Coverage for "bodily injury" applies. We do not have to furnish these bonds.

(c) The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance. We do not have to furnish these bonds.

(d) All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

(e) All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

(f) Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

(g) All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the limit of liability.

(2) If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

(a) The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

(b) This insurance applies to such liability assumed by the insured;

(c) The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

(d) The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

(e) The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

(f) The indemnitee:

(i) Agrees in writing to:

i. Cooperate with us in the investigation, settlement or defense of the "suit";

ii. Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

iii. Notify any other insurer whose coverage is available to the indemnitee; and

 © Insurance Services Office, Inc., 2012 **BP 00 03 07 13**

Case 1:19-cv-01627-RBJ-SAB Document 52-1 Filed 07/29/19 Page 70 of 53 Page 80
PageID: 493

iv. Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(ii) Provides us with written authorization to:

i. Obtain records and other information related to the "suit"; and

ii. Conduct and control the defense of the indemnitee in such "suit".

(3) So long as the conditions in Paragraph (2) are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **B.1.b.(2)** Exclusions in Section **II** – Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the Limits of Insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

(a) We have used up the applicable Limit of Insurance in the payment of judgments or settlements; or

(b) The conditions set forth above, or the terms of the agreement described in Paragraph (2)(f) above, are no longer met.

**2. Medical Expenses**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the Limits of Insurance of Section **II** – Liability. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**B. Exclusions**

**1. Applicable To Business Liability Coverage**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by an insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

 © Insurance Services Office, Inc., 2012 BP 00 03 07 13

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible;

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement or such claim or "suit" by or on behalf of a governmental authority.

g. Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

Case 1:19-cv-01227-RM-SA Document 52-1 Filed 01/09/19 Page 73 of 84 PageID: 83
Case 1:19-cv-01227-RM-SA Document 52-1 Filed 01/09/19 Page 73 of 84 PageID: 83
PageID: 496

This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

   (a) Less than 51 feet long; and

   (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

   (a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where it is licensed or principally garaged; or

   (b) The operation of any of the following machinery or equipment:

     (i) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

     (ii) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition or stunting activity.

**i. War**

"Bodily injury", "property damage" or "personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by government authority in hindering or defending against any of these.

**j. Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" caused by the rendering or failure to render any professional service. This includes but is not limited to:

(1) Legal, accounting or advertising services;

(2) Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;

(3) Supervisory, inspection or engineering services;

(4) Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;

(5) Any health or therapeutic service treatment, advice or instruction;

(6) Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming;

© Insurance Services Office, Inc., 2012 BP 00 03 07 13

Case 1:19-cv-01625-RBM-SAB Document 52-1 Filed 01/29/19/19/22 Page 74 Page 85 of 235
PageID: 497

(7) Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

(8) Body piercing services; and

(9) Services in the practice of pharmacy.

This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering or failure to render of any professional service.

k. **Damage To Property**

"Property damage" to:

(1) Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate Limit of Insurance applies to Damage To Premises Rented To You as described in Paragraph D. Liability And Medical Expenses Limits Of Insurance in Section II – Liability.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

l. **Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

m. **Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

n. **Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

o. **Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

### p. Personal And Advertising Injury

"Personal and advertising injury";

(1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

(2) Arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity;

(3) Arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period;

(4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

(5) Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

(6) Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

(7) Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

(8) Committed by an insured whose business is:

(a) Advertising, broadcasting, publishing or telecasting;

(b) Designing or determining content of web sites for others; or

(c) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under Paragraph **F.** Liability And Medical Expenses Definitions.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, by itself, is not considered the business of advertising, broadcasting, publishing or telecasting.

(9) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time;

(10) With respect to any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants";

(11) Arising out of an electronic chatroom or bulletin board the insured hosts, owns or over which the insured exercises control;

(12) Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan;

(13) Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatags, or any other similar tactics to mislead another's potential customers.

### q. Electronic Data

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

 © Insurance Services Office, Inc., 2012

As used in this exclusion, electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**r. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**s. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.**, **d.**, **e.**, **f.**, **g.**, **h.**, **i.**, **k.**, **l.**, **m.**, **n.** and **o.** in Section **II – Liability** do not apply to damage by fire to premises while rented to you, or temporarily occupied by you with permission of the owner. A separate Damage To Premises Rented To You Limit of Insurance applies to this coverage as described in Paragraph **D. Liability And Medical Expenses Limits of Insurance** in Section **II – Liability.**

**2. Applicable To Medical Expenses Coverage**

We will not pay expenses for "bodily injury":

**a.** To any insured, except "volunteer workers".

**b.** To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c.** To a person injured on that part of premises you own or rent that the person normally occupies.

**d.** To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e.** To a person injured while practicing, instructing or participating in any physical exercises or games, sports or athletic contests.

**f.** Included within the "products-completed operations hazard".

**g.** Excluded under Business Liability Coverage.

**3. Applicable To Both Business Liability Coverage And Medical Expenses Coverage – Nuclear Energy Liability Exclusion**

This insurance does not apply:

**a.** Under Business Liability Coverage, to "bodily injury" or "property damage":

(1) With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

(a) Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

(b) The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

b. Under Medical Expenses Coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

c. Under Business Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of the "nuclear material"; if:

(1) The "nuclear material":

(a) Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

(b) Has been discharged or dispersed therefrom;

(2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(3) The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility"; but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

d. As used in this exclusion:

(1) "By-product material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

(2) "Hazardous properties" include radioactive, toxic or explosive properties;

(3) "Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for:

(I) Separating the isotopes of uranium or plutonium;

(II) Processing or utilizing "spent fuel"; or

(III) Handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

(4) "Nuclear material" means "source material", "special nuclear material" or "by-product material";

(5) "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

(6) "Property damage" includes all forms of radioactive contamination of property;

(7) "Source material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

(8) "Special nuclear material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

(9) "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

 © Insurance Services Office, Inc., 2012 BP 00 03 07 13

**(10)** "Waste" means any waste material:

   **(a)** Containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

   **(b)** Resulting from the operation by any person or organization of any "nuclear facility" included under Paragraphs **(a)** and **(b)** of the definition of "nuclear facility".

**C. Who Is An Insured**

  **1.** If you are designated in the Declarations as:

    **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

    **b.** A partnership or joint venture, you are an insured. Your members, your partners and their spouses are also insureds, but only with respect to the conduct of your business.

    **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

    **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

    **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

    **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

     **(1)** "Bodily injury" or "personal and advertising injury":

      **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

      **(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **(a)** above;

      **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(a)** or **(b)**; or

      **(d)** Arising out of his or her providing or failing to provide professional health care services.

     **(2)** "Property damage" to property:

      **(a)** Owned, occupied or used by;

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

D. Liability And Medical Expenses Limits Of Insurance

1. The Limits of Insurance of Section II – Liability shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The most we will pay for the sum of all damages because of all:

a. "Bodily injury", "property damage" and medical expenses arising out of any one "occurrence"; and

b. "Personal and advertising injury" sustained by any one person or organization;

is the Liability and Medical Expenses limit shown in the Declarations. But the most we will pay for all medical expenses because of "bodily injury" sustained by any one person is the Medical Expenses limit shown in the Declarations.

3. The most we will pay under Business Liability Coverage for damages because of "property damage" to a premises while rented to you or in the case of fire, while rented to you or temporarily occupied by you with permission of the owner is the applicable Damage To Premises Rented To You limit shown for that premises in the Declarations. For a premises temporarily occupied by you, the applicable limit will be the highest Damage To Premises Rented To You limit shown in the Declarations.

4. Aggregate Limits

The most we will pay for:

a. All "bodily injury" and "property damage" that is included in the "products-completed operations hazard" is twice the Liability and Medical Expenses limit.

b. All:

(1) "Bodily injury" and "property damage" except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard";

(2) Plus medical expenses;

(3) Plus all "personal and advertising injury" caused by offenses committed;

is twice the Liability and Medical Expenses limit.

Subject to Paragraph a. or b. above, whichever applies, the Damage To Premises Rented To You limit is the most we will pay for damages because of "property damage" to any one premises, while rented to you, or in the case of fire, while rented to you or temporarily occupied by you with permission of the owner.

The Limits of Insurance of Section II – Liability apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

E. Liability And Medical Expenses General Conditions

1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this policy.

© Insurance Services Office, Inc., 2012  BP 00 03 07 13

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this policy:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Separation Of Insureds**

Except with respect to the Limits of Insurance of Section II – Liability, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**F. Liability And Medical Expenses Definitions**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

c. All other parts of the world if the injury or damage arises out of:

(1) Goods or products made or sold by you in the territory described in Paragraph **a.** above;

(2) The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits in the territory described in Paragraph **a.** above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

(1) The repair, replacement, adjustment or removal of "your product" or "your work"; or

(2) Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(2)** above and supervisory, inspection or engineering services.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

© Insurance Services Office, Inc., 2012

11. "Loading or unloading" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b. While it is in or on an aircraft, watercraft or "auto"; or

   c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, on which are permanently mounted:

      (1) Power cranes, shovels, loaders, diggers or drills; or

      (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      (2) Cherry pickers and similar devices used to raise or lower workers;

   f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

   (1) Equipment designed primarily for:

      (a) Snow removal;

      (b) Road maintenance, but not construction or resurfacing; or

      (c) Street cleaning;

   (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where they are licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law or motor vehicle registration law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at the job site has been put to its intended use by any other person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

The "bodily injury" or "property damage" must occur away from premises you own or rent, unless your business includes the selling, handling or distribution of "your product" for consumption on premises you own or rent.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

(2) The existence of tools, uninstalled equipment or abandoned or unused materials.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

 © Insurance Services Office, Inc., 2012 BP 00 03 07 13

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

(2) The providing of or failure to provide warnings or instructions.

## SECTION III – COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I – PROPERTY AND SECTION II – LIABILITY)

### A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

a. Five days before the effective date of cancellation if any one of the following conditions exists at any building that is Covered Property in this policy:

(1) The building has been vacant or unoccupied 60 or more consecutive days. This does not apply to:

(a) Seasonal unoccupancy; or

(b) Buildings in the course of construction, renovation or addition.

Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

(2) After damage by a Covered Cause of Loss, permanent repairs to the building:

(a) Have not started; and

(b) Have not been contracted for;

within 30 days of initial payment of loss.

(3) The building has:

(a) An outstanding order to vacate;

(b) An outstanding demolition order; or

(c) Been declared unsafe by governmental authority.

(4) Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to such removal that is necessary or incidental to any renovation or remodeling.

(5) Failure to:

(a) Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

(b) Pay property taxes that are owing and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.

b. 10 days before the effective date of cancellation if we cancel for nonpayment of premium.

c. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

© Insurance Services Office, Inc., 2012

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Concealment, Misrepresentation Or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceals or misrepresents a material fact concerning:

**1.** This policy;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this policy.

**D. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**E. Inspections And Surveys**

**1.** We have the right to:

    **a.** Make inspections and surveys at any time;

    **b.** Give you reports on the conditions we find; and

    **c.** Recommend changes.

**2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

    **a.** Are safe and healthful; or

    **b.** Comply with laws, regulations, codes or standards.

**3.** Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**4.** Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**F. Insurance Under Two Or More Coverages**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**G. Liberalization**

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

**H. Other Insurance**

**1.** If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance of Section **I – Property.**

**2.** Business Liability Coverage is excess over:

    **a.** Any other insurance that insures for direct physical loss or damage; or

    **b.** Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured.

**3.** When this insurance is excess, we will have no duty under Business Liability Coverage to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**I. Premiums**

**1.** The first Named Insured shown in the Declarations:

    **a.** Is responsible for the payment of all premiums; and

    **b.** Will be the payee for any return premiums we pay.

**2.** The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

 © Insurance Services Office, Inc., 2012 BP 00 03 07 13

3. With our consent, you may continue this policy in force by paying a continuation premium for each successive one-year period. The premium must be:

   a. Paid to us prior to the anniversary date; and

   b. Determined in accordance with Paragraph 2. above.

   Our forms then in effect will apply. If you do not pay the continuation premium, this policy will expire on the first anniversary date that we have not received the premium.

4. Undeclared exposures or change in your business operation, acquisition or use of locations may occur during the policy period that are not shown in the Declarations. If so, we may require an additional premium. That premium will be determined in accordance with our rates and rules then in effect.

**J. Premium Audit**

1. This policy is subject to audit if a premium designated as an advance premium is shown in the Declarations. We will compute the final premium due when we determine your actual exposures.

2. Premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period, we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

3. The first Named Insured must keep records of the information we need for premium computation and send us copies at such times as we may request.

**K. Transfer Of Rights Of Recovery Against Others To Us**

1. Applicable to Businessowners Property Coverage:

   If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

   a. Prior to a loss to your Covered Property.

   b. After a loss to your Covered Property only if, at time of loss, that party is one of the following:

      (1) Someone insured by this insurance;

      (2) A business firm:

         (a) Owned or controlled by you; or

         (b) That owns or controls you; or

      (3) Your tenant.

   You may also accept the usual bills of lading or shipping receipts limiting the liability of carriers.

   This will not restrict your insurance.

2. Applicable to Businessowners Liability Coverage:

   If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. This condition does not apply to Medical Expenses Coverage.

**L. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

BUSINESSOWNERS
BP 01 89 03 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW JERSEY CHANGES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM
INFORMATION SECURITY PROTECTION ENDORSEMENT

A. **Section I – Property** is amended as follows:

The following exclusion and related provisions are added to Paragraph **B. Exclusions:**

**Domestic Violence Exclusion**

    **a.** We will not pay for loss or damage arising out of any act committed:

      **(1)** By or at the direction of any insured; and

      **(2)** With the intent to cause a loss.

    **b.** However, this exclusion will not apply to deny payment to a co-insured who did not cooperate in or contribute to the creation of the loss if the loss arose out of domestic violence.

    **c.** If we pay a claim pursuant to Paragraph **b.** above, our payment to the insured is limited to that insured's insurable interest in the property. In no event will we pay more than the Limit of Insurance.

To the extent that the Concealment, Misrepresentation Or Fraud Condition conflicts with the provisions of Paragraph **b.** above, the provisions of **b.** will apply.

B. **Section II – Liability** is amended as follows:

    **1.** The term "spouse" is replaced by the following:

Spouse or party to a civil union recognized under New Jersey law.

**2.** The following is added to Paragraph **E. Liability And Medical Expenses** General Conditions:

    **6. Your Right To Loss Information**

We will provide the first Named Insured shown in the Declarations the following loss information relating to this and any preceding Businessowners Liability Coverage Form we have issued to you during the previous three years:

    **a.** A list or other record of each "occurrence" of which we were notified in accordance with Paragraph **2.a.** of the Duties In The Event Of Occurrence, Offense, Claim Or Suit Condition in this Section. We will include a brief description of the "occurrence" and information on whether any claim arising out of the "occurrence" is open or closed.

    **b.** A summary by policy year, of payments made and amounts reserved, stated separately under any applicable Aggregate Limit.

Amounts reserved are based on our judgment. They are subject to change and should not be regarded as ultimate settlement values.

You must not disclose this information to any claimant or any claimant's representative without our consent.

 © Insurance Services Office, Inc., 2014

We will provide this information only if we receive a written request from the first Named Insured during the policy period. We will provide this information within 45 days of receipt of the request.

We compile claim and "occurrence" information for our own business purposes and exercise reasonable care in doing so. In providing this information to the first Named Insured, we make no representations or warranties to insureds, insurers or others to whom this information is furnished by or on behalf of any insured.

**C. Section III – Common Policy Conditions** is amended as follows:

1. Paragraph **A.2. Cancellation** is replaced by the following:

2. If this Policy has been in effect for less than 60 days, we may cancel this Policy for any reason subject to the following:

   a. We may cancel this Policy by mailing or delivering to the first Named Insured and any person entitled to notice under this Policy written notice, of cancellation, at least:

      (1) 10 days before the effective date of cancellation if we cancel for:

         (a) Nonpayment of premium; or

         (b) Existence of a moral hazard, as defined in N.J.A.C. 11:1-20.2(f) as follows:

            (i) "The risk, danger or probability that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. Any change in the circumstances of an insured that will increase the probability of such a destruction may be considered a 'moral hazard'; and

            (ii) "The substantial risk, danger or probability that the character, circumstances or personal habits of the insured may increase the possibility of loss or liability for which an insurer will be held responsible. Any change in the character or circumstances of an individual, corporate, partnership or other insured that will increase the probability of such a loss or liability may be considered a 'moral hazard'."

      (2) 30 days before the effective date of cancellation if we cancel for any other reason.

   b. In the notice of cancellation which is sent to the first Named Insured, we will state the reason for cancellation.

2. The following is added to Paragraph **A. Cancellation:**

   7. **Cancellation Of Policies In Effect For 60 Days Or More**

      a. If this Policy has been in effect for 60 days or more, or is a renewal of a policy we issued, we may cancel this Policy only for one or more of the following reasons:

         (1) Nonpayment of premium;

         (2) Existence of a moral hazard, as defined in N.J.A.C. 11:1-20.2(f);

         (3) Material misrepresentation or nondisclosure to us of a material fact at the time of acceptance of the risk;

         (4) Increased hazard or material change in the risk assumed which we could not have reasonably contemplated at the time of assumption of the risk;

         (5) Substantial breaches of contractual duties, conditions or warranties that materially affect the nature and/or insurability of the risk;

© Insurance Services Office, Inc., 2014

BP 01 89 03 15

(6) Lack of cooperation from the insured on loss control matters materially affecting insurability of the risk;

(7) Fraudulent acts against us by the insured or its representative that materially affect the nature of the risk insured;

(8) Loss of or reduction in available insurance capacity;

(9) Material increase in exposure arising out of changes in statutory or case law subsequent to the issuance of the insurance contract or any subsequent renewal;

(10) Loss of or substantial changes in applicable reinsurance;

(11) Failure by the insured to comply with any federal, state or local fire, health, safety or building or construction regulation, law or ordinance with respect to an insured risk which substantially increases any hazard insured against within 60 days of written notification of a violation of any such law, regulation or ordinance;

(12) Failure by the insured to provide reasonable and necessary underwriting information to us upon written request therefor and a reasonable opportunity to respond;

(13) Agency termination, provided:

    (a) We document that replacement coverage at comparable rates and terms has been provided to the first Named Insured, and we have informed the first Named Insured, in writing, of the right to continue coverage with us; or

    (b) We have informed the first Named Insured, in writing, of the right to continue coverage with us and the first Named Insured has agreed, in writing, to the cancellation or nonrenewal based on the termination of the first Named Insured's appointed agent.

(14) Any other reasons in accordance with our underwriting guidelines for cancellation of commercial lines coverage.

**b.** If we cancel this Policy based on Paragraph **7.a.(1)** or **(2)** above, we will mail or deliver a written notice, to the first Named Insured and any person entitled to notice under this Policy, at least 10 days before the effective date of cancellation. If we cancel this Policy for any other reason listed above, we will mail or deliver a written notice to the first Named Insured and any person entitled to notice under this Policy, not more than 120 days nor less than 30 days before the effective date of such cancellation.

**c.** In the notice of cancellation which is sent to the first Named Insured, we will state the reason for cancellation. For cancellation due to the nonpayment of premium, the notice will state the effect of nonpayment by the due date. Cancellation for nonpayment of premium will not be effective if payment of the amount due is made before the effective date set forth in the notice.

**d.** Notice will be sent to the last mailing addresses known to us, by:

    (1) Certified mail; or

    (2) First class mail, if we have obtained from the post office a date stamped proof of mailing showing names and addresses.

**e.** We need not send notice of cancellation if you have:

    (1) Replaced coverage elsewhere; or

    (2) Specifically requested termination.

3. The following paragraph is added and supersedes any other provision to the contrary:

**M. Nonrenewal**

1. We may elect not to renew this Policy for any reason permitted to cancel it. If we elect not to renew this Policy, we will mail a notice of nonrenewal, stating the reasons for nonrenewal, to the first Named Insured at least 30 days but not more than 120 days before the expiration date of this Policy. If this Policy does not have a fixed expiration date, it shall be deemed to expire annually on the anniversary of its inception.

2. This notice will be sent to the first Named Insured at the last mailing address known to us by:

   a. Certified mail; or

   b. First class mail, if we have obtained from the post office a date stamped proof of mailing showing the first Named Insured's name and address.

3. We need not mail or deliver this notice if you have:

   a. Replaced coverage elsewhere; or

   b. Specifically requested termination.

4. The following paragraph is added:

   Pursuant to New Jersey law, this Policy cannot be cancelled or nonrenewed for any underwriting reason or guideline which is arbitrary, capricious or unfairly discriminatory or without adequate prior notice to the insured. The underwriting reasons or guidelines that an insurer can use to cancel or nonrenew this Policy are maintained by the insurer in writing and will be furnished to the insured and/or the insured's lawful representative upon written request.

   This provision shall not apply to any policy which has been in effect for less than 60 days at the time notice of cancellation is mailed or delivered, unless the Policy is a renewal policy.

5. The following is added to Paragraph **K. Transfer Of Rights Of Recovery Against Others To Us** Condition:

   If we pay a co-insured for loss arising out of an act of domestic violence by another insured, the rights of the co-insured, who did not cooperate in or contribute to the creation of the loss, to recover damages from the perpetrator of domestic violence are transferred to us to the extent of our payment. Following the loss, the co-insured who did not cooperate in or contribute to the loss may not waive such rights to recover against the perpetrator of domestic violence.

D. The following changes apply only to Information Security Protection Endorsement **BP 15 07** if it is attached to this Policy:

1. Paragraph **(2)** of Insuring Agreement **d. Security Breach Liability** is replaced by the following:

   (2) We will pay for "defense expenses" as a result of a "claim" in the form of a "regulatory proceeding" first made against the insured during the "policy period" or during the applicable Extended Reporting Period, in response to a "wrongful act" or a series of "interrelated wrongful acts" covered under Paragraph **d.(1)**.

2. Paragraph **d.** of the definition of "loss" in Paragraph **V.** is replaced by the following:

   d. With respect to Insuring Agreements **d.** Security Breach Liability and **g.** Web Site Publishing Liability:

   Compensatory damages, settlement amounts and costs awarded pursuant to judgments or settlements.

   "Loss" does not include:

   (1) Civil or criminal fines or penalties imposed by law;

   (2) Punitive or exemplary damages;

   (3) The multiplied portion of multiplied damages;

   (4) Taxes;

   (5) Royalties;

   (6) The amount of any disgorged profits; or

   (7) Matters that are uninsurable pursuant to law.

© Insurance Services Office, Inc., 2014   BP 01 89 03 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW JERSEY CHANGES –
## COVERAGE AND EXCLUSION – LIABILITY FOR
## HAZARDS OF LEAD – MULTIPLE PREMISES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**Section II – Liability** is amended as follows:

A. For premises constructed in or after 1978 or premises constructed prior to 1978 which have been certified as being free of existing lead hazards pursuant to standards established by the Department of Community Affairs, the following is added to Paragraph **B.1.f. Pollution** Exclusion:

**B. Exclusions**

   **1. Applicable To Business Liability Coverage**

   **f. Pollution**

   This exclusion does not apply to "bodily injury" arising out of lead contamination, or out of the inhalation, ingestion, use, handling or contact with lead paint at or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to any insured.

This provision will also apply to any premises which receives such certification during the policy period, but only if you notify us of such certification within 30 days after the certification is received, and only for "bodily injury" which occurs after such certification.

B. For premises constructed prior to 1978 and which have not, prior to policy period, been certified as being free of existing lead hazards pursuant to standards established by the Department of Community Affairs, and until certified thereafter as described in Paragraph A., the following is added to Paragraph **B.1. Exclusions:**

This insurance does not apply to:

"Bodily injury" caused in whole or in part, either directly or indirectly, by lead paint or lead contamination, or arising out of or incidental to the inhalation, ingestion, use, handling, or contact with lead paint or lead contamination.

Case 4:19-cv-01627-BMS-SAB Document 1-2 Filed 01/09/19 Page 92 of 233 Page ID 35102

BUSINESSOWNERS
BP 05 01 07 02

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

 © ISO Properties, Inc., 2001 ☐

BUSINESSOWNERS
BP 05 17 01 06

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – SILICA OR SILICA-RELATED DUST

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

A. The following exclusion is added to Paragraph **B. Exclusions in Section II – Liability:**

**B. Exclusions**

This insurance does not apply to:

**SILICA OR SILICA-RELATED DUST**

1. "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

2. "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

3. "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

4. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

B. The following definitions are added to Paragraph **F. Liability And Medical Expenses Definitions in Section II – Liability:**

1. "Silica" means silicon dioxide, (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

2. "Silica-related dust" means a mixture or combination of silica and other dust or particles.

 © ISO Properties, Inc., 2005 ☐

BUSINESSOWNERS
BP 05 23 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following provisions are added to the Businessowners Policy and apply to Property and Liability Coverages:

**A. CAP ON CERTIFIED TERRORISM LOSSES**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for loss or injury or damage that is otherwise excluded under this Policy.

**BUSINESSOWNERS**
**BP 05 38 01 15**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES; CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following provisions are added to the Businessowners Liability Coverage Form **BP 00 06** and **Section II – Liability** of the Businessowners Coverage Form **BP 00 03**:

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of an "other act of terrorism" that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, this exclusion applies only when one or more of the following are attributed to such act:

1. The total of insured damage to all types of property exceeds $25,000,000 (valued in U.S. dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

2. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   a. Physical injury that involves a substantial risk of death; or

   b. Protracted and obvious physical disfigurement; or

   c. Protracted loss of or impairment of the function of a bodily member or organ; or

3. The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

4. The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

5. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

1. For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Form to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage" or "personal and advertising injury" as may be defined in any applicable Coverage Form.

© Insurance Services Office, Inc., 2015

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;

   b. The act resulted in damage:

      (1) Within the United States (including its territories and possessions and Puerto Rico); or

      (2) Outside of the United States in the case of:

         (a) An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

         (b) The premises of any United States mission; and

   c. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

   Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

C. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Policy.

D. If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© Insurance Services Office, Inc., 2015    **BP 05 38 01 15**

BUSINESSOWNERS
BP 05 42 01 15

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF PUNITIVE DAMAGES RELATED TO A CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following provisions are added to the Businessowners Liability Coverage Form **BP 00 06** and **Section II – Liability** of the Businessowners Coverage Form **BP 00 03**:

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**B.** The following definition is added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Policy.

BP 05 42 01 15      © Insurance Services Office, Inc., 2015      Page 1 of 1

BUSINESSOWNERS
BP 05 77 01 06

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION (LIABILITY)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following provisions are added to **Section II – Liability:**

A. The following exclusion is added to Paragraph **B.1., Exclusions – Applicable To Business Liability Coverage:**

    **t. Fungi Or Bacteria**

      **(1)** "Bodily injury", "property damage" or "personal and advertising injury" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

      **(2)** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

      This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

B. The following definition is added Paragraph **F. Liability And Medical Expenses Definitions:**

    **1.** "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi.

 © ISO Properties, Inc., 2004

BUSINESSOWNERS
BP 05 98 07 13

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

Paragraph **9.** under **F. Liability And Medical Expenses Definitions** is replaced by the following:

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

© Insurance Services Office, Inc., 2012

**BUSINESSOWNERS**
BP 15 04 05 14

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

A. Exclusion **B.1.q.** of **Section II – Liability** is replaced by the following:

This insurance does not apply to:

q. **Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

(1) Damages, other than damages because of "personal and advertising injury", arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

(2) Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph (1) or (2) above.

However, unless Paragraph (1) above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**B.** The following is added to Paragraph **B.1.p.
Personal And Advertising Injury** Exclusion of
**Section II – Liability:**

This insurance does not apply to:

**p. Personal And Advertising Injury**

"Personal and advertising injury":

Arising out of any access to or disclosure of
any person's or organization's confidential
or personal information, including patents,
trade secrets, processing methods,
customer lists, financial information, credit
card information, health information or any
other type of nonpublic information.

This exclusion applies even if damages are
claimed for notification costs, credit
monitoring expenses, forensic expenses,
public relations expenses or any other loss,
cost or expense incurred by you or others
arising out of any access to or disclosure of
any person's or organization's confidential
or personal information.

    © Insurance Services Office, Inc., 2013    BP 15 04 05 14

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BUSINESSOWNERS IMPROVED VALUE ENDORSEMENT

This endorsement modifies insurance provided in the following:

BUSINESSOWNERS COVERAGE FORM
CONTRACTORS' INSTALLATION, TOOLS AND EQUIPMENT COVERAGE

## INDEX OF COVERAGES OF THIS FORM

| Coverage Description | Limit of Insurance |
|---|---|
| **On all policies:** | |
| - Water Back-Up And Sump Overflow | $ 20,000 |
| - Fire Protective Equipment recharged and clean up costs after discharge | Actual Loss Sustained |
| - Fire Department Service Charge | $ 5,000 |
| - Lock Replacement | $ 1,000 |
| - Outdoor Property ($1,000 any one tree, shrub or plant) | $ 5,000 |
| - Pollutant Clean-Up And Removal | $ 25,000 |
| - Bail Bonds | $ 1,000 |
| - Limited Exception For A Short-Term Pollution Event | $ 25,000 |
| - "Bodily Injury" definition amended to include Mental Anguish | |
| **If a Limit of Insurance is shown in the Declarations for Building Coverage:** | |
| - Ordinance or Law Coverage: | |
|     Coverage A: Undamaged Portion of Building | $ 25,000 |
|     Coverage B: Demolition Cost | $ 25,000 |
|     Coverage C: Increased Cost of Construction | $ 25,000 |
| - Buildings at Newly Acquired or Constructed Property | $ 500,000 |
| **If a Limit of Insurance is shown in the Declarations for Business Personal Property:** | |
| - Personal Property of Others without regard to legal liability | $ 15,000 |
| - Personal Property at Newly Acquired or Constructed Property | $ 200,000 |
| - Personal Property off Premises | $ 15,000 |
| - Tenants Building Coverage (excluding glass) | $ 20,000 |
| - Personal Effects | $ 5,000 |
| **If the CONTRACTORS' INSTALLATION, TOOLS AND EQUIPMENT COVERAGE Form is a part of this policy:** | |
| - Contractors' Installation Coverage | $ 15,000 |
| - Contractors' Tools and Equipment ($3,000 max any one tool or piece of equipment) | $ 15,000 |

## PART ONE amends SECTION I – PROPERTY of the BUSINESSOWNERS COVERAGE FORM

**PERSONAL PROPERTY OF OTHERS WITHOUT REGARD TO LEGAL LIABILITY**

Covered Business Personal Property Section **A.1.b.** is amended to add:

At your option, we will provide an additional amount of insurance for Personal Property of Others in your care, custody or control without regard to the amount you are legally responsible to insure under a written contract.

The most we will pay for loss or damage under this provision is $15,000. The limit provided is in addition to any other limit provided in the policy for Personal Property of Others.

**TENANTS BUILDING COVERAGE**

Covered Business Personal Property Section **A.1.b.** is amended to add:

Tenants Building Coverage for Building structures, including fixtures and permanently installed machinery or equipment (excluding glass), if you are a tenant and your lease requires it.

The most we will pay for loss or damage under this extension is $20,000.

## ORDINANCE OR LAW COVERAGE

1. The Ordinance or Law Exclusion (**B.1.a.**) of the Exclusions Section is modified by adding the following Extension to the Additional Coverage Section **A.5.:**

   **(1) Coverage A - COVERAGE FOR LOSS TO THE UNDAMAGED PORTION OF THE BUILDING**

   If a Covered Cause of Loss occurs to covered Building Property, we will pay for loss in value of the undamaged portion of the building as a consequence of a requirement to comply with any ordinance or law that:

   - Requires the demolition of parts of the same property not damaged by a Covered Cause of Loss;

   - Regulates the construction or repair of building or establishes zoning or land use requirements at the described premises; and

   - Is in force at the time of loss.

   **(2) Coverage B - DEMOLITION COST COVERAGE**

   If a Covered Cause of Loss occurs to covered Building Property, we will pay the cost to demolish and clear the site of undamaged parts of the property as a consequence of a requirement to comply with building, zoning or land use ordinance or law.

   **(3)** We will not pay under this endorsement for the costs associated with the enforcement of or compliance with any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungi", wet rot or dry rot.

   **(4) Limits of Insurance**

   (a) The most we will pay for Coverage A - Coverage for Loss to the Undamaged Portion of the Building under this endorsement is $25,000 for each building described in the Declarations.

   (b) The most we will pay for Coverage B - Demolition Cost Coverage under this endorsement is $25,000 for each building described in the Declarations.

2. **Coverage C – INCREASED COST OF CONSTRUCTION**

   Section **A.5.l.** Additional Coverage, **INCREASED COST OF CONSTRUCTION** is modified concerning the limit we will pay under **(6)** as follows:

   The most we will pay under this Additional Coverage, for each described building insured, is $25,000. The amount payable under this Additional Coverage is additional insurance.

## NEWLY ACQUIRED OR CONSTRUCTED PROPERTY

**Coverage Extensions** Section **A.6.a.**, items **(1)** and **(2)** the last paragraph of each is amended to read as follows:

**(1) Buildings**

The most we will pay for loss or damage under this Extension is $500,000 at each building regardless of any other limit shown in the policy.

**(2) Business Personal Property**

The most we will pay for loss or damage under this Extension is $200,000 at each building regardless of any other limit shown in the policy.

## PERSONAL PROPERTY OFF PREMISES

**Coverage Extensions** Section **A.6.b.** is amended to read as follows:

You may extend the insurance provided by this policy, to apply to your Covered Property, other than "money" and "securities", "valuable papers and records" or accounts receivable, while it is in the custody of others or while in due course of transit or temporarily at a premises you do not own, lease, or operate without regard to your legal liability.

The most we will pay for loss or damage under this Extension is $15,000 in addition to any other limit shown in the policy.

## OUTDOOR PROPERTY

**Coverage Extensions** Section **A.6.c.** is amended to read as follows:

You may extend the insurance provided by this policy to apply to your outdoor fences, radio and television antennas (including satellite dishes), signs, trees, shrubs and plants (other than trees, shrubs or plants which are part of a vegetated roof), including debris removal expense. Loss or damage must be caused by or result from a Covered Cause of Loss.

The most we will pay for loss or damage under this Extension is $5,000 but not more than $1,000 for any one tree, shrub or plant.

Subject to all aforementioned terms and limitations of coverage, this Coverage Extension includes the expense of removing from the described premises the debris of trees, shrubs and plants which are the property of others, except in the situation in which you are a tenant and such property is owned by the landlord of the described premises.

## PERSONAL EFFECTS

**Coverage Extensions** Section **A.6.d.** is amended to read as follows:

You may extend the insurance that applies to Business Personal Property to apply to personal effects owned by you, your officers, your partners or "members", your "managers" or your employees including temporary or leased employees. This extension does not apply to:

(1) Tools or equipment used in your business; or

(2) Loss or damage by theft.

The most we will pay for loss or damage under this Extension is $5,000 at each described premises.

## WATER BACK-UP AND SUMP OVERFLOW

**Coverage Extensions** Section **A.6.** is amended to add the following:

A. You may extend this coverage to apply to direct physical loss or damage to Covered Property caused by or resulting from:

1. Water or waterborne material which backs up through or overflows or is otherwise discharged from a sewer or drain; or

2. Water or waterborne material which overflows or is otherwise discharged from a sump, sump pump or related equipment, even if the overflow or discharge results from mechanical breakdown of a sump pump or its related equipment.

However, with respect to Paragraph **A.2.**, we will not pay the cost of repairing or replacing a sump pump or its related equipment in the event of mechanical breakdown.

B. The coverage described in Paragraph **A.** of this endorsement does not apply to loss or damage resulting from:

1. An insured's failure to keep a sump pump or its related equipment in proper working condition;

2. An insured's failure to perform the routine maintenance or repair necessary to keep a sewer or drain free from obstructions; or

3. Sump pump failure which is caused by or results from failure of power, unless this policy is endorsed to cover power failure affecting the described premises.

C. For the purposes of this endorsement, the term drain includes a roof drain and related fixtures.

D. With respect to the coverage provided under the Water Back-Up And Sump Overflow section of this endorsement, the **Water Exclusion** in **Section I – Property** is replaced by the following:

1. Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

2. Mudslide or mudflow;

3. Water under the ground surface pressing on, or flowing or seeping through:

a. Foundations, walls, floors or paved surfaces;

b. Basements, whether paved or not; or

c. Doors, windows or other openings; or

4. Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **1.** or **3.**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **1.** through **4.**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **1.** through **4.**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

E. We will pay no more than $20,000 for loss or damage occurring in a building at a premises described in the Declarations in addition to any other limit shown on the policy. A $500 deductible per claim will apply to this Extension.

## LOCK REPLACEMENT

**Coverage Extensions** Section **A.6.** is amended to add the following:

You may extend this coverage to apply to the cost to repair or replace the door locks or tumblers on your described premises due to theft of your door keys. The most we will pay under this Extension is $1,000 regardless of the number of described premises. A $50 deductible per claim will apply to this Extension.

## FIRE PROTECTIVE EQUIPMENT

**Coverage Extensions** Section **A.6.** is amended to add the following:

We will pay your costs to recharge or refill fire protective equipment and clean up and remove the fire extinguishing agent resulting from the discharge of a fire extinguishing agent from fire protective equipment. The discharge must:

(1) Be caused by a covered cause of loss;

(2) Result from the intended operation of the fire protective equipment to prevent or control a covered cause of loss;

(3) Be accidental; or

(4) Result from a malfunction of the fire protective equipment in proper operating condition or if caused by discharge at the time of servicing, refilling or testing of the fire protective equipment.

The most we will pay for loss or damage in any one occurrence is the actual loss sustained subject to a maximum of the limit of insurance for business personal property shown in the Declarations.

No deductible applies to this Extension.

### FIRE DEPARTMENT SERVICE CHARGE

**Additional Coverages** Section **A.5.c.** is amended to read as follows:

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $5,000, for service at each premises described in the Declarations, in addition to the limit shown in the Declarations. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

This Additional Coverage applies to your liability for fire department service charges:

(1) Assumed by contract or agreement prior to loss; or

(2) Required by local ordinance.

### POLLUTANT CLEAN-UP AND REMOVAL

**Additional Coverages** Section **A.5.h.** the last paragraph is amended to read as follows:

The most we will pay for each location under this Additional Coverage is $25,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

### LIMITS OF INSURANCE

Section **C. Limits Of Insurance** is amended to add the following:

Unless otherwise noted, the limits applicable to the BUSINESSOWNERS IMPROVED VALUE ENDORSEMENT are in addition to the Limits of Insurance shown in the Declarations.

---

## PART TWO amends SECTION II – LIABILITY of the BUSINESSOWNERS COVERAGE FORM

### BAIL BONDS

Section **A.1.f Coverage Extension – Supplementary Payments** Item **(1) (b)** is amended to read as follows:

Up to $1,000 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Business Liability Coverage for "bodily injury" applies. We do not have to furnish these bonds.

### LIMITED EXCEPTION FOR A SHORT-TERM POLLUTION EVENT

Exclusion **B.1.f. Pollution** Items **(1)(a)** and **(1)(d)** are amended to include:

(iv) "Bodily Injury" or "property damage" arising out of a "short-term pollution event" provided you notify us of the "short-term pollution event" as soon as practicable, but no more than fourteen (14) days after its ending. However, failure to give notice within the time prescribed shall not invalidate any claim made by the insured or by any other claimant if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible.

The most we will pay is $25,000 for the sum of all such "bodily injury" or "property damage" arising out of a "short-term pollution event" occurring during each separate 12 month period of this policy.

Section **F. Liability And Medical Expenses Definitions** is amended to add the following:

"Short-term pollution event" means a discharge, dispersal, release or escape of "pollutants" which:

a. Begins during the policy period;

b. Begins at an identified time and place;

c. Ends, in its entirety, at an identified time within forty-eight (48) hours of the beginning of the discharge, dispersal, release or escape of the "pollutants";

d. Is not a repeat or resumption of a previous discharge, dispersal, release or escape of the same pollutant from essentially the same source within twelve (12) months of a previous discharge, dispersal, release or escape;

e. Does not originate from an "underground storage tank"; and

f. Is not heat, smoke or fumes from a "hostile fire".

To be a "short-term pollution event", the discharge, dispersal, release or escape of "pollutants" need not be continuous. However, if the discharge, dispersal, release or escape is not continuous, then all discharges, dispersals, releases or escapes of the same "pollutants" from essentially the same source, considered together, must satisfy Provisions a. through f. of this definition to be considered a "short-term pollution event".

"Underground storage tank" means any storage tank, including any attached pumps, valves or piping, buried below the surface of the ground or water, or which, at any time, had been buried under the surface of the ground or water and then subsequently exposed by any means. For the purposes of this definition, buried means that at least 10% of it is below the surface of the ground or water.

## BODILY INJURY REDEFINED

Section **F. Liability And Medical Expenses Definitions** Item 3. is amended to read as follows:

"Bodily Injury" means bodily injury, sickness or disease sustained by a person, including mental anguish or death resulting from any of these at any time.

**PART THREE of this endorsement applies only if the CONTRACTORS' INSTALLATION, TOOLS AND EQUIPMENT COVERAGE Form is part of this policy.**

## CONTRACTORS' INSTALLATION COVERAGE

The CONTRACTORS' INSTALLATION, TOOLS AND EQUIPMENT COVERAGE Form is amended as follows:

In addition to the Limits of Insurance shown in the Schedule for Coverage 1 - Contractors' Installation Coverage, the following is added:

The most we will pay for loss or damage to Covered Property under this Coverage is $15,000 for

(1)   Property At Covered Job Sites;

(2)   Property In Transit; or

(3)   Property At A "Temporary Storage Location".

This is the most regardless of:

(1)   The number of job sites you do not own, lease or operate; or

(2)   The number of "temporary storage locations".

## CONTRACTORS' TOOLS AND EQUIPMENT

In addition to the Limits of Insurance shown in the Schedule for Coverage 2 - Contractors' Tools and Equipment Coverage, the following is added:

The most we will pay for loss or damage under this Coverage is $15,000, subject to a maximum of $3,000 for any one tool or piece of equipment unless a lower blanket per item sub-limit is shown on the Declarations for The Contractors' Installation, Tools And Equipment Coverage Form.

BUSINESSOWNERS
BP HG 51 01 05

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ASBESTOS EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

## BUSINESSOWNERS COVERAGE FORM

### SECTION II – LIABILITY

The following is added to Section **B. –Exclusions**

This insurance does not apply to:

(1) Any "bodily injury", "property damage" or "personal and advertising injury" arising out of or caused by or allegedly caused by, any exposure or threatened exposure to "asbestos", in any manner or form, or in combination with any other factors, substances or events.

(2) Any "bodily injury", "property damage" or "personal and advertising injury" arising out of or caused by the manufacturing, sale, storage, transportation, dispersal, release, leakage, removal, or disposal of any "asbestos" or any products containing "asbestos".

(3) Any testing, monitoring, investigating, treating, removal, clean up, control or destruction of "asbestos".

(4) Any other claim for damages, demands, costs, expenses or reimbursement of costs or expenses relating to or arising from "asbestos".

However, this exclusion does not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

For the purpose of this exclusion endorsement, "asbestos" means any type or form of asbestos, including but not limited to asbestos products or goods, asbestos fibers, asbestos materials, and any dusts, gases, by-products, vapors, or odors that are released or produced by asbestos or asbestos products, goods, fibers or material.

BUSINESSOWNERS
BP HG 58 09 08

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# TOBACCO HEALTH HAZARD EXCLUSION

This endorsement modifies insurance provided under the following:

## BUSINESSOWNERS COVERAGE FORM

**Section II – Liability** is amended as follows:

A. Paragraph **B. Exclusions 1. Applicable To Business Liability Coverage** is amended to add the following:

This insurance does not apply to any liability or damages, including expenses for investigation of defense, arising out of or allegedly arising out of:

1. "Health hazards" from the use of "tobacco products";

2. "Health hazards" caused by or contributed to by second-hand smoke from "tobacco products";

3. The furnishing of "tobacco products" to a person under the legal smoking age;

4. The manufacture, sale, handling, or distribution of "tobacco products";

5. Any statute, ordinance, or regulation relating to the sale, gift, distribution, or use of "tobacco products"; or

6. Any act or failure to act in connection with "tobacco products", including without limitation

   a. the providing of or failure to provide warnings or instructions;

   b. the promotion of the use or consumption of "tobacco products";

   c. any warranties or representations made at any time with respect to the fitness, quality, durability or performance of "tobacco products".

B. For the purposes of this endorsement, Paragraph **F. Liability And Medical Expenses Definition** is amended to add the following:

1. "Health hazards" include, but are not limited to, the actual or alleged emergence, contraction, aggravation or exacerbation or fear of the emergence, contraction, aggravation or exacerbation of any form of cancer, cancerous or precancerous condition, arteriosclerosis, heart disease, emphysema, lung disease or any other injury, disease, malady or impairment of the health of the human body arising out of, in whole or in part, the:

   a. Ingestion, consumption, inhalation or use of; or

   b. Exposure to the ingestion, consumption, inhalation or use of;

   any "tobacco product".

2. "Tobacco product" includes, but is not limited to, tobacco (including raw and cured tobacco), cigars and cigar wrappers, pipes and pipe tobacco, cigarette filters, snuff, chewing tobacco, smokeless tobacco products, tobacco substitutes, cigarettes and cigarette paper, gaseous or solid residues or byproducts of tobacco use or consumption, smoke from any of the above, and any chemical, mineral, or other product sprayed on, applied to or found within or used in conjunction with, any of the above.

BUSINESSOWNERS
BP HG 63 05 09

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EQUIPMENT BREAKDOWN ENHANCEMENT ENDORSEMENT GREEN ENVIRONMENTAL AND EFFICIENCY IMPROVEMENTS

This endorsement modifies insurance provided under the following:

**BUSINESSOWNERS COVERAGE FORM**

Read the entire endorsement carefully to determine rights, duties and what is and is not covered.

**PROPERTY GENERAL CONDITIONS**

The following **Property General Conditions** are added.

I. If Covered Property requires repair or replacement due to an "Equipment Breakdown", "we" will pay;

    **a.** The lesser of the reasonable and necessary additional cost incurred by the Insured to repair or replace physically damaged Covered Property with equipment of like kind and quality which qualifies as "Green". Like kind and quality includes similar size and capacity.

    **b.** The additional reasonable and necessary fees incurred by the Insured for an accredited professional certified by a "Green Authority" to participate in the repair or replacement of physically damaged Covered Property as "Green".

    **c.** The additional reasonable and necessary cost incurred by the Insured for certification or recertification of the repaired or replaced Covered Property as "Green".

    **d.** The additional reasonable and necessary cost incurred by the Insured for "Green" in the removal, disposal or recycling of damaged Covered Property.

    **e.** The business interruption (if covered within the Policy to which this **Equipment Breakdown Enhancement Endorsement – Green Environmental and Efficiency Improvements** is attached) loss during the additional time required for repair or replacement of Covered Property, consistent with "Green", in the coverages above.

"We" will not pay more than 125%, to a maximum limit of $100,000, of what the cost would have been to repair or replace with equipment of like kind and quality inclusive of fees, costs, and any business interruption loss incurred as stated above.

These **Property General Conditions** will be a part of, and not an addition to, the limit of liability per loss or any other sub-limits of liability of this Policy.

**EXCLUSIONS**

The following **Exclusions** are added:

I. **The Equipment Breakdown Enhancement Endorsement - Green Environmental and Efficiency Improvements** does not cover any of the following:

    **a.** Covered Property does not include "stock", raw materials, finished goods, "production machinery", merchandise, electronic data processing equipment not used in the functional support of the real property, process water, molds and dies, property in the open, property of others for which the Insured is legally liable, or personal property of others.

b. Any loss adjusted on any valuation basis other than a repair or replacement basis as per the Valuation section of this policy.

c. Any loss covered under any other section of this policy.

d. Any cost incurred due to any law or ordinance with which the insured was legally obligated to comply prior to the time of the "Equipment Breakdown".

## DEFINITIONS

The following **Definitions** are added:

I. "Green" means products, materials, methods and processes certified by a "Green Authority" that conserve natural resources, reduce energy or water consumption, avoid toxic or other polluting emissions or otherwise minimize environmental impact.

II. "Green Authority" means an authority on "Green" buildings, products, materials, methods or processes certified and accepted by Leadership in Energy and Environmental Design (LEED®), "Green" Building Initiative Green Globes®, Energy Star Rating System or any other recognized "Green" rating system.

III. "Production machinery" means any machine which processes, forms, shapes, or transports raw materials, materials in process, waste materials or finished products.

All other terms and conditions of this policy remain unchanged.

BUSINESSOWNERS
BP HG 64 05 09

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GREEN ENVIRONMENTAL AND EFFICIENCY IMPROVEMENTS

This endorsement modifies insurance provided under the following:

**BUSINESSOWNERS COVERAGE FORM**

**Section I Property Coverage A.5. Additional Coverages** is amended to add the following.

**Green Covered Property**

"We" will pay the reasonable and necessary additional costs "you" incur to repair or replace physically damaged Covered Property at a described premises for "specified causes of loss" other than "equipment breakdown". "We" will pay:

a. The lesser of the reasonable and necessary additional cost incurred by the Insured to repair or replace physically damaged Covered Property with Property of like kind and quality which qualifies as "Green". Like kind and quality includes similar size and capacity.

b. The additional reasonable and necessary fees incurred by the Insured for an accredited professional certified by a "Green Authority" to participate in the repair or replacement of physically damaged Covered Property as "Green".

c. The additional reasonable and necessary cost incurred by the Insured for certification or recertification of the repaired or replaced Covered Property as "Green".

d. The additional reasonable and necessary cost incurred by the Insured for "Green" in the removal, disposal or recycling of damaged Covered Property.

"We" will not pay more than 10% of the Building and/or Business Personal Property limit, to a maximum limit of $50,000, after the application of any deductible, of what the cost would have been to repair or replace with property of like kind and quality inclusive of fees, and costs incurred as stated above. This limit will be a part of, and not an addition to, the limit of liability per loss or any other sub-limits of liability of this Policy.

**EXCLUSIONS**

The following **Exclusion** is added:

1. **Green Covered Property** does not include any of the following:

   a. "Stock", raw materials, finished goods, "production machinery", merchandise, "electronic data" processing equipment not used in the functional support of the real property, process water, molds and dies, property in the open, property of others for which the Insured is legally liable, or personal property of others.

   b. Any loss adjusted on any valuation basis other than a repair or replacement basis as per the Valuation section of this policy.

   c. Any loss covered under any other section of this policy.

   d. Any cost incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the time of the covered loss.

   e. Loss of or damage to "green roofing systems" unless the loss or damage is directly caused by a "specified cause of loss".

**BP HG 64 05 09**

Page 1 of 2

**BUSINESSOWNERS**
**BP HG 64 05 09**

**DEFINITIONS**

The following **Definitions** are added:

I.  "Green" means products, materials, methods and processes certified by a "Green Authority" that conserve natural resources, reduce energy or water consumption, avoid toxic or other polluting emissions or otherwise minimize environmental impact.

II.  "Green Authority" means an authority on "Green" buildings, products, materials, methods or processes certified and accepted by Leadership in Energy and Environmental Design (LEED®), "Green" Building Initiative Green Globes®, Energy Star Rating System or any other recognized "Green" rating system.

III. "Production machinery" means any machine which processes, forms, shapes, or transports raw materials, materials in process, waste materials or finished products.

IV. "Green Roofing Systems" means environmentally friendly roof coverings as defined by the LEED® Green Building Rating System™ of the U.S. Green Building Council.

All other terms and conditions of this policy remain unchanged.

**BUSINESSOWNERS**
**BP IN 01 07 13**

# BUSINESSOWNERS COVERAGE FORM INDEX

This index is provided only as a convenience. It should not be assumed to provide a reference to every provision that can affect a question, claim or coverage. To determine the full scope of coverage and pertinent restrictions and exclusions, the policy (including endorsements) must be read in its entirety. The features may also be affected by related provisions not referenced at all in the index, or noted elsewhere in it. For instance, an **Exclusion** feature addresses a specific policy exclusion; but restrictions of coverage and exclusions also appear within the areas where coverage, covered causes of loss, etc., are described.

| Businessowners Coverage Feature | Page Number | Businessowners Coverage Feature | Page Number |
|---|---|---|---|
| Abandonment Property Loss Condition | 24 | Business Liability Coverage | 34-36 |
| Accounts Receivable Coverage Extension | 16 | Business Personal Property Coverage | 1-2 |
| Accounts Receivable Exclusion | 22 | Business Personal Property Limit – Seasonal Increase (Limit Of Insurance) | 23 |
| Acts Or Decisions Exclusion | 22 | Business Personal Property Temporarily In Portable Storage Units Coverage Extension | 17 |
| Additional Coverages | 3-14 | Cancellation Condition | 50 |
| Additional Exclusion – Loss Or Damage To Products Exclusion | 22 | Certain Computer-related Losses Exclusion | 19 |
| "Advertisement" Definition | 46 | Changes Condition | 51 |
| Aggregate Limits (Liability And Medical Expenses Limits Of Insurance) | 45 | Changes In Or Extremes Of Temperature Exclusion | 21 |
| Aircraft, Auto Or Watercraft Exclusion | 38-39 | Civil Authority Additional Coverage | 8-9 |
| Appraisal Property Loss Condition | 24 | Collapse Additional Coverage | 5-6 |
| "Auto" Definition | 46 | Collapse Exclusion | 21 |
| Bankruptcy General Condition | 45 | "Computer" Definition | 32 |
| "Bodily Injury" Definition | 46 | Concealment, Misrepresentation Or Fraud Condition | 51 |
| Building Coverage | 1 | Consequential Losses Exclusion | 20 |
| Building Limit – Automatic Increase (Limits Of Insurance) | 23 | Continuous Or Repeated Seepage Or Leakage Of Water Exclusion | 21-22 |
| Business Income Additional Coverage | 6-7 | Contractual Liability Exclusion | 36 |
| Business Income And Extra Expense Exclusions | 22 | Control Of Property General Condition | 28 |
| Business Income From Dependent Properties Additional Coverage | 10-11 | "Counterfeit Money" Definition | 32 |

| Businessowners Coverage Feature | Page Number | Businessowners Coverage Feature | Page Number |
|---|---|---|---|
| Coverage Extension – Supplementary Payments (Business Liability Coverage) | 35-36 | Employer's Liability Exclusion | 37 |
| Coverage Extensions – Section I – Property | 14-17 | Equipment Breakdown Protection Optional Coverage | 31-32 |
| "Coverage Territory" Definition | 46-47 | Errors Or Omissions Exclusion | 21 |
| Covered Causes Of Loss | 2 | Examination Of Your Books And Records Condition | 51 |
| Covered Property | 1-2 | Exclusions – Section I – Property | 17-22 |
| Damage To Impaired Property Or Property Not Physically Injured Exclusion | 40 | Exclusions – Section II – Liability | 36-44 |
| Damage To Property Exclusion | 40 | "Executive Officer" Definition | 47 |
| Damage To Your Product Exclusion | 40 | Expected Or Intended Injury Exclusion | 36 |
| Damage To Your Work Exclusion | 40 | Exposed Property Exclusion | 20 |
| Dampness Or Dryness Of Atmosphere Exclusion | 21 | Extended Business Income Coverage (Business Income Additional Coverage) | 7 |
| Debris Removal Additional Coverage | 3-4 | Extra Expense Additional Coverage | 7-8 |
| Deductibles | 23-24 | False Pretense Exclusion | 20 |
| Dishonesty Exclusion | 20 | Fire Department Service Charge Additional Coverage | 5 |
| Duties In The Event Of Loss Or Damage Property Loss Condition | 24 | Fire Extinguisher Systems Recharge Expense Additional Coverage | 11-12 |
| Duties In The Event Of Occurrence, Offense, Claim Or Suit General Condition | 46 | Forgery Or Alteration Additional Coverage | 9 |
| Earth Movement Exclusion | 17-18 | Frozen Plumbing Exclusion | 20 |
| Electrical Apparatus Exclusion | 19-20 | "Fungi" Definition | 32 |
| Electrical Disturbance Exclusion | 21 | "Fungi", Wet Rot Or Dry Rot Exclusion | 19 |
| Electronic Data Additional Coverage | 12 | Glass Expenses Additional Coverage | 11 |
| "Electronic Data" Definition | 32 | Governmental Action Exclusion | 18 |
| Electronic Data Exclusion | 41-42 | "Hostile Fire" Definition | 47 |
| "Employee" Definition | 47 | "Impaired Property" Definition | 47 |
| Employee Dishonesty Optional Coverage | 29-31 | Increased Cost Of Construction Additional Coverage | 9-10 |

© Insurance Services Office, Inc., 2012                **BP IN 01 07 13**

| Businessowners Coverage Feature | Page Number | Businessowners Coverage Feature | Page Number |
|---|---|---|---|
| Inspections And Surveys Condition | 51 | Medical Expenses Exclusions | 42-44 |
| Installation, Testing, Repair Exclusion | 21 | "Member" Definition | 32 |
| Insurance Under Two Or More Coverages Condition | 51 | Mobile Equipment Exclusion | 39 |
| "Insured Contract" Definition | 47 | "Mobile Equipment" Definition | 48 |
| Interruption Of Computer Operations Additional Coverage | 12-13 | Money And Securities Optional Coverage | 29 |
| "Leased Worker" Definition | 47 | "Money" Definition | 32 |
| Legal Action Against Us General Condition – Section II – Liability | 46 | Money Orders And "Counterfeit Money" Additional Coverage | 9 |
| Legal Action Against Us Property Loss Condition – Section I – Property | 24 | Mortgageholders Property General Condition | 28 |
| Liability And Medical Expenses Definitions | 46-50 | Neglect Exclusion | 21 |
| Liability And Medical Expenses General Conditions | 45-46 | Negligent Work Exclusion | 22 |
| Liability And Medical Expenses Limits Of Insurance | 45 | Nesting Or Infestation Exclusion | 21 |
| Liberalization Condition | 51 | Newly Acquired Or Constructed Property Coverage Extension | 14-15 |
| Limitations | 2-3 | No Benefit To Bailee Property General Condition | 28 |
| Limited Coverage For "Fungi", Wet Rot Or Dry Rot Additional Coverage | 13-14 | Nuclear Energy Liability Exclusion | 42-44 |
| Limits Of Insurance – Section I – Property | 23 | Nuclear Hazard Exclusion | 18 |
| Liquor Liability Exclusion | 36-37 | "Occurrence" Definition | 48 |
| "Loading Or Unloading" Definition | 48 | "Operations" Definition | 32 |
| Loss Payment Property Loss Condition | 24-27 | Optional Coverages | 28-32 |
| "Manager" Definition | 32 | Ordinance Or Law Exclusion | 17 |
| Marring Or Scratching Exclusion | 21 | Other Insurance Condition | 51 |
| Mechanical Breakdown Exclusion | 21 | Other Types Of Loss Exclusion | 21 |
| Medical Expenses Coverage | 36 | Outdoor Property Coverage Extension | 15 |

| Businessowners Coverage Feature | Page Number | Businessowners Coverage Feature | Page Number |
|---|---|---|---|
| Outdoor Signs Optional Coverage | 28-29 | Property Not Covered | 2 |
| "Period Of Restoration" Definition | 32 | Recall Of Products, Work Or Impaired Property Exclusion | 40 |
| "Personal And Advertising Injury" Definition | 48 | Recovered Property Loss Condition | 27 |
| Personal And Advertising Injury Exclusion | 40-41 | Resumption Of Operations Property Loss Condition | 27 |
| Personal Effects Coverage Extension | 15 | Rust Or Other Corrosion Exclusion | 21 |
| Personal Property Off-premises Coverage Extension | 15 | Section I – Property | 1-33 |
| Policy Period, Coverage Territory Property General Condition | 28 | Section II – Liability | 34-50 |
| Pollutant Clean-up And Removal Additional Coverage | 8 | Section III – Common Policy Conditions | 50-52 |
| "Pollutants" Definition – Section I – Property | 33 | "Securities" Definition | 33 |
| "Pollutants" Definition – Section II – Liability | 48 | Separation Of Insureds General Condition | 46 |
| Pollution Exclusion – Section I – Property | 21 | Settling, Cracking, Shrinking Or Expansion Exclusion | 21 |
| Pollution Exclusion – Section II – Liability | 37-38 | Smog Exclusion | 21 |
| Premium Audit Condition | 52 | Smoke, Vapor, Gas Exclusion | 20 |
| Premiums Condition | 51-52 | "Specified Causes Of Loss" Definition | 33 |
| Preservation Of Property Additional Coverage | 4-5 | Steam Apparatus Exclusion | 20 |
| "Products-completed Operations Hazard" Definition | 49 | "Stock" Definition | 33 |
| Professional Services Exclusion | 39-40 | "Suit" Definition | 49 |
| "Property Damage" Definition | 49 | "Temporary Worker" Definition | 49 |
| Property Definitions | 32-33 | Transfer Of Rights Of Recovery Against Others To Us Condition | 52 |
| Property General Conditions | 28 | Transfer Of Your Rights And Duties Under This Policy Condition | 52 |
| Property Loss Conditions | 24-28 | Utility Services Exclusion | 18 |

© Insurance Services Office, Inc., 2012
BP IN 01 07 13

| Businessowners Coverage Feature | Page Number | Businessowners Coverage Feature | Page Number |
|---|---|---|---|
| Vacancy Property Loss Condition | 27 | Water Damage, Other Liquids, Powder Or Molten Material Damage Additional Coverage | 6 |
| Valuable Papers And Records Coverage Extension | 15-16 | Water Exclusion | 19 |
| "Valuable Papers And Records" Definition | 33 | Wear And Tear Exclusion | 21 |
| Violation Of Customer Protection Statutes Exclusion | 42 | Weather Conditions Exclusion | 22 |
| Virus Or Bacteria Exclusion | 19 | Who Is An Insured | 44-45 |
| "Volunteer Worker" Definition | 49 | Workers' Compensation And Similar Laws Exclusion | 37 |
| War And Military Action Exclusion | 18 | "Your Product" Definition | 49-50 |
| War Exclusion | 39 | "Your Work" Definition | 50 |

POLICY NUMBER:

**BUSINESSOWNERS**
BP 04 30 07 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

## SCHEDULE

| Premises Number | Building Number | Protective Safeguards Symbols Applicable | Description Of "P-9" If Applicable |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** The following is added to the **Property General Conditions** in **Section I – Property:**

**Protective Safeguards**

**1.** As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

**2.** The protective safeguards to which this endorsement applies are identified by the following symbols:

**a. "P-1" Automatic Sprinkler System,** including related supervisory services.

Automatic Sprinkler System means:

**(1)** Any automatic fire protective or extinguishing system, including connected:

**(a)** Sprinklers and discharge nozzles;

**(b)** Ducts, pipes, valves and fittings;

**(c)** Tanks, their component parts and supports; and

**(d)** Pumps and private fire protection mains.

**(2)** When supplied from an automatic fire protective system:

**(a)** Nonautomatic fire protective systems; and

**(b)** Hydrants, standpipes and outlets.

**b. "P-2" Automatic Fire Alarm,** protecting the entire building, that is:

**(1)** Connected to a central station; or

**(2)** Reporting to a public or private fire alarm station.

**c. "P-3" Security Service,** with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

**d. "P-4" Service Contract,** with a privately owned fire department providing fire protection service to the described premises.

**e. "P-5" Automatic Commercial Cooking Exhaust And Extinguishing System,** installed on cooking appliances and having the following components:

**(1)** Hood;

(2) Grease removal device;

(3) Duct system; and

(4) Wet chemical fire extinguishing equipment.

f. **"P-9"**, the protective system described in the Schedule.

**B.** The following is added to Paragraph **B. Exclusions in Section I – Property:**

We will not pay for loss or damages caused by or resulting from fire if, prior to the fire, you:

**1.** Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

**2.** Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System or Automatic Commercial Cooking Exhaust And Extinguishing System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

© Insurance Services Office, Inc., 2012

BP 04 30 07 13

POLICY NUMBER:

BUSINESSOWNERS
BP 04 48 07 13

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): |
|---|
| |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**Section II – Liability** is amended as follows:

A. The following is added to Paragraph **C. Who Is An Insured:**

   3. Any person(s) or organization(s) shown in the Schedule is also an additional insured, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf in the performance of your ongoing operations or in connection with your premises owned by or rented to you.

   However:

    a. The insurance afforded to such additional insured only applies to the extent permitted by law; and

    b. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

B. With respect to the insurance afforded to these additional insureds, the following is added to Paragraph **D. Liability And Medical Expenses Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

   1. Required by the contract or agreement; or

   2. Available under the applicable Limits Of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits Of Insurance shown in the Declarations.

POLICY NUMBER:

**BUSINESSOWNERS**
**BP 04 89 01 10**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LIQUOR LIABILITY COVERAGE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

## SCHEDULE

| |
|---|
| **A. Liquor Liability Aggregate Limit:** $ |
| **B. Each Common Cause Limit:** $ |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**Section II – Liability** is amended as follows:

A. The insurance provided under Paragraph **A.1. Business Liability** also applies to all "bodily injury" or "property damage" arising out of the selling, serving or furnishing of alcoholic beverages.

B. For the insurance provided by this endorsement only, Paragraph **B. Exclusions** is amended as follows:

1. Paragraph **1. Applicable To Business Liability Coverages**, other than Exclusions **a. Expected Or Intended Injury**, **d. Workers' Compensation And Similar Laws** and **e. Employer's Liability**, does not apply.

2. The following exclusions are added:

   This insurance does not apply to:

   a. "Bodily injury" or "property damage" arising out of any alcoholic beverage sold, served or furnished while any required license is not in effect.

   b. "Bodily injury" or "property damage" arising out of "your product". This exclusion does not apply to "bodily injury" or "property damage" for which the insured or the insured's indemnities may be held liable by reason of:

      (1) Causing or contributing to the intoxication of any person;

      (2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

      (3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

   c. Any "bodily injury" or "property damage" with respect to which other insurance is afforded, or would be afforded but for the exhaustion of the Limits of Insurance.

      This exclusion does not apply if the other insurance responds to liability for "bodily injury" or "property damage" imposed on the insured by reason of the selling, serving or furnishing of any alcoholic beverage.

C. The following are added to Paragraph **D. Liability And Medical Expenses Limits Of Insurance:**

   D. Liability And Medical Expenses Limits Of Insurance

   5. The Liquor Liability Aggregate Limit shown in the Schedule of this endorsement is the most we will pay for all "bodily injury" and "property damage" as the result of the selling, serving or furnishing of alcoholic beverages.

 © Insurance Services Office, Inc., 2009

6. Subject to the Liquor Liability Aggregate Limit, the Each Common Cause Limit shown in the Schedule of this endorsement is the most we will pay for all "bodily injury" and "property damage" sustained by one or more persons or organizations as the result of the selling, serving or furnishing of alcoholic beverages to any one person.

Neither the Liability And Medical Expenses Limit of Insurance shown in the Declarations nor its aggregate limits apply to damages arising out of the selling, serving or furnishing of alcoholic beverages.

© Insurance Services Office, Inc., 2009
BP 04 89 01 10

BUSINESSOWNERS
BP 07 78 07 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# RESTAURANTS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

A. The following are added to Paragraph **A.5. Additional Coverages** of Section I – Property:

  **a. Reward Payment**

    (1) We will reimburse you for rewards paid as follows:

      (a) Up to $5,000 to an eligible person for information leading to the arrest and conviction of any person or persons committing a crime resulting in loss of or damage to Covered Property from a Covered Cause of Loss. However, we will pay no more than the lesser of the following amounts:

        (i) Actual cash value of the Covered Property at the time of loss or damage, but not more than the amount required to repair or replace it; or

        (ii) The amount determined by the loss settlement procedure applicable to the Covered Property under the Loss Payment Condition.

      (b) Up to $5,000 to an eligible person for the return of stolen Covered Property, when the loss is caused by theft. However, we will pay no more than the lesser of the following amounts:

        (i) Actual cash value based on the condition of the Covered Property at the time it is returned, but not more than the amount required to repair or replace it; or

        (ii) The amount determined by the loss settlement procedure applicable to the returned Covered Property under the Loss Payment Condition.

    (2) This Additional Coverage applies, subject to the following conditions:

      (a) An eligible person means that person designated by a law enforcement agency as being the first to voluntarily provide the information leading to the arrest and conviction or return of the stolen Covered Property, and who is not:

        (i) You or any family member;

        (ii) Your employee (including a temporary or leased employee) or any of his or her family members;

        (iii) An employee of a law enforcement agency;

        (iv) An employee of a business engaged in property protection;

        (v) Any person who had custody of the Covered Property at the time the theft was committed; or

        (vi) Any person involved in the crime.

      (b) No reward will be reimbursed unless and until the person(s) committing the crime is (are) convicted or the Covered Property is returned.

      (c) The lesser of the amount of the reward or $5,000 is the most we will reimburse for loss under this Additional Coverage in any one occurrence.

  **b. Brands And Labels**

    (1) If branded or labeled merchandise that is Covered Property is damaged by a Covered Cause of Loss, we may take all or any part of the property at an agreed or appraised value. If so, you may:

      (a) Stamp the word salvage on the merchandise or its containers, if the stamp will not physically damage the merchandise; or

(b) Remove the brands or labels, if doing so will not physically damage the merchandise. You must relabel the merchandise or its containers to comply with the law.

(2) We will pay reasonable costs you incur to perform the activity described in Paragraph (a) or (b) above. But the total we pay for these costs and the value of the damaged property will not exceed the applicable Limit Of Insurance on such property.

c. **Ordinance Or Law – Equipment Coverage**

(1) Subject to Paragraph (2), if a Covered Cause of Loss occurs to equipment that is Covered Property, we will pay to repair or replace the equipment as required by law.

(2) If a Covered Cause of Loss occurs to refrigeration equipment that is Covered Property, we will pay:

(a) The cost to reclaim the refrigerant as required by law;

(b) The cost to retrofit the equipment to use a non-CFC refrigerant as required by the Clean Air Act of 1990, and any amendments thereto or any other similar laws; and

(c) The increased cost to recharge the system with a non-CFC refrigerant.

(3) The terms of this coverage apply separately to each piece of covered equipment.

(4) We will not pay under this Additional Coverage for the costs associated with the enforcement of or compliance with any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungi", wet rot or dry rot.

(5) Loss to the equipment will be determined as follows:

(a) If the equipment is repaired or replaced, on the same or another premises, we will not pay more than the lesser of:

(i) The amount you actually spend to repair the equipment, but not for more than the amount it would cost to replace the equipment with equipment of the same kind and quality; or

(ii) The Limit Of Insurance shown in the Declarations as applicable to the covered Building or Business Personal Property.

(b) If the equipment is not repaired or replaced, we will not pay more than the lesser of:

(i) The actual cash value of the equipment at the time of loss; or

(ii) The Limit Of Insurance shown in the Declarations as applicable to the Building or Business Personal Property.

(c) We will not pay for loss due to any ordinance or law that:

(i) You were required to comply with before the loss, even if the equipment was undamaged; and

(ii) You failed to comply with.

d. **Lock Replacement**

(1) We will pay for the cost to repair or replace locks at the described premises due to theft or other loss to keys.

(2) The most we will pay under this Additional Coverage for all loss or damage in any one occurrence is $1,000.

(3) A per occurrence deductible of $100 will apply.

e. **Spoilage Coverage**

(1) We will pay for the loss of "perishable stock" caused by:

(a) A change in temperature or humidity resulting from mechanical breakdown or failure of refrigeration, cooling or humidity control apparatus or equipment, only while such apparatus or equipment is at the described premises;

(b) Contamination by a refrigerant; and

(c) Power outage, meaning change in temperature or humidity resulting from complete or partial interruption of electrical power, either on or off the described premises, due to conditions beyond your control.

(2) The most we will pay for loss under this Additional Coverage is $10,000 unless a different Limit Of Insurance for spoilage coverage is shown in the Declarations.

 © Insurance Services Office, Inc., 2012 BP 07 78 07 13

(3) The value of the "perishable stock" will be the selling price, as if no loss or damage had occurred, less discounts and expenses you otherwise would have had.

(4) This Additional Coverage does not apply if the spoilage results from:

(a) Earth movement;

(b) Governmental action;

(c) Nuclear hazard;

(d) War and military action;

(e) Water;

(f) The disconnection of any refrigerating, cooling or humidity control system from the source of power;

(g) The deactivation of electrical power caused by the manipulation of any switch or other device used to control the flow of electrical power or current;

(h) The inability of an electrical utility company or other power source to provide sufficient power due to:

(i) Lack of fuel; or

(ii) Governmental order;

(i) The inability of a power source at the described premises to provide sufficient power due to lack of generating capacity to meet demand; and

(j) Breaking of any glass that is a permanent part of any refrigerating, cooling or humidity control unit.

(5) We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of that deductible, up to the applicable Limit of Insurance. No other deductible in this policy applies to the coverage provided by this Additional Coverage.

(6) You must maintain a refrigeration maintenance or service agreement. If you voluntarily terminate this agreement and do not notify us within 10 days, the spoilage coverage provided by this Additional Coverage will be automatically suspended at the involved location.

However, coverage provided by this Additional Coverage is restored upon:

(a) Reinstatement of the applicable refrigeration maintenance or service agreement; or

(b) Procurement of a replacement refrigeration maintenance or service agreement.

A refrigeration maintenance agreement means a written service contract, between you and the refrigeration service organization, which provides for regular periodic inspection of the refrigeration equipment at the insured location, and the servicing and repair of the equipment, including emergency response at the insured location.

f. Food Contamination

(1) If your business at the described premises is ordered closed by the Board of Health or any other governmental authority as a result of the discovery or suspicion of "food contamination", we will pay:

(a) Your expense to clean your equipment as required by the Board of Health or any other governmental authority;

(b) Your expense to replace food which is, or is suspected to be, contaminated;

(c) Your expense to provide necessary medical tests or vaccinations for your employees (including temporary or leased employees) who are potentially infected by the "food contamination". However, we will not pay for any expense that is otherwise covered under a Workers' Compensation policy;

(d) The loss of Business Income you sustain due to the necessary suspension of your "operations". The coverage for Business Income will begin 24 hours after you receive notice of closing from the Board of Health or any other governmental authority; and

(e) Additional advertising expenses you incur to restore your reputation.

(2) The definition of Business Income in the **Business Income** Additional Coverage also applies to this **Food Contamination** Additional Coverage.

(3) The most we will pay for all loss in any one occurrence under Paragraphs **(1)(a)** through **(1)(d)**, including Business Income, is \$10,000, unless a higher Food Contamination Limit Of Insurance is indicated in the Declarations.

The most we will pay for all loss in any one occurrence under Paragraph **(1)(e)** is \$3,000, unless a higher Additional Advertising Expenses Limit Of Insurance Is indicated in the Declarations.

(4) We will not pay any fines or penalties levied against you by the Board of Health or any other governmental authority as a result of the discovery or suspicion of food contamination at the described premises.

(5) With respect to the coverage provided under this Paragraph **f.**, Exclusion **B.1.j.** Virus Or Bacteria in Section I – Property does not apply.

**B.** If the Employee Dishonesty Optional Coverage is shown as an applicable coverage in the Declarations, the following is added to Paragraph **3. Employee Dishonesty** of Paragraph **G. Optional Coverages** of **Section I – Property** and is subject to the provisions of that paragraph:

We will also pay for loss of or damage to "money", "securities" and "other property" sustained by your customer resulting directly from theft committed by an identified employee, acting alone or in collusion with other persons.

The property covered under this coverage is limited to property:

**a.** That your customer owns or leases; or

**b.** That your customer holds for others.

Coverage applies only while the property is in a covered Building at the premises described in the Declarations.

However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization, including your customer. Any claim for loss that is covered under this coverage must be presented by you.

**C.** For coverage provided under this endorsement, the following definitions are added to Paragraph **H. Property Definitions** of **Section I – Property:**

1. "Food contamination" means an outbreak of food poisoning or food-related illness of one or more persons arising out of:

   **a.** Tainted food you distributed or purchased;

   **b.** Food which has been improperly processed, stored, handled or prepared in the course of your business operations; or

   **c.** Food which has been contaminated by virus or bacteria transmitted through one or more of your employees, including temporary or leased employees.

2. "Other property" means any tangible property other than "money" and "securities" that has intrinsic value but does not include any property specifically excluded under this policy.

3. "Perishable stock" means property:

   **a.** Maintained under controlled temperature or humidity conditions for its preservation; and

   **b.** Susceptible to loss or damage if the controlled temperature or humidity conditions change.

**D.** The following are added to Paragraph **A. Coverages** of **Section II – Liability:**

1. **Delivery Errors And Omissions Coverage**

   **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of a failure to deliver or a misdelivery of items you hold for sale by you, any of your "employees" or by a concessionaire trading under your name. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for delivery errors and omissions to which this insurance does not apply. We may, at our discretion, investigate the circumstances of any misdelivery or failure to deliver and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Paragraph **1.e.** below;

© Insurance Services Office, Inc., 2012

(2) We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds $250. We will then pay the amount of loss or damage in excess of $250 up to the applicable Limit of Insurance for this coverage; and

(3) Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements under this Delivery Errors And Omissions Coverage.

**b.** This coverage applies only to errors in deliveries that take place or omissions of such deliveries that should have taken place in the "coverage territory" and during the policy period.

**c.** This coverage does not apply to:

(1) Intentional error or intentional misdelivery or failure to deliver "your product".

(2) "Bodily injury", "property damage" or "personal and advertising injury".

(3) Discrimination based on a customer's race, color, national origin, religion, gender, marital status, age, sexual orientation or preference, physical or mental condition or residence location.

**d.** The Supplementary Payments provision applicable to the Bodily Injury, Property Damage, and Personal And Advertising Injury Liability Coverages also applies to this Delivery Errors And Omissions Coverage.

**e.** The most we will pay for the sum of all damages under this coverage because of all failures or misdeliveries is $10,000 in any annual period starting with the beginning of the policy period shown in the Declarations. This limit applies separately to each premises described in the Declarations.

**f.** The following replaces the **Duties In The Event Of Occurrence, Offense, Claim Or Suit** Condition under Paragraph **E. Liability And Medical Expenses General Conditions** of **Section II – Liability** for the **Delivery Errors Or Omissions Coverage:**

**Duties In The Event Of A Delivery Error Or Omission**

(1) You must see to it that we are notified as soon as practicable of an error or omission which may result in a claim. To the extent possible, notice should include:

(a) How, when and where the error or omission took place; and

(b) The name(s) and address(es) of the affected customer(s).

(2) If a claim is made or "suit" is brought against any insured, you must:

(a) Immediately record the specifics of the claim or "suit" and the date received; and

(b) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

(3) You and any other involved insured must:

(a) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(b) Authorize us to obtain records and other information;

(c) Cooperate with us in our investigation or settlement of the claim or defense against the "suit"; and

(d) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of error or omission to which this insurance may apply.

© Insurance Services Office, Inc., 2012

(4) No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur an expense without our consent.

2. **Merchandise Withdrawal Expenses Coverage**

   a. We will reimburse you for "merchandise withdrawal expenses" incurred because of "merchandise withdrawal" to which this insurance applies.

   b. This insurance applies to a "merchandise withdrawal" only if the "merchandise withdrawal" is initiated in the "coverage territory" during the policy period because:

      (1) You determine that the "merchandise withdrawal" is necessary; or

      (2) An authorized government entity has ordered you to conduct a "merchandise withdrawal".

   c. The initiation of a "merchandise withdrawal" will be deemed to have been made only at the earliest of the following times:

      (1) When you first announced, in any manner, to the general public, your vendors or to your "employees" (other than those "employees" directly involved in making the determination) your decision to conduct or participate in a "merchandise withdrawal". This applies regardless of whether the determination to conduct a "merchandise withdrawal" is made by you or is requested by a third party; or

      (2) When you first received, either orally or in writing, notification of an order from an authorized government entity to conduct a "merchandise withdrawal".

   d. "Merchandise withdrawal expenses" incurred to withdraw "your products" which contain the same or substantially similar "defects" will be deemed to have arisen out of the same "merchandise withdrawal".

   e. We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds $250. We will then pay the amount of loss or damage in excess of $250 up to the applicable Limit of Insurance for this coverage.

   f. This insurance does not apply to "merchandise withdrawal expense" arising out of:

      (1) Any "merchandise withdrawal" initiated due to:

         (a) The failure of "your product" to accomplish its intended purpose, including any breach of warranty of any kind, whether written or implied. This exclusion does not apply if such failure has caused or is reasonably expected to cause "bodily injury".

         (b) Copyright, patent, trade secret, trade dress or trademark infringement.

         (c) Transformation of a chemical nature, deterioration, or decomposition of "your product". This exclusion does not apply if it is caused by:

            (i) An error in manufacturing, design, or processing;

            (ii) Transportation of "your product"; or

            (iii) "Merchandise tampering".

         (d) Expiration of the designated shelf life of "your product"; or

      (2) A "defect" in "your product" known to exist by you or your "executive officers", prior to the date this endorsement was first issued to you or prior to the time "your product" leaves your control or possession;

      (3) Recall of any specific product for which "bodily injury" or "property damage" is excluded under Paragraph **A.** Coverages of Section **II – Liability** by endorsement;

      (4) Recall when "your product" or a component contained within "your product" has been:

         (a) Banned from the market by an authorized government entity prior to the policy period; or

         (b) Distributed or sold by you subsequent to any governmental ban;

      (5) The defense of a claim or "suit" against you for liability arising out of a "merchandise withdrawal"; or

      (6) The costs of regaining goodwill, market share, revenue or "profit" or the costs of redesigning "your product".

 © Insurance Services Office, Inc., 2012 BP 07 78 07 13

g. The most we will reimburse you for the sum of all "merchandise withdrawal expenses" incurred for all "merchandise withdrawals" initiated during the policy period is $25,000.

h. The following replaces the **Duties In The Event Of Occurrence, Offense, Claim Or Suit** Condition under Paragraph **E. Liability And Medical Expenses General Conditions of Section II – Liability** for the **Merchandise Withdrawal Expenses Coverage:**

**Duties In The Event Of A Defect Or A Merchandise Withdrawal**

(1) You must see to it that we are notified as soon as practicable of any actual, suspected or threatened "defect" in "your product" or any governmental investigation, that may result in a "merchandise withdrawal". To the extent possible, notice should include:

    (a) How, when and where the "defect" was discovered;

    (b) The names and addresses of any injured persons and witnesses; and

    (c) The nature, location and circumstances of any injury or damage arising out of use or consumption of "your product".

(2) If a "merchandise withdrawal" is initiated, you must:

    (a) Immediately record the specifics of the "merchandise withdrawal" and the date it was initiated; and

    (b) Notify us as soon as practicable.

    You must see to it that we receive written notice of the "merchandise withdrawal" as soon as practicable.

(3) You must promptly take all reasonable steps to mitigate the expenses associated with a "merchandise withdrawal". Any "profit" that you receive from mitigating the expenses will be deducted from the amount of reimbursement that you will receive for "merchandise withdrawal expenses".

(4) You and any other involved insured must:

    (a) Immediately send us copies of pertinent correspondence received in connection with the "merchandise withdrawal";

    (b) Authorize us to obtain records and other information; and

    (c) Cooperate with us in our investigation of the "merchandise withdrawal".

E. For coverage provided under this endorsement, the following are added to Paragraph **F. Liability And Medical Expenses Definitions of Section II – Liability:**

1. "Defect" means a defect, deficiency or inadequacy that creates a dangerous condition.

2. "Merchandise tampering" is an act of intentional alteration of "your product" which has caused or is reasonably expected to cause "bodily injury".

    When "merchandise tampering" is known, suspected or threatened, a "merchandise withdrawal" will be limited to those batches of "your product" which are known or suspected to have been tampered with.

3. "Merchandise withdrawal" means the recall or withdrawal:

    a. From the market; or

    b. From use by any other person or organization;

    of "your products" or products which contain "your products", because of known or suspected "defects" in "your product", or known or suspected "product tampering", which has caused or is reasonably expected to cause "bodily injury".

4. "Merchandise withdrawal expenses" means those reasonable and necessary extra expenses listed below, paid and directly related to a "merchandise withdrawal":

    a. Costs of notification;

    b. Costs of stationery, envelopes, production of announcements and postage or facsimiles;

    c. Costs of overtime paid to your regular nonsalaried employees and costs incurred by your employees including costs of transportation and accommodations;

    d. Costs of computer time;

    e. Costs of hiring independent contractors and other temporary employees;

    f. Costs of transportation, shipping or packaging;

    g. Costs of warehouse or storage space; or

    h. Costs of proper disposal of "your products" or products that contain "your products" that cannot be reused, not exceeding your purchase price or your cost to produce the products.

5. "Profit" means the positive gain from business operation after subtracting for all expenses.

F. With respect to "bodily injury" or "property damage" arising out of "your products" manufactured, sold, handled or distributed in conjunction with the conduct of your restaurant operation, when conducted by you or on your behalf, Paragraph **a.** of the definition of "products-completed operations hazard" in Paragraph **F. Liability And Medical Expenses Definitions** of **Section II – Liability** is replaced by the following:

    **a.** Includes all "bodily injury" and "property damage" that arises out of "your products" if the "bodily injury" or "property damage" occurs after you have relinquished possession of those products.

 © Insurance Services Office, Inc., 2012 **BP 07 78 07 13**

BUSINESSOWNERS
BPHG40 0713

# EQUIPMENT BREAKDOWN ENHANCEMENT ENDORSEMENT

This endorsement changes coverage provided by the Businessowners Coverage Form BP0003. Read the entire endorsement carefully to determine rights, duties and what is and is not covered.

This endorsement provides coverage for the perils of mechanical, electrical and steam boiler explosion for "Equipment Breakdown" as defined.

## SECTION I – PROPERTY

### A. Coverage

The following Limitations are deleted:

### 4. Limitations

a. We will not pay for loss of or damage to:

(1) Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

(2) Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

The following limit under **5. Additional Coverages, h.** has been changed to:

### 5. Additional Coverages

#### h. Pollutant Clean-up and Removal

We will pay for the pollutant clean up and removal for loss resulting from an "Equipment Breakdown." The most we will pay for the pollutant clean up and removal is $250,000 unless a higher limit is provided by an endorsement to the property form for which this endorsement is attached. In that case, whichever limit is greater will apply.

The following Coverage Extensions are added:

### 6. Coverage Extensions

#### Expediting Expense

We will pay for the expediting expense loss resulting from an "Equipment Breakdown" with respect to your damaged Covered Property. We will pay the reasonable extra cost to:

(1) Make temporary repairs;
(2) Expedite permanent repairs; and
(3) Expedite permanent replacement.

Reasonable extra cost shall mean the extra cost of temporary repair and of expediting the repair of such damaged equipment of the insured, including overtime and the extra cost of express or other rapid means of transportation. This payment may be adjusted for salvage expenses or recoveries.

#### Refrigerant Contamination

We will pay the loss from contamination by refrigerant used in refrigerating, cooling or humidity control equipment at the described premises as a result of "Equipment Breakdown."

The most we will pay for loss or damage under this coverage is $250,000 unless a higher limit is provided by an endorsement to the property form for which this endorsement is attached. In that case, whichever limit is greater will apply. This payment may be adjusted for salvage expenses and recoveries.

**Spoilage Coverage**

We will pay for loss of perishable goods due to spoilage resulting from lack of power, light, heat, steam or refrigeration caused by "Equipment Breakdown" to types of property covered by this policy, that are:

(1) located on or within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater,

(2) owned or used by you, the building owner at your described premises, or owned by a public utility; and

(3) used to supply telephone, electricity, air conditioning, heating, gas, water or steam to your described premises.

However, we will not pay for any loss, damage, cost or expense directly caused by, contributed to by, resulting from or arising out of the following causes of loss:

Fire, lightning, combustion explosion, windstorm or hail, weight of snow, ice or sleet, falling objects, smoke, aircraft or vehicles, riot or civil commotion, vandalism, sinkhole collapse, volcanic action, leakage from fire extinguishing equipment, water, water damage, earth movement and flood.

The most we will pay for loss or damage under this coverage is $250,000 unless a higher limit is provided by an endorsement to the property form for which this endorsement is attached. In that case, whichever limit is greater will apply.

**CFC Refrigerants**

We will pay for the additional cost to repair or replace Covered Property because of the use or presence of a refrigerant containing CFC (chlorofluorocarbon) substances caused by an "Equipment Breakdown".

Additional costs mean those in excess of what would have been required to repair or replace covered property had no CFC refrigerant been involved. We also pay for additional loss as described under the Spoilage Coverages provided by this endorsement, caused by the presence of a refrigerant containing CFC substances.

We pay no more than the following:

(1) The cost to repair the damaged property and replace any lost CFC refrigerant;

(2) The cost to repair the damaged property, retrofit the system to accept a non-CFC refrigerant, and charge the system with a non-CFC refrigerant; or

(3) The cost to replace the system with one using a non-CFC refrigerant.

**Utility Interruption**

We will pay for loss of business income and extra expense from a total or partial interruption of business to run your business during the interruption resulting from an "Equipment Breakdown" to power or other utility service supplied to the described premises as follows:

(1) located on or within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater,

(2) owned by the building owner at your described premises, or owned by a public utility; and

(3) used to supply telephone, electricity, air conditioning, heating, gas, water or steam to your described premises.

But if failure of power or other utility service results in an "Equipment breakdown" to covered property, we will pay for the loss or damage caused by the "Equipment Breakdown."

However, we will not pay for any loss, damage, cost or expense directly caused by, contributed to by, resulting from or arising out of the following causes of loss:

Fire, lightning, combustion explosion, windstorm or hail, weight of snow, ice or sleet, falling objects, smoke, aircraft or vehicles, riot or civil commotion, vandalism, sinkhole collapse, volcanic action, leakage from fire extinguishing equipment, water, water damage, earth movement and flood.

The most we will pay for loss or damage under this coverage is $25,000 unless a higher limit is provided by an endorsement to the property form for which this endorsement is attached. In that case, whichever limit is greater will apply.

**Computer Equipment**

We will pay for loss or damage to your Computers caused by an "Equipment Breakdown".

**Valuable Papers and Records**

We will pay for your reasonable and necessary cost to research, replace and restore lost information on electronic media and records as a result of an "Equipment Breakdown".

This will be part of and not an addition to the limits provided by the Valuable Papers and Records coverage under the property form to which this endorsement is attached.

**B. Exclusions**

The following Exclusions are deleted:

**2. a. Electrical Apparatus**

Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

(1) Electrical or electronic wire, device, appliance, system or network; or
(2) Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

(1) Electrical current, including arcing;
(2) Electrical charge produced or conducted by a magnetic or electromagnetic field;
(3) Pulse of electromagnetic energy; or
(4) Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by fire. We will pay for loss or damage to "computer(s)" due to artificially generated electrical, magnetic or electromagnetic energy if such loss or damage is caused by or results from:

(1) An occurrence that took place within 100 feet of the described premises; or
(2) Interruption of electric power supply, power surge, blackout or brownout if the cause of such occurrence took place within 100 feet of the described premises.

**2. d. Steam Apparatus**

Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**2. f. Other Types of Loss**

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. This exclusion does not apply with respect to the breakdown of "computer(s)";

## F. Property General Conditions

The following Property General Conditions are added:

### 5. Suspension

Whenever "Equipment Breakdown" property is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss to that "Equipment Breakdown" property for the perils covered by this endorsement. Coverage can be suspended and possibly reinstated by delivering or mailing a written notice of suspension / coverage reinstatement to:

**(a)** Your last known address; or
**(b)** The address where the property is located; or
**(c)** As otherwise required by applicable law concerning notification of suspension.

If we suspend your insurance, you will get a pro rata refund of premium. But the suspension will be effective even if we have not yet made or offered a refund.

### 6. Inspections and Surveys

**a.** We have the right to:

**(1)** Make inspections and surveys at any time;
**(2)** Give you reports on the conditions we find; and
**(3)** Recommend changes.

**b.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. We do not warrant that conditions:

**(1)** Are safe or healthful; or
**(2)** Comply with laws, regulations, codes or standards.

**c.** Paragraphs **a.** and **b.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**d.** Paragraph **b.** of this condition does not apply to any inspections, surveys, reports, or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

### 7. Environmental, Safety and Efficiency Improvements

If Covered Property requires repair or replacement due to an "Equipment Breakdown", we will pay your additional cost to replace with equipment that is better for the environment, safer, or more efficient than the equipment being replaced.

However, we will not pay more than 125% of what the cost would have been to repair or replace with like kind and quality. This Condition does not apply to any property to which Actual Cash Value applies.

## G. Optional Coverages

The following Optional Coverages are changed:

### 1. Outdoor Signs

The following exclusion is removed.

**c. (5)** Mechanical Breakdown

The provisions of this endorsement supercede the following optional coverage:

**4. Equipment Breakdown Protection Coverage**

H. Property Definitions

"Equipment Breakdown" as used herein means physical loss or damage, both originating within:

1. Boilers, fired or unfired pressure vessels, vacuum vessels, and pressure piping, all normally subject to vacuum or internal pressure other than static pressure of contents, excluding:

   a. Waste disposal piping;
   b. Any piping forming part of a fire protective system;
   c. Furnaces; and
   d. Any water piping other than

      (1) Boiler feed water piping between the feed pump and the boiler;
      (2) Boiler condensate return piping; or
      (3) Water piping forming part of a refrigerating or air conditioning system used for cooling, humidifying or space heating purposes;

2. All mechanical, electrical, electronic or fiber optic equipment; and caused by, resulting from or consisting of:

   a. Mechanical breakdown; or
   b. Electrical or electronic breakdown; or
   c. Rupture, bursting, bulging, implosion, or steam explosion.

"Equipment Breakdown" does not mean:

Physical loss or damage caused by or resulting from any of the following. However, if loss or damage not otherwise excluded results, then we will pay for such resulting damage:

1. Wear and tear;

2. Rust or other corrosion, decay, deterioration, hidden or latent defect, mold or any other quality in property that causes it to damage or destroy itself;

3. Smog;

4. Settling, cracking, shrinking or expansion;

5. Nesting or infestation, or discharge or release of waste products or secretions, by birds, rodents or other animals;

6. Any accident, loss, damage, cost, claim, or expense, whether preventative, remedial, or otherwise, directly or indirectly arising out of or relating to the recognition, interpretation, calculation, comparison, differentiation, sequencing, or processing of data by any computer system including any hardware, programs or software.

7. The following causes of loss to personal property:

   a. dampness or dryness of atmosphere;
   b. marring or scratching.

8. Loss, damage, cost or expense directly caused by, contributed to by, resulting from or arising out of the following causes of loss:

   Fire, lightning, combustion explosion, windstorm, hail, weight of snow, ice or sleet, falling objects, smoke, aircraft or vehicles, riot or civil commotion, vandalism, sinkhole collapse, volcanic action, leakage from fire extinguishing equipment, water, water damage, earth movement or flood.

BUSINESSOWNERS
BPHG80 0713

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT PRACTICES LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**THIS ENDORSEMENT PROVIDES CLAIMS MADE AND REPORTED COVERAGE. DEFENSE COSTS APPLY AGAINST THE LIMITS OF INSURANCE AND ARE SUBJECT TO THE DEDUCTIBLE.**

**SCHEDULE**

| Employment Practices Liability Limits Of Insurance: | |
|---|---|
| Each "Claim" Limit | $ |
| Aggregate Limit | $ |
| Deductible: | |
| Each "Claim" | $ |
| Retroactive Date: | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

For the purposes of the coverage provided by this Employment Practices Liability Endorsement, **SECTION II - LIABILITY** is amended as follows:

**A.** The following is added to paragraph **A. Coverages**:

    **3. Employment Practices Liability**

        **a.** We will pay on behalf of the insured for "damages" in excess of the Deductible arising out of any "employment practices" to which this insurance applies. We have no obligation under this insurance to make payments or perform acts or services except as provided for in this paragraph and in paragraph **f.** below.

        **b.** This insurance applies to such "damages" only if:

            **(1)** The "damages" result from "claims" made by "employees", "leased workers", "temporary workers", former "employees" or applicants for employment by you;

            **(2)** The "employment practices" take place in the "coverage territory";

            **(3)** Such "employment practices" occurred on or after the Retroactive Date, if any, shown in the Schedule and before the end of the "coverage period"; and

            **(4)** A "claim" is both:

                **(a)** First made against any insured, in accordance with paragraph **c.** below, during the "coverage period" or any Extended Reporting Period we provide under **F. EXTENDED REPORTING PERIODS**; and

                **(b)** Reported to us either **(i)** during the "coverage period" or within thirty (30) days thereafter, or **(ii)** with respect to any "claim" first made during any Extended Reporting Period we provide under **F. EXTENDED REPORTING PERIODS**, during such Extended Reporting Period.

        **c.** A "claim" will be deemed to have been made at the earlier of the following times:

      **(1)** When notice of such "claim" is received and recorded by you or by us, whichever comes first; or

      **(2)** When we make settlement in accordance with paragraph **f.(2)(b)** below.

**d.** All "claims" by one or more claimants for "damages" based on or arising out of:

      **(1)** One "employment practice"; or

      **(2)** An "interrelated" series of "employment practices", by one or more insureds shall be deemed to be one "claim" and to have been made at the time the first of those "claims" is made against any insured.

**e.** Each payment we make for "damages" or "defense expense" reduces the Limit of Insurance available, as provided under Paragraph **D.** of this endorsement.

**f.** **Defense of Claims, Administrative Hearings & Settlement Authority**

Subject to the limits of insurance, deductible, conditions, exclusions, definitions, and other terms of this Endorsement:

      **(1)** We have the right and duty to defend "claims" against the insured seeking "damages" to which this insurance applies and to pay for related, "defense expense."

      However, we have no duty to:

      **(a)** Defend "claims" against the insured seeking "damages"; or

      **(b)** Pay for related "defense expense",

      when this insurance does not apply.

      **(2)** We may, at our sole discretion:

      **(a)** Investigate any "employment practice" that may result in "damages"; and

      **(b)** Settle any "claim" which may result, provided:

        **(i)** We have the insured's written consent to settle; and

        **(ii)** The settlement is within the applicable Limit of Insurance available.

      **(3)** Our liability will be limited as described below if:

      **(a)** The insured refuses to consent to any settlement we recommend; and

      **(b)** Such recommended settlement is acceptable to the claimant.

      After such refusal, our liability under this endorsement for such "claim" shall not exceed the amount we would have paid for "damages" and "defense expense" if the insured had consented to our settlement recommendation. The insured shall thereafter be responsible for the negotiation and defense of that "claim" at their own cost and without our involvement.

      **(4)** Our right and duty to defend such "claims" ends when we have used up the Limit of Insurance available, as provided under Paragraph **D.** of this endorsement. This applies both to "claims" pending at that time and any that may be made.

      **(5) (a)** When we control defense of a "claim", we will pay associated "defense expense" and choose a counsel of our choice from the panel of attorneys we have selected to deal with "employment practices" "claims".

      If you give us a specific written request at the time a "claim" is first made:

      **(i)** You or any involved insured may select one of our panel of employment law attorneys; or

      **(ii)** You or such insured may ask us to consider the approval of a defense attorney of your or that insured's choice who is not on our panel.

      We will then use the attorney selected in **(i)** above, or consider the request in **(ii)** above, if we deem it appropriate to engage counsel for such "claim".

      **(b)** If by mutual agreement or court order the insured assumes control of the defense before the applicable Limit of Insurance is used up, the insured will be allowed to

select defense counsel and we will reimburse the insured for reasonable "defense expense". You and any involved insured must:

**(i)** continue to comply with **E.2. Duties in the Event of "Employment Practices" or "Claims".**

**(ii)** Direct defense counsel to:

**(aa)** Furnish us with the additional information we request to evaluate the "employment practices" or "claim"; and

**(bb)** Cooperate with any counsel we may select to monitor or associate in the defense of the "employment practices" or "claim".

If we defend any insured under a reservation of rights, both such insured's counsel and our counsel will be required to maintain records pertinent to "defense expenses". These records will be used to determine the allocation of any "defense expenses" for which you or any insured may be solely responsible, including defense of an allegation not covered by this insurance.

We will notify you in writing when the applicable limit of insurance has been used-up by the payment of judgments, settlements or "defense expense". We will also initiate and cooperate in the transfer of defense of any "claim" to an appropriate insured for whom the duty to defend has ended by reason of paragraph **f.(4)** above.

**(6)** Upon notice to us and with our prior approval, the first Named Insured is authorized to act on behalf of all insureds with respect to the payment of "damages" in settlement of any Administrative Hearing or other non-judicial proceeding before the Federal Equal Employment Opportunity Commission, or any similar Federal, state or local body or commission. This authorization is limited to:

**(i)** "Damages" covered by this endorsement; together with

**(ii)** "Defense expenses", as defined in paragraph **H.26.d.**,

in a total amount not to exceed two times the amount of the Deductible stated in the Schedule.

**B.** The following is added to paragraph **B. Exclusions:**

**4. Applicable To Employment Practices Liability Coverage:**

This insurance does not apply to "claims" based on, arising out of, or in any way involving:

**a. (1)** "Employment practices" which were the subject of any demand, suit or other proceeding which was initiated against any insured; or

**(2)** Facts and circumstances which would cause a reasonable person to believe a "claim" would be made and which were known to any insured;

prior to the effective date or the earlier of:

**(i)** The first coverage endorsement of this type that we issued to you of which this endorsement was an uninterrupted renewal of this type of coverage; or

**(ii)** This endorsement.

**b.** Loss of any benefit conferred or loss of any obligation imposed under an express contract of employment.

**c.** Any obligation to pay "damages" by reason of the assumption of liability in any contract or agreement.

However, this exclusion does not apply to liability for "damages" that the insured would have in the absence of the contract or agreement.

**d.** Liability arising under any of the following laws:

**(1)** Any workers compensation, disability benefits or unemployment compensation law or any similar law.

However, this exclusion shall not apply to any "claim" based upon, arising from or in consequence of any actual or alleged retaliatory treatment of the claimant by the insured on account of the claimant's exercise of rights pursuant to any such law;

  **(2)** Employees' Retirement Income Security Act of 1974, Public Law 93-406, (ERISA) as now or hereafter amended, or any similar state or other governmental law. This includes:

    **(a)** Fiduciary liability;

    **(b)** Liability arising out of the administration of any employee benefit plan; and

    **(c)** Any other liability under any such laws;

  **(3)** The Fair Labor Standards Act, or any state or common law wage or hour law, including, but not limited to laws governing minimum wages, hours worked, overtime compensation and including any recordkeeping and reporting related thereto.

This exclusion includes actions or claims brought by or on behalf of individuals or agencies seeking wages, fines, penalties, taxes, disgorgement or other affirmative relief or compensation.

This exclusion does not include claims based on the Equal Pay Act or retaliation related to Equal Pay Act claims;

  **(4)** The National Labor Relations Act;

  **(5)** The Worker Adjustment and Retraining Notification Act (Public Law 100-379);

  **(6)** The Consolidated Omnibus Budget Reconciliation Act of 1985; or

  **(7)** The Occupational Safety and Health Act.

This exclusion **d. (1) – (7)** also applies to:

  **(i)** Any rules or regulations promulgated under any of the foregoing and amendments thereto;

  **(ii)** Any similar provisions of any federal, state or local law;

  **(iii)** That part of any "damages" awarded for the cost or replacement of any insurance benefits due or alleged to be due to any current or former "employee"; and

  **(iv)** Any "claim" based upon, arising from or in consequence of any actual or alleged retaliatory treatment of the claimant by the insured on account of the claimant's exercise of rights pursuant to any such law described in this exclusion **d.** This provision **d.(iv)** does not apply to the specific retaliation exceptions shown in exclusions **d.(1)** and **d.(3)** above.

**e.** Oral or written publication of material, if such material:

  **(1)** Was published by or at the direction of the insured with knowledge of the material's falsity; or

  **(2)** Was first published before the Retroactive Date, if any, shown in the Schedule.

**f.** Dishonest, criminal or fraudulent acts of the insured.

**g.** The willful failure by the insured or with the insured's consent to comply with any law or any governmental or administrative order or regulation relating to "employment practices".

Willful, as used in this exclusion **g.**, means acting with intentional or reckless disregard for such employment related laws, orders or regulations.

The enforcement of this exclusion against any insured shall not be imputed to any other insured."

**h.** "Bodily injury".

**i.** "Employment practices" which occur when or after:

  **(1)** You file for or are placed in any bankruptcy, receivership, liquidation or reorganization proceeding; or

  **(2)** Any other business entity acquires an ownership interest in you, which is greater than fifty percent.

**j.** Costs of complying with physical modifications to your premises or any changes to your usual business operations as mandated by the Americans with Disabilities Act of 1990 including any amendment thereto, or any similar federal, state or local law.

This exclusion also applies to any "claim" based upon, arising from or in consequence of any actual or alleged retaliatory treatment of the claimant by the insured on account of the claimant's exercise of rights pursuant to any such law described in this exclusion **j.**

**k.** Lockout, strike, picket line, related worker replacements or other similar actions resulting from labor disputes or labor negotiations.

This exclusion also applies to any "claim" based upon, arising from or in consequence of any actual or alleged retaliatory treatment of the claimant by the insured on account of the claimant's exercise of rights pursuant to labor disputes or labor negotiations.

**C.** Paragraph **C. Who Is An Insured** is deleted and replaced by the following:

**1.** If you are designated in the Declarations as:

   **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   **b.** A partnership or joint venture, you are an insured. Your current or former members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   **c.** A limited liability company, you are an insured. Your current or former members are also insureds, but only with respect to the conduct of your business. Your current or former managers are insureds, but only with respect to their duties as your managers.

   **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**2.** Each of the following is an insured:

   **a.** Your "employees",

   **b.** Your former "employees", but only with respect to "employment practices" committed while in your employ.

   **c.** Any heirs, executors, administrators, assignees or legal representatives of any individual insured in subparagraphs **1.a.**, **1.b.**, **2.a.** and **2.b.** above, in the event of the death, bankruptcy or incapacity of such insured, shall be insureds, but only to the extent this insurance would have been available to such insured but for their death, bankruptcy or incapacity.

   **d.** Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   **(1)** You must provide us notice of such acquisition or formation within 30 days of the effective date of your acquisition or formation;

   **(2)** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   **(3)** Coverage does not apply to any "wrongful act" that occurred before you acquired or formed the organization; and

   **(4)** You must pay us any additional premium due as a condition precedent to the enforceability of this additional extension of coverage.

   This Paragraph **d.** does not apply to any organization after it is shown in the Declarations.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**D.** Paragraphs **1.** through **4.** of item **D. Liability And Medical Expenses Limits Of Insurance** is deleted and replaced by the following:

    **1.** The Limit of Insurance stated as Aggregate Limit in the Employment Practices Liability Endorsement Schedule is the most we will pay for the sum of:

        **a.** "Damages" for all "claims" arising out of any actual or alleged "employment practices" covered by this insurance; and

        **b.** "Defense expense" for all "claims" seeking "damages" payable under paragraph **1.a.** above.

        Each payment we make for such "damages" or "defense expenses" reduces the Aggregate Limit by the amount of the payment.

        This reduced limit will then be the Limit of Insurance available for further "damages" and "defense expenses" under this endorsement.

    **2.** Subject to paragraph **1.** above, the Limit of Insurance stated as the Each "Claim" Limit of Insurance is the most we will pay in excess of the Deductible as further described in paragraph **5.** below for the sum of:

        **a.** "Damages" for injury arising from "employment–practices" covered by this insurance and arising out of one "claim"; and

        **b.** "Defense expense" associated with that specific "claim" in item **2.a.** immediately preceding.

    **3.** We will pay all interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the amount available for the judgment under the provisions of paragraphs **1.** and **2.** above. This payment will be in addition to the Limits of Liability.

    **4.** The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the "coverage period" shown in the Declarations, unless the "coverage period" is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

    **5.** Deductible

        **a.** A deductible applies to all "damages" for injury arising from "employment practices" and any "defense expense" however caused.

        **b.** Our obligation under this Employment Practices Liability Endorsement to pay "damages" and "defense expense" on behalf of any insured applies only to the sum of the amount of "damages" and "defense expense" for any one "claim" which are in excess of the deductible amount stated in the Schedule.

        **c.** Your obligation is to pay the deductible applicable to each "claim" made against this insurance. That deductible applies to the sum of all "damages" because of injury arising from "employment practices" paid for any one "claim" and applicable "defense expense" associated therewith. If there should be no "damages" paid for a "claim", you are still obligated to pay the applicable deductible for any "defense expense" incurred by us in connection with that "claim".

        **d.** The terms of this insurance apply irrespective of the application of the deductible, including those with respect to:

            **(1)** Our right and duty to defend any "claims" seeking those "damages"; and

            **(2)** Your and any involved insured's duties in the event of a "claim".

        **e.** We may pay any part or all of the deductible to effect settlement of any "claim" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible as we may have paid for "damages" or "defense expense."

        **f.** The application of the deductible does not reduce the applicable Limits of Insurance.

## Example No. 1

Deductible: $5,000

Limit of Insurance: $100,000

Damages and "Defense Expenses": $75,000

The Deductible will be subtracted from the amount of damages and "defense expenses" in calculating the amount payable:

$75,000 - $5,000 = $70,000 Amount Payable

## Example No. 2

Deductible: $5,000

Limit of Insurance: $100,000

Damages and "Defense Expenses": $120,000

The Deductible will be subtracted from the amount of damages and "defense expenses" ($120,000 - $5,000 = $115,000). Since the amount of the damages and "defense expenses" minus the Deductible exceeds the Limit of Insurance, the policy will pay the full Limit of Insurance ($100,000).

E. Paragraph **E. Liability And Medical Expenses General Conditions** is amended as follows:

    1. Paragraph **2. Duties In The Event Of Occurrence, Offense, Claim Or Suit** is deleted and replaced by the following:

    **2. Duties in the Event of "Employment Practices" or "Claims"**

        a. You must see to it that we are notified as soon as practicable of any specific "employment practices" which you believe may result in an actual "claim". Your belief must be reasonably certain as the result of specific allegations made by a potential claimant or such potential claimant's representative, or as the result of specifically identifiable injury sustained by a potential claimant. Notices of "employment practices" should include the following detailed information:

           (1) How, when and where such "employment practices" took place;

           (2) The names and addresses of any potential claimants and witnesses; and

           (3) The nature of any injury arising out of such "employment practices".

        Notice of such "employment practices" is not notice of a "claim", but preserves any insured's rights to future coverage for subsequent "claims" arising out of such "employment practices" as described in the Basic Extended Reporting Period of paragraph **F. EXTENDED REPORTING PERIODS** of this endorsement.

        b. If a "claim" is received by any insured:

           (1) You must immediately record the specifics of the "claim" and the date received;

           (2) You and any other involved insured must see to it that we receive written notice of the "claim", as soon as practicable, but in any event we must receive notice either:

              (a) If paragraph **F – EXTENDED REPORTING PERIODS** of this endorsement does not apply, during the "coverage period" or within thirty (30) days thereafter

              (b) No later than thirty (30) days after the occurrence of an event outlined in paragraph **(1)** of paragraph **F – EXTENDED REPORTING PERIODS** of this endorsement; or

              (c) With respect to any "claim" first made during any Extended Reporting Period we provide under paragraph **F. EXTENDED REPORTING PERIODS** of this endorsement, during such Extended Reporting Period.

           As a condition precedent for coverage under this insurance, notice of a "claim" must include the detailed information required in paragraphs 2.a.(1), (2) and (3); and

           (3) You and any other involved insured must:

              (a) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim";

        **(b)** Authorize us to obtain records and other information;

        **(c)** Cooperate with us in the investigation, settlement or defense of the "claim"; and

        **(d)** Assist us, upon our request, in the enforcement of any right against any person or organization, which may be liable to the insured because of injury or damage to which this insurance may also apply.

  **c.** No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent, other than those specific payments authorized under paragraph **A.3.f.(4) Defense of Claims, Administrative Hearings & Settlement Authority.**

**2.** The following paragraph is added:

  **5. Representations**

  By accepting this policy, you agree that:

  **a.** The statements in the Declarations and Schedule are accurate and complete;

  **b.** Those statements are based upon representations you made to us; and

  **c.** We have issued this policy in reliance upon your representations.

## F. EXTENDED REPORTING PERIODS

**1. a.** We will provide Extended Reporting Periods, as described below, if:

  **(1)** This endorsement is cancelled or not renewed for any reason other than due to:

    **(a)** Nonpayment of premium;

    **(b)** Failure to comply with terms or conditions of the coverage; or

    **(c)** Fraud;

  **(2)** This endorsement is renewed with insurance that does not apply on a claims-made basis;

  **(3)** This endorsement is modified so that it has a Retroactive Date later than the date shown in the Schedule; or

  **(4)** We renew or replace this endorsement with insurance that has a reduction in coverage other than:

    **(a)** A reduction in limits; or

    **(b)** An increase in deductible amount.

  **b.** When we provide Extended Reporting Periods as provided under paragraph **1.(a)(4)** above, coverage shall apply only to the portion of coverage that has been reduced.

**2.** Extended Reporting Periods are an extension of time allowed for coverage to apply for "claims" first made against any insured and for those "claims" to be reported to us. Extended Reporting Periods do not extend the "coverage period" or change the scope of coverage provided. They apply only to "claims" as the result of "employment practices" committed after the Retroactive Date, if any, shown in the Schedule and before the end of the "coverage period". Once in effect, Extended Reporting Periods may not be cancelled.

**3.** A Basic Extended Reporting Period is automatically provided without additional charge.

  **a.** This period starts on the day the Extended Reporting Period is triggered as described in paragraph **1.** above and lasts for:

  **(1)** Five years with respect to "claims" arising out of "employment practices" which had been properly reported to us before the end of the "coverage period" in accordance with paragraph **E.2., Duties in the Event of "Employment Practices" or "Claims"**; and

  **(2)** Sixty-days with respect to "claims" arising from "employment practices" not previously reported to us.

  **b.** This period does not:

  **(1)** Reinstate or increase the Limits of Insurance; or

  **(2)** Apply to "claims" that are covered under any subsequent insurance you purchase, or that would be covered but for exhaustion of the Limit of Insurance applicable to such "claims".

4. A Supplemental Extended Reporting Period of either twelve (12) or thirty-six (36) months duration is available, but only by endorsement and for an extra charge.

    **a.** This supplemental period starts when the Basic Extended Reporting Period set forth in paragraph **3.a.(2)** above ends.

    **b.** You must give us a written request for this optional coverage, and its length, within 30 days after the end of the "coverage period".

    **c.** The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium when due.

    **d.** We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

        **(1)** The exposures insured;

        **(2)** Previous types and amounts of insurance;

        **(3)** Limits of Insurance available under this endorsement for future payment of "damages" or "defense expense"; and

        **(4)** Other related factors.

    The additional premium will not exceed 200% of the annual premium for this endorsement.

5. Coverage provided by a Supplemental Extended Reporting Period Endorsement shall apply excess over any other valid and collectible insurance available under policies in force after the Supplemental Extended Reporting Period begins.

6. When the Supplemental Extended Reporting Period Endorsement is in effect, we will provide a Supplemental Extended Reporting Period Limit of Insurance for any "claim" first made during the Supplemental Extended Reporting Period. The Supplemental Extended Reporting Period Limit of Insurance will be equal to the unimpaired dollar amount stated in the Schedule under Aggregate Limit on the day the Extended Reporting Period is triggered as described in paragraph **1.** above.

**G.** Definitions **3.**, **4.** and **5.** contained in Paragraph **F. Liability And Medical Expenses Definitions** are deleted and replaced by the following :

    **3.** **"Bodily injury"** means physical injury to the body, sickness or disease sustained by a person as the result of direct physical injury to the body, including death resulting from any of these at any time.

    "Bodily injury" does not include mental anguish that results from an "employment practice".

    **4.** **"Coverage territory"** means:

        **a.** The United States of America (including its territories and possessions) and Puerto Rico; or

        **b.** Anywhere in the world with respect to the activities of a person whose place of employment is in the territory described in paragraph **4.a.** above, while he or she is away for a short time on your business, provided that the insured's responsibility to pay "damages" is determined in a suit on the merits (or any type of civil proceeding described under the definition of "claim") in and under the substantive law of the United States of America (including its territories and possessions) or Puerto Rico.

    **5.** **"Employee"** means:

        **a.** A person employed by you for wages or salary; or

        **b.** A person who is a current or former member of your board of directors.

    However, "employee" does not include:

        **(i)** Any independent contractor;

        **(ii)** Any employees of any independent contractor while acting within the scope of their employment;

        **(iii)** Any "leased worker"; or

        **(iv)** Any "temporary worker".

H. The following definitions are added to Paragraph **F. Liability And Medical Expenses Definitions** of the policy:

    **23. "Claim"** means written or oral notice presented by:

      **a.** Any:

        **(1)** "Employee";

        **(2)** "Leased worker";

        **(3)** "Temporary worker";

        **(4)** Former "employee"; or

        **(5)** Applicant for employment by you; or

      **b.** The EEOC or any other federal, state or local administrative or regulatory agency on behalf of a person described in paragraph **23.a.** above,

    alleging that the insured is responsible for "damages" as a result of injury arising out of any "employment practice".

    "Claim" includes any civil proceeding in which either "damages" are alleged or fact finding will take place, when either is the result of any "employment practice" to which this insurance applies. This includes:

      **(i)** An arbitration proceeding in which such "damages" are claimed and to which the insured submits with our consent;

      **(ii)** Any other alternative dispute resolution proceeding in which such "damages" are claimed and to which the insured submits with our consent; or

      **(iii)** Any administrative proceedings as established under federal, state or local laws applicable to "employment practices" covered under this insurance.

    **24. "Coverage period"** means the period of time between the effective date of this endorsement and:

      **a.** The policy expiration date; or

      **b.** If coverage provided by this endorsement is terminated prior to the expiration date; the date of such termination,

    whichever comes first.

    **25. "Damages"** means monetary amounts to which this insurance applies and which the insured is legally obligated to pay as judgments or awards, or as settlements to which we have agreed in writing.

    "Damages" include:

      **a.** "Pre-judgment interest" awarded against the insured on that part of the judgment we pay;

      **b.** Any portion of a judgment or award, to the extent allowed by law, that represents a multiple of the compensatory amounts, punitive or exemplary damages; and

      **c.** Statutory attorney fees.

    "Damages" do not include:

      **a.** Civil, criminal, administrative or other fines or penalties;

      **b.** Equitable relief, injunctive relief, declarative relief or any other relief or recovery other than money; or

      **c.** Judgments or awards because of acts deemed uninsurable by law.

    **26. "Defense expense"** means payments allocated to a specific "claim" for its investigation, settlement, or defense, including:

      **a.** Attorney fees and all other litigation expenses.

      **b.** The cost of bonds to appeal a judgment or award in any "claim" we defend. We do not have to furnish these bonds.

    **c.** The cost of bonds to release attachments, but only for bond amounts within the Limit of Insurance available. We do not have to furnish these bonds.

    **d.** Reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of any "claim", including actual loss of earnings up to $250 a day because of time off from work.

    **e.** Costs taxed against the insured in the "claim". However, these payments do not include attorney's fees or attorney's expenses taxed against the insured.

    "Defense expense" does not include:

    **i.** Salaries and expenses of our employees or your "employees", other than:

        **(a)** That portion of our employed attorneys' fees, salaries and expenses allocated to a specific "claim" for the defense of the insured; and

        **(b)** The expenses described in paragraph **d.** above; and

    **ii.** Interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the amount available for the judgment under the provisions of Paragraph **D.**

**27. "Employment practices"** means any of the following actual or alleged practices:

    **(i)** Which are directed against any of your

        **a.** "Employees";

        **b.** "Leased workers";

        **c.** "Temporary workers";

        **d.** Former "employees"; or

        **e.** Applicants for employment by you; and

    **(ii)** For which remedy is sought under any civil employment law whether federal, state or local and whether arising out of statutory or common law:

        **a.** Wrongful refusal to employ a qualified applicant for employment;

        **b.** Wrongful failure to promote, or wrongful deprivation of career opportunity;

        **c.** Wrongful demotion, evaluation, reassignment or discipline;

        **d.** Wrongful termination of employment, including retaliatory or constructive discharge;

        **e.** Employment related misrepresentation;

        **f.** Harassment, including sexual harassment, coercion, discrimination or humiliation as a consequence of race, color, creed, national origin, marital status, medical condition, gender, age, physical appearance, physical and or mental impairments, pregnancy, sexual orientation or sexual preference or any other protected class or characteristic established by any applicable federal, state, or local statute; or

        **g.** Oral or written publication of material that slanders, defames or libels, or violates or invades a right of privacy.

**28. "Interrelated"** means having as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

**29. "Pre-judgment interest"** means interest added to a settlement, verdict, award or judgment based on the amount of time prior to the settlement, verdict, award or judgment, whether or not made part of the settlement, verdict, award or judgment.

ILHG07 0416

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CYBER LIABILITY ENDORSEMENT
## CLAIMS-MADE AND REPORTED COVERAGE
## (DEFENSE COSTS AND LEGAL EXPENSES ARE PAID
## WITHIN THE LIMITS OF LIABILITY)

### SCHEDULE

| Cyber Liability Insurance | |
|---|---|
| Each **Claim** Limit: | $100,000 |
| Each **First Party Insured Event** Limit: | $100,000 |
| Annual Aggregate Limit: | $100,000 |

**Retroactive Date:**

(Enter date. If left blank, the entry will be deemed the same as the inception of the policy period shown in the Declarations.)

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

## I. WHAT IS COVERED

**We** agree to pay (1) **loss** resulting from a **claim** for an actual or alleged **wrongful act** and (2) **first party costs** resulting from a **first party insured event**, but only if:

A. With respect to a **claim** for **wrongful acts** (third party liability coverage):
1. The **claim** is first made against an **insured** during the policy period or any extended reporting period (if applicable). A **claim** will be deemed to be first made against an **insured** when the **insured** first receives written notice of the **claim**;
2. The entirety of the **wrongful act** takes place on or after the **retroactive date**;
3. The **claim** is reported to **us** in writing no later than sixty (60) days after the **claim** is first made against the **insured**; and
4. The **claim** does not arise from any **wrongful acts**, incidents, events, facts or circumstances of which any **insured** had knowledge prior to the **retroactive date**.

B. With respect to **first party insured events** (first party loss coverage):
1. The entirety of the **first party insured event** takes place on or after the **retroactive date**;
2. The **first party insured event** is discovered by any **insured** during the policy period or any extended reporting period (if applicable);
3. The **first party insured event** is reported to **us** no later than sixty (60) days after any **insured** first discovers the **first party insured event**; and
4. The **first party insured event** does not arise from any incidents, events, facts or circumstances of which any **insured** had knowledge prior to the **retroactive date**.

## II. LIMITS OF LIABILITY

A. The "each **claim** limit" in the **SCHEDULE** is the most **we** will pay for any one **claim**.
B. The "each **first party insured event** limit" in the **SCHEDULE** is the most **we** will pay for any one **first party insured event**.

ILHG07 0416                                                                                    Page 1 of 6

C. The "annual aggregate limit" in the **SCHEDULE** is the most **we** will pay for the sum of all **claims** made against all **insureds** and all **first party insured events** discovered during the **policy period** and any automatic extended reporting period (if applicable). If the "annual aggregate limit" is exhausted, **our** obligations under this Endorsement will be deemed completely fulfilled and extinguished.

D. The "each **claim** limit," the "each **first party insured event** limit" and the "annual aggregate limit" include defense costs and legal expenses.

## III. WHAT IS NOT COVERED

**We** are not obligated to defend any **claim** or to pay any **loss** or **first party costs** based upon, arising from, attributable to, or in any way involving:

A. Any **wrongful act** or **first party insured event**, if, prior to the original inception date of **your** Cyber Liability coverage, such **wrongful act** or **first party insured event** was: (1) reported to us or to any other insurer; (2) the subject of any written demand for monetary damages or legal or administrative proceedings received by an **insured**; (3) identified or disclosed to **us** in connection with **your** insurance application; or (4) known to any **insured**.

B. Liability any **insured** assumes under any contract or agreement. This exclusion does not apply to: (1) liability an **insured** would have in the absence of the contract or agreement, provided such liability is otherwise covered under this Endorsement; (2) with respect to any actual or alleged **wrongful act**, liability for **loss** which **you** assume in the form of a written hold harmless or indemnification agreement, provided that such hold harmless or indemnification agreement is executed prior to the date the **wrongful act(s)** take place.

C. Any actual or alleged breach of contract, warranty, guarantee or promise. This exclusion does not apply to: (1) liability an **insured** would have in the absence of the contract, warranty, guarantee or promise, provided such liability is otherwise covered under this Endorsement; (2) a **claim** alleging breach of **your** privacy policy.

D. Any **claim** brought by or on behalf of an **insured** against another **insured**. This exclusion does not apply to a **claim** brought by **your** employee alleging breach of such employee's personal or confidential information.

E. Any actual or alleged intentional or fraudulent act or omission or intentional violation of law by an **insured**, including the use of unlicensed programs. This exclusion does not apply to a **claim** or **first party insured event** resulting from sabotage by **your** employee.

F. **Your** use of programs that are not **operational programs** or **delivered programs**.

G. Any operations and/or services not related to the business or enterprise named in the Policy declaration page or schedule of **insureds**.

H. Any actual or alleged infringement of any patent or trade secret; or actual or alleged unfair competition, deceptive trade practices or restraint of trade.

I. Satellite failures; the failure of overhead transmission and distribution lines; the gradual deterioration of subterranean insulation; or electrical or mechanical failures or interruption, such as an electrical spike or surge, brownout or blackout; or outages to gas, water, telephone, cable, telecommunications or other infrastructure unless such infrastructure is under **your** direct operational control and the incident forms a part of an otherwise covered **first party insured event**.

J. Any **adverse media report** that also affects or refers in similar terms to a general security issue, an industry, or **your** competitors without any specific allegations regarding a **security breach** or **privacy breach**.

## IV. CONDITIONS

A. **We** have the right and duty to defend any **claim**. **We** have the exclusive right to appoint legal counsel for the defense and investigation of any **claim** or **first party insured event**. **We** have the right to investigate, adjust, and request documentation in connection with any **claim** or **first party insured event**.

B. All **claims** arising out of the same or related events, incidents, facts or circumstances shall be considered as one **claim** first made on the date the earliest of such **claims** is first made. Appeals and post-trial proceedings shall be considered as part of the original **claim**. All **first party insured events** arising out of

the same or related incidents, facts or circumstances shall be considered as one **first party insured event** first reported to **us** on the date the earlier of such **first party insured events** is reported to **us**. In the event an **insured** reports a **first party insured event** and such **first party insured event** results in a **claim** against an **insured**, such **claim** will be deemed first made when **we** first receive notice of the **first party insured event**, and only one limit of liability will apply.

C. The coverage provided by this Endorsement is excess of and payable only after all other valid and collectible insurance available to the **insured** is exhausted. If all other valid and collectible insurance is excess, **we** will pay only the proportionate share of **loss** and/or **first party costs** which the "each **claim** limit" or "**first party insured** event limit" under this Endorsement bears to the total of all limits that apply, but **we** will not pay more than the "each **claim** limit" or "**first party insured event** limit," whichever applies.

## V. EXTENDED REPORTING PERIOD

### A. AUTOMATIC EXTENDED REPORTING PERIOD

In the event of non-renewal of **your** Policy, or termination of **your** Policy for any reason other than non-payment of premium, **we** will provide, at no additional cost, an Automatic Extended Reporting Period of sixty (60) days within which **claims** or **first party insured events** otherwise covered by this Endorsement may be made and reported. Such Automatic Extended Reporting Period will commence immediately upon termination or expiration of the Policy and will apply to:

1. Any **claim** which:
   a. arises out of **wrongful act(s)** that take place or first commence on or after the **retroactive date**, but prior to the Policy termination or expiration date; and
   b. is first made against an **insured** and reported to us in writing during the Automatic Extended Reporting Period.

2. A **first party insured event** which:
   a. occurs or first commences on or after the **retroactive date**, but prior to the Policy termination or expiration date;
   b. is first discovered by any **insured** during the Automatic Extended Reporting Period; and
   c. is reported to **us** in writing during the Automatic Extended Reporting Period.

### B. SUPPLEMENTAL EXTENDED REPORTING PERIOD

**You** shall have the option, upon payment of the required additional premium, to purchase a Supplemental Extended Reporting Period of 12 months or 36 months following the effective date of termination of coverage and will receive a Supplemental Extended Reporting Endorsement. The Supplemental Extended Reporting Period will extend the time during which **claims** for **wrongful acts** or **first party insured events** otherwise covered by this Endorsement may be made and reported. If the Supplemental Extended Reporting Period is purchased, the Automatic Extended Reporting Period will be included within the Supplemental Extended Reporting Period. Such Supplemental Extended Reporting Period will apply only to:

1. Any **claim** which:
   a. arises out of **wrongful act(s)** that take place or first commence on or after the **retroactive date**, but prior to the Policy termination or expiration date; and
   b. is first made against an **insured** during the Supplemental Extended Reporting Period; and
   c. is reported in writing to **us** no later than 60 days after the **claim** is first made against the **insured**.

2. A **first party insured event** which:
   a. occurs or first commences on or after the **retroactive date**, but prior to the Policy termination or expiration date;
   b. is first discovered by any **insured** during the Supplemental Extended Reporting Period; and

c. is reported to **us** in writing no later than 60 days from the date any **insured** discovers the **first party insured event**.

The right to purchase the Supplemental Extended Reporting Period Endorsement shall terminate unless written notice of such election, together with full payment of the required additional premium due, is received by **us** no later than sixty (60) days after the effective date of termination of coverage. The additional premium for the Supplemental Extended Reporting Period Endorsement shall be a percentage of the rates for Cyber Liability coverage in effect on the date the policy was issued or last renewed. If **you** do not elect to purchase a Supplemental Extended Reporting Period, then coverage under this Endorsement will terminate at the end of the Automatic Extended Reporting Period. If **you** elect to purchase a Supplemental Extended Reporting Period, coverage will terminate at the end of the Supplemental Extended Reporting Period.

Once in effect, the Supplemental Extended Reporting Period may not be canceled, and the entire premium will be deemed fully earned. **We** will not be liable to return any portion of the premium to **you** for such Supplemental Extended Reporting Period. If **you** have not paid the required additional premium for the Supplemental Extended Reporting Period when due, then such Supplemental Extended Reporting Period shall be void.

C. All terms and conditions of this Endorsement, including the limits of liability set forth in Section II – Limits of Liability, will continue to apply during any extended reporting period.

D. The existence of any extended reporting period will not increase or reinstate any "each **claim** limit," "each **first party insured event** limit" or "annual aggregate limit".

## VI. DEFINITIONS:

With respect to the coverage provided by this Endorsement, certain words are shown in bold face print and are defined as follows. Refer to the Definitions section in the Policy for terms that are shown in bold in this Endorsement, but are not defined below. If a term is defined below and in the Policy, the definition below applies to the coverage provided by this Endorsement. All other terms in this Endorsement will be interpreted according to their generally accepted meaning or common customary usage.

**Acquiring bank** means a bank or financial institution that accepts credit and/or debit card payments (including credit cards, debits cards, stored value cards and pre-paid cards) for products or services on behalf of a merchant, including processing and crediting those payments to a merchant's account.

**Act of cyber terrorism** means the premeditated use of disruptive activities, or the threat thereof, against computers, computer systems, networks and/or public internet by any person or group(s) of persons, whether acting alone or on behalf of, or in connection with, any organization(s) or government(s) with the intention to intimidate or cause destruction or harm and/or further social, ideological, religious, political or similar objectives. **Act of cyber terrorism** includes, but is not limited to, the use of information technology to organize and execute large-scale attacks against computer systems, networks and/or public internet resulting in disabling and/or deleting critical infrastructure, data or information.

**ADCR** means the Account Data Compromise Recovery process as established by Visa or similar processes as established by other **card associations**.

**Adverse media report** means any unpredictable report or communication of an actual or potential **security breach** or **privacy breach**, which has been publicized through any media channel including, but not limited to, television, print media, radio or electronic networks, the internet, and/or electronic mail; and threatens material damage to **your** reputation or **your** brand.

**Business associate** means any third party independent contractor that provides **you** with business process outsourcing services or information technology services under a written contract with **you** to provide such services.

ILHG07 0416

Page 4 of 6

**Card association** means Visa International, MasterCard, Discover, JCB, American Express and any similar credit or debit card association that is a participating organization of the Payment Card Industry Security Standards Council.

**Claim** means: (1) a written demand for monetary damages or other non-monetary relief made against an **insured**; (2) civil proceedings or arbitration proceedings commenced against an **insured** by the service of a summons or complaint; (3) written notification of a government investigation commenced against an **insured**; or (4) a written demand for a **PCI DSS assessment** made against an **insured** by an **acquiring bank** or **card association** due to non-compliance with the **PCI Data Security Standard**.

**Delivered programs** means programs, applications, and software where the development stage has been finalized, having passed all test-runs and been proven successful in a live environment.

**First party costs** means the following reasonable and necessary costs and expenses incurred by **you** as a result of a **first party insured event**: (1) **privacy breach** or **security breach** mitigation costs, including legal expenses, forensic investigation fees, proactive and reactive crisis management expenses, public relations and advertising expenses, costs to notify affected individuals of a **privacy breach**, whether or not notification is required in the applicable jurisdiction, and a maximum of twelve (12) months of credit monitoring and identity restoration services; (2) income loss **you** sustain, business interruption expenses **you** incur, and/or costs **you** incur to restore, replace or recreate **your** electronic data that is damaged, corrupted or destroyed as a direct result of a **network security incident** or an **act of cyber terrorism**; or (3) funds **you** pay to persons reasonably believed to be responsible for a cyber extortion threat made against **you**. **First party costs** do not include: (1) any amounts to repair damage to, or to replace, **your** tangible property, including computer hardware; (2) any liability to third parties for whatever reason, including legal costs and expenses of any type; (3) contractual penalties or consequential damages; or (4) fines, penalties, taxes or sanctions.

**First party insured event** means: (1) a **security breach** or **privacy breach**; (2) a **network security incident**; (3) a cyber extortion threat; (4) an **act of cyber terrorism**; or (5) an **adverse media report**. **First party insured event** does not include any **claim** made by a third party.

**Insured** means any person or organization qualifying as such under the Policy to which this Endorsement attaches.

**Loss** means: (1) damages, judgments, awards, or amounts designated by a government entity as civil or administrative fines or penalties, any of which an **insured** is legally obligated to pay as a result of a **claim**; (2) settlements negotiated with **our** consent; (3) reasonable and necessary legal fees, costs or expenses incurred in the defense of a **claim**; and (4) a **PCI DSS Assessment**. **Loss** does not include any amounts deemed uninsurable by law, or any costs associated with the adoption and implementation of any compliance plan.

**Network security incident** means any of the following which results in damage, corruption, theft or misuse of **your** electronic data: (1) accidental damage or destruction of **your** computer hardware or electronic media; (2) administrative or operational mistakes by **you**, **your** employee, or **your business associate** in the handling of **your** electronic data or in the operation of **your** computer system; or (3) a **security breach**.

**Operational programs** means programs and software that are ready for operational use, having been fully developed, tested, and accepted by **you**.

**PCI DSS assessment** means a monetary fine or penalty assessed against an **insured** by an **acquiring bank** or **card association**, including related compliance case costs, **ADCR** financial liability and card replacement costs, as a result of a **security breach** or **privacy breach**.

**PCI Data Security Standard** (known as "PCI DSS") means the published Payment Card Industry Security Council Data Security Standard in effect now or as hereafter amended, which all merchants and processors must follow when storing, processing and transmitting cardholder data.

**Privacy breach** means an unauthorized disclosure of personal or confidential information that violates **your** privacy policy or any federal or state law or regulation associated with the confidentiality, access, control and use of personally identifiable, non-public information, but only if committed or allegedly committed by **you, your** employee, or a **business associate** that is holding, processing, storing or transferring such personal or confidential information for **you.**

**Security breach** means: (1) unauthorized access to or use of **your** computer system; (2) a denial of service attack against **your** computer system; or (3) infection of **your** computer system by malicious code.

**Retroactive date** means the date specified as such on this Endorsement, on or after which any **wrongful act** or **first party insured event** must have taken place in order to be considered for coverage under this Endorsement.

**We, us,** and **our** means the company which is providing the insurance under this Endorsement.

**Wrongful act(s)** means any of the following, whether actual or alleged: (1) an act or error committed by an **Insured** in the release or display of **your** electronic or print media, which results in privacy injury, infringement of copyright, trademark or domain name, or plagiarism; (2) a **privacy breach**; (3) an **Insured's** failure to prevent or hinder, or to timely disclose, a **security breach** or **privacy breach**; or (4) an **insured's** non-compliance with **PCI Data Security Standards**.

**You** or **Your** means any person or organization shown on the Policy Declarations, and any other person or organization qualifying as a Named Insured under the Policy to which this Endorsement attaches.



# EXHIBIT B

(OMITTED - UNDERLYING COMPLAINT)

# EXHIBIT C

# COMMERCIAL INSURANCE APPLICATION
## APPLICANT INFORMATION SECTION

**ACORD®**

| | | | DATE (MM/DD/YYYY) |
|---|---|---|---|
| | | | 11/13/2015 |

| AGENCY | CARRIER | | NAIC CODE |
|---|---|---|---|
| BIONDI INS AGENCY INC | Rarford Mutual Insurance Company | | |

525 ELMER STREET

P. O. BOX 1418

VINELAND                NJ   08362-1418

| UNDERWRITER: | | UNDERWRITER OFFICE: Producing Office |
|---|---|---|
| POLICIES OR PROGRAM REQUESTED | | POLICY NUMBER |
| | | LANDIS 623 |

| CONTACT NAME: | Renee Scribner |
|---|---|
| PHONE (A/C, No, Ext): | (856) 696-0700 |
| FAX (A/C, No): | (856) 696-0293 |
| E-MAIL ADDRESS: | ReneeS@Biondiins.com |

| CODE: | | SUB CODE: |
|---|---|---|

AGENCY CUSTOMER ID: 00008461

| INDICATE SECTIONS ATTACHED | | | | |
|---|---|---|---|---|
| | ACCOUNTS RECEIVABLE/ VALUABLE PAPERS | | ELECTRONIC DATA PROC | | TRUCKERS/MOTOR CARRIER |
| | BOILER & MACHINERY | | EQUIPMENT FLOATER | | UMBRELLA |
| | BUSINESS AUTO | | GARAGE AND DEALERS | | VEHICLE SCHEDULE |
| X | COMMERCIAL GENERAL LIABILITY | | GLASS AND SIGN | | WORKERS COMPENSATION |
| | CRIME/MISCELLANEOUS CRIME | | INSTALLATION/BUILDERS RISK | | YACHT |
| | DEALERS | | OPEN CARGO | | |
| | DRIVER INFO SCHEDULE | X | PROPERTY | | |
| | | | TRANSPORTATION/ MOTOR TRUCK CARGO | | |

## STATUS OF TRANSACTION

| X | QUOTE | | ISSUE POLICY | | RENEW |
|---|---|---|---|---|---|
| | BOUND (Give Date and/or Attach Copy): | | | | |
| | CHANGE | DATE | TIME | X | AM |
| | CANCEL 11/17/2015 | 12:01 | | | PM |

## PACKAGE POLICY INFORMATION

ENTER THIS INFORMATION WHEN COMMON DATES AND TERMS APPLY TO SEVERAL LINES, OR FOR MONOLINE POLICIES.

| PROPOSED EFF DATE | PROPOSED EXP DATE | BILLING PLAN | PAYMENT PLAN | AUDIT |
|---|---|---|---|---|
| 11/17/2015 | 11/17/2016 | X DIRECT BILL | | |
| | | AGENCY BILL | PACKAGE POLICY PREMIUM: $ | 0.00 |

## APPLICANT INFORMATION

| NAME (First Named Insured & Other Named Insureds) | MAILING ADDRESS INCL ZIP+4 (of First Named Insured) |
|---|---|
| Z & D Realty LLC t/a, DBA: East Park Ave Apartments | 242 Mystic Dr |
| | Egg Harbor          NJ 08234 |

| FEIN OR SOC SEC # (of First Named Insured): | PHONE (A/C, No. Ext): |
|---|---|
| E-MAIL ADDRESS(ES): | WEBSITE ADDRESS(ES): |

| | INDIVIDUAL | | CORPORATION | | SUBCHAPTER "S" CORPORATION | X | LLC | NO. OF MEMBERS AND MANAGERS | CR BUREAU NAME: | DATE BUS STARTED |
|---|---|---|---|---|---|---|---|---|---|---|
| | PARTNERSHIP | | JOINT VENTURE | | NOT FOR PROFIT ORG. | | | | ID NUMBER: | 2012 |

| INSPECTION CONTACT: Zyggi Dobkowski | | ACCOUNTING RECORDS CONTACT: | |
|---|---|---|---|
| PHONE (A/C, No. Ext): (609) 432-8646 | E-MAIL ADDRESS: | PHONE (A/C, No. Ext): | E-MAIL ADDRESS: |

## PREMISES INFORMATION      ACORD 823 attached for additional premises

| LOC # | BLD # | STREET, CITY, COUNTY, STATE, ZIP+4 | CITY LIMITS | | INTEREST | YR BUILT | # EMPLOYEES | ANNUAL REVENUES | % OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 623 E Landis Ave Vineland        NJ   08360 Cumberland | X INSIDE | X | OWNER | 1960 | | | 100 |
| | | | OUTSIDE | | TENANT | | | | |
| | | | INSIDE | | OWNER | | | | |
| | | | OUTSIDE | | TENANT | | | | |
| | | | INSIDE | | OWNER | | | | |
| | | | OUTSIDE | | TENANT | | | | |
| | | | INSIDE | | OWNER | | | | |
| | | | OUTSIDE | | TENANT | | | | |

## NATURE OF BUSINESS/DESCRIPTION OF OPERATIONS BY PREMISE(S)

LRO / building: restaurant & 4 apartments

MERC

FIRSTLINEHARFORD0609

## GENERAL INFORMATION

AGENCY CUSTOMER ID: 00008461

| EXPLAIN ALL "YES" RESPONSES | Y/N |
|---|---|
| 1a.  IS THE APPLICANT A SUBSIDIARY OF ANOTHER ENTITY ? | N |
| 1b.  DOES THE APPLICANT HAVE ANY SUBSIDIARIES? | N |
| 2.  IS A FORMAL SAFETY PROGRAM IN OPERATION? | N |
| 3.  ANY EXPOSURE TO FLAMMABLES, EXPLOSIVES, CHEMICALS? | N |
| 4.  ANY CATASTROPHE EXPOSURE? | N |
| 5.  ANY OTHER INSURANCE WITH THIS COMPANY OR BEING SUBMITTED? | N |
| 6.  ANY POLICY OR COVERAGE DECLINED, CANCELLED OR NON-RENEWED DURING THE PRIOR THREE (3) YEARS? (Not applicable in MO) | N |
| 7.  ANY PAST LOSSES OR CLAIMS RELATING TO SEXUAL ABUSE OR MOLESTATION ALLEGATIONS, DISCRIMINATION OR NEGLIGENT HIRING? | N |
| 8.  DURING THE LAST FIVE YEARS (TEN IN RI), HAS ANY APPLICANT BEEN INDICTED FOR OR CONVICTED OF ANY DEGREE OF THE CRIME OF FRAUD, BRIBERY, ARSON OR ANY OTHER ARSON-RELATED CRIME IN CONNECTION WITH THIS OR ANY OTHER PROPERTY? (In RI, this question must be answered by any applicant for property insurance. Failure to disclose the existence of an arson conviction is a misdemeanor punishable by a sentence of up to one year of imprisonment) | N |
| 9.  ANY UNCORRECTED FIRE CODE VIOLATIONS? | N |
| 10.  ANY BANKRUPTCIES, TAX OR CREDIT LIENS AGAINST THE APPLICANT IN THE PAST FIVE (5) YEARS? | N |
| 11.  HAS BUSINESS BEEN PLACED IN A TRUST? IF "YES", NAME OF TRUST: | N |
| 12.  ANY FOREIGN OPERATIONS, FOREIGN PRODUCTS DISTRIBUTED IN USA, OR US PRODUCTS SOLD/DISTRIBUTED IN FOREIGN COUNTRIES? (If "YES", attach ACORD 815 for Liability Exposure and/or ACORD 816 for Property Exposure) | N |

REMARKS/PROCESSING INSTRUCTIONS (Attach additional sheets if more space is required)

COPY OF THE NOTICE OF INFORMATION PRACTICES (PRIVACY) HAS BEEN GIVEN TO THE APPLICANT. (Not applicable in all states, consult your agent or broker for your state's requirements.)

NOTICE OF INSURANCE INFORMATION PRACTICES - PERSONAL INFORMATION ABOUT YOU, INCLUDING INFORMATION FROM A CREDIT REPORT, MAY BE COLLECTED FROM PERSONS OTHER THAN YOU IN CONNECTION WITH THIS APPLICATION FOR INSURANCE AND SUBSEQUENT POLICY RENEWALS. SUCH INFORMATION AS WELL AS OTHER PERSONAL AND PRIVILEGED INFORMATION COLLECTED BY US OR OUR AGENTS MAY IN CERTAIN CIRCUMSTANCES BE DISCLOSED TO THIRD PARTIES WITHOUT YOUR AUTHORIZATION. YOU HAVE THE RIGHT TO REVIEW YOUR PERSONAL INFORMATION IN OUR FILES AND CAN REQUEST CORRECTION OF ANY INACCURACIES. A MORE DETAILED DESCRIPTION OF YOUR RIGHTS AND OUR PRACTICES REGARDING SUCH INFORMATION IS AVAILABLE UPON REQUEST. CONTACT YOUR AGENT OR BROKER FOR INSTRUCTIONS ON HOW TO SUBMIT A REQUEST TO US.

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR ANOTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THE PERSON TO CRIMINAL AND [NY: SUBSTANTIAL] CIVIL PENALTIES. (Not applicable in CO, FL, HI, MA, NE, OH, OK, OR, or VT; in DC, LA, ME, TN, VA and WA, insurance benefits may also be denied) IN FLORIDA, ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE.

THE UNDERSIGNED IS AN AUTHORIZED REPRESENTATIVE OF THE APPLICANT AND REPRESENTS THAT REASONABLE ENQUIRY HAS BEEN MADE TO OBTAIN THE ANSWERS TO QUESTIONS ON THIS APPLICATION. HE/SHE REPRESENTS THAT THE ANSWERS ARE TRUE, CORRECT AND COMPLETE TO THE BEST OF HIS/HER KNOWLEDGE.

| PRODUCER'S SIGNATURE | PRODUCER'S NAME (Please Print) | NATIONAL PRODUCER NUMBER |
|---|---|---|
| APPLICANT'S SIGNATURE | | DATE |

ACORD 125 (2007/07)
INS125 (200707)

FIRSTLINEHARFORD0610

**AGENCY CUSTOMER ID:** 00008461

## PRIOR CARRIER INFORMATION

| LINE | CATEGORY | CLAIMS MADE | OCCURRENCE | CLAIMS MADE | OCCURRENCE | CLAIMS MADE | OCCURRENCE | CLAIMS MADE | OCCURRENCE | CLAIMS MADE | OCCURRENCE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **GENERAL COMMERCIAL LIABILITY** | CARRIER | | | | | | | | | | |
| | POLICY NUMBER | | | | | | | | | | |
| | POLICY TYPE | | | | | | | | | | |
| | RETRO DATE | | | | | | | | | | |
| | EFF-EXP DATE | | | | | | | | | | |
| | GENERAL AGGREGATE | | | | | | | | | | |
| | PRODUCTS COMP OP AGGREGATE | | | | | | | | | | |
| | PERSONAL & ADV INJ | | | | | | | | | | |
| | EACH OCCURRENCE | | | | | | | | | | |
| | FIRE DAMAGE | | | | | | | | | | |
| | MEDICAL EXPENSE | | | | | | | | | | |
| | BODILY INJURY OCCURRENCE | | | | | | | | | | |
| | AGGREGATE | | | | | | | | | | |
| | PROPERTY DAMAGE OCCURRENCE | | | | | | | | | | |
| | AGGREGATE | | | | | | | | | | |
| | COMBINED SINGLE LIMIT | | | | | | | | | | |
| | MODIFICATION FACTOR | | | | | | | | | | |
| | TOTAL PREMIUM | | | | | | | | | | |
| **AUTOMOBILE LIABILITY** | CARRIER | | | | | | | | | | |
| | POLICY NUMBER | | | | | | | | | | |
| | POLICY TYPE | | | | | | | | | | |
| | EFF-EXP DATE | | | | | | | | | | |
| | COMBINED SINGLE LIMIT | | | | | | | | | | |
| | BODILY INJURY EA PERSON | | | | | | | | | | |
| | EA ACCIDENT | | | | | | | | | | |
| | PROPERTY DAMAGE | | | | | | | | | | |
| | MODIFICATION FACTOR | | | | | | | | | | |
| | TOTAL PREMIUM | | | | | | | | | | |
| **PROPERTY** | CARRIER | | | | | | | | | | |
| | POLICY NUMBER | V1402350A | | | | | | | | | |
| | POLICY TYPE | | | | | | | | | | |
| | EFF-EXP DATE | 1/3/2015   1/3/2016 | | | | | | | | | |
| | BUILDING AMT | | | | | | | | | | |
| | PERS PROP AMT | | | | | | | | | | |
| | MODIFICATION FACTOR | | | | | | | | | | |
| | TOTAL PREMIUM | | | | | | | | | | |
| | CARRIER | | | | | | | | | | |
| | POLICY NUMBER | | | | | | | | | | |
| | POLICY TYPE | | | | | | | | | | |
| | EFF-EXP DATE | | | | | | | | | | |
| | LIMIT | | | | | | | | | | |
| | MODIFICATION FACTOR | | | | | | | | | | |
| | TOTAL PREMIUM | | | | | | | | | | |

## LOSS HISTORY

ENTER ALL CLAIMS OR LOSSES (REGARDLESS OF FAULT AND WHETHER OR NOT INSURED) OR OCCURRENCES THAT MAY GIVE RISE TO CLAIMS FOR THE PRIOR 5 YEARS (3 YEARS IN KS & NY)    X  CHK HERE IF NONE    SEE ATTACHED LOSS SUMMARY

| DATE OF OCCURRENCE | LINE | TYPE/DESCRIPTION OF OCCURRENCE OR CLAIM | DATE OF CLAIM | AMOUNT PAID | AMOUNT RESERVED | CLAIM STATUS OPEN CLSD |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

**REMARKS**    NOTE: FIDELITY REQUIRES A FIVE YEAR LOSS HISTORY

**ATTACHMENTS**
STATE SUPPLEMENT(S) (if applicable)

ACORD 125 (2007/07)    Page 3 of 3
INS125 (200707)

FIRSTLINEHARFORD0611

## Additional Named Insureds

Other Named Insureds

East Park Ave Apartments                          Doing Business As

AGENCY CUSTOMER ID: 00008461

# PROPERTY SECTION

DATE (MM/DD/YYYY)
11/13/2015

| AGENCY BIONDI INS AGENCY INC | APPLICANT (First Named Insured) Z & D Realty LLC t/a, DBA: East Park Ave Apartments | | |
|---|---|---|---|
| POLICY NUMBER LANDIS623 | CARRIER Harford Mutual Insurance Company | | NAIC CODE |

| EFFECTIVE DATE 11/17/2015 | EXPIRATION DATE 11/17/2016 | X | DIRECT BILL | PAYMENT PLAN | AUDIT | FOR COMPANY USE ONLY |
|---|---|---|---|---|---|---|
| | | | AGENCY BILL | | | APT W/MERC |

**PREMISES INFORMATION**

PREMISES #: 1

BUILDING #: 1

STREET ADDRESS: 623 E Landis Ave

BLDG DESCRIPTION: Three stories joisted masonry building with restaurant LRO

| SUBJECT OF INSURANCE | AMOUNT | COINS % | VALU-ATION | CAUSES OF LOSS | INFLATION GUARD % | DED | BLKT # | FORMS AND CONDITIONS TO APPLY |
|---|---|---|---|---|---|---|---|---|
| Building | 1,035,000 | 80 | RC | Special form | | 1,000 | | CSP - 0321 |
| BI w/ Extra Expense | 100,000 | 100 | RC | Special form | | | | RENTAL (iii) |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| ADDITIONAL INFORMATION | X | BUSINESS INCOME / EXTRA EXPENSE - Attach ACORD 810 | | VALUE REPORTING INFORMATION - Attach ACORD 811 |
|---|---|---|---|---|

## ADDITIONAL COVERAGES, OPTIONS, RESTRICTIONS, ENDORSEMENTS AND RATING INFORMATION

| SPOILAGE COVERAGE (Y/N) | DESCRIPTION OF PROPERTY COVERED | LIMIT $ | DEDUCTIBLE $ | REFRIG MAINT AGREEMENT (Y/N) | OPTIONS |
|---|---|---|---|---|---|

(not rated per ISO)

CPHG10
CPHG40

T-060

# OF OPEN SIDES ON STRUCTURE: _____

| CONSTRUCTION TYPE Joisted Masonry | DISTANCE TO HYDRANT 999 FT FIRE STAT 5 MI | FIRE DISTRICT/CODE NUMBER Vineland | PROT CL 4 | # STORIES 3 | # BASM'TS 1 | YR BUILT 1960 | TOTAL AREA 6100 |
|---|---|---|---|---|---|---|---|

| BUILDING IMPROVEMENTS | | BLDG CODE GRADE | TAX CODE | ROOF TYPE Poured | OTHER OCCUPANCIES $170 A SQ FT | | |
|---|---|---|---|---|---|---|---|
| X WIRING, YR: 2012 | X PLUMBING, YR: 2012 | | | | | | |
| X ROOFING, YR: 2012 | X HEATING, YR: 2012 | WIND CLASS | | SEMI- RESISTIVE | HEATING BOILER ON PREMISES? (Y/N) | | Y |
| OTHER: | YR: | X RESISTIVE | | | IF YES, IS INSURANCE PLACED ELSEWHERE? (Y/N) | | N |

| RIGHT EXPOSURE & DISTANCE | LEFT EXPOSURE & DISTANCE | FRONT EXPOSURE & DISTANCE | REAR EXPOSURE & DISTANCE |
|---|---|---|---|

| BURGLAR ALARM TYPE Premises | | CERTIFICATE # | | EXPIRATION DATE | CENTRAL STATION |
|---|---|---|---|---|---|
| BURGLAR ALARM INSTALLED AND SERVICED BY | | EXTENT | GRADE | # GUARDS/WATCHMEN | WITH KEYS |
| | | | | | CLOCK HOURLY |

| PREMISES FIRE PROTECTION (Sprinklers, Standpipes, CO2/Chemical Systems) Wet | % SPRNK 100 | FIRE ALARM MANUFACTURER | | X CENTRAL STATION |
|---|---|---|---|---|
| | | | | LOCAL GONG |

## ADDITIONAL INTERESTS

| RANK: | NAME AND ADDRESS: | REFERENCE #: | | CERTIFICATE REQUIRED | INTEREST IN ITEM NUMBER | |
|---|---|---|---|---|---|---|
| INTEREST | | | | LOCATION: | BUILDING: | |
| LOSS PAYEE MORT-GAGEE | | | | SCHEDULED ITEM NUMBER: | | |
| ITEM DESCRIPTION: | | | | OTHER: | | |

ACORD 140 (2007/09)
INS140 (200709)

ATTACH TO ACORD 125 © 1985-2007 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

FIRSTLINEHARFORD0613

AGENCY CUSTOMER ID: _____

**ADDITIONAL PREMISES INFORMATION**

| PREMISES #: | STREET ADDRESS: |
| BUILDING #: | BLDG DESCRIPTION: |

| SUBJECT OF INSURANCE | AMOUNT | COINS % | VALU-ATION | CAUSES OF LOSS | INFLATION GUARD % | DED | BLKT # | FORMS AND CONDITIONS TO APPLY |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| ADDITIONAL INFORMATION | BUSINESS INCOME / EXTRA EXPENSE - Attach ACORD 810 | VALUE REPORTING INFORMATION - Attach ACORD 811 |

**ADDITIONAL COVERAGES, OPTIONS, RESTRICTIONS, ENDORSEMENTS AND RATING INFORMATION**

| SPOILAGE COVERAGE (Y/N) | DESCRIPTION OF PROPERTY COVERED | LIMIT $ | DEDUCTIBLE $ | REFRIG MAINT AGREEMENT (Y/N) | OPTIONS |
|---|---|---|---|---|---|
| | | | | | |

# OF OPEN SIDES ON STRUCTURE: _____

| CONSTRUCTION TYPE | DISTANCE TO HYDRANT FT / FIRE STAT MI | FIRE DISTRICT/CODE NUMBER | PROT CL | # STORIES | # BASM'TS | YR BUILT | TOTAL AREA |
|---|---|---|---|---|---|---|---|

| BUILDING IMPROVEMENTS | | BLDG CODE GRADE | TAX CODE | ROOF TYPE | OTHER OCCUPANCIES |
|---|---|---|---|---|---|
| WIRING, YR: | PLUMBING, YR: | | | | |
| ROOFING, YR: | HEATING, YR: | WIND CLASS | SEMI- RESISTIVE | HEATING BOILER ON PREMISES? (Y/N) | |
| OTHER: | YR: | RESISTIVE | | IF YES, IS INSURANCE PLACED ELSEWHERE? (Y/N) | |

| RIGHT EXPOSURE & DISTANCE | LEFT EXPOSURE & DISTANCE | FRONT EXPOSURE & DISTANCE | REAR EXPOSURE & DISTANCE |
|---|---|---|---|

| BURGLAR ALARM TYPE | CERTIFICATE # | EXPIRATION DATE | CENTRAL STATION WITH KEYS |
|---|---|---|---|

| BURGLAR ALARM INSTALLED AND SERVICED BY | EXTENT | GRADE | # GUARDS/WATCHMEN | CLOCK HOURLY |
|---|---|---|---|---|

| PREMISES FIRE PROTECTION (Sprinklers, Standpipes, CO2/Chemical Systems) | % SPRNK | FIRE ALARM MANUFACTURER | CENTRAL STATION / LOCAL GONG |
|---|---|---|---|

**ADDITIONAL INTERESTS**

| RANK: | NAME AND ADDRESS: | REFERENCE #: | CERTIFICATE REQUIRED | INTEREST IN ITEM NUMBER |
|---|---|---|---|---|
| INTEREST | | | | LOCATION: / BUILDING: |
| LOSS PAYEE MORT-GAGEE | | | | SCHEDULED ITEM NUMBER: |
| | ITEM DESCRIPTION: | | | OTHER: |

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR ANOTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THE PERSON TO CRIMINAL AND [NY: SUBSTANTIAL] CIVIL PENALTIES. (Not applicable in CO, FL, HI, MA, NE, OH, OK, OR or VT; in DC, LA, ME, TN, VA and WA, insurance benefits may also be denied)

IN FLORIDA, ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE.

IN MASSACHUSETTS, NEBRASKA, OREGON AND VERMONT, ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR ANOTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND MAY SUBJECT THE PERSON TO CRIMINAL AND CIVIL PENALTIES.

ACORD 140 (2007/09)                    Page 2 of 2
INS140 (200709)

FIRSTLINEHARFORD0614

**ACORD®**

## BUSINESS INCOME / EXTRA EXPENSE / RENTAL VALUE
### SUPPLEMENT TO PROPERTY SECTION

| | DATE (MM/DD/YYYY) |
|---|---|
| | 11/13/2015 |

| AGENCY | PHONE (A/C. No. Ext): (856) 696-0700 | APPLICANT Z & D Realty LLC t/a, DBA: East Park Ave |
|---|---|---|
| | FAX (A/C. No): (856) 696-0293 | (First Named Insured) Apartments |

BIONDI INS AGENCY INC
525 ELMER STREET
P. O. BOX 1418
VINELAND          NJ   08362-1418

| COMPANY |
|---|
| Harford Mutual Insurance Company |

| CODE: | SUB CODE: |
|---|---|

AGENCY CUSTOMER ID: 00008461

### PREMISES INFORMATION

PREMISES #: 1
BUILDING #: 1

| [X] BUSINESS INCOME / EXTRA EXPENSE | [ ] BUSINESS INCOME W/O EXTRA EXPENSE | [ ] EXTRA EXPENSE | [ ] BUSINESS INCOME / RENTAL VALUE | [ ] RENTAL VALUE |
|---|---|---|---|---|

| TYPE OF BUSINESS | ORDINARY PAYROLL | EXT PERIOD | POWER/HEAT | OFF PREM POWER | DEPEND PROP |
|---|---|---|---|---|---|
| NON MFG | EXCL [ ] INCL [ ] | DAYS | $ DED | POWER | BROAD FORM [ ] LIMITED FORM [ ] |
| MFG | 60 DAYS | MO PERIOD | ELEC MEDIA | WATER | |
| MINING | 180 DAYS | LIMIT | DAYS | COMM (DESCR BELOW) | COIN % |
| ____ % COINS | | | ORD OR LAW | | |
| | $ | MAX PERIOD | DAYS | TUITION FEES | CONT LOC [ ] MFG LOC [ ] |
| | | | CIVIL AUTH | $ STUDENTS | REC LOC [ ] LDR LOC (DESC BELOW) [ ] |
| EXTRA EXPENSE | LIMIT LOSS PAY | | DAYS | $ ____ OTHER PD SERV/INC | |
| ____ DAYS PERIOD REST | ____ % ____ % | | | | |

NAME(S) AND ADDRESS(ES) FOR OFF PREM POWER OR DEPEND PROP

OTHER COVERAGES

| ACORD 810 (2006/04) | ATTACH TO PROPERTY SECTION | © ACORD CORPORATION 2005-2006 |
|---|---|---|
| INS810 (200604) | | |

FIRSTLINEHARFORD0615

## ADDITIONAL PREMISES INFORMATION

| | BUSINESS INCOME / EXTRA EXPENSE | | BUSINESS INCOME W/O EXTRA EXPENSE | | EXTRA EXPENSE | | BUSINESS INCOME / RENTAL VALUE | | RENTAL VALUE |
|---|---|---|---|---|---|---|---|---|---|

**PREMISES #:**

**BUILDING #:**

| TYPE OF BUSINESS | ORDINARY PAYROLL | EXT PERIOD | POWER/HEAT | OFF PREM POWER | DEPEND PROP |
|---|---|---|---|---|---|
| NON MFG | EXCL    INCL | DAYS | $    DED | POWER | BROAD FORM    LIMITED FORM |
| MFG | 90 DAYS | MO PERIOD | ELEC MEDIA | WATER | |
| MINING | 180 DAYS | LIMIT | DAYS | COMM (DESCR BELOW) | COIN    % |
| % COINS | | | ORD OR LAW | | |
| | $ | MAX PERIOD | DAYS | TUITION FEES | CONT LOC    MFG LOC |
| | | | CIVIL AUTH | $    STUDENTS | REC LOC    LDR LOC (DESC BELOW) |
| EXTRA EXPENSE        LIMIT LOSS PAY | | | DAYS | $    OTHER ED SERV/INC | |
| DAYS PERIOD REST | | %    % | | | |
| | | % | | | |

**NAME(S) AND ADDRESS(ES) FOR OFF PREM POWER OR DEPEND PROP**

**OTHER COVERAGES**

ACORD 810 (2006/04)
INS810 (200604)

FIRSTLINEHARFORD0616

# STATEMENT OF VALUES

**ACORD**

| DATE (MM/DD/YYYY) |
|---|
| 11/13/2015 |

| AGENCY | PHONE (A/C, No, Ext): (856) 696-0700 | COMPANY | | NAIC CODE: | PAGE |
|---|---|---|---|---|---|
| | FAX (A/C, No): (856) 696-0293 | Harford Mutual Insurance Company | | | OF |
| | | INSURED/APPLICANT | POLICY NUMBER | | EFFECTIVE DATE |
| BIONDI INS AGENCY INC | | Z & D Realty LLC t/a, | LANDIS623 | | 11/17/2015 |
| 525 ELMER STREET | | HEADQUARTERS ADDRESS | | | |
| P. O. BOX 1418 | | 242 Mystic Dr | Egg Harbor | | NJ 08234 |
| VINELAND           NJ 08362-1418 | | COINS % | APPLICABLE CAUSES OF LOSS | | |

| CODE: | SUBCODE: |
|---|---|
| AGENCY CUSTOMER ID | |
| 00008461 | |

| COINS % | APPLICABLE CAUSES OF LOSS | | | SPECIFIC AVERAGE RATE REQUESTED |
|---|---|---|---|---|
| X | 80% | BASIC | EARTHQUAKE COV | |
| | 90% | BROAD | FLOOD | BLANKET RATE REQUESTED |
| X | 100% X | SPECIAL | SPRINKLER LEAKAGE EXCL | |
| X | 80 | | VANDALISM EXCL | |

APPLICABLE FORM NUMBERS (Attach completed forms and endorsements that require completion to provide necessary information affecting rates or loss costs)

| CLASS CODE | LOC # | BLDG # | DESCRIPTION AND ADDRESS OF PROPERTY | ACV/ RC [1] | SUBJECT [2] | 100% VALUES | RATE OR LOSS COST [3] | PREMIUM |
|---|---|---|---|---|---|---|---|---|
| | 1 | 1 | DESC: Three stories joisted masonry ADDRESS: 623 E Landis Ave, Vineland, NJ | RC | B | 1,035,000 | | |
| | 1 | 1 | DESC: Three stories joisted masonry ADDRESS: 623 E Landis Ave, Vineland, NJ | RC | BUSIN | 100,000 | | |
| | | | DESC: ADDRESS: | | | | | |
| | | | DESC: ADDRESS: | | | | | |
| | | | DESC: ADDRESS: | | | | | |
| | | | DESC: ADDRESS: | | | | | |
| | | | DESC: ADDRESS: | | | | | |
| | | | DESC: ADDRESS: | | | | | |
| | | | DESC: ADDRESS: | | | | | |
| | | | DESC: ADDRESS: | | | | | |
| | | | DESC: ADDRESS: | | | | | |
| | | | DESC: ADDRESS: | | | | | |

Totals include items found on all pages, not including Loc # = BLNK.  | $ 1,135,000 | N/A | $

| INSTRUCTIONS | SIGNATURE |
|---|---|
| 1. ACV (Actual Cash Value) or RC (Replacement Cost): If other valuation basis applies, provide necessary information. | ALL VALUES AND LOCATION INFORMATION ARE CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF |
| 2. SUBJECT: B = Building   S = Stock   F = Furniture & Fixtures   M = Machinery BPP = Your Business Personal Property   PPO = Personal Property of Others BI = Business Income   R = Rental Income   Other - specify | INSURED'S SIGNATURE: _____ TITLE: _____ |
| 3. RATE OR LOSS COST: For class rated property, attach class rate information form or equivalent information for each location. For specifically rated property, attach specific rate or loss cost information if known. | DATE: _____ |

ACORD 139 (2004/03)
INS139 (0404)a

© ACORD CORPORATION 1996

FIRSTLINEHARFORD0617

# ACORD® COMMERCIAL GENERAL LIABILITY SECTION

| | | DATE (MM/DD/YYYY) |
|---|---|---|
| | | 11/13/2015 |

| AGENCY | PHONE (A/C, No. Ext): (856) 696-0700 | APPLICANT (First Named Insured): Z & D Realty LLC t/a, DBA: East Park Ave Apartments | | | | |
|---|---|---|---|---|---|---|
| BIONDI INS AGENCY INC | FAX (A/C, No): (856) 696-0293 | | | | | |
| 525 ELMER STREET | | EFFECTIVE DATE 11/17/2015 | EXPIRATION DATE 11/17/2016 | X | DIRECT BILL | PAYMENT PLAN | AUDIT |
| P. O. BOX 1418 | | | | | AGENCY BILL | | |
| VINELAND        NJ    08362-1418 | | FOR COMPANY USE ONLY | | | | |
| CODE: | SUB CODE: | | | | | |
| AGENCY CUSTOMER ID: 00008461 | | | | | | |

## COVERAGES

| | | LIMITS | | |
|---|---|---|---|---|
| X | COMMERCIAL GENERAL LIABILITY | GENERAL AGGREGATE | $2,000,000 | **PREMIUMS** |
| | CLAIMS MADE      X   OCCURRENCE | PRODUCTS & COMPLETED OPERATIONS AGGREGATE | $2,000,000 | PREMISES/OPERATIONS |
| | OWNER'S & CONTRACTOR'S PROTECTIVE | PERSONAL & ADVERTISING INJURY | $1,000,000 | |
| | | EACH OCCURRENCE | $1,000,000 | PRODUCTS |
| DEDUCTIBLES | | DAMAGE TO RENTED PREMISES (each occurrence) | $100,000 | |
| | PROPERTY DAMAGE     $ | MEDICAL EXPENSE (Any one person) | $5,000 | OTHER |
| | BODILY INJURY     $ | EMPLOYEE BENEFITS | $ | |
| | $ | | | TOTAL |

OTHER COVERAGES, RESTRICTIONS AND/OR ENDORSEMENTS (For hired/non-owned auto coverages attach the applicable state Business Auto Section, ACORD 137)

CG2101, CG2144    CG2151, CGHG29

T-017

## SCHEDULE OF HAZARDS

| LOC # | HAZ # | CLASSIFICATION | CLASS CODE | PREMIUM BASIS | EXPOSURE | TERR | RATE | | PREMIUM | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | PREM/OPS | PRODUCTS | PREM/OPS | PRODUCTS |
| 1 | | Restaurant LRO with 4 apartments | 61217 | A Area | ~~6,160~~ 4,067 | 027 | | | | |
| | | APTS | 60010 | | 4 UNITS | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| RATING AND PREMIUM BASIS | (P) PAYROLL - PER $1,000/PAY | (C) TOTAL COST - PER $1,000/COST | (U) UNIT - PER UNIT |
|---|---|---|---|
| (S) GROSS SALES - PER $1,000/SALES | (A) AREA - PER 1,000/SQ FT | (M) ADMISSIONS - PER 1,000/ADM | (T) OTHER |

## CLAIMS MADE (Explain all "Yes" responses)

| EXPLAIN ALL "YES" RESPONSES | Y/N |
|---|---|
| 1.  PROPOSED RETROACTIVE DATE: | |
| 2.  ENTRY DATE INTO UNINTERRUPTED CLAIMS MADE COVERAGE | |
| 3.  HAS ANY PRODUCT, WORK, ACCIDENT, OR LOCATION BEEN EXCLUDED, UNINSURED OR SELF-INSURED FROM ANY PREVIOUS COVERAGE? | |
| 4.  WAS TAIL COVERAGE PURCHASED UNDER ANY PREVIOUS POLICY? | |

## EMPLOYEE BENEFITS LIABILITY

| 1.  DEDUCTIBLE PER CLAIM:  $ | 3.  NUMBER OF EMPLOYEES COVERED BY EMPLOYEE BENEFITS PLANS: |
|---|---|
| 2.  NUMBER OF EMPLOYEES: | 4.  RETROACTIVE DATE: |

| ACORD 126 (2007/05) | Page 1 of 4 | © ACORD CORPORATION 1993-2007. All rights reserved. |
|---|---|---|
| INS126 (200705) | | |

The ACORD name and logo are registered marks of ACORD

FIRSTLINEHARFORD0618

**CONTRACTORS**

| EXPLAIN ALL "YES" RESPONSES (For past or present operations) | Y / N |
|---|---|
| 1. DOES APPLICANT DRAW PLANS, DESIGNS, OR SPECIFICATIONS FOR OTHERS? | ☐ |
| 2. DO ANY OPERATIONS INCLUDE BLASTING OR UTILIZE OR STORE EXPLOSIVE MATERIAL? | ☐ |
| 3. DO ANY OPERATIONS INCLUDE EXCAVATION, TUNNELING, UNDERGROUND WORK OR EARTH MOVING? | ☐ |
| 4. DO YOUR SUBCONTRACTORS CARRY COVERAGES OR LIMITS LESS THAN YOURS? | ☐ |
| 5. ARE SUBCONTRACTORS ALLOWED TO WORK WITHOUT PROVIDING YOU WITH A CERTIFICATE OF INSURANCE? | ☐ |
| 6. DOES APPLICANT LEASE EQUIPMENT TO OTHERS WITH OR WITHOUT OPERATORS? | ☐ |

| DESCRIBE THE TYPE OF WORK SUBCONTRACTED | $ PAID TO SUB-CONTRACTORS: | % OF WORK SUBCONTRACTED: | # FULL-TIME STAFF: | # PART-TIME STAFF: |
|---|---|---|---|---|
| | | | | |

**PRODUCTS/COMPLETED OPERATIONS**

| PRODUCTS | ANNUAL GROSS SALES | # OF UNITS | TIME IN MARKET | EXPECTED LIFE | INTENDED USE | PRINCIPAL COMPONENTS |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

| EXPLAIN ALL "YES" RESPONSES (For any past or present product or operation)  PLEASE ATTACH LITERATURE, BROCHURES, LABELS, WARNINGS, ETC. | Y / N |
|---|---|
| 1. DOES APPLICANT INSTALL, SERVICE OR DEMONSTRATE PRODUCTS? | ☐ |
| 2. FOREIGN PRODUCTS SOLD, DISTRIBUTED, USED AS COMPONENTS? (If "YES", attach ACORD 815) | ☐ |
| 3. RESEARCH AND DEVELOPMENT CONDUCTED OR NEW PRODUCTS PLANNED? | ☐ |
| 4. GUARANTEES, WARRANTIES, HOLD HARMLESS AGREEMENTS? | ☐ |
| 5. PRODUCTS RELATED TO AIRCRAFT/SPACE INDUSTRY? | ☐ |
| 6. PRODUCTS RECALLED, DISCONTINUED, CHANGED? | ☐ |
| 7. PRODUCTS OF OTHERS SOLD OR RE-PACKAGED UNDER APPLICANT LABEL? | ☐ |
| 8. PRODUCTS UNDER LABEL OF OTHERS? | ☐ |
| 9. VENDORS COVERAGE REQUIRED? | ☐ |
| 10. DOES ANY NAMED INSURED SELL TO OTHER NAMED INSUREDS? | ☐ |

ACORD 126 (2007/05)
INS126 (200705)

ATTACH TO ACORD 125

FIRSTLINEHARFORD0619

| ADDITIONAL INTEREST/CERTIFICATE RECIPIENT | | ☐ ACORD 45 attached for additional names | | | | | |
|---|---|---|---|---|---|---|---|
| **INTEREST** | **RANK:** | **NAME AND ADDRESS** | **REFERENCE #:** | | **CERTIFICATE REQUIRED** | **INTEREST IN ITEM NUMBER** | |
| ADDITIONAL INSURED | | | | | | LOCATION: | BUILDING: |
| LOSS PAYEE | | | | | | VEHICLE: | BOAT: |
| MORTGAGEE | | | | | | SCHEDULED ITEM NUMBER: | |
| LIENHOLDER | | | | | | OTHER | |
| EMPLOYEE AS LESSOR | | | | | | | |
| | | ITEM DESCRIPTION: | | | | | |

## GENERAL INFORMATION

| EXPLAIN ALL "YES" RESPONSES (For all past or present operations) | Y / N |
|---|---|
| 1.  ANY MEDICAL FACILITIES PROVIDED OR MEDICAL PROFESSIONALS EMPLOYED OR CONTRACTED? | N |
| 2.  ANY EXPOSURE TO RADIOACTIVE/NUCLEAR MATERIALS? | N |
| 3.  DO/HAVE PAST, PRESENT OR DISCONTINUED OPERATIONS INVOLVE(D) STORING, TREATING, DISCHARGING, APPLYING, DISPOSING, OR TRANSPORTING OF HAZARDOUS MATERIAL? (e.g. landfills, wastes, fuel tanks, etc) | N |
| 4.  ANY OPERATIONS SOLD, ACQUIRED, OR DISCONTINUED IN LAST FIVE (5) YEARS? | N |
| 5.  MACHINERY OR EQUIPMENT LOANED OR RENTED TO OTHERS? | N |
| 6.  ANY WATERCRAFT, DOCKS, FLOATS OWNED, HIRED OR LEASED? | N |
| 7.  ANY PARKING FACILITIES OWNED/RENTED? | N |
| 8.  IS A FEE CHARGED FOR PARKING? | N |
| 9.  RECREATION FACILITIES PROVIDED? | N |
| 10. IS THERE A SWIMMING POOL ON THE PREMISES? | N |
| 11. SPORTING OR SOCIAL EVENTS SPONSORED? | N |
| 12. ANY STRUCTURAL ALTERATIONS CONTEMPLATED? | N |
| 13. ANY DEMOLITION EXPOSURE CONTEMPLATED? | N |
| 14. HAS APPLICANT BEEN ACTIVE IN OR IS CURRENTLY ACTIVE IN JOINT VENTURES? | N |
| 15. DO YOU LEASE EMPLOYEES TO OR FROM OTHER EMPLOYERS? | N |
| 16. IS THERE A LABOR INTERCHANGE WITH ANY OTHER BUSINESS OR SUBSIDIARIES? | N |

FIRSTLINEHARFORD0620

**GENERAL INFORMATION (continued)**

| EXPLAIN ALL "YES" RESPONSES (For all past or present operations) | Y / N |
|---|---|
| 17.  ARE DAY CARE FACILITIES OPERATED OR CONTROLLED? | N |
| 18.  HAVE ANY CRIMES OCCURRED OR BEEN ATTEMPTED ON YOUR PREMISES WITHIN THE LAST THREE (3) YEARS? | N |
| 19.  IS THERE A FORMAL, WRITTEN SAFETY AND SECURITY POLICY IN EFFECT? | N |
| 20.  DOES THE BUSINESSES' PROMOTIONAL LITERATURE MAKE ANY REPRESENTATIONS ABOUT THE SAFETY OR SECURITY OF THE PREMISES? | N |

**REMARKS**

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR ANOTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THE PERSON TO CRIMINAL AND [NY: SUBSTANTIAL] CIVIL PENALTIES. (Not applicable in CO, FL, HI, MA, NE, OH, OK, OR or VT   in DC, LA, ME, TN, VA and WA insurance benefits may also be denied)
IN FLORIDA, ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE.

# EXHIBIT D

# ACORD® BUSINESS OWNERS APPLICATION

DATE (MM/DD/YYYY) 12/14/2015

| AGENCY | PHONE (A/C, No, Ext): 8566960700 | COMPANY | | NAIC CODE: |
|---|---|---|---|---|
| | FAX (A/C, No): 8566960293 | Firstline National Insurance Company | | POLICY #: |

Biondi Insurance Agency, Inc.
PO Box 1418
Vineland, NJ 08362

| COMPANY POLICY OR PROGRAM NAME | PROGRAM CODE: |
|---|---|
| Horizon Restaurant Program | |
| | TOTAL PREMIUM: $ 2354 |

| E-MAIL ADDRESS: | | NEW | EFFECTIVE DATE | EXPIRATION DATE | DIRECT BILL | PAYMENT PLAN |
|---|---|---|---|---|---|---|
| | | RNWL | 01-03-2016 | 01-03-2017 | AGENCY BILL | |
| CODE: 9051-BAS | SUB CODE: | QUOTE | | ISSUE POLICY | POLICY TYPE | | DEPOSIT |
| AGENCY CUSTOMER ID: | | BOUND (DATE) | | | STD | X SPEC | $ |

## APPLICANT INFORMATION

| NAME (First Named Insured) | | | | GL CODE | SIC | FEIN OR SOC SEC # |
|---|---|---|---|---|---|---|
| Landis Pig Roast LLC | INDIVIDUAL | X LLC | | | | |
| MAILING ADDRESS (INCLUDING ZIP+4) | PARTNERSHIP | JOINT VENTURE | | | | |
| 623 East Landis Avenue | CORPORATION | OTHER | | | | |
| Vineland NJ 08360 | CONTACT FOR INSPECTION | | PHONE (A/C, No, Ext): (609) 432-8646 | | | |
| | Ziggy Dobkowski | | | | | |
| | CREDIT BUREAU NAME | | | | ID NUMBER | |
| INTERNET ADDRESS: | | | | | | |

## NATURE OF BUSINESS

| OFFICE | RETAIL | APARTMENTS | X RESTAURANT | DATE BUSINESS STARTED |
|---|---|---|---|---|
| SERVICE | WHOLESALE | CONDOMINIUMS | CONTRACTOR | 2010 |

DESCRIPTION OF OPERATIONS

Family style restaurant with sales of alcoholic beverages less then 30% of Total Sales

KEZ 12/14/2015

RETAIL STORES: _____ % INSTALLATION, SERVICE OR REPAIR WORK

## GENERAL INFORMATION

| | PLEASE EXPLAIN ALL "YES" RESPONSES | YES | NO | | PLEASE EXPLAIN ALL "YES" RESPONSES | YES | NO |
|---|---|---|---|---|---|---|---|
| 1 | DO/HAVE PAST, PRESENT OR DISCONTINUED OPERATIONS INVOLVE(D) STORING, TREATING, DISCHARGING, APPLYING, DISPOSING, OR TRANSPORTING OF HAZARDOUS MATERIAL? (e.g. landfills, wastes, fuel tanks, etc) | ☐ | X | | DO YOU HAVE OR CONTEMPLATE ANY OTHER BUSINESS? | ☐ | X |
| | | | | 9 | ANY OTHER INSURANCE WITH THIS COMPANY? (LIST POLICY NUMBERS) | ☐ | X |
| 2 | ARE ATHLETIC TEAMS SPONSORED? | ☐ | X | | | | |
| 3 | ARE SUB CONTRACTORS ALLOWED TO WORK WITHOUT PROVIDING A CERTIFICATE OF INSURANCE? IF NOT, WHO CHECKS CERTIFICATES? | ☐ | X | 10 | ARE YOU INVOLVED IN MANUFACTURING, MIXING, RELABELING OR REPACKAGING OF PRODUCTS? | ☐ | X |
| | | | | 11 | DO YOU RENT OR LOAN EQUIPMENT TO OTHERS? | ☐ | X |
| 4 | DURING THE LAST FIVE YEARS (TEN IN RI), HAS ANY APPLICANT BEEN INDICTED FOR OR CONVICTED OF ANY DEGREE OF THE CRIME OF FRAUD, BRIBERY, ARSON OR ANY OTHER ARSON-RELATED CRIME IN CONNECTION WITH THIS OR ANY OTHER PROPERTY? (In RI, failure to disclose the existence of an arson conviction is a misdemeanor punishable by a sentence of up to one year of imprisonment) | ☐ | X | 12 | HAS APPLICANT HAD A FORECLOSURE, REPOSSESSION, BANKRUPTCY JUDGEMENT OR LIEN DURING THE PAST FIVE (5) YEARS? | ☐ | X |
| | | | | 13 | ANY EXPOSURE TO FLAMMABLES, EXPLOSIVES OR CHEMICALS? | ☐ | X |
| 5 | ANY POLICY OR COVERAGE DECLINED, CANCELLED OR NON-RENEWED DURING THE PRIOR 3 YEARS? (NOT APPLICABLE IN MO) | ☐ | X | 14 | ANY CATASTROPHE EXPOSURE? | ☐ | X |
| 6 | DO YOU LEASE EMPLOYEES TO OR FROM OTHER EMPLOYERS? | ☐ | X | 15 | ANY PAST LOSSES OR CLAIMS RELATING TO SEXUAL ABUSE OR MOLESTATION ALLEGATIONS, DISCRIMINATION OR NEGLIGENT HIRING? | ☐ | X |
| 7 | ANY WORKERS COMPENSATION CARRIED? | ☐ | X | 16 | ANY UNCORRECTED FIRE CODE VIOLATIONS? | ☐ | X |

DESCRIBE ANY LOCATION / BUSINESS INTEREST OWNED / OPERATED BY INSURED BUT NOT LISTED

FIRSTLINEHARFORD0024

**PRIOR POLICY(IES)/LOSS HISTORY**  ☐ See attached loss summary

| PREVIOUS CARRIER | POLICY NUMBER | TOTAL PREMIUM | EXP DATE | # LOSSES LAST ___ YRS | TOTAL LOSSES |
|---|---|---|---|---|---|
| AmGuard Ins Co | LABP609586 | | 03-07-2016 | 0 | $ |

DESCRIPTION OF LOSSES, WHETHER OR NOT INSURED (Date, cause, amt paid, claim status)

## POLICY LEVEL COVERAGES

### LIABILITY (Choose the limit options compatible with the program you are requesting)

| COVERAGE | | LIMIT | DED | COVERAGE | LIMIT | DED |
|---|---|---|---|---|---|---|
| COMBINED SINGLE LIMIT | | $ | | HIRED AUTO | $ | |
| BODILY INJURY & PROP DAMAGE | OCCURRENCE | $ 1,000,000 | | NON-OWNED AUTO | $ | |
| | AGGREGATE | $ | | EMPLOYEE BENEFITS | $ | |
| MEDICAL EXPENSE (PER PERSON) | | $ 5,000 | | | $ | |
| DAMAGE TO RENTAL PREMISES | | $ 100,000 | | | $ | |
| PROFESSIONAL LIABILITY | | $ | | | $ | |
| LIQUOR LIABILITY | | | | | $ | |
| | GEN AGGREGATE | $ 1,000,000 | | | $ | |
| | PER PERSON | $ | | | $ | |
| OTHER  Alcohol Receipts | | $ 60000 | | | $ | |

### ADDITIONAL COVERAGES - Total Amount of Policy Coverage Desired

| COVERAGE | TOTAL AMOUNT | DED | END #s | COVERAGE | TOTAL AMOUNT | DED | END #s |
|---|---|---|---|---|---|---|---|
| EXTRA EXP | ACTUAL LOSS SUSTAINED NO. OF MONTHS ___ | $ | | COMPUTERS | $ | $ | |
| | $ | | | ORD OR LAW | $ | $ | |
| LOSS OF INC | ACTUAL LOSS SUSTAINED NO. OF MONTHS ___ | $ | | ERISA | $ | $ | |
| | $ | | | FLOOD | $ | $ | |
| VAL PAPERS | $ | $ | | EARTHQUAKE | $ | $ | |
| ACCNTS REC | $ | $ | | B & M BASIC | $ | $ | |
| SIGN | $ | $ | | B & M BROAD | $ | $ | |
| EMPL DISHON | $ | $ | | B & M SPOILAGE | $ | $ | |
| BRG/ROB STG | $ | $ | | TRANSIT | $ | $ | |
| BRG/ROB MNY | $ | $ | | | $ | $ | |
| MONEY & SEC  INSIDE | $ | $ | | | $ | $ | |
| MONEY & SEC OUTSIDE | $ | $ | | | $ | $ | |
| SPOILAGE | $ | $ | | | $ | $ | |

## SPECIALTY PROGRAMS

| RESTAURANTS - ATTACH ACORD 165 FOR EACH LOCATION |
|---|
| CONTRACTORS - ATTACH ACORD 186 FOR EACH LOCATION |
| PROFESSIONAL LIABILITY - ATTACH ACORD 197 FOR BARBER AND BEAUTY SHOPS, FUNERAL HOMES, OPTICAL AND HEARING AID ESTABLISHMENTS, PRINTERS OR VETERINARIANS |

### ADDITIONAL INTEREST          ☐ ACORD 45 ATTACHED

| INTEREST | RANK | NAME AND ADDRESS | REFERENCE #: | | CERTIFICATE REQUIRED | INTEREST IN ITEM NUMBER | |
|---|---|---|---|---|---|---|---|
| ADDITIONAL INSURED | | | | | | PREMISES: | BUILDING: |
| LOSS PAYEE | | | | | | VEHICLE: | BOAT: |
| MORTGAGEE | | | | | | SCHEDULED ITEM NUMBER: | |
| LIENHOLDER | | | | | | OTHER | |
| | | ITEM DESCRIPTION: | | | | | |

NOTICE OF INSURANCE INFORMATION PRACTICES - PERSONAL INFORMATION ABOUT YOU, INCLUDING INFORMATION FROM A CREDIT REPORT, MAY BE COLLECTED FROM PERSONS OTHER THAN YOU IN CONNECTION WITH THIS APPLICATION AND SUBSEQUENT RENEWALS. SUCH INFORMATION AS WELL AS OTHER PERSONAL AND PRIVILEGED INFORMATION COLLECTED BY US OR OUR AGENTS MAY IN CERTAIN CIRCUMSTANCES BE DISCLOSED TO THIRD PARTIES WITHOUT YOUR AUTHORIZATION. YOU HAVE THE RIGHT TO REVIEW YOUR PERSONAL INFORMATION IN OUR FILES AND CAN REQUEST CORRECTION OF ANY INACCURACIES. A MORE DETAILED DESCRIPTION OF YOUR RIGHTS AND OUR PRACTICES REGARDING SUCH INFORMATION IS AVAILABLE UPON REQUEST. CONTACT YOUR AGENT OR BROKER FOR INSTRUCTIONS ON HOW TO SUBMIT A REQUEST TO US.

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR ANOTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THE PERSON TO CRIMINAL AND [NY: SUBSTANTIAL] CIVIL PENALTIES. (Not applicable in CO, HI, NE, OH, OK, OR, or VT; In DC, LA, ME, TN, VA and WA, insurance benefits may also be denied)

THE UNDERSIGNED IS AN AUTHORIZED REPRESENTATIVE OF THE APPLICANT AND CERTIFIES THAT REASONABLE ENQUIRY HAS BEEN MADE TO OBTAIN THE ANSWERS TO QUESTIONS ON THIS APPLICATION. HE/SHE CERTIFIES THAT THE ANSWERS ARE TRUE, CORRECT AND COMPLETE TO THE BEST OF HIS/HER KNOWLEDGE.

| APPLICANT'S SIGNATURE | DATE | PRODUCER'S SIGNATURE | NATIONAL PRODUCER NUMBER |
|---|---|---|---|
| | | | |

ACORD 160 (2006/08)                Page 2 of 4

**PREMISES** | PREM #: Location BLDG #: Restaurant | **BLANKET RATE** | YES | NO | ACORD 139 ATTACHED

| ADDRESS (Street, City, State) | | CHECK IF PRIMARY PREMISES | INTEREST | PERCENTAGE OCCUPIED | SURROUNDING EXPOSURES & OTHER OCCUPANCIES |
|---|---|---|---|---|---|

623 East Landis Avenue

Vineland

NJ

| | OWNER | 100 | FRONT | RIGHT |
| | TENANT | SQUARE FEET OCCUPIED | REAR | LEFT |
| | YEAR BUILT 1960 | 7000 | ANY AREA LEASED? YES NO |

| COUNTY: Cumberland | ZIP: 08360 | PROT CLASS 4 | RATE TERR 017 | DISTANCE TO HYDRANT FIRE STAT FT MI | FIRE DISTRICT/CODE NUMBER | INSIDE CITY LIMITS? YES NO |
|---|---|---|---|---|---|---|

DESCRIPTION OF OPERATIONS AT THIS PREMISES | BUILDING DESCRIPTION

| # OF EMPLOYEES | HOURS OF OPERATION | | ANNUAL SALES/RECEIPTS | TOTAL PAYROLL |
|---|---|---|---|---|
| | START TIME: | CLOSING TIME: | $ 260,000 | $ |

| CLASS CODE 54116 | RATE # | RATE GROUP | DESCRIPTION OF ALL OCCUPANCIES AT THIS PREMISES |
|---|---|---|---|

## PROPERTY

| | LIMIT | % COINS | VALUATION: | RC / FVRC | ACV | INFL % | $ | DED | CONSTRUCTION TYPE | TOT SQ FT AREA |
|---|---|---|---|---|---|---|---|---|---|---|
| BLDG | $ | | | | | | | DED | Joisted Masonry | 7000 |
| PERS PROP | LIMIT $ 100000 | % COINS | VALUATION: X | RC / FVRC | ACV | (N/A) | $ 1,000 | DED DED DED | # STORIES | % SPRNK Yes | BASEMENT PRESENT? YES NO IS IT FINISHED? YES NO |

| BUILDING IMPROVEMENTS | WIRING YEAR 2012 | ROOFING YEAR 2012 | PLUMBING YEAR 2012 | HEATING YEAR 2012 | ROOF TYPE | BLDG CODE GRADE | INSPECTED? YES NO | TAX CODE COMM Vineland SPEC | WIND CLASS 1921 RESISTIVE | SEMI-RESISTIVE |
|---|---|---|---|---|---|---|---|---|---|---|

## LIABILITY - PREMISES COVERAGE ONLY (Choose the limit options compatible with the program you are requesting)

| COVERAGE | | LIMIT | DED | COVERAGE | | LIMIT | DED |
|---|---|---|---|---|---|---|---|
| LIQUOR LIABILITY | | | | | $ | | |
| | GEN AGGREGATE | $ | | | $ | | |
| | PER PERSON | $ | | | $ | | |
| OTHER | $ | | | | $ | | |
| | $ | | | | $ | | |
| | $ | | | | $ | | |
| | $ | | | | | | |

| CLASSIFICATION | | CLASS CODE | PREMIUM BASIS EXPOSURE | CODE | |
|---|---|---|---|---|---|
| Restaurant | | 54116 | | | (S) gross sales - per $1,000/sales (P) payroll - per $1,000/pay (A) area - per 1,000/sq ft (C) total cost - per $1,000/cost (M) admissions - per 1,000/adm (U) unit - per unit    (T) other |

## ADDITIONAL COVERAGES - PREMISES COVERAGE ONLY - Total Amount of Coverage Desired

| COVERAGE | TOTAL AMOUNT | DED | END #s | COVERAGE | TOTAL AMOUNT | DED | END #s |
|---|---|---|---|---|---|---|---|
| EXTRA EXP | ACTUAL LOSS SUSTAINED NO. OF MONTHS ___ $ | | | SPOILAGE | $ | $ | |
| LOSS OF INC | ACTUAL LOSS SUSTAINED NO. OF MONTHS ___ $ | $ | | COMPUTERS | $ | $ | |
| | | | | ORD OR LAW | $ | $ | |
| VAL PAPERS | $ | $ | | FLOOD | $ | $ | |
| ACCNTS REC | $ | $ | | EARTHQUAKE | $ | $ | |
| SIGN | $ | $ | | B & M BASIC | $ | $ | |
| EMPL DISHON | $ | $ | | B & M BROAD | $ | $ | |
| BRG/ROB ETC | $ | $ | | B & M SPOILAGE | $ | $ | |
| ORD/ROB NNY | $ | $ | | TRANSIT | $ | $ | |
| MONEY & SEC INSIDE | $ 10,000 | $ | | | $ | $ | |
| MONEY & SEC OUTSIDE | $ 2,000 | $ | | | $ | $ | |

| GLASS | LOCATION IN BUILDING | # PLATES | AREA SQ FT | LENGTH LINEAR FT | GLASS TYPE | INTERIOR | TENANTS EXT | VALUE | DED |
|---|---|---|---|---|---|---|---|---|---|
| | GROUND FLOOR GLASS | | | | | | | $ | $ |
| | ABOVE GROUND FLOOR GLASS | | | | | | | $ | $ |

## PREMISES GENERAL INFORMATION

| | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| 1. DOES APPLICANT HAVE A HEATING OR PROCESSING BOILER? (IF YES: INDICATE DATE OF LAST INSPECTION) 10/15/2015 | | X | 4. IS ALL EQUIPMENT INSPECTED ANNUALLY AND WELL MAINTAINED? | | |
| 2. CURRENT CARRIER FOR BOILER & MACHINERY COVERAGE: | | | 5. IS THERE A SWIMMING POOL ON PREMISES? | | |
| 3. ANY SPECIALIZED EQUIPMENT SUCH AS MEDICAL EQUIPMENT OR OTHER, VALUED OVER $100,000? IF YES, DESCRIBE | | X | YES / NO | FENCED / LIMITED ACCESS | DIVING BOARD / SLIDE | ABOVE GROUND / IN GROUND | LIFE GUARD |

## REMARKS (Attach additional sheets if more space is required)

ACORD 160 (2008/08)    Page 3 of 4

FIRSTLINEHARFORD0026

## APARTMENTS AND CONDOMINIUMS

| | YES | NO | | | | | | | YES | NO |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 IS THERE A PLAYGROUND ON PREMISES? | | | 5 SMOKE DETECTORS: | | NONE | | BATTERY | WIRED | | |
| 2 IS ALUMINUM WIRE USED? (IF YES, DESCRIBE PROTECTION) | | | 6 ATTACH COPY OF CONDO ASSOCIATION BYLAWS IF D&O COVERAGE IS REQUESTED | | | | | | | |
| 3 # OF FIRE DIVISIONS: | # UNITS PER FIRE DIVISION | | # UNITS OWNER OCCUPIED | | 7 IS DEVELOPER OR CONTRACTOR A BOARD MEMBER? | | | | | |
| 4. INDICATE WHERE COVERAGE APPLIES TO | BARE WALLS | | FINISHED WALLS | | 8 IS A PROPERTY MANAGER EMPLOYED? | | | | | |

## CRIME

| ALARM TYPE | ALARM DESCRIPTION | GRADE | EXTENT OF PROTECTION | | | | | SAFE/VAULT/RECEPTACLE MANUFACTURER'S NAME | LABEL | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | SAFE/VAULT | | PREMISES ALARM | | | | | UL |
| HOLD-UP | LOCAL GONG | | | | 1 | 2 | 3 | | | |
| PREMISES | CNTRL STAT W KEYS | | PARTIAL | | | | | | SMNA | |
| SAFE/VAULT | CNTRL STAT WO KEYS | | COMPLETE | | | | | | CLASS | |
| | POLICE CONNECT | CERT #: | EXP DATE: | | | | | | | |

| MAXIMUM CASH ON PREMISES | MAXIMUM CASH WITH MESSENGER | MONEY ON PREMISES OVERNIGHT | FREQUENCY OF DEPOSITS | DEADBOLT CYLINDER DOOR LOCKS? | | SAFE DOOR CONSTRUCTION |
|---|---|---|---|---|---|---|
| $ | $ | $ | | X   YES | NO | |

OTHER PROTECTION (Lighting, fences, watchpersons, etc.)

## REMARKS (Attach additional sheets if more space is required)

**ATTACHMENTS**

| STATE SUPPLEMENT(S) (if applicable) |
|---|
| |
| |
| |
| |

AGENT COMMENTS : Alex, find attached supplementalapplication in File Attachments and insured receipts from liquor is 23% Please approve this submission and issue as of 01/03/2016. Thank you!

FIRSTLINEHARFORD0027

## Name and Address

Landis Pig Roast LLC
623 East Landis Avenue
Vineland, NJ 08360

## Additional Information

ADDITIONAL INFORMATION FOR PREMISES AND DESCRIPTION: Location 1, Restaurant
PREMISES INFORMATION
CLASSIFICATION:Restaurant

PROPERTY SECTION
SEASONAL INCREASE:25%
OCCUPANCY:Occupant

BUILDING COVERAGES SECTION:
CUSTOMER SEATING CHARGE:Yes
RESTAURANT ENDORSEMENTS:Yes

GENERAL QUESTIONNAIRE:
Are you a condo unit owner for any of the locations : NO
Is any portion of the building(s) used for habitational purposes : YES

GENERAL QUESTIONNAIRE REMARKS:
2nd and 3rd floor of the building have apartments

ADDITIONAL INFORMATION FROM POLICY LEVEL COVERAGE SECTION:
DEBIT/CREDIT:1

ATTACHMENTS ARE :
Document Type: Supplemental Application

LIQUOR LIABILITY COVERAGE QUESTIONNAIRE:
Is restaurant open past 11:00 pm :
NO

**Acord Additional Info (2004/08)**

FIRSTLINEHARFORD0028

**ACORD®**

AGENCY CUSTOMER ID: _____
LOC #: _____

# RESTAURANT/TAVERN SUPPLEMENT

COMPLETE THIS SUPPLEMENT FOR EACH APPLICABLE LOCATION

DATE (MM/DD/YYYY)

| AGENCY | NAMED INSURED/APPLICANT'S NAME | POLICY NUMBER |
|---|---|---|
| Biondi Insurance Agency | Landis Pig Roast LLC | |
| COMPANY NAME: | | NAIC CODE: |

## GENERAL RATING/UNDERWRITING

**LOCATION OF PROPERTY**
623 E Landis Ave
Vineland, NJ 08360

**TYPE OF BUSINESS - CHECK ALL THAT APPLY**

| | | | | | NUMBER OF EMPLOYEES |
|---|---|---|---|---|---|
| X RESTAURANT | X FAMILY STYLE | NIGHTCLUB | FRANCHISED | SEASONAL | |
| DINER | BANQUET HALL | BED & BREAKFAST INN | X NOT FRANCHISED | X YEAR ROUND | FULL TIME: 5 |
| FAST FOOD | TAVERN | OTHER (Describe): | | | PART TIME: 2 |

**SQUARE FOOTAGE**
TOTAL BUILDING: 6100    RESTAURANT: 2035    APARTMENTS: 4    NUMBER OF APARTMENTS: 4

| SEATING CAPACITY | HOURS OF OPERATION |
|---|---|
| 40 | 11:00am- 10:00pm |

**ORIGINAL USE AND SUBSEQUENT OCCUPANCIES OF THE BUILDING**
same

**RECEIPTS (LAST 3 YEARS)**

| | FOOD | LIQUOR | OTHER (Describe Below) |
|---|---|---|---|
| YEAR: 2015 | $ 200,000 | $ 60,000 | $ 0 |
| YEAR: | $ | $ | $ |
| YEAR: | $ | $ | $ |

**CHECK ALL THAT APPLY**

| | | | |
|---|---|---|---|
| STAIRWAY(S) | ELEVATOR(S) | ESCALATOR(S) | X EMERGENCY LIGHTING SYSTEMS (Describe) |
| GRILLING | DEEP FAT FRYING | OPEN BROILING | |
| X ROASTING | TABLESIDE COOKING | | |
| NON-OWNED AUTOMOBILE(S) - NUMBER OF EMPLOYEES: | | WOODBURNING STOVE OR FIREPLACE INSERT | DATE INSTALLED: ___ |
| VALET PARKING | | MANUFACTURER NAME: | |
| GARAGE KEEPERS LEGAL LIABILITY REQUIRED/MAINTAINED FOR VALET PARKING | | PROPERTY HAS BEEN DESIGNATED AN HISTORICAL MARKER | |
| OFF PREMISES PARKING          ADDRESS: | | | |
| SQUARE FOOTAGE: | | | |
| CATERING/BANQUET OPERATIONS | ON PREMISES     DESCRIBE: | | |
| % OF TOTAL RECEIPTS: | OFF PREMISES | | |

| EXPLAIN ALL "YES" RESPONSES UNLESS STATED OTHERWISE | Y/N |
|---|---|
| 1. HAS APPLICANT NOW OR IN THE PAST BEEN INVOLVED IN BANKRUPTCY, FORECLOSURE, TAX LIEN, BUSINESS FAILURE, OR ANY LITIGATION? | N |
| 2. HAS BUSINESS BEEN IN OPERATION LESS THAN 5 YEARS AT THIS LOCATION? IF YES, DESCRIBE PRIOR EXPERIENCE OF OWNER/MANAGER. | N |
| 3. ARE THERE LODGING OPERATIONS OTHER THAN APARTMENTS? | N |
| 4. ANY DELIVERIES? | N |
| 5. ARE ADEQUATE EMERGENCY EXITS PROVIDED AND EQUIPPED WITH PANIC HARDWARE? (No explanation needed) | Y |
| 6. HAVE ADEQUATE SMOKE ALARMS BEEN INSTALLED? (No explanation needed) | Y |
| 7. ANY OTHER ON OR OFF PREMISES EXPOSURES NOT LISTED ABOVE? | N |

FIRSTLINEHARFORD0029

AGENCY CUSTOMER ID: _____

LOC #: _____

## KITCHEN FIRE PROTECTION

CHECK ALL THAT APPLY

| | | |
|---|---|---|
| X | U.L. 300 APPROVED AUTOMATIC EXTINGUISHING SYSTEM COVERS ALL COOKING SURFACES | |
| | NAME OF SYSTEM: *Pro-tex 11* | [X] WET   [ ] DRY |

| | |
|---|---|
| X | U.L. 300 APPROVED AUTOMATIC EXTINGUISHING SYSTEM UNDER MAINTENANCE CONTRACT - # MONTHS: ___6___ |

| | | | |
|---|---|---|---|
| X | AUTOMATIC GAS OR ELECTRIC SHUT OFFS FOR COOKING | X | HOODS AND DUCTS OVER ALL COOKING EQUIPMENT |
| X | HOOD AND FILTERS CLEANED WEEKLY BY STAFF | X | HOODS AND DUCTS MAINTENANCE CONTRACT SCHEDULE - # MONTHS: ___6___ |
| X | BC AND K EXTINGUISHERS AVAILABLE IN KITCHEN | X | ADEQUATE CLEARANCE BETWEEN HOODS, DUCTS, COOKING EQUIPMENT AND COMBUSTIBLE MATERIALS |

### FINANCIAL INFORMATION - MOST RECENT 12 MONTH PERIOD

| | |
|---|---|
| TOTAL OPERATING EXPENSES (FOOD AND LIQUOR ONLY) | $ 70,000 |
| TOTAL OPERATING EXPENSES (OTHER THAN COST OF FOOD AND LIQUOR) | $ 130,000 |
| NET PROFIT OR LOSS (IF LOSS, ATTACH FINANCIAL STATEMENT) | $ 60,000 (Profit) |
| ACCOUNTS PAYABLE | $ — |
| NOTES PAYABLE (NOT TO BANKS) | $ — |
| BANK LOANS PAYABLE | $ — |

## LIQUOR LIABILITY INFORMATION

| LIQUOR LICENSE NUMBER | LIQUOR LICENSE TYPE | | |
|---|---|---|---|
| 0814-33-015-008 | Consumption | | |

| NUMBER OF BARS ON PREMISES | NUMBER OF BARTENDERS | NUMBER OF WAITERS/WAITRESSES | AVERAGE LENGTH OF EMPLOYMENT |
|---|---|---|---|
| 1 | 1 | 2 | 5 years |

CHECK ALL THAT APPLY

| | | | | | |
|---|---|---|---|---|---|
| | BEER SALES | WINE SALES | X | FULL BAR | SHOTS GIVEN/SERVED | SHOTS SPECIALS |
| | WRITTEN POLICY ON SERVING ALCOHOL FOR EMPLOYEES AND CUSTOMERS | | | | REDUCED PRICE DRINKS | HAPPY HOUR |
| X | MANAGEMENT NOTIFIED PRIOR TO SHUTTING OFF PATRONS | | | | LAST CALL GIVEN - TIME: | |
| X | STEADY BAR CLIENTELE | | | | SALES OF PACKAGE GOODS - PERCENT OF LIQUOR RECEIPTS: ____ % | |

| EXPLAIN ALL "YES" RESPONSES UNLESS STATED OTHERWISE | Y/N |
|---|---|
| 1. ARE EMPLOYEES GIVEN LIQUOR TRAINING? IF YES, EXPLAIN TYPE AND WHEN TRAINED.<br>Bar-tending school | [Y] |
| 2. HAVE THERE BEEN ANY LIQUOR BOARD VIOLATIONS? IF YES, LIST ALL VIOLATIONS. | [N] |
| 3. IS DOCUMENTATION KEPT ON EACH INCIDENT SHUTTING OFF PATRONS? (No explanation needed)   *Never happend* | [X] |

## ENTERTAINMENT INFORMATION  *NONE*

| TYPE OF ENTERTAINMENT | | NIGHTS OF WEEK | | | |
|---|---|---|---|---|---|
| [ ] ROCK GROUP | [ ] BAND (ANY KIND): | [ ] MONDAY | [ ] WEDNESDAY | [ ] FRIDAY | [ ] SUNDAY |
| [ ] DJ | [ ] OTHER (Describe): | [ ] TUESDAY | [ ] THURSDAY | [ ] SATURDAY | |

| AGE OF CLIENTELE | [ ] UNDER 21 | [ ] 21 - 40 | [ ] OVER 40 | DANCING (Check all that apply) | [ ] PERMITTED | [ ] DANCE FLOOR |
|---|---|---|---|---|---|---|

| AMUSEMENT DEVICES | COUNT | DESCRIPTION |
|---|---|---|
| POOL TABLES | | |
| VIDEO GAMES | | |
| GAMBLING | | |

| EXPLAIN ALL "YES" RESPONSES | Y/N |
|---|---|
| 1. ARE THERE BOUNCERS OR DOORMEN? IF YES, EXPLAIN WHY. | [N] |

## BED & BREAKFAST INFORMATION ONLY  *NONE*

| NAME OF INN: | NUMBER OF GUEST ROOMS: |
|---|---|
| CLEANING SOLVENTS STORAGE LOCATION: | CLEANING SOLVENT CABINET LOCKED OR STORED OUT OF REACH OF CHILDREN |

| EXPLAIN ALL "YES" RESPONSES | Y/N |
|---|---|
| 1. DOES THE INN OWNER RESIDE ELSEWHERE; OR IS THE INN OPERATED BY SOMEONE OTHER THAN THE OWNER? IF YES, PROVIDE NAME AND EXPERIENCE OF OPERATOR. | [ ] |
| 2. DOES INN PROVIDE GUESTS WITH ANY SPORTS EQUIPMENT, INCLUDING BOATS, BICYCLES, MOTORCYCLES OR HORSES? IF YES, DESCRIBE. | [ ] |

ACORD 185 (2007/05)                     Page 2 of 3

FIRSTLINEHARFORD0030

AGENCY CUSTOMER ID: _____

LOC #: _____

**REMARKS**

**ATTACHMENTS**

| | |
|---|---|
| FINANCIAL STATEMENT | |
| PHOTOS | |
| | |
| | |

PERSONAL INFORMATION ABOUT YOU, INCLUDING INFORMATION FROM A CREDIT OR OTHER INVESTIGATIVE REPORT, MAY BE COLLECTED FROM PERSONS OTHER THAN YOU IN CONNECTION WITH THIS APPLICATION FOR INSURANCE AND SUBSEQUENT AMENDMENTS AND RENEWALS. SUCH INFORMATION AS WELL AS OTHER PERSONAL AND PRIVILEGED INFORMATION COLLECTED BY US OR OUR AGENTS MAY IN CERTAIN CIRCUMSTANCES BE DISCLOSED TO THIRD PARTIES WITHOUT YOUR AUTHORIZATION. CREDIT SCORING INFORMATION MAY BE USED TO HELP DETERMINE EITHER YOUR ELIGIBILITY FOR INSURANCE OR THE PREMIUM YOU WILL BE CHARGED. WE MAY USE A THIRD PARTY IN CONNECTION WITH THE DEVELOPMENT OF YOUR SCORE. YOU HAVE THE RIGHT TO REVIEW YOUR PERSONAL INFORMATION IN OUR FILES AND CAN REQUEST CORRECTION OF ANY INACCURACIES. A MORE DETAILED DESCRIPTION OF YOUR RIGHTS AND OUR PRACTICES REGARDING SUCH INFORMATION IS AVAILABLE UPON REQUEST. CONTACT YOUR AGENT OR BROKER FOR INSTRUCTIONS ON HOW TO SUBMIT A REQUEST TO US.

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR ANOTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THE PERSON TO CRIMINAL AND [NY: SUBSTANTIAL] CIVIL PENALTIES. (Not applicable in CO, FL, HI, MA, NE, OH, OK, OR, or VT; in DC, LA, ME, TN, VA and WA, insurance benefits may also be denied)
IN FLORIDA, ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE.

_Zygqi Dobkowski_     _[signature]_     12-11-15
APPLICANT/NAMED INSURED NAME (Please Print) | APPLICANT/NAMED INSURED SIGNATURE | DATE

_____ | _____ | _____
APPLICANT/NAMED INSURED NAME (Please Print) | APPLICANT/NAMED INSURED SIGNATURE | DATE

_____ | _____ | _____
APPLICANT/NAMED INSURED NAME (Please Print) | APPLICANT/NAMED INSURED SIGNATURE | DATE

ACORD 185 (2007/05)     Page 3 of 3

FIRSTLINEHARFORD0031

# EXHIBIT E



PENNOCK INSURANCE, INC.
2 Christy Drive, Suite 301, Chadds Ford, PA 19317-2000
Phone: (610)358-2600

**Commercial Package Application**

MCP015F01X6
Version 2

You or your agent provided the information used to complete the questions below. Please answer all remaining questions in the space provided. By signing this application you are warranting that all information on this application is true and correct.

I.   **General Information**

Applicant's Name:  Z&D REALTY LLC
Form Of Business: ☐Individual ☐Corporation ☐Partnership ☒LLC ☐Other: _____
Mailing Address:  242 Mystic Dr.
City:  Egg Harbor Twp          State: NJ      Zip: 08234
Phone Number: 856-696-9045    Fax Number: same
Web Address:  N/A              E-mail Address: N/A
Inspection Contact:  Diane Dobkowski

Coverage Desired:  ☐Monoline Liability  ☐Monoline Property  ☐Monoline Liquor  ☒Package
Policy Term:        ☐3 Months          ☐6 Months          ☐9 Months          ☒Annual

Has coverage been cancelled or non-renewed in the last 3 years (not applicable in the state of MO)?   ☐Yes ☒No

If Yes, provide complete details:
What year did the business start?  2015 (Banquet hall)
Loss Information for the past 3 years:   ☒None or provide details below

Please advise all entities requesting to be added as Additional Insured on this policy:   ☒Not Applicable

| Complete Name | Address | Interest |
|---|---|---|
|  |  |  |
|  |  |  |

Description of Operations:

Building owner and operation of banquet hall.

Has insurance coverage been cancelled or non-renewed in the past 3 years? (not applicable in MO)   ☐ Yes ☒ No
No past, pending or planned foreclosure and/or bankruptcy or judgment for unpaid taxes against the named insured or any officer, partner, member or owner of the applicant individually within the past five (5) years.   ☒ True ☐ False

II.   **Locations of Coverage and Corresponding Classifications**

Location #1

| Address | City | State | Zip |
|---|---|---|---|
| 619-21 E Landis Ave | Vineland | NJ | 08360 |

Years At Current Location:  3
Construction: Joisted Masonry              Protection Class: 5
No. of Stories:  1    Year Built:  1928    Total Square Footage: 5,000

2/18/2015                                                                Page  1  of  3

Years at this location: 3

Roof Age: 3    Roof Type: ☒Flat ☐Shingle ☐Wood Shake ☐Metal ☐Tile ☐Slate ☐Other

Plumbing: ☒PVC ☐Copper ☐Lead ☐Iron ☐Galvanized ☐Other

Updates:    Plumbing: 2014    Electrical: 2014    Heating: 2014

| Protective Devices: | ☐Functional & operational smoke detectors | | |
|---|---|---|---|
| | ☒Burglar Alarm | ☐Central Station | ☒Local |
| | ☒Fire Alarm | ☐Central Station | ☒Local |
| | ☒Sprinkler System - | 100    % of the building | |
| Cause of Loss: | ☒Special Form | ☐Broad Form ☐Basic Form | |
| Exclusions: | ☐Wind & Hail | ☐Sprinkler Leakage ☐Theft | ☐Water Damage |

Deductible: ☐$500 ☒$1,000 ☐$2,500 ☐$5,000 ☐Other

| | Coverage | Limit | Additional Information | | |
|---|---|---|---|---|---|
| ☑ | Building | $625,000 | Co-Insurance: ☑ 80% | ☐ 90 | ☐ 100% |
| | | | Valuation: ☐ Replacement Cost | | ☑ Actual Cash Value |
| ☑ | Equipment Breakdown | Included in Building and Personal Property | Co-Insurance: ☐ 80% | ☐ 90 | ☐ 100% |
| | | | Valuation: ☐ Replacement Cost | | ☑ Actual Cash Value |
| ☑ | Fungus, wet rot, dry rot, and bacteria limited coverage | $15,000 | Co-Insurance: ☑ 80% | ☐ 90 | ☐ 100% |

Underwriting Information for Location 1

| Classification | Code No. | GL Class Code | Premium Basis | Exposure | Applicable Sq. Ft. |
|---|---|---|---|---|---|
| Halls - Other than Not-For-Profit | 0843 | 44276 | Total Area | 5000 | N/A |

Does the insured keep any animals on the premise?    ☐Yes ☒No

**Property**

Does any location built prior to 1978, have aluminum wiring or knob-and-tube wiring?    ☐ Yes ☒ No

For any building built prior to 1978, 100% of the wiring is on functioning and operational circuit breakers    ☒ True ☐ False

Functioning and operational smoke and/or heat detectors in all units and/or occupancies    ☒ True ☐ False

Functioning and operational fire extinguishers readily available    ☒ True ☐ False

Any seasonal exposure is reviewed and accepted by Home Office    N/A    ☐ True ☐ False

**Liability**

No armed security or off-duty police officers employed    ☒ True ☐ False

## III.    Limits of Insurance
**COMMERCIAL GENERAL LIABILITY**

Each Occurrence    $1,000,000

Personal Injury and Advertising Injury    $1,000,000

Medical Expense (Any One Person)    $5,000

Damage to Premises Rented to You    $100,000

Products/Completed Ops Aggregate    Included

General Aggregate    $2,000,000

General Liability Deductible    $0

## IV.    Eligibility Criteria

| Classification |
|---|
| Halls - Other than Not-For-Profit |

Liability

| | |
|---|---|
| Every floor with public access has at least 2 means of egress (exits) | ☒ True ☐ False |
| No firearms on the premises | ☒ True ☐ False |
| No pyrotechnic displays, foam machines or mosh pits | ☒ True ☐ False |
| No exposure to pyrotechnic displays, foam machines, trampolines, or swimming pools | ☒ True ☐ False |
| All alcohol served within the legally allowable time frames | ☒ True ☐ False |

## V.    Additional Eligibility Information

Does the Applicant engage in any operations or have any classifications on their premise(s) other than those listed ☐ Yes ☒ No
in  Item II Locations of Coverage and Corresponding Classifications?

**New Jersey Fraud Statement:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**Fraud Statement:** Any person who knowingly and with intent to defraud any insurance company or other person, files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and may subject such person to criminal and/or civil penalties and other sanctions,

**Applicant's Warranty Statement:** I warrant that the information provided in this Application, and any amendments or modifications to this Application are true and correct. I acknowledge that the information provided in this Application is material to acceptance of the risk and the issuance of the requested policy by Company. I agree that any claim, incident, occurrence, event or material change in the Applicant's operation taking place between the date this application was signed and the effective date of the insurance policy applied for which would render inaccurate, untrue or incomplete, any information provided in this Application, will immediately be reported in writing to the Company and the Company may withdraw or modify any outstanding quotations and/or void any authorization or agreement to bind the insurance. Company may, but is not required, to make investigation of the information provided in this Application. A decision by the Company not to make or to limit such investigation does not constitute a waiver or estoppel of Company's rights.

I acknowledge that this Application is deemed incorporated by reference in any policy issued by Company in reliance thereon whether or not the Application is attached to the policy.

I acknowledge and agree that a breach of this WARRANTY STATEMENT is grounds for Company to declare void any policy or policies issued in reliance thereon and/or deny any claim(s) for coverage thereunder.

Applicants Signature*: _Diane Dobkowski_   Title: _Owner_   Date: _3-2-2015_
                                                                    (Required)
Brokers Signature: _Samuel C. Ma__   Date: _3-3-2015_
               (Must be Owner, Officer or Partner)    (Required)
If your state requires that we have the name and address of your (insured's) authorized Agent or Broker.
Name of Authorized Agent or Broker: _____
Address: _____

**SUBMITTING THIS APPLICATION DOES NOT BIND THE APPLICANT TO PURCHASE INSURANCE.
ACCEPTANCE OF THIS APPLICATION DOES NOT BIND THE COMPANY TO ISSUE INSURANCE.**

# DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Program Reauthorization Act of 2015 ("the Act"), you now have a right to purchase insurance coverage for losses arising out of acts of terrorism, *as defined in Section 102(1) of the Act*: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of Homeland Security, and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that any coverage for losses caused by certified acts of terrorism is partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 85% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage for calendar year 2015. Beginning on January 1, 2016, the federal share shall decrease by 1 percentage point per calendar year until equal to 80% in calendar year 2020. The premium charged for this coverage is provided below and does not include any charges for the portion of loss covered by the federal government under the Act.

Coverage for "insured losses", as defined in the Act, is subject to the coverage terms, conditions, amounts and limits in this policy applicable to losses arising from events other than acts of terrorism.

You should know that the Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement, as well as insurers' liability, for losses resulting from certified acts of terrorism. When the amount of such losses for all insurers exceeds $100 billion, your coverage may be reduced.

You should also know that, under federal law, you are not required to purchase coverage for losses caused by certified acts of terrorism.

## REJECTION OR SELECTION OF TERRORISM INSURANCE COVERAGE

Please "X" one of the boxes below and return this notice to the Company.

| | |
|---|---|
| ✗ | I decline to purchase Terrorism Coverage. I understand that I will have no coverage for losses arising from acts of Terrorism. |
| | I elect to purchase coverage for certified acts of Terrorism for a premium of $                . |

Note: If you do not respond to our offer and do not return this notice to the Company, you will have no Terrorism Coverage under this policy.

Diane Dobkowski                        Z + D Realty LLC
Applicant Name (Print)                 Named Insured

Diane Dobkowski                        3-2-2015
Authorized Signature                   Date

# EXHIBIT F



 UNITED STATES LIABILITY INSURANCE GROUP
A Berkshire Hathaway Company

## Bar/Tavern/Restaurant/Nightclub Inspection Report
### Property ~ General Liability ~ Liquor

Named Insured:    Z&D Realty                         D/B/A: Z&D Realty
Policy Number:    CP1607675
Type of business:☐ Sole Proprietorship ☐ Partnership ☐ Corporation ☒ LLC ☐ Non-Profit☐ Other ☐
Interviewed/Title:    John Lanka manager                    Phone Number 2566969045
Surveyed By: R. Prebesh                                Survey Date:  04/03/2015
Mailing Address:   242 Mystic Drive Egg Harbor NJ 08234
Location Address:  619-21 East Landis Avenue Vineland NJ 08360
Website address:                        ☐ N/A
Building Interest:   ☒ Owner      ☐ Tenant      ☐ If tenant, part occupied %

| Type of business (check all that apply): | ☒ Bar/Tavern | ☐ Restaurant | ☐ Nightclub | ☐ Banquet Hall |
| --- | --- | --- | --- | --- |
| | ☐ Comedy Club | ☐ Adult Entertainment/Strip Clubs | ☐ Bowling Alley | ☐ Pool/Billiard Hall |
| | ☐ Private/Fraternal Club | ☐ Takeout/Package Store | ☐ Catering Off Premises | |
| | ☐ Casino/Gaming | ☐ Hostess Bar | ☐ Other | |

**Any check in the R column must be explained following that particular question and provide photo if appropriate**

| General Information | R* | A |
| --- | --- | --- |
| 1.  Month and year current owner began operation at this location:*03 2015* | | |
| 2.  Years of experience the insured has in managing this type of operation (i.e. restaurant, nightclub): 0 | | |
| 3.  Has insured ever operated this location under a different name or DBA (other than above)? <br> a. If yes, provide name or DBA used: | ☐ Yes ☒ No | |
| 4.  Any past, pending or planned bankruptcy or judgment for unpaid taxes against the applicant <br> Named insured or any officer, partner, member or owner of the applicant individually within <br> the past (5) years <br> If yes, specify                                    ☒ N/A <br> a. The entity or name and title of the person involved: <br> b. the actual or planned date of the filing judgment: | ☐ Yes ☒ No | |
| 5.  Is all electric on functioning and operational circuit breakers? | ☐ No ☒ Yes | |
| a. If **YES** are the circuit breaker manufactured by Federal Pacific Electric Company and/or the <br> Stab-Lok brand name displayed on the inside of the electrical box, installed in the 70's or 80'? <br><br> **Note to Inspector:** The electrical box should state "Federal Pacific Electric Company" or the <br> "Stab-Lok" brand on the inside panel. Federal Pacific Equipment, Inc. is a different company <br> And not subject to this issue. If Yes, issue a recommendation to replace the circuit breaker panel box. | ☐ Yes ☒ No | |
| 6.  Any building with aluminum and/or knob & tube wiring? | ☐ Yes ☒ No | |
| 7.  Are there functioning and operational smoke or heat detectors used in all public areas? | ☐ No ☒ Yes | |
| 8.  Are there functioning and operational fire extinguishers appropriate to the occupancy in all <br> units/common areas with current inspection tags readily available for use or if less than a year <br> old was purchase receipt provided? | ☐ No ☒ Yes | |
| 9.  Is the risk located on a vessel? | ☐ Yes ☒ No | |

| 10 Does the insured have any pyrotechnic displays? | ☐ **Yes** ☒ No |
|---|---|

11. What is the latest hour of alcohol service? 1:30AM
   a. Closing Time: 2:00AM

| 12. Any firearms on premises? | ☐ **Yes** ☒ No |
|---|---|

13. # of Apartment Units (owned by insured) at this location: 0
0  Apartment Sq. Ft:
   (If apartment is present, complete Apartment Inspection Report)

| 14. Does the insured sponsor any "Teen" or "Under 21" nights? | ☐ **Yes** ☒ No |
|---|---|

| 15. Has the insured ever acted as or intends on acting as a franchisor? | ☒ **Yes** ☐ No |
|---|---|
|    a. Is the insured affiliated with a national franchise operation? | ☒ **Yes** ☐ No |

| 16. Any losses in the past three years? If yes, give complete details | ☐ **Yes** ☒ No |
|---|---|

| Year | Number of Claims | Incurred Amounts | Description |
|---|---|---|---|
| | | | |

---

| Cooking Information  N/A ☒ |
|---|

1. Cooking equipment used  ☐ Open Flame  ☐ Deep Fat Fryers
           ☐ Grills    ☐ Oven    ☐ Charcoal Grill
           ☐ Other    ☐ Barbeque Pit/Smoker   Distance from building:

2. Is all commercial cooking equipment protected by a functioning and operational automatic
extinguishing system?                                 ☐ No ☐ Yes
a. If yes, is it NFPA #96 compliant (ex, Adequate Service Contract)?    ☐ No ☐ Yes
b. Type of extinguishing system:  ☐ Wet ☐ Dry

| 3. Is there a cleaning/service contract in force for the hood and duct system with an outside firm? | ☐ No ☐ Yes |
|---|---|

4. Is vegetable oil used in frying?   ☐ Yes   ☐ No   ☐ N/A
   a. If No, what is used?

---

                                          R*     A

**Class code? Assault & Battery Information** (General Liability and Liquor Liability)

**Total Annual Receipts:** (Inspector is not required to review insured's books. A verbal estimate is adequate.)

| Food On Premises Consumption | Food Off Premises Consumption | Alcohol On Premises Consumption | Alcohol Off premises Consumption | Other receipts (List items ) | Total Annual Receipts |
|---|---|---|---|---|---|
| $ | $ | $120,000 | $ | $ | $120,000 |

1. List items included in Other Receipts (above) :

| 2. Are there Bouncers/Security/Doorpersons employed | ☐ **Yes** ☒ No |
|---|---|
|    a. If yes, please check all boxes that apply ☐ Check ID's ☐ Bouncer/Patron removal | |

| 3. Are there any previous assault & battery claims in the past three years? | ☐ **Yes** ☒ No |
|---|---|

| 4. Is there any **entertainment**? | ☒ **Yes** ☐ No |
|---|---|
|    a. If yes, check all that apply: | |

| Entertainment | Frequency | |
|---|---|---|
| ☒ DJ w/dancing | 2 x per week | 104 x per year |
| ☐ Stage/Floor show | x per week | x per year |
| ☐ Adult/Exotic | x per week | x per year |

| | | |
|---|---|---|
| ☐ Solo Acts | x per week | x per year |
| ☐ Comedy Acts | x per week | x per year |
| ☐ Banquet Entertainment by insured or lessee | x per week | x per year |
| ☐ Bands w/ 3 or more members (Excluding Jazz, Mariachi, Steel drum/Island Music # Bank Members        Type of Music | x per week | x per year |
| ☐ Other | x per week | x per year |

| | |
|---|---|
| 4. Is dancing permitted? <br> *dance floor to center of premises* | ☒ Yes ☐ No |
| 6. Are there any Gaming (gambling) Machines that pay out for winnings <br>    a. Number of Gaming Machines | ☐ Yes ☒ No |
|    b. Any Casino tables? | ☐ Yes ☒ No |
| 7. Does insured have any of the following <br>    a. Table seating <br>    b. Table service? <br>    c. Bar Seating <br> 20 | ☐ Yes ☒ No <br> ☐ Yes ☒ No <br> ☒ Yes ☐ No |

| General Liability Information | |
|---|---|
| 1. Are **all** common areas, stairs, balconies, sidewalks, driveways and parking lots in good condition? | ☐ No ☒ Yes |
| a. If no, provide specific location(s) of defect(s): <br> b. If the risk is in a climate exposed to snow and ice, does the insured provide removal of snow from all sidewalks, walkways, & parking areas within 4 hours after the final fall and apply an anti-freezing agent | ☐ N/A ☐ No ☒ Yes |
| 2. Are periodic checks and necessary repairs made on the premises, i.e. common areas, stairs, sidewalks, driveways, parking lots, etc. | ☐ No ☒ Yes |
| 3. Are all railings and hand rails in good condition and present where required? | ☐ No ☒ Yes |
| a. Is baluster spacing installed according to local code, if required? <br> *(Please indicate in recommendations if required by local code)* | ☒ N/A ☐ No ☒ Yes |
| 5. Is a secondary means of egress (exit) provided for each floor (including basement) having public access? (Provide recommendations regarding inadequate means of egress for this type of operation.) | ☐ No ☒ Yes |
| 6. Does insured have any of the following exposures: trampoline, foam machines, swimming pool or beach the insured is responsible for? | ☐ Yes ☒ No |
| 7. Any inhalation of oxygen gas from tanks or hookah smoking on premises? | ☐ Yes ☒ No |
| 8. Are there any mechanical rides? | ☐ Yes ☒ No |
| 9. Any athletic activities conducted on premises? | ☐ Yes ☒ No |
| 10. Is the insured a sweepstakes or gambling parlor? | ☐ Yes ☒ No |
| 11. If the insured is the building owner and there is an elevator, is the inspection current? | ☒ N/A ☐ No     ☐ Yes |
| 12. If insured is building owner and there is an elevator, is there a maintenance agreement? | ☒ N/A ☐ No     ☐ Yes |
| 13. Is emergency lighting in place if required by local code/authorities having jurisdiction in which the building located | ☐ N/A ☐ No     ☒ Yes |

| 14.. Are there illuminated exit signs above all means of egress, checked on a regular basis to ensure proper functioning in the event of an emergency? | ☐ No ☒ Yes |

**Hired and Non Owned Auto Liability**

| 1. | Is there a delivery or ride home service or will one be implemented at any time in the future? | ☐ Yes ☒ No |
| 2. | Does insured own or lease on a long-term basis any automobile? | ☐ Yes ☒ No |
| 3 | Does insured require its employees to use their personal automobile to conduct the insured's business on a regular basis? | ☐ Yes ☒ No |

**Liquor Liability Information**     N/A ☐ (Only if no alcohol exposure exists)

| 1. Are all alcohol-servers certified in a Formal Alcohol Training Course not mandated by the state (for the state of TX – TABC)? | ☒ No ☐ Yes |

a. If Yes, provide name of the course (i.e.: TIPS, TAM, RAMP, BEST, etc.):
b. Were certificates visually verified for all alcohol servers?          ☐ No ☒ Yes

c. Does the insured have written policies for responsible alcohol service and ensures each employee understands these policies (Texas only)          ☒ N/A ☐ No ☐ Yes

| 2. Does the establishment attract predominantly youthful clientele ranging from 21-25 years of age? | ☐ Yes ☒ No |
| 3. Does the establishment utilize an identification scanner on all patrons regardless of age? | ☐ No ☒ Yes |
| 4. Does insured permit "BYOB" (bring your own bottle), other than for banquet operations? | ☐ Yes ☒ No |

If Yes, complete the following
a. What is the maximum occupancy of the establishment?
b. What percentage of patrons brings their own bottle? ☐ Less than 50% ☐ 50% or more

| 5. Does or will insured ever offer any of the following? Check all that apply | ☐ Yes ☒ No |

☐ On Premises tasting or sampling of alcoholic beverages in conjunction with any retail operation
☐ Bottle service or set ups
☐ Drink specials/happy hours after 9:00 PM
☐ Beer pong or other drinking games
☐ More than 2 complimentary drinks per patron per day (For Nevada, # of drinks must be monitored)
☐ "All you can drink" specials or other offers involving unlimited alcoholic beverages
☐ Beer for less than $1.00
☐ Liquor or wine price for less than $1.50

| 6. Does insured have a valid liquor license, if required by ordinance of law, prior to selling serving or distributing alcohol? | ☐ N/A ☐ No ☒ Yes |

a. Name on the License: grand plaza
b. License #: 0614–33-015-00.

| 7. Does insured ever sell or serve alcohol away from the premises? | ☐ Yes ☒ No |
| 8. Are employees or other persons serving alcohol permitted to consume alcohol during their hours of employment or service? | ☐ Yes ☒ No |
| 9. Are patrons under the legal drinking age permitted on the premises? | ☐ Yes ☒ No |
| a. If "yes," are patrons under the legal drinking age permitted on the premises after 11:00 PM? | ☐ Yes ☐ No |

10. Has the insured had any reported liquor liability and/or assault or battery claims or notification of potential liquor liability and/or assault or battery claims at this location within the past five years?   ☐ Yes  ☒ No
If yes, provide the following information on each claim:
   a.  Date(s):
   b.  Description(s):
   c.  Total incurred losses (reserves and payments):
   d.  Status:
   e.  Measures in place to prevent future incidents:

11. Have there been any citations, violations, charges or enforcement actions at this location within the past five years?   ☐ Yes  ☒ No
   a. If "yes," provide the following information on each citation, violation, charge or enforcement action
       Date(s):
       Description(s): _
       Measures in place to prevent future violations:

12. Is Insured requesting liquor liability limits greater than general liability limits carried?   ☐ Yes  ☒ No

---

**Restaurants or Bars with Banquet Operations  N/A ☐**

12. Are facilities available for banquets, receptions or private affairs?   ☒ Yes  ☐ No
   a. Are only the insured and its authorized employees or members permitted to serve alcohol at all events where alcohol is present?   ☐ No  ☒ Yes

   I. If "no," are persons serving alcohol who are not insured's authorized employees or members required to carry liquor liability insurance with limits greater than or equal to limits covered under the insured's liquor policy?   ☐ No  ☐ Yes

+

---

**Fine Dining Establishments  N/A ☒**

1 Is the average entree price greater than $20.00?   ☐ No  ☐ Yes

2. Is the average bottle of wine price greater than $30.00   ☐ No  ☐ Yes

3. Is the number of bottles on the wine list greater than 10?   ☐ No  ☐ Yes

---

**Non-Profit Private Fraternal or Social Clubs N/A ☒**

1.  Is this a Non Profit Private, Fraternal or Social Club? (If yes, please answer the following.)   ☐ Yes  ☐ No

   a. Are same-day memberships available?   ☐ Yes  ☐ No

   b. Are members permitted to bring more than 3 guests per day (excluding banquet activities and immediate family members)?   ☐ Yes  ☐ No

   c. Is self-service of alcohol permitted by members?   ☐ Yes  ☐ No

   d. Are any single drinks sold for less than $.50?   ☐ Yes  ☐ No

   e. Is BYOB (bring your own bottle) permitted for banquet operations only?   ☐ Yes  ☐ No

   f. Does the insured have any drink specials or happy hours?   ☐ Yes  ☒ No

   g. **Minnesota risks only:** Does insured's liquor license restrict service to club members and legitimate guests?   ☒ N/A  ☐ No  ☐ Yes

| Bring Your Own Bottle (BYOB) Restaurants  N/A ☒ | | |
|---|---|---|
| 1.  Does the establishment have a wait staff that actively monitors all alcohol consumption and requests a valid ID from all patrons? | ☐ No | ☐ Yes |
| 2.      Are patrons permitted to bring hard alcohol on the premises? | ☐ Yes | ☐ No |

| On-Premises Tasting of Alcohol      N/A ☒ | | |
|---|---|---|
| 1. Is eight ounces the maximum amount of complimentary samples permitted for any one patron per day? | ☐ No | ☐ Yes |
| 2. If someone other than the insured's employees  is serving the samples are they required to carry their own Liquor Liability insurance with limits equal to or greater than the insured's? | ☐ No | ☐ Yes |

| Property Information | | |
|---|---|---|
| 1 Total Sq. Ft of Insured's Building, excluding basement: 5550<br>Occupied by Insured's Sq. Ft 5,550                Leased to Others Sq. Ft.<br>        Total Sq. Ft of finished basement:<br>        Occupancy of finished basement: utilities/storage        Occupied by Insured or Lessee:  insured<br>        *Note: If multiple exposures within the insured's building or multiple buildings belonging to the insured, provide*<br>        *The square footage for each (other than garage(s) or sheds). 0* | | |
| 2    Age of building: 54 | | |
| 3    Construction type (Mixed – Provide Percentage)? Masonry Non - Combustible<br>Masonry Non Combustible | | |
| 4    Protection Class?  5<br>        a. How far away is the nearest Fire Station from the risk? 2 Miles<br>        b. How far away is the nearest fire hydrant from the risk? 100 Feet<br>            I.   Where is it located? | | |
| 5    Is the building in area prone to brush fires? | ☐ Yes | ☒No |
| 6    Are there any adjacent hazardous exposures?<br>        a. If yes, what is the distance from the insured's risk? | ☐ Yes | ☒No |
| 7. Are there vacancies in building?<br>        a. If Yes, what is the square footage? | ☐ Yes | ☒No |
| 8    Housekeeping and Maintenance acceptable? | ☐ No | ☒Yes |
| 9    Has owner ever been convicted of the felony of arson? | ☐ Yes | ☒No |
| 10. Is the property seasonal?<br>        a. If yes, months closed: | ☐ Yes ☒ No | |
| 11. Are trash dumpsters at least 35 feet, or at the edge of the premises if less than 35 feet, from Insured's structure? | ☒ N/A ☐ No ☐ Yes | |
| 12. Are there any unprotected openings? (Holes in floors, walls or ceilings)?<br>        (Photographs should be taken and recs developed that "Any unprotected opening should be filled with fireproofing material with at least a 2-hour fire rating.) | ☐ Yes ☒ No | |
| 13. Is a minimum of 3 ft. provided from combustibles in the Electric/Utility Room?<br>        (If not a recommendation to improve the housekeeping in these areas should be developed. | ☐ No | ☒Yes |

| Property Building Coverage / Broad or Special Cause of Loss | R* | A |
|---|---|---|
| 1  Is any of the plumbing water pipes (not including sewer lines) galvanized, iron or steel? | ☐ Yes | ☒ No |

2  Type of roof? ☒ Flat  ☐ Composite Shingle  ☐ Wood Shingle  ☐ Metal  ☐ Tile
    ☐ Rubber  ☐ Tar  ☐ Slate  ☐ Other
  a.  Roof age (if flat, indicate date last recoated): 2014
  b.  If roof is flat perform roof inspection if accessible and provide recommendations if needed (include but not limited to verification of material in general condition, standing water anyplace where there is caulking, proper drainage, debris or build-up, and any equipment or heavy weight on roof
    ☒ Not accessible  ☐ Accessible but no access allowed  ☐ Roof not flat
    Details:

| Protective Safeguards | | | |
|---|---|---|---|
| 1 | ☒ Functioning and Operational Central Station Burglar Alarm w/monitoring contract | | ☐ NONE |
| 2 | Fire Protection: ☒ Central Station Fire Alarm | ☒ 100% Sprinklers | ☐ None |

**Brief Description of Operations:**
The insured is the owner of the building and operates a bar at this location has owned the building for the last 2 years. The dba of the bar is Grant Plaza "The interior of the building has been gut renovated. All utilities are less than 1 year old. The business has been in operation for 1 month. The bar is open on Friday and Saturday from 5pm-2am. There is dancing on the premises from 8pm-2am. There are bartenders on the premises. There are no bouncers or security on site. Bartenders have no formal training. There is no cooking on the premises. Liquor license number is 0614-33-015-00. There is a loudspeaker speaker system set up for the bar. The premises can be leased for banquets that are catered. The basement is used for utilities/storage, all major repairs are done by outside contractors with certificates of liability in place. Snow removal is done by the insured.

**Brief Description of Additional Exposures on Insured's Premises:** ☒ N/A

**Specific Underwriting Questions:** ☒ None

**Recommendations/Comments:** ☐ No  ☒ Yes (if yes list below and provide photo if appropriate)
2015-04-01:
All alcohol servers should attend a formal alcohol awareness program with certificates of completion of program kept on the premises. This should be done to lessen the potential for liquor liability claims.



**Photo Supplement**

| | | | |
|---|---|---|---|
| Account: | Z&D REALTY | Location ID #: | 11529896 |
| Address: | 619-21 East Landis Avenue | RRI Client: | USLSURVEY |
| City/State/Zip: | Vineland NJ 08360 | Policy #: | CP1607675 |

front exterior





Rear exterior



grade interior

Insured: **Z&D REALTY**
Address: 619-21 East Landis Avenue Vineland
NJ 08360

Location Number: 11529896
Policy: CP1607675



| | fire alarm pull and panel |
| --- | --- |
| | main sprinkler alarm |

# EXHIBIT G

**Jean Bereznai**

| | |
|---|---|
| .om: | Jean Bereznai |
| **Sent:** | Monday, May 04, 2015 1:41 PM |
| **To:** | 'Nancy Mulvihill' |
| **Subject:** | RE: Z&D REALTY, LLC - CP1607675 |

Nancy –

See answers in red below. Hope this is helpful.

*Jean*



Jean Bereznai
The Martin Company
500 Jessup Road
West Deptford, NJ 08066
Phone: 856-845-3636
Fax   : 856-845-9191
Email : jean.bereznai@spmartinco.com

THE DOCUMENTS ACCOMPANYING THIS TELECOPY TRANSMISSION CONTAIN INFORMATION WHICH IS CONFIDENTIAL &/OR LEGALLY
PRIVILEDGED. THIS INFORMATION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY NAMED ON THIS TRANSMISSION SHEET. IF YOU
ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION OR THE TAKING OF ANY
ACTION IN RELIANCE ON THE CONTENTS OF THIS TELECOPIED INFORMATION IS STRICTLY PROHIBITED AND THAT THE DOCUMENTS SHOULD BE
RETURNED IMMEDIATELY. IN THIS REGARD, IF YOU HAVE RECEIVED THIS TELECOPY IN ERROR, PLEASE NOTIFY US BY TELEPHONE IMMEDIATELY
SO THAT WE CAN ARRANGE FOR THE RETURN OF THE ORIGINAL DOCUMENTS TO US AT NO COST TO YOU.

**From:** Nancy Mulvihill [mailto:nmulvihill@pennockins.com]
**Sent:** Monday, May 04, 2015 9:10 AM
**To:** Jean Bereznai
**Subject:** FW: Z&D REALTY, LLC - CP1607675

Good Morning Jean,

Our underwriter is requesting additional information.

Can you confirm who is operating the bar and who is operating the hall?
Restaurant has Liquor Legal. Restaurant is called Landis Pig Roast LLC. LL policy is under their name.
Banquet hall is operated by Z & D Realty LLC.  Landis Pig Roast provides bartender and bar services.
Can you confirm they are within the same location?
The businesses are next door to each other.
Do patrons of the bar/restaurant have access to the hall and/or vice versa?
Landis Pig Roast LLC and Z & D Realty (banquet hall) are separate. Banquet hall is used for private functions. Restaurant
is a sit-down, family clientele with normal restaurant operations/hours. They are also two separate buildings.

Please advise. Thank you.



Nancy Mulvihill

1

# EXHIBIT H

**Jean Bereznai**

From:      Jean Bereznai
Sent:      Wednesday, April 29, 2015 9:42 AM
To:        'Donna Mansi'
Subject:   RE: Z&D REALTY, LLC - CP1607675

Donna —

The bar exposure is covered elsewhere. Insured says he "contracts" out to the restaurant operation next door to handle the bar. Restaurant provides the bartender and liquor legal liability.

How does that effect the attached memo? And if it doesn't negate the need to add the exposure, please explain.

Thank you.

*Jean*

Jean Bereznai
The Martin Company
500 Jessup Road
West Deptford, NJ  08066
Phone: 856-845-3636
Fax   : 856-845-9191
Email : jean.bereznai@spmartinco.com

) DOCUMENTS ACCOMPANYING THIS TELECOPY TRANSMISSION CONTAIN INFORMATION WHICH IS CONFIDENTIAL &/OR LEGALLY
..IVILEDGED, THIS INFORMATION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY NAMED ON THIS TRANSMISSION SHEET. IF-YOU
ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION OR THE TAKING OF ANY
ACTION IN RELIANCE ON THE CONTENTS OF THIS TELECOPIED INFORMATION IS STRICTLY PROHIBITED AND THAT THE DOCUMENTS SHOULD BE
RETURNED IMMEDIATELY. IN THIS REGARD, IF YOU HAVE RECEIVED THIS TELECOPY IN ERROR. PLEASE NOTIFY US BY TELEPHONE IMMEDIATELY
SO THAT WE CAN ARRANGE FOR THE RETURN OF THE ORIGINAL DOCUMENTS TO US AT NO COST TO YOU.

**From:** Donna Mansi [mailto:dmansi@pennockins.com]
**Sent:** Tuesday, April 28, 2015 4:23 PM
**To:** Jean Bereznai
**Subject:** Z&D REALTY, LLC - CP1607675

Please see attached memo for the above captioned insured and advise at your earliest convenience.
Thank you

Donna Mansi, Underwriting Assistant
Pennock Insurance, Inc.
800.662.5182 x 1242
Fax: 484.631.0816
Website: pennockins.com

*Pennock
Insurance, Inc.*

# EXHIBIT I

CP 1607675A
_____
Renewal of Number

POLICY DECLARATIONS

No. CP 1607675B

# United States Liability Insurance Company
### 1190 Devon Park Drive, Wayne, Pennsylvania 19087
A Member Company of United States Liability Insurance Group

Home Office Copy
Direct Bill Policy

NAMED INSURED AND ADDRESS:
**Z&D REALTY**
**242 MYSTIC DR**
**EGG HARBOR, NJ 08234**

POLICY PERIOD: (MO. DAY YR.)  From: 02/21/2017 To: 02/21/2018

12:01 A.M. STANDARD TIME AT YOUR
MAILING ADDRESS SHOWN ABOVE

FORM OF BUSINESS:

BUSINESS DESCRIPTION: Hall

| IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY. |
|---|

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.
THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

PREMIUM

Commercial Liability Coverage Part

Commercial Property Coverage Part

TOTAL:

Coverage Form(s) and Endorsement(s) made a part of this policy at time of issue
### See Endorsement EOD (1/95)

Agent:  PENNOCK INSURANCE, INC. (1205)
2 Christy Drive, Suite 100
Chadds Ford, PA  19317-2000

Issued:  02/23/2017 10:09 AM

Broker:  The Martin Company
500 Jessup Road
West Deptford, NJ  08066

By: _Thomas P. Kinney_
Authorized Representative

UPD (08-07)

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS,
COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF,
COMPLETE THE ABOVE NUMBERED POLICY.

# EXTENSION OF DECLARATIONS

**Policy No. CP 1607675B**    Effective Date:    02/21/2017

12:01 AM STANDARD TIME

## FORMS AND ENDORSEMENTS

The following forms apply to multiple coverage parts

| Endt# | Revised | Description of Endorsements |
|---|---|---|
| CG2173 | 01/08 | Exclusion Of Certified Acts Of Terrorism |
| CG2620 | 10/93 | New Jersey Changes - Loss Information |
| IL0017 | 11/98 | Common Policy Conditions |
| IL0021 | 09/08 | Nuclear Energy Liability Exclusion Endorsement |
| IL0111 | 11/03 | New Jersey Changes |
| IL0141 | 09/08 | New Jersey Changes - Civil Union |
| IL0208 | 09/07 | New Jersey Changes - Cancellation And Nonrenewal |
| IL0935 | 07/02 | Exclusion Of Certain Computer-Related Losses |
| L-610 | 11/04 | Expanded Definition Of Bodily Injury |
| LLQ100 | 07/06 | Amendatory Endorsement |
| LLQ368 | 08/10 | Separation Of Insureds Clarification Endorsement |
| NTE | 01/15 | Notice Of Terrorism Exclusion |
| Jacket | 09/10 | Commercial Insurance Policy Jacket |

The following forms apply to the Commercial Liability coverage part

| Endt# | Revised | Description of Endorsements |
|---|---|---|
| CG0001 | 12/07 | Commercial General Liability Coverage Form |
| CG0068 | 05/09 | Recording And Distribution Of Material Or Information In Violation Of Law Exclusion |
| CG2107 | 05/14 | Exclusion - Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability - Limited Bodily Injury Exception Not Included |
| CG2136 | 03/05 | Exclusion - New Entities |
| CG2147 | 12/07 | Employment-Related Practices Exclusion |
| L-428 | 01/12 | Absolute Firearms Exclusion |
| L-461 | 12/11 | Assault Or Battery Exclusion |
| L-525 | 01/15 | Absolute War Or Terrorism Exclusion |
| L-599NJ | 10/12 | Absolute Exclusion for Pollution, Organic Pathogen, Silica and Asbestos-New Jersey |
| L-618C | 09/09 | Amendment Of Premium Audit Conditions |
| L-686 | 10/12 | Absolute Exclusion for Liquor and Other Related Liability |

The following forms apply to the Commercial Property coverage part

| Endt# | Revised | Description of Endorsements |
|---|---|---|
| CP 101 | 06/08 | Maintenance Of Heat Condition |
| CP 112 | 10/12 | Equipment Breakdown Enhancement Endorsement |
| CP 132 | 10/08 | Mortgagee/Loss Payable Provisions |
| CP 138 NJ | 02/08 | Lead Exclusion - New Jersey |
| CP 141 | 04/08 | Actual Cash Value Definition |

# EXTENSION OF DECLARATIONS

**Policy No. CP 1607675B**

Effective Date: **02/21/2017**

12:01 AM STANDARD TIME

## FORMS AND ENDORSEMENTS

| | | |
|---|---|---|
| CP 142 | 04/14 | Protective Devices Or Services Provisions |
| CP 147 NJ | 08/16 | Limitation Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria |
| CP 224 | 02/11 | Asbestos Material Exclusion |
| CP 226 | 02/11 | Absolute Pollution Exclusion - Property |
| CP 245 | 09/15 | Earth Movement Exclusion |
| CP0010 | 06/07 | Building And Personal Property Coverage Form |
| CP0090 | 07/88 | Commercial Property Conditions |
| CP0140 | 07/06 | Exclusion Of Loss Due To Virus Or Bacteria |
| CP1030 | 06/07 | Causes Of Loss - Special Form |
| CP1032 | 08/08 | Water Exclusion Endorsement |
| P 248 | 02/15 | Exclusion of Certified Acts of Terrorism (Coverage for Certain Fire Losses) |

EOD (01/95)    All other terms and conditions remain unchanged.    Page  2  of  2

## COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

Policy No. CP 1607675B

Effective Date: 02/21/2017

12:01 AM STANDARD TIME

### DESCRIPTION OF PREMISES

| Prem | Bldg | Location, Construction, Occupancy and Other Information | | Territory | Fire Code |
|---|---|---|---|---|---|
| 1 | 1 | 619-21 East Landis Avenue, Vineland, NJ 08360 | | 017 | 0843 |
| | | Description: Hall | | | |
| | | Covered Causes of Loss: Special | | Protection Class: 5 | |
| | | Construction: Joisted Masonry | | Square Footage: 5550 | |
| | | Special Deductible: None | Special Deductible Type: | | |

### COVERAGES PROVIDED - INSURANCE AT THE DESCRIBED PREMISES APPLIES ONLY FOR COVERAGES FOR WHICH A LIMIT OF INSURANCE IS SHOWN

| Prem | Bldg | Coverage | Limits of Insurance | Deductible | Coinsurance % or Monthly Indemnity | + Valuation | Premium |
|---|---|---|---|---|---|---|---|
| 1 | 1 | Building | $625,000 | $1,000 | 80% | ACV | |
| 1 | 1 | Equipment Breakdown | Included | $1,000 | | |  |
| 1 | 1 | Fungus, wet rot, dry rot, and bacteria limited coverage | $15,000 | $1,000 | 80% | |  |

MINIMUM PREMIUM FOR PROPERTY COVERAGE PART:

TOTAL PREMIUM FOR PROPERTY COVERAGE PART:

MP - minimum premium

+ Valuation: ACV - Actual Cash Value; RC - Replacement Cost; RC/ACV - Replacement Cost/ACV Roof
FBV - Functional Building Value; AA - Agreed Amount

LOSS PAYABLE(S): CP-132 (10-08)

Coverage Form(s)/Part(s) and Endorsement(s) made a part of this policy at time of issue:
See Endorsement EOD (01/95)

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission.
Copyright, ISO Commercial Risk Services, Inc., 1983, 1984, 1988

CF 150 (01/03)

Page    1 Of 1

## COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

Policy No.    CP 1607675B

Effective Date: 02/21/2017
12:01 AM STANDARD TIME

### LIMITS OF INSURANCE

| | |
|---|---:|
| Each Occurrence Limit | $1,000,000 |
| Personal & Advertising Injury Limit (Any One Person/Organization) | $1,000,000 |
| Medical Expense Limit (Any One Person) | $5,000 |
| Damages To Premises Rented To You (Any One Premises) | $100,000 |
| Products/Completed Operations Aggregate Limit | Included |
| General Aggregate Limit | $2,000,000 |

### LIABILITY DEDUCTIBLE

$0

### LOCATIONS OF ALL PREMISES YOU OWN, RENT OR OCCUPY

| Location | Address | Territory |
|---|---|---|
| 1 | 619-21 East Landis Avenue, Vineland, NJ 08360 | 017 |

### PREMIUM COMPUTATION

| Loc | Classification | Code No. | Premium Basis | Rate Pr/Co | Rate All Other | Advance Premium Pr/Co | Advance Premium All Other |
|---|---|---|---|---|---|---|---|
| 1 | Halls - Other than Not-For-Profit | 44276 | 5,550 Per 1,000 Total Area | Included | 437.237 | Included | ████ |

MINIMUM PREMIUM FOR GENERAL LIABILITY COVERAGE PART:    ████

TOTAL PREMIUM FOR GENERAL LIABILITY COVERAGE PART:    ████
(This Premium may be subject to adjustment.)    MP - minimum premium

Coverage Form(s)/Part(s) and Endorsement(s) made a part of this policy at time of issue:
**See Form EOD (01/95)**

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

# EXHIBIT J

**3**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OFF NEW JERSEY
 2               CAMDEN DIVISION
          CASE NOS: 1:19-cv-01627 & 1:19-cv-01583
 3
 4   FIRSTLINE NATIONAL INSURANCE COMPANY
     200 North Main Street
 5   Bel Air, MD  21014,
                Plaintiff
 6
 7   vs.             DEPOSITION TESTIMONY OF:
                     ZYGGI H. DOBKOWSKI
 8   LANDIS PIG ROAST, LLC.
     623 E. Landis Avenue
 9   Vineland, NJ  08360
        and
10   DENNIS COSBY
     1123 Chestnut Avenue
11   Vineland, NJ  08360
        and
12   EUGENE COSBY
     1123 Chestnut Avenue
13   Vineland, NJ  08360
                Defendants
14   HARFORD MUTUAL INSURANCE COMPANY,
                Plaintiff
15
16   vs.
17   Z&D REALTY, LLC
     623 E. Landis Avenue
18   Vineland, NJ  08360
        and
19   DENNIS COSBY
     1123 Chestnut Avenue
20   Vineland, NJ  08360
        and
21   EUGENE COSBY
     1123 chestnut avenue
22   Vineland, NJ  08360
                Defendants
23            * * *
24        WORD FOR WORD REPORTING, LLC
          5 NORTH BROAD STREET/SUITE 202
25          WOODBURY, NEW JERSEY  08096
                (856) 384-2770
```

COPY

WORD FOR WORD REPORTING, LLC (856) 384-2770

**4**

```
 3   WITNESS: ZYGGI H. DOBKOWSKI

 4   EXAMINATION                    PAGE
 5   BY MR. NIEDELMAN                5, 176
     BY MR. BERG                   154, 177
 6   BY MR. STOLOFF                162, 178

 7            E X H I B I T S
             * * *
 8
 9   NUMBER    DESCRIPTION          MK'D

10   ZD-1      Photograph..............96

11   ZD-2      Photograph..............97

12   ZD-3      Photograph..............97

13   ZD-4      Photograph..............98

14   ZD-5      Photograph..............99

15   ZD-6      Photograph.............100

16   ZD-7      Photograph.............101

17   ZD-8      Photograph.............102

18   ZD-9      Photograph.............103

19   ZD-10     Photograph.............104

20   ZD-11     Photograph.............105

21   ZD-12     Photograph.............106

22   ZD-13     Photograph.............106

23   ZD-14     Photograph.............108

24   ZD-15     Photograph.............109

25   ZD-16     Photograph.............111
```

WORD FOR WORD REPORTING, LLC (856) 384-2770

**2**

```
 1        Oral sworn deposition of ZYGGI H.
 2   DOBKOWSKI, held at the law offices of Jacobs &
 3   Barbone, P.A., 1125 Pacific Avenue, Atlantic
 4   City, New Jersey, on Thursday, February 6,
 5   2020, commencing at 11:00 a.m., before Lisa
 6   Reagan, CCR in the State of New Jersey, there
 7   being present:
 8   A P P E A R A N C E S :
 9   COOPER LEVENSON, P.A.
     BY: LOUIS NIEDELMAN, ESQUIRE
10   1125 Atlantic Avenue, Third Floor
     Atlantic City, New Jersey  08401
11   Attorneys for the Plaintiffs
     Firstline National Insurance Company
12   and Harford Mutual Insurance Company

13   MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
     BY: LAWRENCE B. BERG, ESQUIRE
14   15000 Midlantic Drive, Suite 200
     Mt. Laurel, New Jersey  08054
15   Attorneys for the Third-Party Defendant
     Biondi Insurance Agency
16
17   LAW OFFICES OF RICHARD A. STOLOFF
     BY: RICHARD A. STOLOFF, ESQUIRE
18   605 New Road
     Linwood, NJ  08221
19   Attorneys for the Defendants
     Cosby, Cosby & Mays
20
     JACOBS & BARBONE, P.A.
     BY: PHYLLIS WIDMAN, ESQUIRE
21   1125 Pacific Avenue
     Atlantic City, New Jersey  08401
     Attorneys for the Defendants
     Zyggi Dobkowski, Z&D Realty, LLC
23   and Landis Pig Roast, LLC

24   Also Present:
25   Matthew A. Stachowiak, AIC
     Harford Mutual Litigation Specialist
```

WORD FOR WORD REPORTING, LLC (856) 384-2770

**4**

```
 1            E X H I B I T S

 2   ZD-17    Copy of Z&D Realty Check......117

 3   ZD-18    Statement from Martin Co......119

 4   ZD-19    Restaurant/Tavern Supplement..121

 5   ZD-20    Harford Mutual Survey.........126

 6   ZD-21    Landis Pig Roast Ad...........130

 7   ZD-22    Grant Plaza Lease Agreement...131

 8   ZD-23    Grant Plaza Credit
 9           Card Receipt..................143

10   ZD-24    List of Grant Plaza Employees.148

11   ZD-25    Copy of a Black/White
12           Photograph....................151

15        REQUESTS FOR PRODUCTION

16        Page    Line

17        21      7
```

WORD FOR WORD REPORTING, LLC (856) 384-2770

ENTERED IN TIME MATTERS

1  Q.      Did you ever have lunch with Anatoliy
2  at Landis?
3  A.      No.
4  Q.      Did you ever go out to lunch with
Anatoliy other than eating at Landis?
6  A.      No.
7  Q.      What is Anatoliy's country of origin,
8  if you know?
9  A.      I think Ukrainian.
10  Q.      Do you still speak the language of
11  Ukraine?
12  A.      I don't speak Ukraine.  I speak
13  Russian.  But Ukraine and Russian similar.  He
14  knows some Polish.  So we talk a little bit.
15  Q.      Do you talk to Anatoliy in --
16  A.      Russian, Ukraine and Poland, and
17  English, a fourth one.
18  Q.      Let me ask you this question, Zyggi.
19  We talked about your businesses.  You have
20  certain rules for your businesses, and I'm
21  going to give you an example, all right, so
22  let me give you the example and then you can
23  say yes or no.
24          At Landis you have a license from
25  the State of New Jersey for alcohol, right?

WORD FOR WORD REPORTING, LLC  (856) 384-2770

46

1  A.      Right.
2  Q.      And you serve alcohol at Landis when
3  you are open; am I right?
4  A.      Correct.
5  Q.      And does that include beer, whiskey,
6  wine, any of those spirits?
7  A.      Yes.
8  Q.      Do you allow a customer to bring their
9  own alcohol into Landis to drink?
10  A.      No.
11  Q.      So that's your rule; am I right?
12  A.      It's not my rule.  It's the State's
13  law.
14  Q.      The State?
15  A.      Yes.
16  Q.      Do you allow anyone to come in to
17  Landis and bring their own food to eat?
18  A.      No.
19  Q.      Why not?
20  A.      It's my restaurant.
21  Q.      I knew that answer, but I wanted to
22  test you on that.  So you have a Landis rule
23  that no one can come in and bring their own
24  food; am I right?
25  A.      I don't see a restaurant yet where you

WORD FOR WORD REPORTING, LLC  (856) 384-2770

48

1  can bring your own food, unless I missed
2  something.
3  Q.      No, I'm saying you have a rule for
4  Landis where you're serving food and people
5  are paying for it and the rule is you can't
6  bring your own food in; is that right?
7  A.      Correct.
8  Q.      Do you understand that insurance
9  companies have rules also that they are
10  obligated to follow?
11          MS. WIDMAN:  Objection.
12          THE WITNESS:  I don't know.
13  BY MR. NIEDELMAN:
14  Q.      Do you know whether any insurance
15  companies in your business history, whether it
16  be Garden Truck Stop or Virginia or Landis or
17  Grant, have ever evaluated your business and
18  said, "We can't write your business or we
19  don't want to write your business, your
20  insurance business"?
21          MS. WIDMAN:  Objection to form.
22          THE WITNESS:  I don't know.
23  BY MR. NIEDELMAN:
24  Q.      You don't know?
25  A.      No.

WORD FOR WORD REPORTING, LLC  (856) 384-2770

48

1  Q.      Have you ever been refused insurance
2  coverage?
3  A.      I never deal with the insurance.  The
4  agent did.  So if they refuse to him or not, I
5  don't know.  I just deal with the agents.  I
6  need insurance and you find me one and they go
7  and find them.  If they refuse to me, he might
8  know better than I do.  He came to me, "This
9  is what I got for you, this is what it is
10  going to cost you, this is coverage.  You like
11  it?"  "Sounds okay."  "Good, okay, let's do
12  it."
13  Q.      Have Biondi or Martin or any of the
14  people there ever come to you and said,
15  "Zyggi, this insurance company doesn't want to
16  write your property" or "This insurance
17  company wants to cancel"?
18          MR. BERG:  Objection.
19          THE WITNESS:  I don't know.
20  BY MR. NIEDELMAN:
21  Q.      You don't remember any of those
22  conversations?
23  A.      No.
24  Q.      Did you ever have one insurance
25  company for the full life of Landis from the

WORD FOR WORD REPORTING, LLC  (856) 384-2770

1   first time you began the business until now,
2   the same insurance company?
3   A.      Probably not.  I don't know who was
4   the insurance company.
5   Q.      Would the answer be the same for
6   Grant?  You just don't know?
7   A.      I don't know.
8   Q.      Am I correct?
9   A.      Correct.
10  Q.      Did you ever have one insurance policy
11  ever that insured both Landis and Grant at the
12  same time?
13  A.      I don't know.
14  Q.      You don't know?
15  A.      No.
16  Q.      Landis has a license from the State of
17  New Jersey for alcoholic beverage; am I right?
18  A.      The license for both place.
19  Q.      Isn't it true that the license was
20  transferred from another entity when you first
21  started Landis into Landis?  Wasn't there a
22  liquor license transfer?
23  A.      No, I purchase the liquor license.
24  Transfer, no, we didn't transfer.
25  Q.      Who did you purchase it from?

WORD FOR WORD REPORTING, LLC  (856) 384-2770

---

1   was too small to spend 300,000 for the
2   license.
3           MR. STOLOFF:  Can I just clarify,
4   Lou?
5           MR. NIEDELMAN:  Anytime.
6           MR. STOLOFF:  When you say both
7   places, do you mean Landis and Grant Plaza?
8           THE WITNESS:  Yes.
9           MR. STOLOFF:  Thanks, Lou.
10  BY MR. NIEDELMAN:
11  Q.      Have you ever heard of the insurance
12  company USLI?
13  A.      No.
14  Q.      United States Liability Insurance,
15  have you ever heard of that name?
16  A.      No.
17  Q.      And before the shootings at Grant in
18  April of 2017, did you ever hear of the name
19  Harford Mutual Insurance?
20  A.      Harford, yes.
21  Q.      Harford Mutual?
22  A.      Harford, I heard the name.
23  Q.      Did you ever understand that Harford
24  Mutual provided any insurance to Landis before
25  the shootings in April of 2017?

WORD FOR WORD REPORTING, LLC  (856) 384-2770

---

50

1   A.      From DiTomassi.
2   Q.      How do you spell that?
3   A.      I don't know.  It's Italian name.
4   Q.      How long ago?
5   A.      Sixteen years ago.
6   Q.      Sixteen years?
7   A.      No, no, when did we open?  Six, seven
8   years ago.  D-E-T-O-M-A-S-E, I think.
9   Q.      So you bought the license from him; am
10  I right?
11  A.      Yes.
12  Q.      And then the license was transferred
13  from him to you, according to Trenton and the
14  ABC; is that right?
15  A.      Yes.
16  Q.      And the license is now owned by Landis
17  or Z&D?
18  A.      It's me personally.
19  Q.      Zyggi?
20  A.      Correct.
21  Q.      Did Grant ever obtain their own ABC
7   license?
23  A.      No.  The license is for both places.
24  The City allow me to use for both.  That's the
25  reason I bought the license.  The restaurant

WORD FOR WORD REPORTING, LLC  (856) 384-2770

---

52

1   A.      I don't know.
2   Q.      Now I want to be clear.  It's not
3   Hartford, H-A-R-T-F-O-R-D, it's H-A-R-F-O-R-D.
4   A.      That I don't know.  Spelling to me,
5   it's both the same basically.
6   Q.      Did you know before the shootings in
7   April of 2017 the name Harford Mutual
8   Insurance Company out of Bel Air, Maryland?
9   A.      That I don't know.
10  Q.      And had you ever, before the shootings
11  in April of 2017, heard the name Firstline
12  National Insurance Company out of Bel Air,
13  Maryland?
14  A.      No.
15  Q.      So as we sit here, you can't tell us
16  in April of 2017 when the shootings occurred
17  the name of the insurance companies that
18  insured Landis; is that right?
19  A.      Correct.
20  Q.      And the same question for Grant.  Am I
21  correct?
22  A.      Correct.
23  Q.      Did you ever have any personal contact
24  with any representatives of Harford Mutual
25  Insurance Company from Bel Air, Maryland?

WORD FOR WORD REPORTING, LLC  (856) 384-2770

**Page 55 (top-left)**

1  A.  No.
2  Q.  Same question for Firstline National
3  Insurance Company from Bel Air, Maryland?
4  A.  No.
   Q.  Do you know what types of insurance
6  were written for Landis over the last five
7  years?
8  A.  No.
9  Q.  Do you know what types of insurance
10  were issued for Grant over the last five
11  years?
12  A.  I ask what I want, I want coverage for
13  A, B, C and D, and that's what they come up, I
14  got you covered for this, for this and for
15  that. That's what I know. What's the
16  language in the paper, that I don't know.
17  Q.  I'm going to ask the reporter to read
18  back the last question, so listen to it and
19  then if you can answer it, please answer it.
20  A.  Okay, read back.
21       (The reporter read the pending
22  question.)
23  A.  Types, no.
24  Q.  And you relied on Martin Company or
25  Biondi to do the right thing by you; is that

WORD FOR WORD REPORTING, LLC  (856) 384-2770

**Page 56 (top-right)**

2  A.  No.
3  Q.  Do you know whether they were
4  representatives who were sent by Biondi or
5  Martin?
6  A.  Probably yes, but I don't remember.
7  Every year different people come.
8  Q.  Did you ever have a disagreement with
9  any of the inspectors?
10  A.  One of them.
11  Q.  When was that, Zyggi?
12  A.  When we was building -- renovating the
13  restaurant, and --
14  Q.  Landis?
15  A.  Landis. I have construction
16  insurance, and they break my door, it was
17  $2,000 door, and then he say they not cover.
18  Then I say why do I have construction
19  insurance if you don't cover the damage, and
20  that's why I have the disagreement. I have
21  insurance four and a half thousand dollars for
22  six months --
23  Q.  Is that forty five hundred dollars?
24  A.  Yes.
25  Q.  For six months?

WORD FOR WORD REPORTING, LLC  (856) 384-2770

**Page 54 (bottom-left)**

1  correct?
2       MR. BERG: Objection.
3       MS. WIDMAN: Objection to the
4  form.
5       THE WITNESS: Correct.
6  BY MR. NIEDELMAN:
7  Q.  As we sit here today, can you tell us
8  if any representatives of Harford Mutual or
9  Firstline National ever visited Grant or
10  Landis before April 21st, 2017?
11       MR. BERG: Does that include the
12  inspection people?
13       MR. NIEDELMAN: Yes.
14       THE WITNESS: I don't remember.
15  BY MR. NIEDELMAN:
16  Q.  You don't know?
17  A.  I don't remember.
18  Q.  Did anyone, to your knowledge, ever
19  inspect Landis or Grant for purposes of
20  obtaining insurance coverage?
21  A.  Yes, always the inspector come in and
   look at the place.
23  Q.  Do you know who those inspectors were?
24  A.  No.
25  Q.  Do you know what companies they worked

WORD FOR WORD REPORTING, LLC  (856) 384-2770

**Page 56 (bottom-right)**

1  A.  For six months, and every six months
2  we renew it. And they broke the door and he
3  said, "I'm not going to pay you because that
4  not covered." So what the sense in having
5  coverage for? So that was the disagreement.
6  Q.  How did the damage occur to the door?
7  A.  The guys was working on the stucco
8  outside. They have the scissor lift and
9  somehow the door was opened when he was
10  lowering it.
11  Q.  Was he injured or just the door was
12  broken?
13  A.  No, the door.
14  Q.  Is Grant an LLC or a New Jersey
15  corporation?
16  A.  LLC.
17  Q.  Is that the way it's always been?
18  A.  Yes.
19  Q.  And how about Landis?
20  A.  Yes.
21  Q.  Same?
22  A.  Yes.
23  Q.  And Z&D Realty, are they a corporation
24  or LLC?
25  A.  LLC.

WORD FOR WORD REPORTING, LLC  (856) 384-2770

1  Q.    And does Z&D own the real estate upon
2  which Grant and Landis are located?
3  A.    Yes.
4  Q.    And Landis, LLC operates the
restaurant; am I right?
6  A.    Right.
7  Q.    And Grant, LLC operates the banquet
8  hall; am I right?
9  A.    It's Grant Catering now.
10  Q.    When did Grant Catering come into
11  being?
12  A.    Two years or so.
13  Q.    And why did you create Grant Catering?
14  A.    I want to separate it, the building
15  from the business.
16  Q.    So you wanted to separate Grant Plaza
17  from Grant Catering; is that right?
18  A.    Yes.
19  Q.    What type of business does Grant
20  Catering do?
21  A.    Events, weddings, christenings.
22  Q.    How is that different from what Grant
23  Plaza has been doing?
24  A.    Not much different.
25  Q.    Why is that?

WORD FOR WORD REPORTING, LLC  (856) 384-2770

---

from the prior building; is that right?
2  A.    Yes.
3  Q.    And you renovated it inside and out;
4  is that right?
5  A.    Correct.
6  Q.    And who did the construction?
7  A.    It's all different. Electric was done
8  by different person, plumbing by different,
9  facade by different, inside was Leon Lopez
10  Construction.
11  Q.    Was there a general contractor who
12  oversaw the construction?
13  A.    Me.
14  Q.    You did. And did you obtain the
15  required state and local permits for the
16  construction?
17  A.    Yes.
18  Q.    When did the construction end, please?
19  When did you open for business as Landis?
20  A.    Six, seven years ago.
21  Q.    Six, seven years ago?
22  A.    Something like that. I don't remember
23  all the dates.
24  Q.    All right. Was there any construction
25  after Landis opened in or out?

WORD FOR WORD REPORTING, LLC  (856) 384-2770

---

58

1  A.    It was recommended by my lawyer.
2  Q.    Mark Stein?
3  A.    I don't remember.
4  Q.    Is Grant Catering still in business?
5  A.    Yes.
6  Q.    Does Grant Catering use any other
7  physical place other than where Grant Plaza
8  is?
9  A.    No.
10  Q.    Does Grant Plaza use any other
11  physical space other than 621?
12  A.    No.
13  Q.    Was there a building at 623 before you
14  built the restaurant?
15  A.    No.
16  Q.    It was a vacant lot?
17  A.    No, no, there was a building, yes.
18  Q.    What type of building was it?
19  A.    The same building like now. Inside we
20  renovated.
21  Q.    Did you do anything on the outside?
22  A.    Yes.
23  Q.    What did you do on the outside?
24  A.    All new facade.
25  Q.    So Landis Pig Roast was constructed

WORD FOR WORD REPORTING, LLC  (856) 384-2770

---

60

1  A.    No.
2  Q.    Now let's go to Grant. Was there a
3  building at 621 before there was Grant Plaza?
4  A.    Yes.
5  Q.    What was there?
6  A.    Drugstore, Rite-Aid drugstore.
7  Q.    A Rite-Aid building?
8  A.    That was the business. Is the
9  building Rite-Aid? I don't know. But there
10  used to be Rite-Aid store there, drugstore.
11  Q.    Was that building torn down to build
12  Grant?
13  A.    No.
14  Q.    Did you use that building?
15  A.    We renovated the same building.
16  Q.    And how long ago was that renovation,
17  Zyggi?
18  A.    We finish five and a half, six years
19  ago.
20  Q.    After Landis was finished?
21  A.    Right.
22  Q.    So Landis was your first project on
23  Landis Avenue and then Grant was your second;
24  is that right?
25  A.    Correct.

WORD FOR WORD REPORTING, LLC  (856) 384-2770

1  else.  Thank you, sir.
2            MR. NIEDELMAN:  You're done.
3            *  *  *
4       (The deposition concluded at 2:55
   p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**WORD FOR WORD REPORTING, LLC  (856) 384-2770**

182

1    C E R T I F I C A T E
2
3       I, LISA REAGAN, a Certified Court Reporter
4  of the State of New Jersey, do hereby certify
5  that prior to the commencement of the
6  examination,
7            ZYGGI H. DOBKOWSKI
8  was duly sworn by me to testify to the truth,
9  the whole truth and nothing but the truth.  I
10  do further certify that the foregoing is a
11  true and accurate transcript of the
12  stenographic notes of testimony taken by me at
13  the time, place and on the date hereinbefore
14  set forth.  I do further certify that I am
15  neither a relative nor employee nor attorney
16  nor counsel of any of the parties to this
17  action, and that I am neither a relative nor
18  employee of such attorney or counsel and that
19  I am not financially interested in this
20  action.
21
2'
23   _____
24  LISA REAGAN, CCR
    Certificate No. XI01671
25  Date:  February 21, 2020

**WORD FOR WORD REPORTING, LLC  (856) 384-2770**

# EXHIBIT K

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2                     CAMDEN DIVISION
                 CASE NO. 1:19-cv-01627 & 1:19-cv-01583
 3

 4                                    - - - x
 5   FIRSTLINE NATIONAL            :
     INSURANCE COMPANY,            :
 6   200 North Main Street         :
     Bel Air, MD  21014            :
 7                                 : DEPOSITION
             Plaintiff,            : TESTIMONY OF:
 8                                 :
         -v-                       : JEAN W. BEREZNAI
 9                                 :
     LANDIS PIG ROAST, LLC,        :
10   623 E. Landis Avenue          :
     Vineland, NJ  08360           :
11   And                           :
     DENNIS COSBY                  :
12   1123 Chestnut Avenue          :
     Vineland, NJ  08360           :
13   And                           :
     EUGENE COSBY                  :
14   1123 Chestnut Avenue,         :
                                   :
15           Defendants.           :
                                   - - x
16   CAPTION CONTINUED:

17           TAKEN BEFORE: CATHY D. CORVINE, a Certified
     Court Reporter and Notary Public of the State of New
18   Jersey, License No. X101216, at the offices of MARTIN
     COMPANY, 500 Jessup Road, West Deptford, New Jersey
19   08066, on Wednesday, January 29, 2020, commencing at
     10:34 a.m.
20

21   ------------------------------------
22            WORD FOR WORD REPORTING, LLC
              CERTIFIED COURT REPORTERS
23                6 NORTH BROAD STREET
                      SUITE 202
24              WOODBURY, NEW JERSEY  08096
                  PHONE:  (856) 384-2770
25                 FAX:  (856) 384-2779
              Email:  Office@word4word.net
```

WORD FOR WORD REPORTING, LLC

```
                                              2
                            - - - - X
     HARFORD MUTUAL INSURANCE        :
 2   COMPANY,                        :
     200 North Main Street           :
 3   Bel Air, MD  21014              :
                                     :
 4           Plaintiff,              :
                                     :
 5       -v-                         :
                                     :
 6   Z&D REALTY, LLC,                :
     623 E. Landis Avenue            :
 7   Vineland, NJ  08360             :
     And                             :
 8   DENNIS COSBY                    :
     1123 Chestnut Avenue            :
 9   Vineland, NJ  08360             :
     And                             :
10   EUGENE COSBY                    :
     1123 Chestnut Avenue            :
11   Vineland, NJ  08360             :

12           Defendants.             :
                            - - - - X
13
14
15
16
17
18
19
20
21
22
23
24
25
```

WORD FOR WORD REPORTING, LLC

```
                                              3
                    A P P E A R A N C E S:
     COOPER LEVENSON, P.A.
 2   BY: LOUIS NIEDELMAN, ESQUIRE
 3   1125 Atlantic Avenue, Third Floor
     Atlantic City, New Jersey  08401
 4   For the Plaintiffs, Firstline National Insurance
       Company & Harford Mutual Insurance Company
 5
     CONNOR, WEBER & OBERLIES, ESQUIRES
 6   BY: AMELIA M. LOLLI, ESQUIRE
     304 Harper Drive, Suite 201
 7   Moorestown, New Jersey  08057
     For Martin Company
 8
     MARSHALL, DENNEHEY,
 9   WARNER, COLEMAN & GOGGIN, ESQUIRES
     BY: LAWRENCE B. BERG, ESQUIRE
10   15000 Midlantic Drive, Suite 200
     P.O. Box 5429
11   Mount Laurel, New Jersey  08054
       For the Defendant, Biondi Insurance Agency
12
     RICHARD A. STOLOFF, ESQUIRE
13   BY: GARY B. CUTLER, ESQUIRE
     Two Penn Center
14   1500 JFK Boulevard, Suite 520
     Philadelphia, Pennsylvania  19102
15   For the Defendants, Cosby, Cosby & Mays
16
17
18
19
20
21
22
23
24
25
```

WORD FOR WORD REPORTING, LLC

```
                                              4
 1                  I N D E X
 2   WITNESS                              PAGE
 3   JEAN W. BEREZNAI
 4     Examination by Mr. Niedelman       4, 131
 5     Examination by Mr. Berg            117
 6     Examination by Mr. Cutler          119
 7
 8                  E X H I B I T S
 9
10   Number  Description                   Id.
11   JB-1   Application - 11/1/13          44

12   JB-2   Bizguard - Policy Declarations - 47
            3/7/14
13   JB-3   Lloyd's of London Policy -     50
            12/18/13
14   JB-4   Application                    54
15   JB-5   E-mails & Documents            63
16   JB-6   Policy                         66
17   JB-7   Reinstatement Notice & Notice of  69
            Cancellation
18   JB-8   Handwritten Notes & Documents  71
19   JB-9   E-mails & Documents            75
20   JB-10  E-mail                         77
21   JB-11  Handwritten Notes & E-mails    79
22   JB-12  Certificate of Liability Insurance  85
23   JB-13  E-mails & Documents            86
24   JB-14  E-mails & Documents            88
25
```

WORD FOR WORD REPORTING, LLC

COPY

ENTERED IN THE MATTERS

5

| 1 | JB-15 | Policy & Declarations Page | 93 |
| 2 | JB-16 | Quote | 96 |
| 3 | JB-17 | E-mails | 98 |
| 4 | JB-18 | E-mails | 101 |
| 5 | JB-19 | Letter of Ms. Bereznai = 3/15/16 & Attachments | 102 |
| 6 | JB-20 | E-mails & Handwritten Note | 103 |
| 7 | JB-21 | E-mails | 105 |
| 8 | JB-22 | Notice of Nonrenewal of Insurance | 107 |
| 9 | JB-23 | Documents | 111 |
| 10 | JB-24 | E-mails & Attachments | 112 |
| 11 | JB-25 | Letter - 5/30/17, Handwritten Note & Documents | 114 |

12  (Exhibits attached.)
13
14
15
16
17
18
19
20
21
22
23
24
25

WORD FOR WORD REPORTING, LLC

6

1    MR. NIEDELMAN: I just contacted Mr.
2  Barbone's office, and he's counsel of record in this
3  matter, but I just learned that he will not be
4  attending this deposition. So, we're going to proceed
5  without him.
6  J E A N  W.  B E R E Z N A I,
7  having been first duly sworn, testified as follows:
8  EXAMINATION BY MR. NIEDELMAN:
9      **Q.** You gave me the liberty to call you Jean. Is
10  that correct?
11     **A. That's correct.**
12     **Q.** Thank you. My name is Louis Niedelman. I'm
13  an attorney in a federal case that has been initiated
14  by me for my clients and my clients in this matter are
15  Firstline National Insurance Company and Hartford
16  Mutual Insurance Company, and they have brought suit
17  against a number of entities and individuals seeking
18  to deny insurance coverage for an incident that
19  occurred in April of 2017 in Vineland, New Jersey.
20  That's just my introduction. That's why we are here.
21  All right?
22     **A. Yes.**
23     **Q.** Have you ever had your deposition taken before?
24     **A. Never.**
25     **Q.** All right. So, let me give you some

WORD FOR WORD REPORTING, LLC

7

1  structions, Jean. I and some of the other attorneys
2  seated at this table will be asking you questions.
3  We're looking for information to the best of your
4  knowledge and to the best of your recollection. We
5  don't want you to guess. We don't want you to assume.
6  If you know the answer, kindly give us the answer to
7  the question. If you don't understand our questions,
8  just tell us that, and we will rephrase the question
9  so that you do understand it. Do you understand it so
10  far?
11     **A. Yes.**
12     **Q.** You have to keep your voice up. You'll have
13  to answer out loud. You cannot nod your head or shrug
14  your shoulders. All right?
15     **A. Yes.**
16     **Q.** All right. If the testimony that you are
17  about to give is testimony that you can respond to a
18  question rather than I don't know and I don't
19  remember, then that testimony has to be honest,
20  accurate and complete. Do you understand that?
21     **A. Yes.**
22     **Q.** Do you understand that you are under oath this
23  morning and, therefore, you're obligated to give your
24  testimony honestly. Do you understand that?
25     **A. Yes.**

WORD FOR WORD REPORTING, LLC

8

1      **Q.** All right. Do you have any questions of me
2  before we begin?
3     **A. No.**
4     **Q.** All right. So, you are Jean Bereznai?
5     **A. Bereznai.**
6     **Q.** You're employed by the Martin Company?
7     **A. Yes.**
8     **Q.** How long have you been employed here?
9     **A. Off and on for 25 years or so.**
10     **Q.** What is your current position with Martin
11  Company?
12     **A. Like, assistant CSR, customer service.**
13     **Q.** There's competing noise. You'll have to keep
14  your voice up.
15     **A. Assistant customer service representative.**
16     **Q.** And we are seated at 500 Jessup Road in West
17  Deptford; is that correct?
18     **A. Yes.**
19     **Q.** Is this the only office of Martin & Company?
20     **A. Yes.**
21     **Q.** Is it Martin Company or is it Martin &
22  Company?
23     **A. Martin Insurance Agency, Martin Company,**
24  Martin & Company.
25     **Q.** There's several names?

WORD FOR WORD REPORTING, LLC

**21**

1    A. No.

2    Q. Were the Dobkowskis, Diane and Zyggi, ever

3  insured personally when you took over the accounts in

4  2013?

5    A. I don't know personal-wise.

6    Q. To your knowledge, was it only Z&D Realty that

7  was the named insured when you took over the accounts

8  in 2013 for the Dobkowskis and/or Z&D Realty?

9    A. It could be their names doing business as Z&D

10  Realty.  That, I don't know.  I'd have to look at the

11  file.

12    Q. Okay.  When in 2015 you became aware of Grant

13  Plaza, can you tell us the circumstances of how that

14  came about?

15    A. They called.

16    Q. Who called?

17    A. Diane.

18    Q. And she called you?

19    A. Yes.

20    Q. All right.  What did she tell you?

21    A. Said they were buying a building from Vineland

22  Development Company or Corp.

23    Q. And?

24    A. They were going to renovate it and they needed

25  insurance to do so.

WORD FOR WORD REPORTING, LLC

**22**

1    Q. Insurance to purchase it and renovate it?

2    A. Yes.

3    Q. All right.  And did you undertake finding

4  insurance for them?

5    A. Yes.

6    Q. Was what was the name of the insured for that

7  policy?

8    A. I believe it was just Z&D.

9    Q. Z&D Realty, but it applied to the building

10  known as Grant Plaza?  Is that right?

11    A. I did not know the name of building at that

12  point.  Yes.

13    Q. Did there come a point in time when you

14  learned the name of that building?

15    A. Somewhere along the way.

16    Q. But then you learned it was Grant Plaza?

17       (Discussion off the record.)

18  BY MR. NIEDELMAN:

19    Q. There came a point in time when Martin Agency

20  found insurance for Z&D Realty as it applied to Grant

21  Plaza?  Is that correct?

22    A. Yes.

23    Q. Do you recall the address of Grant Plaza?

24    A. Landis Avenue 619-623.

25    Q. I have in my file 619-621 East Landis.

WORD FOR WORD REPORTING, LLC

**23**

1    A. Could be.

2    Q. Does that sound right?

3    A. Yes.

4    Q. That was the address that you and Martin used

5  for Grant Plaza to insure the building?  Is that

6  correct?

7    A. As far as I know.

8    Q. Did you review any documents before we began

9  today's deposition?  I don't mean today.  At any time

10  for the deposition.

11    A. No.

12    Q. So, you did not review the Martin Company

13  insurance file for Z&D or Grant Plaza or the

14  Dobkowskis?  Is that correct?

15    A. Correct.

16    Q. Did you speak to anyone here at Martin where

17  your attorney was not present in connection with

18  preparing for today's deposition?

19    A. Yes.

20    Q. Who did you speak to?

21    A. Don.

22    Q. What did you discuss with Don?

23    A. Just to relax.

24    Q. Is that what he told you, or you told him?

25    A. No, he told me.

WORD FOR WORD REPORTING, LLC

**24**

1    Q. Okay.  Anything substantively about the

2  insurance portfolio for Z&D and Grant?

3    A. Just how to answer yes and no and if I didn't

4  know say I didn't know.

5    Q. Okay.  Do you know if Don had been through a

6  deposition process before?

7    A. Yes, he had.

8    Q. At some point, Jean, did you understand what

9  the Dobkowskis or Z&D was going to do with Grant

10  Plaza?

11    A. Yes.

12    Q. What did you understand was going to happen

13  there?

14    A. They were going to make it a hall for bridal

15  showers, baby showers.

16    Q. Events; right?

17    A. Yes, of that kind of nature.

18    Q. And did that eventually happen after the

19  renovations?

20    A. Yes.

21    Q. All right.  Did insurance continue for Z&D for

22  Grant Plaza after it was first written or, in other

23  words, was it renewed year to year?  Was the first

24  policy renewed year to year?

25    A. No.

WORD FOR WORD REPORTING, LLC

1   **Q.** Why not?

2   **A. Okay. Because it started as a builder's risk,**

3   **which included the renovations for the building, and**

4   it was vacant at that time. Then after that it was

5   done and it opened as a business. It converted over

6   to a business policy.

7   **Q.** Okay. So, there was a first policy. Then

8   there was a second policy?

9   **A. Correct.**

10   **Q.** What was the name of the first policy in the

11   insurance jargon for the renovations?

12   **A. The named insured.**

13   **Q.** I'm going beyond that. Who was the named

14   insured?

15   **A. Z&D Realty.**

16   **Q.** But it applied to Grant Plaza?

17   **A. Which, yeah, I didn't know the name.**

18   **Q.** You didn't know the name then?

19   **A. No.**

20   **Q.** And you didn't know the name during the

21   renovations? Is that correct?

22   **A. Correct.**

23   **Q.** At some point in time you learned of the name

24   Grant Plaza? Is that correct?

25   **A. Yes.**

WORD FOR WORD REPORTING, LLC

---

1   **Q.** Was there ever while you were handling this

2   account?

3   **A. Absolutely not.**

4   **Q.** Because that would be a different type of

5   risk? Is that right?

6   **A. Yes.**

7   **Q.** Is there a name for this type of policy that

8   you wrote for Grant Plaza once the renovations were

9   complete?

10   MS. LOLLI: I'm just going to object to

11   the form of the question, but you can answer.

12   **A. A package policy.**

13   **Q.** Package policy. Is that a BOP, business

14   owner's policy?

15   **A. Okay. Yes.**

16   **Q.** Was it a BOP account -- when Grant Plaza

17   opened, was it a business owner's policy?

18   **A. I'm not sure.**

19   **Q.** And the coverage continued from the time the

20   renovation started with one type of policy to the

21   point where Grant Plaza opened for these events with a

22   second type of policy for the address of 619-621 East

23   Landis Avenue? Is that correct?

24   **A. Yes.**

25   **Q.** Did the Martin Company ever issue insurance,

WORD FOR WORD REPORTING, LLC

---

26

1   **Q.** Was that when the renovations were completed?

2   **A. Yes.**

3   **Q.** And they were going to open for business?

4   **A. Yes.**

5   **Q.** And the business would be to host events? Is

6   that correct?

7   **A. Baby showers and bridal.**

8   **Q.** Let's talk about events. It would be events

9   such as bridal showers, weddings, bar mitzvahs,

10   whatever it was?

11   **A. Okay.**

12   **Q.** Would that be fair enough?

13   **A. Fair enough.**

14   **Q.** Okay. And at that point in time was a

15   different policy written for Grant Plaza?

16   **A. Yes.**

17   **Q.** What type of policy was that?

18   **A. Standard commercial policy as the owner of a**

19   **building with a business in existence.**

20   **Q.** Do you remember the primary policy limit?

21   **A. General liability would be about a million.**

22   That's what we do.

23   **Q.** Do you know whether there was any alcohol

24   beverage coverage at that time?

25   **A. There was not.**

WORD FOR WORD REPORTING, LLC

---

28

1   to your knowledge, to a company known as Landis Pig

2   Roast?

3   **A. No.**

4   MS. LOLLI: I'm going to object to the

5   form. Go ahead. Sorry.

6   MR. NIEDELMAN: Did I mispronounce

7   Landis Pig Roast?

8   MS. LOLLI: No, just issue insurance. I

9   don't want make a make verbal objection.

10   **Q.** I don't want to mislead. I know Martin

11   Insurance Agency is not a carrier. They're an agency.

12   Was there ever an insurance policy issued through

13   Martin Agency for Landis Pig Roast?

14   **A. No.**

15   **Q.** Did you ever hear of Landis Pig Roast?

16   **A. Yes.**

17   **Q.** When did you first hear the name of Landis Pig

18   Roast?

19   **A. Zyggi mentioned it maybe.**

20   **Q.** Who did?

21   **A. Zyggi mentioned it.**

22   **Q.** Do you remember when?

23   **A. Around the time that they opened the banquet**

24   **hall.**

25   **Q.** For business?

WORD FOR WORD REPORTING, LLC

1    **A.** Yes.

2    **Q.** Do you recall what that conversation was?

3    **A. To clarify what was happening there, what was**

4    **going to happen there.**

5    **Q.** At Grant Plaza?

6    **A.** Yes.

7    **Q.** How did the name Landis Pig Roast come into

8    play?

9    **A. I would have asked him if there was any food**

10   to be insured, any food services to be insured, if

11   there is was going to be any kind of liquor involved,

12   and that's when he told me it was handled elsewhere.

13   **Q.** So, the liquor component was going to be

14   handled elsewhere? Is that right?

15   **A. And food.**

16   **Q.** Did he mention Landis as where it was going to

17   be handled?

18   **A. He did.**

19   **Q.** How about the food and food service?

20   **A. Landis.**

21   **Q.** Landis?

22   **A.** Yes.

23   **Q.** Was Landis going to take the responsibility

24   for anything else other than the liquor, food and food

25   service pertaining to Grant Plaza from this

WORD FOR WORD REPORTING, LLC

---

1    **Q.** To your knowledge, did they ever ask you for

2    insurance coverage for the address of 623 East Landis,

3    which would be the adjacent building?

4    **A. Not to my knowledge.**

5    **Q.** If I represent to you that Landis Pig Roast is

6    located at 623 East Landis Avenue, would your answer

7    be that the Dobkowskis and Z&D never asked for

8    coverage for that address or that company?

9    **A. They had another agent covering that.**

10   **Q.** Do you remember the agent's name?

11   **A. It was a friend and had a nickname.**

12   **Q.** If I suggest that the name was Biondi

13   Insurance or Biondi Insurance in Vineland, does that

14   strike you as a name that you remember?

15   **A. I know that now.**

16   **Q.** When you say now --

17   **A. Because I saw your paperwork.**

18      MR. BERG: Lou, can you ask her if the

19   name Rettino rings a bell?

20      MR. NIEDELMAN: What's the name?

21      MR. BERG: Rettino.

22   **Q.** Does the name Rettino Agency -- I think

23   they're in Mays Landing -- strike you as a name that

24   was associated with any of this business?

25      THE WITNESS: No.

WORD FOR WORD REPORTING, LLC

---

30

1    conversation?

2    **A. As I understand it, no.**

3    **Q.** So, Grant Plaza, as you understood it, when it

4    opened for business and continued to be an insured of

5    yours, the Martin Company, was going to be a banquet

6    hall?

7    **A.** Yes.

8    **Q.** Is that correct?

9    **A.** Yes.

10   **Q.** Nothing else; am I right?

11   **A. Correct.**

12   **Q.** Did you understand anything about Grant

13   Plaza's operation in terms of whether or not they were

14   going to have security, or whether or not they were

15   going to have guards at the entrance or anything like

16   that?

17   **A. I may have asked them, but no.**

18   **Q.** No. Did you understand that once Grant Plaza

19   opened it was going to be the Dobkowskis and/or Z&D

20   who were going to rent out Grant Plaza as a banquet

21   hall? Is that correct?

22   **A.** Yes.

23   **Q.** Okay. Did the Dobkowskis ever ask you for

24   insurance coverage for Landis Pig Roast?

25   **A.** No.

WORD FOR WORD REPORTING, LLC

---

32

1      MS. LOLLI: Is it R-A --

2      MR. NIEDELMAN: R-A-T-T-I-N-O.

3    **Q.** Did you find out why Dobkowski -- let's do it

4    this way. When I say Z&D, I mean the individuals

5    also, so that we have a record that's clear. All

6    right?

7    **A.** Yes.

8    **Q.** Do you know why Z&D had a different agent for

9    Landis or the next door property than they did for

10   you?

11   **A. He said it was a friend.**

12   **Q.** A friend. Do you know whether or not Z&D ever

13   went to Biondi or Rettino for the coverage for Grant

14   Plaza?

15   **A. No. I don't know, no.**

16   **Q.** Do you know how Z&D, including the owners,

17   first learned of Martin Company?

18   **A. No.**

19   **Q.** But they're familiarity with this agency and

20   their business with this agency predated 2013 when you

21   took over this account? Is that right?

22   **A.** Yes.

23   **Q.** Do you know how many years they were

24   affiliated with this agency?

25   **A. We have no record. I didn't find it.**

WORD FOR WORD REPORTING, LLC

1  **Q.** Did you look for that record?

2  **A. We did.**

3  **Q.** How far back did you find any records?

4  **A. Probably 2013 when I took over.**

  **Q.** Okay.

6      MR. CUTLER:  I think she misunderstood

7  the question.

8  **Q.** Do you have any records before 2013 that have

9  to do with the insurance business of Z&D and their

10  owners?

11  **A. Not to my knowledge.**

12  **Q.** Was there a search for that?

13  **A. No.**

14  **Q.** How do you know there's nothing prior to 2013?

15  **A. That's when I took it over.  That's all I**

16  **know.**

17  **Q.** Did you or Don or somebody else at Martin ever

18  go back and see if there were ever any records that

19  predated 2013 for this account?

20  **A. Physical records.**

21  **Q.** Physical records or on the computer.

22  **A. There might be a mention of it on our computer**

23  **and a date.**

24      MS. LOLLI:  Are you done?

25  **A. But not for Grant View.**

WORD FOR WORD REPORTING, LLC

---

34

1  **Q.** Grant Plaza?

2  **A. Grant Plaza.**

3  **Q.** For another address?

4  **A. Yes.**

5  **Q.** Okay.  What other address and business would

6  that be for?

7  **A. They had an apartment complex.**

8  **Q.** Okay.  Do you remember the address of that?

9  **A. If I heard it, I'd know it.**

10  **Q.** Okay.

11      MR. BERG:  247 Park.

12  **A. Park.**

13  **Q.** 1045 East Park Avenue in Vineland?

14  **A. Park Avenue.**

15  **Q.** An apartment building, apartment complex?

16  **A. Yes.**

17  **Q.** Okay.  And was there insurance written for

18  this Park Avenue complex through the Martin Company?

19  **A. Yes.**

20  **Q.** And was that insurance written as a commercial

21  policy?

22  **A. Yes.**

23  **Q.** Do you remember how long that insurance was in

24  place through Martin?

25  **A. No.**

WORD FOR WORD REPORTING, LLC

---

35

2  **Q.** Is it in place today?

2  **A. No.**

3  **Q.** Why not?

4  **A. They moved it.**

5  **Q.** They moved it?

6  **A. Yes.**

7  **Q.** They moved the coverage to somebody else?

8  **A. Yes, another agency.**

9  **Q.** Do you know the name of that agency?

10  **A. I do not.**

11  **Q.** Do you know why they moved it?

12  **A. Yes.**

13  **Q.** Why?

14  **A. Pricing.**

15  **Q.** So, they got a better price somewhere else?

16  **A. Yes.**

17  **Q.** Did Martin attempt to satisfy their pricing

18  for the Park Avenue complex?

19  **A. Probably.**

20  **Q.** But you couldn't meet a lower price?  Is that

21  right?

22  **A. Yes.**

23  **Q.** For how long consecutively was Grant Plaza an

24  insured of Martin?

25  **A. Grant Plaza '13 through '18, 2013 through**

WORD FOR WORD REPORTING, LLC

---

36

1  2018, builder's risk through the active policy.

2  **Q.** Consecutive '13 through '18; is that right?

3  **A. Yes.**

4  **Q.** Was all the insurance for those years written

5  through Martin?

6  **A. Through who?**

7  **Q.** Were all the coverages for those years for

8  Grant Plaza written through Martin Company?

9  **A. Martin, yes.**

10  **Q.** Was there one carrier or more than one carrier

11  who underwrote that insurance for those years?

12  **A. More than one.**

13  **Q.** Do you remember the names of the carriers?

14  **A. Both were brokers.**

15  **Q.** Say that again.

16  **A. Both were brokers.  I do not know the**

17  companies that wrote.

18  **Q.** Do you remember Scottsdale being one of them?

19  **A. Could be, yes.**

20  **Q.** Do you remember USLI being one of them?

21  **A. Yes.**

22  **Q.** Is USLI one of your favored carriers at

23  Martin?

24  **A. For surplus lines, yes.**

25  **Q.** Help me out and tell me what a surplus line is.

WORD FOR WORD REPORTING, LLC

1    A. If you can't get insurance through a standard

2  carrier, such as a vacant building or a builder's risk

3  or an area that isn't favored by a company, you would

4  go to surplus lines or a brokerage to see what they

5  could offer.

6    Q. Okay. Would that be -- that would be because

7  of, one reason, the risks involved?

8    A. Yes.

9    Q. To your knowledge, were there any risks

10  involved with Grant Plaza from 2013 through 2018 that

11  required a surplus line?

12    A. As a vacant building with renovation.

13    Q. It had to be written through a surplus line?

14    A. Yes.

15    Q. Once Grant Plaza opened for business for

16  banquets, was a surplus line needed or did you go to

17  the standard carriers?

18    A. It -- we may have tried a standard carrier.

19    Q. And?

20    A. Probably couldn't get a price or couldn't get

21  a policy for it. I don't know.

22    Q. Let me try to figure this out. Would it be

23  fair to say that from 2013 through 2018 Grant Plaza,

24  through the Martin Company, was always with a surplus

25  line carrier?

WORD FOR WORD REPORTING, LLC

38

1    A. Yes.

2    Q. Okay. What was there, to your knowledge and

3  experience, about Grant Plaza that forced it into a

4  surplus line market?

5    A. Initially, because it was vacant and being

6  renovated and then after that because it was a banquet

7  hall and not a lot of places take banquet hall -- not

8  a lot of companies will take banquet halls.

9    Q. Why is that?

10    A. The parameters. The underwriting parameters,

11  what they're looking to write.

12    Q. Okay. Were you still handling the Grant Plaza

13  account in 2018?

14    A. Yes.

15    Q. In 2018 Grant Plaza left the Martin Company?

16  Is that correct?

17    A. Yes.

18    Q. Why was that?

19    A. They were non-renewed.

20    Q. Yes.

21    A. And we could not find another market for them.

22    Q. Another surplus line market?

23    A. Yeah.

24    Q. Was there a particular reason for that?

25    A. Losses.

WORD FOR WORD REPORTING, LLC

---

1    MR. CUTLER: I'm sorry. What was that?

2    THE WITNESS: Losses.

3    MR. CUTLER: Thank you.

4    Q. Did you have a history of losses as of 2018

5  with Grant Plaza that precluded Martin from writing

6  coverage for them?

7    A. Yes.

8    Q. Can you identify what they were?

9    A. I know they had that shooting.

10    Q. The shooting that brings us together here?

11    A. There you go.

12    Q. Any other losses that you're familiar with?

13    A. Not to my knowledge. I don't handle claims.

14    Q. Do you know who currently insures Grant Plaza?

15    A. No.

16    Q. Do you know what agency is used or brokerage

17  firm for insurance for Grant Plaza currently?

18    A. No.

19    Q. Did you ever learn whether or not there was an

20  entranceway between Landis Pig Roast and Grant Plaza?

21    A. Yes.

22    Q. What did you learn about that?

23    A. I asked Zyggi how they would get between

24  because there was an alley.

25    Q. For purposes of food, food service and

WORD FOR WORD REPORTING, LLC

40

1  alcohol? Is that correct?

2    A. Yes.

3    Q. And what did he say?

4    A. That there was access between the two

5  buildings.

6    Q. Did he describe it any more than that?

7    A. He said there was an alley and a door.

8    Q. An alley and a door. But that did not change

9  the fact that your insured from '13 to '18 was still

10  Grant Plaza for a banquet hall? Am I correct?

11    A. No. '13 to, say, '15 it was the vacant

12  building being renovated.

13    Q. Okay. So, my question would be from '15

14  through '18 the fact that there was an alley and an

15  access door didn't change the risk for Grant Plaza --

16    A. No.

17    Q. -- as far as Martin was concerned? Is that

18  correct?

19    A. Correct.

20    Q. Did Martin, or any of your carriers, between

21  '15 and '18 know that there was going to be food, food

22  service and/or alcohol service out of Landis into

23  Grant Plaza?

24    A. Yes.

25    Q. And was -- were the carriers in the surplus

WORD FOR WORD REPORTING, LLC

1   line market aware of that to your knowledge?
2       **A. To my knowledge, yes.**
3       **Q.** Would the fact from your experience, Jean, in
4   2015, '16, '17 and '18 for Grant Plaza, that there was
5   going to be music in the banquet hall change the
6   degree of risk for that insured?
7       **A. No.**
8       **Q.** Okay. How about security guards?
9       **A. Yes.**
10      **Q.** Why would that be so?
11      **A. I would have to disclose that to the**
12  **companies.**
13      **Q.** Would that have to come from the Dobkowskis
14  first because you wouldn't otherwise know of it? Is
15  that correct?
16      **A. Correct.**
17      **Q.** Was there ever a time when you were told by
18  the Dobkowskis that they were going to have a party
19  that may have 500 people with music and dancing and
20  security guards?
21      **A. No.**
22      **Q.** All right. Would that have raised a flag in
23  your own mind in terms of the risk for that type of
24  event?
25      **A. Absolutely.**

WORD FOR WORD REPORTING, LLC

---

1   **A. Depends on Zyggi or what Diane would disclose**
2   **as to what was happening there.**
3       **Q.** Let's assume they told you there was going to
4   be security guards, dancing, a DJ and 500 people and
5   security at the entrance for people coming in and
6   getting out, coming in and leaving, with that
7   information, would you communicate that to the carrier
8   who was on the risk in April of 2017?
9       **A. If I had known there was security guards?**
10      **Q.** Yes.
11      **A. I would have wanted the company to know that.**
12      **Q.** Why?
13      **A. I don't know. I just would.**
14      **Q.** It would be out of the ordinary --
15      **A. Yeah.**
16      **Q.** -- wedding/shower situation? Am I right?
17      **A. That said, I would go first to Don, but yeah.**
18      **Q.** Okay. Have you ever had experience where,
19  under these type of circumstances, you had to go to
20  Don or go to the carrier on a particular risk and tell
21  them that something's happening here, and there may be
22  an issue as to whether your coverage should be
23  applied?
24      **A. Not to my knowledge.**
25      **Q.** Okay. Did that ever happen in connection with

WORD FOR WORD REPORTING, LLC

---

42

1       **Q.** Why would that be?
2       **A. Baby showers and wedding receptions don't**
3   **require security guards.**
4       **Q.** Okay. If the Dobkowskis came to you, let's
5   say, a month before such an event, and they said I
6   want to make sure, Jean, that the coverage that I have
7   in place in 2017, to use that year, applied to this
8   type of event, what would you do with that
9   information?
10      MS. LOLLI:  We're talking about a
11  500-person event with security?
12      MR. NIEDELMAN:  Yes, and music, dancing.
13      MS. LOLLI:  Okay.
14      **A. Depending on what they disclose, security, I**
15  **would have to find that out. If he told me there was**
16  **some different kind of event going on than I was**
17  **expecting, baby showers, wedding, then I would have to**
18  **go to the company to be sure.**
19      **Q.** When you say the company --
20      **A. The carrier.**
21      **Q.** The carrier who's writing that risk? Is that
22  right?
23      **A. Correct. Yes.**
24      **Q.** Okay. And what kind of conversation would you
25  have with that carrier?

WORD FOR WORD REPORTING, LLC

---

44

1   Grant Plaza during the time that Martin had that
2   account?
3       **A. No.**
4       **Q.** Where you learned information that took it out
5   of the standard type of policy?
6       **A. Not while I was handling it, no.**
7       **Q.** Do you recall an address for Z&D Realty?
8       **A. Oh. I'm sorry.**
9       **Q.** Okay. The answer is no; right? Is that
10  right?
11      **A. What you told me, 619?**
12      **Q.** No. I mean if you had to send an insurance
13  bill, a premium bill, to Z&D, do you know what address
14  you used?
15      **A. No.**
16      **Q.** I'm going to go to some documents that I
17  received from Martin Company. I'm going to be asking
18  you questions about these. All right. I'm going to
19  be sharing these documents between us and other
20  counsel while we talk about them. All right?
21      **A. Yes.**
22          (At which time a recess was taken.)
23          (Application received and marked for
24          identification as JB-1.)
25  BY MR. NIEDELMAN:

WORD FOR WORD REPORTING, LLC

45

1    **Q.** Jean, I'm first going to hand you a document
2    that I've marked as JB-1, and this has come from your
3    file, and it's nine pages. Unfortunately, there's not
4    a title on it, but I marked it as JB-1. It starts
5    with the word contractors in print on the first page,
6    and I'd like you to take a look at this, and tell me
7    whether you recognize this.
8    **A. Yes, I recognize it.**
9    **Q.** You recognize that document?
10   **A. I know what it is.**
11   **Q.** What is it?
12   **A. Application.**
13   **Q.** Application for insurance?
14   **A. Correct.**
15   **Q.** Is there a date on that?
16   **A. 11/1/2013.**
17   **Q.** Do you know what address and what property
18   that pertained to?
19   **A. 619-621 East Landis Avenue, Vineland, New**
20   **Jersey.**
21   **Q.** There are questions that are asked? Am I
22   right?
23   **A. Yes.**
24   **Q.** And there's yes and no answers? Am I correct?
25   **A. Correct.**

WORD FOR WORD REPORTING, LLC

46

1    **Q.** Did you understand that this was for Grant
2    Plaza with that address?
3    **A. I did not know the name Grant Plaza.**
4    **Q.** But it was a vacant building? Am I right?
5    **A. Correct.**
6    **Q.** This would be the time period when this
7    building was or intended to be under renovations? Is
8    that correct?
9    **A. Correct.**
10   **Q.** On the bottom of the first page of this
11   exhibit, it says under -- there are questions; are
12   there not?
13   **A. Yes.**
14   **Q.** To be answered yes or no? Am I right?
15   **A. Yes.**
16   **Q.** And it says, 9. Recreation facilities
17   provided, and it says no?
18   **A. Correct.**
19   **Q.** And 11. Sporting or social events sponsored it
20   says no; right?
21   **A. Yes.**
22   **Q.** And then 15. Do you lease employees to or from
23   other employers and the answer is no; right?
24   **A. Correct.**
25   **Q.** Would this be information that would be

WORD FOR WORD REPORTING, LLC

47

1    obtained from the Dobkowskis?
2    **A. Yes.**
3    **Q.** Pardon me.
4    **A. Yes.**
5    **Q.** Yes, okay. The next page lists as the
6    applicant information Z&D Realty, LLC; correct?
7    **A. Yes.**
8    **Q.** And it has a proposed inception date of the
9    coverage 12/12/13; right?
10   **A. Correct.**
11   **Q.** And the expiration date proposed is
12   December 12, 2014; correct?
13   **A. Correct.**
14   **Q.** Again, it's for the vacant building at that
15   address of 619-621 Landis Avenue; right?
16   **A. Correct.**
17   **Q.** All right. We're going to put that aside
18   because that will be an exhibit that's attached to the
19   transcript. That's how we're going to work each one.
20       (Bizguard Policy Declarations dated
21        March 7, 2014 received and marked for
22        identification as JB-2.)
23   BY MR. NIEDELMAN:
24   **Q.** I next want to hand you a document that we'll
25   mark as JB-2. It says Bizguard plus Amguard Insurance

WORD FOR WORD REPORTING, LLC

48

1    Company, A Stock Company. So, I'd like you to take a
2    look at that JB-2 with the Bizguard title and ask you
3    whether you've ever seen that before, or is that
4    something that you recognize?
5    **A. I recognize it.**
6    **Q.** So, look at all the pages so your answer would
7    be accurate, please.
8    **A. (Witness complies.) Okay.**
9    **Q.** All right. This came from your file. So,
10   what is this?
11   **A. This is information the insured provided me**
12   for their current carrier for Landis Pig Roast.
13   **Q.** Was this supplied for any particular purpose
14   to Martin & Company?
15   **A. Apparently, I tried to see if I could match it**
16   **or place it.**
17   **Q.** For Landis?
18   **A. For Landis Pig Roast.**
19   **Q.** Do you know what the result of that search was?
20   **A. I can tell from up here that I could not get**
21   it on Hartford or Penn National.
22   **Q.** That's in handwriting? Is that right?
23   **A. That is correct.**
24   **Q.** Is that your handwriting?
25   **A. That is my handwriting.**

WORD FOR WORD REPORTING, LLC

49

1    Q. And the premium is listed as $3,531; correct?

2    A. Correct.

3    Q. Would that be the proposed premium?

4    A. I would say that's their agent's premium,

their policy premium.

6    Q. That's with the Rettino Insurance Agency?  Am

7 I right?

8    A. Yes.

9    Q. This would have been submitted or completed by

10 someone in Martin.  Would it have been you?

11   A. No.

12   Q. Someone else; correct?

13   A. What would have been completed?

14   Q. Who would have completed this form, which is

15 JB-2?

16   A. This is a policy information page.  So, it's

17 from their agent, their company Rettino.

18   Q. From Rettino?

19   A. Rettino.

20   Q. This would have come from Rettino?

21   A. Through Zyggi or Diane, yes.

22   Q. And the second page lists the address as 623

23 East Landis as it does on the first page; right?

24   A. Yes.

25   Q. And it says Classification: Family style

WORD FOR WORD REPORTING, LLC

50

1 restaurant with sales of alcoholic beverages up to

2 50 percent of total sales; correct?

3    A. Yes.

4    Q. Did Martin ever find a carrier for this Landis

5 Pig Roast at that time?

6    A. No.

7    Q. Do you know why?

8    A. I don't.

9    Q. There's yellow highlighting on these exhibits.

10 So the record is clear, it's mine so I can abbreviate

11 and know what I'm asking.

12        MS. LOLLI:  Okay.

13        (Lloyds of London Policy dated December

14        18, 2013 received and marked for

15        identification as JB-3.)

16 BY MR. NIEDELMAN:

17   Q. I next want to show you JB-3 and ask if you

18 can take a look at this.  It starts with Lloyd's of

19 London Exportable.  Tell me what this is, please.

20   A. This is our policy.

21   Q. When you say our policy --

7    A. The policy that Martin Company is responsible

23 for our insured through Jimcor.

24   Q. Is Jimcor a cake year?

25   A. Jimcor is a brokerage.

WORD FOR WORD REPORTING, LLC

51

1    Q. Who is the carrier for this policy?

2    A. Lloyd's of London.

3    Q. This was issued for which policy year?

4    A. December 12, 2013, extended through

5 February 21 of 2015.

6    Q. It says this is for the address of 619-621

7 East Landis Avenue; correct?

8    A. That's my writing, yes.

9    Q. Is that your writing?

10   A. Yes, that's my writing.  So, I'm looking for

11 it specifically in here.

12   Q. You probably have a dec page somewhere.

13   A. 619-621 East Landis Avenue.

14   Q. Are you looking at a dec page?

15   A. Dec page.

16   Q. Declaration page for the record.  And that, as

17 you understood it to be, was the Grant Plaza location,

18 and this would have been the first policy issued?

19   A. I did not know it as Grant Plaza at that time.

20   Q. It's for 619-621 and it's for a building owned

21 by Z&D Realty?  Is that correct?

22   A. That's correct.

23   Q. That's the building that they eventually --

24   A. Vacant building only.

25   Q. Eventually, you learned it was to be Grant

WORD FOR WORD REPORTING, LLC

52

1 Plaza?

2    A. Right.  At that point I was not told it was

3 going to be a renovation.

4    Q. It says vacant building.  Is that your --

5    A. Yes.

6    Q. It says no R-E-N-O-V.

7    A. That means no renovation.

8    Q. Does that mean the building was not renovated

9 or was to be renovated?

10   A. Was not in the process to be renovated at that

11 point.

12   Q. If we turn to a page that is highlighted -- I

13 think you're there now -- it says Location of all

14 premises you own, rent or occupy.  This would be

15 directed to Z&D?

16   A. Yes.

17   Q. It says 619-621 East Landis Avenue, Vineland,

18 New Jersey?

19   A. Correct.

20   Q. Do you know if the intent of that question was

21 just for that address in terms of premises owned, or

22 do you know whether or not it applied to other

23 addresses for businesses owned by Z&D?

24   A. It would apply simply to what this policy

25 regards.

WORD FOR WORD REPORTING, LLC

**53**

1  Q. Okay. I'm going to turn to a bill that came

2  out of the Martin Company. Do you see that that's a

3  bill for the premium? Is that right? 7434.

4  MS. LOLLI: We're not there yet.

5  A. Here we go.

6  Q. All right. That's for a premium of $2,494.50;

7  correct?

8  A. Correct.

9  Q. Would that have been an annual premium?

10  A. No, this is for a six-month policy.

11  Q. Is that how the policy was written, this

12  particular policy, on a six-month period?

13  A. Yes, it is.

14  Q. Okay. Do you know if it was renewed for the

15  second six months?

16  A. It was extended.

17  Q. All right. This is for -- at the bottom of

18  that particular page and highlighted for vacant

19  building: 619-621 East Landis Avenue; correct?

20  A. Correct.

21  Q. All right. I'm done with that exhibit. Thank

22  you. I'm going to leave these little flags on the

23  copies I give you, because it will be easier to move

24  through it. Even though it says sign here, that's all

25  we had left.

WORD FOR WORD REPORTING, LLC

**55**

1  A. LLC, yes.

2  Q. LLC, yeah. This is for the policy period from

3  February 21, 2015 to February 21, 2016; correct?

4  A. Correct.

5  Q. I'm going to take you to the next flag and you

6  see it says Markel; does it not?

7  A. Yes.

8  Q. What is Markel?

9  A. That would be the name of the carrier.

10  Q. For this particular policy?

11  A. Correct.

12  Q. All right. And this would be for the address

13  of 619-621 East Landis Avenue; correct?

14  A. Correct.

15  Q. And it says Occupancy Class 0843?

16  A. Yes.

17  Q. Is that an insurance designation, or is that a

18  Markel designation?

19  A. It's a Markel designation.

20  Q. That's fine. Okay. And it says halls and

21  auditoriums; right?

22  A. Right.

23  Q. That would be the class of the use of the

24  property; right?

25  A. Yes.

WORD FOR WORD REPORTING, LLC

**54**

1  (Application received and marked for

2  identification as JB-4.)

3  BY MR. NIEDELMAN:

4  Q. I'm going to give you another exhibit, which

5  I'm going to mark as JB-4. This is entitled

6  Scottsdale Insurance, General Liability and

7  Miscellaneous Articles Application. Applicant's Name:

8  Z&D Realty. Would you take a look at these and tell

9  me whether you've ever seen that before?

10  A. I have.

11  Q. What is that please, Jean?

12  A. This is an application.

13  Q. Okay. And the first page -- how many pages

14  are the application?

15  A. It indicates on the bottom five.

16  Q. It says 1 of 5?

17  A. Right.

18  Q. But there's nothing after one; right?

19  A. Right.

20  Q. Let's just stay with one.

21  A. Okay.

22  Q. And what is the address for this property,

23  location of the building to be insured?

24  A. 619-621 East Landis Avenue, Vineland.

25  Q. Applicant's Name is Z&D Realty?

WORD FOR WORD REPORTING, LLC

**56**

1  Q. We're already talking about, are we not, Grant

2  Plaza at this point in 2015? Do you know that from

3  looking at this?

4  A. No, I don't. I don't know that.

5  Q. Okay. I want to go to the next flag, and it's

6  an e-mail here from Martha Barlow. Do you see that?

7  A. Yes.

8  Q. From pnat.com. What is that?

9  A. Penn National Insurance.

10  Q. It's directed to you and dated February 17,

11  2015; correct?

12  A. Yes.

13  Q. And would you read that into the record where

14  it's addressed to you and what her e-mail says?

15  A. "Per our earlier discussion today on this

16  lessor's risk only, since this is a banquet hall with

17  a liquor liability exposure, it is not eligible for

18  our BOP product. You stated the owner is trying to

19  combine the lessor's risk and banquet hall into one

20  policy. This seems a little confusing if they are

21  planning to keep the lessor's risk.

22  Also, regarding exposure, Penn National would

23  not be interested in providing coverage on the hall

24  and liquor liability. There are numerous general

25  liability exposures that are difficult to control. We

WORD FOR WORD REPORTING, LLC

1  believe the premium being generated would not be
2  commensurate with the exposure."
3      **Q.** Is that really a turndown by Penn National of
4  this risk?
5      **A. Definitely.**
6      **Q.** Okay.
7          MS. LOLLI:  Jean, what was the date of
8  that?  I'm sorry.
9          THE WITNESS:  It's dated February 17,
10 2015.
11     **Q.** Look at the next page, Jean.  That page says
12 Z&D Realty LLC and Grant Plaza LLC.  You see that?
13     **A. Yes.**
14     **Q.** And it says declined by Martha.  Would that be
15 Martha at Penn National?
16     **A. That would relate to this letter.**
17     **Q.** That has the address of 619 East Landis on
18 that page; correct?
19     **A. Yes, it does.  Yes.**
20     **Q.** Now, I'd like you to look at the next flag,
21 please, and tell us what that page is.
22     **A. This is a quote.  Is this the same one?  Yes,**
23 **this is a quote.**
24     **Q.** A quote from whom?
25     **A. Penn National.**

1      **A. Yes.  Yes.**
2      **Q.** Okay.  Now, I'd like you to look at the next
3  flag, and that's it's labeled Certificate of Liability
4  Insurance.  It's dated June 13, 2014; right?
5      **A. Yes.**
6      **Q.** What is a Certificate of Liability Insurance?
7      **A. It's something that our agency will put out**
8  **that indicates that our insurance is on the building**
9  or on a premises for that insured.
10     **Q.** Would that be in a situation where the insured
11 is asked to add some other individual or some other
12 company as an additional insured or as a certificate
13 holder?
14     **A. Yes.**
15     **Q.** Okay.  And do you know whether this page adds
16 anyone as either a certificate holder or a named
17 insured, additional insured?
18     **A. Vineland Development Corp. Included as**
19 **mortgagee/loss payee.**
20     **Q.** And that is for, again, the address of 619-621
21 Landis; correct?
22     **A. Correct.**
23     **Q.** Let's go to the next flag please, Jean, and
24 there's a check written by Z&D Realty to the Martin
25 Company for a dollar amount 2,362.50.  What is that to

WORD FOR WORD REPORTING, LLC

58

1      **Q.** And this is for 619 East Landis; correct?
2      **A. Yes.**
3      **Q.** And it says under building questions, does
4  building occupancy include restaurant(s) and it says
5  no?
6      **A. Correct.**
7      **Q.** Where would that information have come from?
8      **A. The insured.**
9      **Q.** Okay.  Would these two pages -- it's two
10 pages; is it not?
11     **A. Yes.**
12     **Q.** Okay.  Would these two pages have come before
13 the Penn National decline of coverage?
14     **A. Absolutely.  Yes.**
15     **Q.** Okay.  I'd like you to look at the next flag,
16 and it's an e-mail from you to Diane.  That would be
17 Diane Dobkowski?
18     **A. Dobkowski.**
19     **Q.** Correct.  This would be the subject matter
20 619-621 East Landis; correct?
21     **A. Yes.**
22     **Q.** And it asks in the second paragraph, "Are you
23 still on target to start the renovation work around
24 February 2015?"  Right?  It's a question from you in
25 the second --

1  your knowledge?
2      **A. I would say from her memo line that it's for**
3  **the insurance for 619 Landis.**
4      **Q.** Do you know who the carrier was as of June
5  2014?
6      **A. I would have to look it up.**
7      **Q.** Let's go onto the next flag, and this is a
8  letter dated December 13.  I'm sorry for the fact that
9  it's not chronological order, but it's December 17,
10 2013 for 619-621 East Landis Avenue; correct?
11     **A. Yes.**
12     **Q.** And it's a letter sent to Diane and Zyggi of
13 Z&D by you?  Am I right?
14     **A. Yes, that is correct.**
15     **Q.** Do you remember this letter as you look at it?
16     **A. I know I wrote it.**
17     **Q.** Why don't you just take a minute and look at
18 it and then you can tell me what this is about.
19     **A. (Witness complies.)  Yes.**
20     **Q.** What was that letter about?
21     **A. It's outlining that this -- I'm thanking them**
22 **for -- for their request to bind their insurance to a**
23 **vacant building.  I'm stipulating what warranties of a**
24 **vacant building carries with it under this policy.**
25 **I'm also stipulating that they cannot cancel without a**

WORD FOR WORD REPORTING, LLC

60

81

1    Q. Does it appear that your notes apply to both
2  Landis, the apartments and Grant?
3    A. Yes.
4    Q. Okay. And it appears from your notes that the
5  apartments are already covered by Greater New York;
6  right?
7    A. They are. And this is to figure out combined
8  ownership.
9    Q. And the descriptions are -- your notes derived
10  from a conversation you had with either Diane or
11  Zyggi?
12    A. Yes.
13    Q. And it appears that the building with the pig
14  roast is identified as a restaurant; right?
15    A. Yes.
16    Q. And the other building, which would have been
17  Grant Plaza, is a banquet hall; right?
18    A. Correct.
19    Q. The next page, please. This is a series of
20  e-mails, which appears to consist of two pages. So,
21  if we go to the second page at the bottom first,
22  because that's the stream of e-mails. Does it appear
23  to start with an e-mail from you to Diane on
24  February 5, 2015?
25    A. Yes.

WORD FOR WORD REPORTING, LLC

83

1    Q. And then we go to another e-mail on
2  February 17 at 4:00 where you're clarifying the
3  percentage interests in the properties; right?
4    A. Yes.
5    Q. And then Diane to you dated February 17 at
6  8:08 p.m. All buildings are owned by Z&D and then the
7  percentage of ownership, and then the next paragraph
8  Landis Pig Roast is the restaurant itself and also the
9  liquor license for both locations.
10    A. Yes.
11    Q. Did you understand that to be the case until
12  now that they had the liquor license for both
13  locations?
14    A. She said there was no liquor license needed
15  for Grant.
16    Q. Do you know why?
17    A. It was all handled by Landis Pig Roast. They
18  were bringing all the food and all the liquor.
19    Q. And it says here in that same e-mail Z&D
20  Realty owns the building at 623. There are four
21  apartments above the restaurant. Right?
22    A. Right.
23    Q. And the next line, Grant Plaza is the name of
24  the building at 619 East Landis. Z&D Realty owns that
25  building. Am I right?

WORD FOR WORD REPORTING, LLC

82

1    Q. Okay. And you're putting together a quote for
2  the new banquet facility? Am I right?
3    A. Yes.
4    Q. And it says Zyggi may also want to put Landis
5  on the same policy? Am I right?
6    A. Right.
7    Q. And then there's an e-mail dated February 16
8  from Diane to you. Good morning, Jean. Did you get a
9  quote for the 619 building, which is Grant? Am I
10  right?
11    A. I believe so, yes.
12    Q. Right?
13    A. Yes.
14    Q. Okay. And then there's a reply from you dated
15  February 17, 2015. Still in the works, Diane. I'm
16  working several companies to get the best quote.
17  Right?
18    A. Correct.
19    Q. And then Diane, same date in the afternoon,
20  1:58 p.m., to you. We will be opening soon so we need
21  it. Correct?
22    A. Correct.
23    Q. And, again, she's speaking about Grant? Am I
24  right?
25    A. Yes.

WORD FOR WORD REPORTING, LLC

84

1    A. Yes.
2    Q. So, up until now -- and we're in February of
3  2015 -- it was your understanding, was it is, not,
4  Jean, that 623 East Landis was Landis Pig Roast with
5  an alcohol license and apartments above it? Am I
6  right?
7    A. Yes.
8    Q. And at the same time you also understood that
9  619-621 East Landis was the Grant Plaza property? Am
10  I right?
11    A. Yes.
12    Q. And that was understood to be a banquet hall?
13  Am I right?
14    A. Yes.
15    Q. Okay. Let's go to -- let's go to the last
16  page of that exhibit, and it has just handwriting on
17  it. Can you tell me whose handwriting appears there?
18    A. It's mine.
19    Q. All of yours; right?
20    A. Yes.
21    Q. Can you tell us what those notes mean or
22  signify?
23    A. They're probably just notes I took while I was
24  on a phone call with them.
25    Q. Do those notes -- I'm sorry. What address do

WORD FOR WORD REPORTING, LLC

```
 1              C E R T I F I C A T E
 2
 3        I, Cathy D. Corvine, a Certified Court Reporter
 4   and a Notary Public of the State of New Jersey, do
 5   hereby certify that prior to the commencement of the
 6   examination, JEAN W. BEREZNAI was duly sworn by me to
 7   testify the truth, the whole truth and nothing but the
 8   truth.
 9        I do further certify that the foregoing is a
10   true and accurate transcript of the testimony as taken
11   stenographically by and before me at the time, place
12   and on the date hereinbefore set forth.
13        I do further certify that I am neither a
14   relative nor employee nor attorney nor counsel of any
15   of the parties to this action, and that I am neither a
16   relative nor employee of such attorney or counsel, and
17   that I am not financially interested in the action.
18
19
20
21   CATHY D. CORVINE
     Certified Court Reporter
22   License No. XI01216
     Notary Public of the State of New Jersey
23
24
25   DATED:  February 2, 2020
              WORD FOR WORD REPORTING, LLC
```